**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| CHRISTIAN ALBERTO SANTOS GARCIA; SANTOS SALVADOR BOLANOS HERNANDEZ; GERSON AMILCAR PEREZ GARCIA; ISMAEL CASTILLO GUTIERREZ, <br><br> *Plaintiffs*, <br><br> v. <br><br> CHAD F. WOLF, in his official capacity as Acting Secretary, U.S. Department of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T. ALBENCE, in his official capacity as Deputy Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement; RUSSELL HOTT, in his official capacity as Field Office Director, Washington Field Office, Enforcement and Removal Operations, U.S. Immigration & Customs Enforcement; JEFFREY CRAWFORD, in his official capacity as Director, Farmville Detention Center; IMMIGRATION CENTERS OF AMERICA, LLC; ARMOR CORRECTIONAL HEALTH SERVICES, INC., <br><br> *Defendants*. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.　　A humanitarian crisis is rapidly unfolding at Farmville Detention Center.  More than 80% of the civil immigration detainees housed there, including Plaintiffs, have contracted COVID-19—the highly contagious and potentially lethal virus that is sweeping the globe.

Defendants, who are collectively charged with caring for these individuals and who should have been working to protect them from the virus, have failed at every step, instead turning Farmville into a COVID-19 tinderbox that has engulfed nearly everyone in the facility, from Plaintiffs to hundreds of other detainees to dozens of staff members.

2.     The first match was struck in early June 2020, when Defendants Wolf, U.S. Immigration and Customs Enforcement ("ICE"), Albence, and Hott (collectively, "the federal defendants") transferred 74 detainees to Farmville from Florida and Arizona facilities—without prior testing—even though the federal defendants knew that those facilities were experiencing COVID-19 outbreaks, and despite the CDC's recommendation against transfers unless medically necessary.  Defendants Crawford, Immigration Centers of America, LLC ("ICA"), and Armor Correctional Health Services, Inc. ("Armor") (collectively, "the Farmville defendants") accepted the 74 transferees into their facility, even though they knew that they did not have the capacity to quarantine, isolate, or adequately screen them at intake.  Fifty-one of the individuals who were transferred subsequently tested positive for COVID-19.

3.     The virus then spread like wildfire throughout the facility: As of July 20, 2020, at least 315 detainees—or more than *80 percent* of the overall detainee population—had tested positive for COVID-19.  Plaintiffs Santos Garcia, Perez Garcia, and Castillo Gutierrez have all tested positive for COVID-19, while Plaintiff Salvador Bolanos is still waiting for his test results weeks after he was tested.

4.     The distressingly high number is as unfortunate as it is unsurprising.  Defendants did not take, and have not taken, appropriate precautions to protect the individuals inside Farmville.  Defendants have packed up to 80 individuals in poorly ventilated dorm rooms, making them sleep inches from one another—the opposite of appropriate social distancing and a recipe for

uncontrollable spread of the virus.  Defendants have not provided Plaintiffs with sufficient personal protective equipment ("PPE"), like masks and hand sanitizer.  And although Plaintiffs exhibited the hallmark symptoms of COVID-19 shortly after Defendants transferred COVID-19 positive individuals into the Farmville facility—fever, aches, pains, coughing, breathing issues—Defendants waited several days to test them for COVID-19, and several additional days to inform them that they had tested positive.

5.     Defendants' failures on the front end were replicated on the back end.  Plaintiffs were all denied any medical treatment for multiple days after they started showing symptoms of COVID-19.  Their requests for doctor's visits fell on deaf ears.  Once they started to receive treatment, three of the Plaintiffs only ever received Tylenol.  Plaintiff Perez Garcia eventually became so sick that he was placed into isolation, and even then he received only Tylenol and a few pills for his cough.  Three of the Plaintiffs (all but Perez Garcia) remained in their dorms while awaiting their test results and while continuing to exhibit symptoms of COVID-19.

6.     In addition, for the past several weeks, including while Plaintiffs have suffered from COVID-19, they have also been denied adequate nutrition.  The Farmville defendants served them expired food, uncooked or undercooked food, and food infested with bugs.

7.     Defendants' actions have jeopardized Plaintiffs' lives, health, and recovery.  They have violated Plaintiffs' right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution, which guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.  Defendants have violated this right by acting with deliberate indifference with regard to Plaintiffs' medical care and nutrition, which has subjected Plaintiffs to objectively unreasonable risks to their health and safety, to cruel treatment, and to conditions of confinement that amount to punishment.

8.      The federal defendants' actions have also violated the Administrative Procedure Act ("APA").  Defendants have failed to live up to their own binding standards for providing medical treatment and food services to detainees.  They have additionally failed to follow the Centers for Disease Control and Prevention's ("CDC") guidance on managing the COVID-19 pandemic—including stopping transfers unless absolutely necessary and providing appropriate testing, prevention techniques, and treatment—even though their binding standards require them to follow CDC guidance.

9.      Instead of solving the constitutional and statutory violations at Farmville, Defendants are poised to repeat them.  The federal defendants are now threatening to transfer Plaintiffs—while they are still recovering from COVID-19 and likely remain COVID-19 positive—to a facility in Texas.  Such a transfer would seriously endanger the health of Plaintiffs and the public.

10.     Plaintiffs seek to improve the inhumane conditions present at Farmville.  They ask that the Court declare that their constitutional rights have been violated and that the federal defendants violated the APA.  They further ask the Court to issue an injunction ordering a third-party inspection of Farmville's COVID-19 prevention and mitigation efforts, medical care plan, and food supply and preparation regimen, and ordering Farmville to comply with CDC guidelines and recommendations for prevention and control of infectious diseases, including as they relate to transfers and social-distancing.  Plaintiffs ask the Court to retain jurisdiction over Defendants to monitor compliance with the Court's order.

## PARTIES

11.     Plaintiff Christian Alberto Santos Garcia is a 23-year-old citizen of El Salvador. He is being held in the custody of Defendant ICE at Farmville Detention Center, which is controlled and operated by the private company and Defendant ICA in Farmville, Virginia.  An Immigration Judge granted Plaintiff Santos Garcia withholding of removal and relief under the

4

Convention Against Torture in December 2019.  He is being held in custody pending the outcome of the Department of Homeland Security's ("DHS") appeal of that decision to the Board of Immigration Appeals.

12.     Plaintiff Santos Salvador Bolanos Hernandez is a 35-year-old citizen of El Salvador.  An Immigration Judge granted Plaintiff Bolanos Hernandez withholding of removal in April 2020.  He is being held in the custody of Defendant ICE at Farmville Detention Center pending the outcome of DHS's appeal of that decision to the Board of Immigration Appeals.

13.     Plaintiff Gerson Amilcar Perez Garcia is a 27-year old citizen of Honduras.  He is being held in the custody of Defendant ICE at Farmville Detention Center pending his hearing in immigration court.

14.     Plaintiff Ismael Castillo Gutierrez is a 43-year old noncitizen from Honduras.  He is being held in the custody of Defendant ICE at Farmville Detention Center pending his hearing in immigration court.

15.     Defendant Chad F. Wolf is named in his official capacity as Acting Secretary of DHS.  In his official capacity, Defendant Wolf is responsible for administering the immigration laws pursuant to 8 U.S.C. § 1103(a); routinely transacts business in the Eastern District of Virginia; supervises Defendant Russell Hott; and is legally responsible for the pursuit of the detention and removal of foreign nationals.  As such, he is a legal custodian of Plaintiffs.

16.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is a federal law enforcement agency within DHS.  ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants.  Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration detention system.  As such, Defendant ICE is a legal custodian of Plaintiffs.

17.     Defendant Matthew T. Albence is named in his official capacity as Deputy Director and Senior Official Performing the Duties of the Director of ICE.  In this capacity, he is responsible for the enforcement of immigration laws and for ICE's policies, practices, and procedures.  He has authority over the detention and removal of noncitizens throughout the United States.  As such, he is a legal custodian of Plaintiffs.

18.     Defendant Russell Hott is named in his official capacity as Director, Washington Field Office of ICE.  The Washington Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at Farmville Detention Center, and Defendant Hott is responsible for administering the immigration laws and the execution of detention and removal determinations for individuals under the jurisdiction of the Washington Field Office.  As such, he is a legal custodian of Plaintiffs.

19.     Defendant Jeffrey Crawford is named in his official capacity as the Director of Farmville Detention Center.  Defendant Crawford is responsible for overseeing the administration and management of Farmville Detention Center.  In this capacity, he is the immediate custodian of Plaintiffs.  Defendant Crawford was at all times relevant to this complaint an employee and agent of Defendant ICA.

20.     Defendant Immigration Centers of America, LLC ("ICA") is a limited liability corporation that owns and operates Farmville Detention Center.  Its principal place of business is located at 508 Waterworks Road in Farmville, Virginia 23901-2674, and it is registered as a limited liability corporation under the laws of the Commonwealth of Virginia.  Defendant ICA contracted with the Town of Farmville for the operation of Farmville Detention Center.[1]

---

[1]   In 2008, Defendant ICE entered into an Intergovernmental Service Agreement ("IGSA") with the Town of Farmville "for the detention and care of aliens."  Exhibit E at 1.  In exchange for payment on a per-detainee per-diem basis, the Town of Farmville ensures the daily operation

21.     Defendant Armor Correctional Health Services, Inc. ("Armor") is a Florida corporation that contracts with Defendant ICA to provide health care services to detainees at Farmville Detention Center.  Its principal place of business is located at 4960 S.W. 72nd Ave. Suite 400, Miami, Florida 33155.  Defendant Armor was at all times relevant to this complaint an agent of Defendant ICA.

22.     Defendants Crawford, ICA, Armor, and their officers and employees were at all times relevant to this complaint acting under color of state law as an agent of the Town of Farmville.  In the alternative, Defendants Crawford, ICA, Armor, and their officers and employees were at all times relevant to this complaint acting under color of federal law as an agent of Defendant ICE.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States and, as to Defendants Crawford, ICA, and Armor, under 42 U.S.C. § 1983.

24.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 28 U.S.C. § 1651.

---

of the detention center.  The IGSA requires the Town of Farmville to, among other things, "house all detainees as determined within [Farmville's] classification system," "provide detainees with safekeeping, housing, subsistence, medical and other services [and] ensure compliance with all applicable laws, regulations, fire and safety codes, policies and procedure," and "house detainees and perform related detention services in accordance with the most current edition of the ICE National Detention Standards." *Id.* at 3, 6.  The Town of Farmville, in turn, subcontracted for the operation of the facility to a private for-profit company, Defendant ICA.  The Town of Farmville is required under the IGSA to notify and obtain approval of ICE for any subcontractor hired to carry out its responsibilities under the IGSA and ensure that "any subcontractor includes all provisions of [the IGSA]." *Id.* at 2. Upon information and belief, the Town of Farmville obtained the requisite approval and executed an agreement with Defendant ICA for the operation of Farmville Detention Center, which remains valid today.

25.     Venue is proper in this district under 28 U.S.C. § 1391, and in this division under Local Civil Rule 3(C), because a defendant is an agency of the United States or an officer or employee of the United States or any agency thereof acting in his official capacity, a defendant resides in this district, and a substantial part of the events giving rise to the claims occurred in this district.  Defendant Hott oversees the Washington Field Office of ICE Enforcement and Removal Operations, which manages the contract for detentions at the Farmville Detention Center, and his principal place of business is located in Fairfax, Virginia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

26.     No statutory exhaustion requirement applies to Plaintiffs' claims of unlawful detention because no administrative agency exists to adjudicate Plaintiffs' constitutional challenges.

27.     Similarly, no exhaustion requirement applies to Plaintiffs' APA claim because Plaintiffs allege that the agency acted unlawfully.

28.     The Prison Litigation Reform Act, 42 U.S.C. § 1997e, does not apply to Plaintiffs because they are not "prisoner[s]" as defined in that statute.  *See* 42 U.S.C. § 1997e(h) ("[T]he term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for or adjudicated delinquent for violations of criminal law . . . ."); *see also Agyeman v. INS*, 296 F.3d 871, 886 (9th Cir. 2002) ("[W]e hold that an alien detained by the INS pending deportation is not a 'prisoner' within the meaning of the PLRA"); *LaFontant v. INS*, 135 F.3d 158, 165 (D.C. Cir. 19888) (same); *Ojo v. INS*, 106 F.3d 680, 683 (5th Cir. 1997) (same).  Accordingly, Plaintiffs were not required to exhaust administrative remedies by filing grievances.

## STATEMENT OF FACTS

I. **COVID-19 POSES A GRAVE RISK OF HARM TO PLAINTIFFS**

29.     COVID-19 is a highly contagious coronavirus disease that has reached pandemic status.  As of July 21, 2020, more than 3.7 million people in the United States have tested positive for the virus, and more than 140,000 have died.[2]  Those numbers are growing exponentially, with more than 63,000 new cases in the United States on July 19 alone.[3]  The Commonwealth of Virginia has had more than 78,000 cases, 7,200 hospitalizations, and 2,000 deaths.[4]

30.     SARS-CoV-2, which causes the COVID-19 illness, is easily transmitted.  Everyone shares a risk of contracting the COVID-19 virus, and everyone who contracts it shares a risk of transmitting the virus to other people.  The most likely means of transmitting the coronavirus that causes COVID-19 is through close human-to-human contact, especially indoors.  That is because the virus that causes COVID-19 mainly spreads through respiratory droplets produced when an infected person coughs, sneezes, or talks.  Emerging research indicates that the virus is easily transmitted in indoor spaces where too many people are enclosed for protracted periods.

31.     Symptoms of COVID-19 include fever, cough, shortness of breath, headache, body aches, loss of taste and smell, nausea, and diarrhea.[5]  People can carry and spread the virus even if they are asymptomatic or pre-symptomatic, although precisely how the virus spreads remains unknown.  Testing or secluding only those who are symptomatic is therefore an ineffective solution to preventing further spread of COVID-19.

---

[2]  CDC, *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.* (last visited July 20, 2020), https://bit.ly/2SyyE6k.

[3]  *Id.*

[4]  Va. Dep't of Health, *COVID-19 Daily Dashboard* (last visited July 20, 2020), https://www.vdh.virginia.gov/coronavirus/covid-19-daily-dashboard/.

[5]  CDC, *Coronavirus Disease 2019 (COVID-19): Symptoms of Coronavirus* (last visited July 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

32.     There is no known vaccine against COVID-19 and no known medication to prevent infection.  The most effective measures to reduce the risk of contracting and spreading COVID-19 is to prevent infection and avoid community spread.  Such measures include avoiding close contact with other people by practicing appropriate social distancing, washing hands often, covering one's mouth and nose with cloth, and vigorously cleaning and disinfecting touched surfaces.

33.     Contracting COVID-19 may cause serious and lasting health damage.  People who have COVID-19 can die.  Infected individuals who survive may face severe damage to their respiratory system, neurological system, and lungs, heart, liver, or other organs, resulting in prolonged recovery periods and permanent damage.  These complications can manifest in as little as two days after exposure.  Infected individuals' conditions can seriously deteriorate within days, and recovery can take weeks if not months.

34.     Even younger and healthier individuals who contract COVID-19 may require supportive care.  And those who develop serious complications will need advanced support, including highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.

## II.   DEFENDANTS HAVE FAILED TO TAKE SUFFICIENT PRECAUTIONS TO PREVENT THE SPREAD OF COVID-19 AT FARMVILLE

35.     On March 11, 2020, the World Health Organization ("WHO") classified the spread of COVID-19 as a pandemic.[6]  On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*[7]

---

[6]  World Health Org., *WHO Characterizes COVID-19 as a Pandemic* (Mar. 11, 2020), https://bit.ly/2W8dwpS.

[7]  White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://bit.ly/39m4CtK.

36.     On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance advising people to adopt physical distancing measures, such as working from home, avoiding gatherings of more than 10 people, and limiting trips to grocery stores, bars, restaurants, and other areas where people share space.

37.     Following this advice, many states—including Virginia—shut down some or all parts of ordinary life, issuing orders suspending or severely curtailing the operation of non-essential schools, businesses, and other public spaces, limiting gatherings, and ordering citizens to take precautions such as wearing face masks.[8]

38.     To combat the disease, and to halt its advance, the White House and the CDC have urged people in the United States to take basic preventive actions, such as avoiding crowds or large groups, staying six feet away from others, keeping surfaces disinfected, and frequently washing hands or using hand sanitizer.[9]

39.     The CDC has also issued guidance specific to managing COVID-19 in detention facilities.[10]  The CDC has recognized that "[m]any opportunities exist for SARS-CoV-2 to be introduced into a correctional or detention facility, including daily staff movements" and "transfer of incarcerated/detained persons between facilities and systems."[11]  Detained individuals "often come from a variety of locations, increasing the potential to introduce SARS-CoV-2 from different

---

[8]   *See, e.g.*, Order of the Governor and State Health Commissioner, Declaration of Public Health Emergency (Mar. 17, 2020), https://bit.ly/32ozJDq.

[9]   *See* Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, N.Y. Times (Mar. 17, 2020), https://nyti.ms/3dl2yD4; CDC, *Coronavirus Disease 2019 (COVID-19): Clinical Questions About COVID-19: Questions and Answers* (last updated June 17, 2020), https://bit.ly/2y6X6Eh; CDC, *Coronavirus Disease 2019 (COVID-19): Social Distancing* (last updated July 15, 2020), https://bit.ly/2N4b5PF.

[10]   CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (last updated July 14, 2020), https://bit.ly/2Bkd6F8.

[11]   *Id.*

geographic areas."[12]   And the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent hand washing) may be limited."[13]   "Social distancing options within correctional and detention settings may be limited due to crowded living conditions."[14]

40.    Because individuals in detention facilities face acute risks of contracting COVID-19, the CDC has instructed such facilities to "[l]imit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding."[15]   To that end, the U.S. Bureau of Prisons stopped nearly all transfers among its facilities in March 2020.[16]

41.    The CDC has also instructed facilities to "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available and have a plan in place to restock as needed."[17]   The CDC has further instructed facilities to "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units."[18]

---

[12]  *Id.*
[13]  *Id.*
[14]  *Id.*
[15]  *Id.*; *see also* Exhibit F, Decl. of Dr. Homer D. Venters, MD Regarding COVID-19 Inspection of Farmville Detention Center ("Venters Decl.") ¶ 10 .
[16]  Fed. Bureau of Prisons, *Updates to BOP COVID-19 Action Plan* (last updated Mar. 19, 2020), https://www.bop.gov/resources/news/20200319_covid19_update.jsp.
[17]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note 10.
[18]  *Id.*; *see also* Venters Decl. ¶ 10 (explaining that recent CDC guidelines have explained that social distancing "is not simply a concept that detained people should follow, but reflects an infection control approach that individuals, groups and the facility operations must implement together").

42.     ICE has published Performance-Based National Detention Standards ("PBNDS") that establish mandatory policies and practices relating to medical care and nutrition that facilities and operators of facilities must follow.[19]   As relevant here, the PBNDS provide that CDC "guidelines for the prevention and control of infectious and communicable diseases shall be followed."   The PBNDS also provide "Medical Care" standards that require facilities to ensure that detainees have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment.   Among other requirements, the PBNDS require that facilities have a plan that addresses the management of infectious diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization, treatment, follow-up, isolation and reporting to local, state and federal agencies; a requirement that 24-hour emergency medical services be available to all detainees; and a requirement that the facility comply with current and future plans implemented by federal, state, or local authorities addressing specific public health issues including communicable disease reporting requirements.   Finally, the PBNDS provide "Food Service" standards, which require that food "shall meet federal standards for quality," "shall be protected from dust, insects and rodents," and shall maintain a "high level of sanitation."

43.     As a highly contagious infectious disease, COVID-19 has proven particularly pernicious in enclosed, high-density environments like detention and correctional facilities, which have become "hotbeds for the virus."[20]   Indeed, in mid-June, when the United States' overall infection rate remained relatively constant, new infections in prisons and jails "soared," doubling

---

[19]   ICE, Performance-Based National Detention Standards (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.
[20]   Tammy La Gorce, *'Everybody Was Sick': Inside an ICE Detention Facility*, N.Y. Times (May 15, 2020), https://nyti.ms/2UUqF4F.

since mid-May to more than 68,000, with coronavirus-related deaths also rising by 73 percent since that time.[21] According to media sources, the five largest known clusters of the virus in the United States are in correctional institutions.[22]

44.     ICE facilities fare no better than prisons and jails. As of July 20, 2020, ICE reported that more than 3,600 individuals in its custody have tested positive for the virus.[23]

45.     Three individuals detained in ICE facilities have died in ICE custody because of COVID-19 complications.[24]

46.      Farmville is no exception: as of July 20, 2020, at least 315 detainees—or more than *80 percent* of the overall detainee population at the facility—had tested positive for COVID-19.[25] That Farmville has emerged as a COVID-19 hotspot is hardly surprising in light of reports of abysmal conditions at the facility.[26]

---

[21] Timothy Williams et al., *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. Times (June 16, 2020), https://nyti.ms/3fwXKeT.

[22] *See id.*; *see also* Laura Hawks et al., *COVID-19 in Prisons and Jails in the United States*, JAMA Internal Medicine (Apr. 28, 2020), https://bit.ly/3jpUncg (noting that "[p]rior viral epidemics have wrought havoc in carceral settings" because the "infrastructure of most prisons and jails is . . . conducive to spreading disease" and thus "people who are incarcerated will be at higher risk of exposure").

[23] *See* ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, https://bit.ly/2YB9BBS (last visited July 20, 2020).

[24] *Id.*; Camilo Montoya-Galvez, *Third Immigrant Detained by ICE Dies After Contracting the Coronavirus*, CBS News (July 13, 2020), https://cbsn.ws/2DLiTEl.

[25] ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 23; *see also* Letter from Sens. Warner and Kaine to Acting Sec'y Wolf and Acting Director Albence (July 16, 2020), https://bit.ly/3h23SMW; Exhibit G, Decl. of Jeffrey Crawford ("Crawford Decl."), *Lizama Gutierrez v. Hott et al.*, No. 1:20-cv-712-LMB-IDD (E.D. Va. July 9, 2020), ECF No. 13-1, ¶¶ 44–45; Jenny Gathright, *More Than 70% of People Detained at the Farmville Detention Center Are COVID Positive*, DCist (July 10, 2020), https://bit.ly/3fYpZUx.

[26] *See, e.g.*, Priscilla Alvarez, *Immigrant Detainees Describe Deteriorating Conditions as Coronavirus Spreads in Facilities*, CNN (June 27, 2020), https://cnn.it/3eXYM3x (highlighting alarming conditions at Farmville Detention Center); Jenny Gathright, *After Transfers from Coronavirus Hotspots, Cases Spike at Farmville ICE Detention Facility*, DCist (June 29, 2020), https://bit.ly/3gncDkf (same).

47.     Public health officials have long warned that prisons, jails, and detention facilities like Farmville were positioned to "become vectors in the pandemic because they are often overcrowded, unsanitary places where social distancing is impractical, bathrooms and day rooms are shared by hundreds of [people], and access to cleaning supplies is tightly controlled."[27]  Indeed, individuals who are incarcerated or detained have limited ability to take the precautionary steps that public health officials recommend as a means to guard against infection and spread, such as social distancing, mask wearing, and use of adequate ventilation.  They also have no control over the movements of others with whom they live in close proximity, and share spaces and resources.

48.     The design and operation of detention facilities, including Farmville, make it extremely difficult or impossible for those detained inside to engage in these and other prophylactic measures.  If anything, facilities like Farmville that house pre-trial detainees are at a particularly high risk for contagion because of substantial turnover among the population inside.

49.     The federal defendants have exacerbated this risk by transferring detainees among facilities, including from facilities with active COVID-19 cases.  Further, this practice persisted at Farmville despite Defendant Crawford's request—supported by Farmville's Medical Director and Defendant Armor—to Defendant ICE, on or about April 1, 2020, that ICE cease transfers to the Farmville facility.[28]  The federal defendants' decision to transfer detainees among facilities contradicted CDC's guidance that all transfers should be suspended absent narrow, compelling reasons such as medical necessity.[29]

---

[27]   *See* Williams et al., *supra* note 21.
[28]   Crawford Decl. ¶ 19; Exhibit H, Decl. of Teresa Moore, MD ("Moore Decl."), *Lizama Gutierrez v. Holt et al.*, No. 1:20-cv-712-LMB-IDD (E.D. Va. July 9, 2020), ECF No. 13-2, ¶ 13.
[29]   CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note 10.

50.     In April 2020, in response to Defendant Crawford's request to "eliminate further intakes to Farmville," the federal defendants proposed to institute a policy whereby transferees to Farmville Detention Center would be quarantined in individual cells in a facility in Caroline County, Virginia before ultimately being transferred to Farmville.  Farmville's Medical Director and Defendant Armor agreed to this policy, which was "approved and implemented" on April 17, 2020.[30]

51.     On June 2, 2020, the federal defendants transferred 74 detainees from detention facilities in Florida and Arizona to Farmville.  They did so knowing that there were COVID-19 cases at the Florida facility from which some of the transferred detainees came.[31]  The federal defendants also knew or should have known that detainees in ICE's Arizona detention facilities had tested positive for COVID-19.[32]  Nevertheless, the federal defendants did not test transferees for COVID prior to initiating the transfer.  In conducting this transfer, the federal defendants did not follow CDC guidelines.

52.     Defendant Crawford and the Farmville defendants accepted the incoming detainees, despite knowing they did not have the capacity to isolate, quarantine, and properly screen them for COVID-19.   In accepting this transfer, the Farmville defendants violated Farmville's own policy:  The incoming detainees were not quarantined at the facility in Caroline County, Virginia because that facility "could not accommodate such a large group"; instead, they

---

[30]  Crawford Decl. ¶ 19.

[31]  *Id.* ¶ 28.

[32]  *See, e.g.*, Daniel Gonzalez, *COVID-19 Outbreak at ICE Detention Center in Eloy Has Ballooned into One of the Largest in the Nation*, Arizona Republic (May 31, 2020), https://bit.ly/2WshDwF (noting that "[a]t least 76" individuals detained at the Eloy, Arizona detention facility "had tested positive" and that it was the "sixth largest coronavirus outbreak at an immigration detention facility in the country").

were taken directly to Farmville.[33]  Defendant Crawford acknowledged that he had the contractual authority to reject the transferees, but he chose not to do so, even though he knew that by accepting them he was violating the principal infection control mechanism at Farmville.[34]

53.     Upon arrival at Farmville Detention Center, on June 2, 2020, a detainee was identified as having COVID-19 symptoms and taken to a nearby hospital.[35]  He tested positive for COVID-19.  Thereafter, all 74 of the transferred detainees were tested, and 51 of those detainees tested positive for COVID-19.[36]  While Defendant Crawford contends that these individuals did not interact with the rest of the general population,[37] they necessarily interacted with Farmville personnel who worked with other detainees at the facility.

54.     Nor are detainees in detention facilities safe from infection by a virus that originates outside the facility itself, in light of the large number of staff, contractors, and vendors who come and go on a daily basis.  As of July 16, 2020, at least 26 Farmville employees have tested positive for COVID-19.[38]  Moreover, detention facilities typically are not well-equipped to contain the spread of, or to treat inmates or detainees sick with, a hyper-contagious infectious disease like COVID-19.  According to Teresa Moore, MD, the full-time Medical Director for Farmville, although Farmville was initially capable of isolating a detainee in an isolation room as the need arose, there are not enough rooms currently to serve this purpose for all at-risk individuals or those with positive test results.[39]

---

[33]   Crawford Decl. ¶ 28; Moore Decl. ¶ 15.
[34]   Crawford Decl. ¶ 29.
[35]   *Id.*
[36]   *Id.*
[37]   *Id.*
[38]   *See* Letter from Sens. Warner and Kaine to Acting Sec'y Wolf and Acting Director Albence, *supra* note 25; *see also* Crawford Decl. ¶ 45.
[39]   Moore Decl. ¶ 15.

55.     For all of these reasons, conditions at Farmville place immigrant detainees like Plaintiffs at risk of infection and severe illness and complications from COVID-19.  Like other detention facilities, Farmville is an enclosed environment in which contagious diseases spread quickly and easily.  Detainees live in close quarters and are subject to security measures that make it extremely difficult or impossible for them to take the precautionary steps that medical and public health officials recommend as a means of guarding against infection.  For example, the design and operation of Farmville is such that detainees are unable to practice effective (and necessary) social distancing.  Further, detainees are rarely let outside, and are instead confined indoors in a facility with inadequate ventilation.  Moreover, they have no control over the movements of the other detainees with whom they live in close proximity and share spaces and resources, or the guards and other staff at the facility who are themselves potential carriers of the virus.

## III.   DEFENDANTS HAVE ACTIVELY ENDANGERED PLAINTIFFS' HEALTH AND DENIED PLAINTIFFS ADEQUATE MEDICAL CARE

### A.     Plaintiffs Were Exposed To And Contracted COVID-19 While In Defendants' Care

56.     Because of Defendants' failure to take adequate precautions to avoid the spread of COVID-19, all four Plaintiffs were exposed to and likely contracted COVID-19 while detained at Farmville.  Thereafter, Defendants failed to provide them with sufficient medical care, and they suffered needlessly as a result.

### 1.      Plaintiff Christian Alberto Santos Garcia

57.     Defendants have failed to provide Plaintiff Santos Garcia with adequate protection from COVID-19 and adequate medical care.

58.     The federal defendants exposed Plaintiff Santos Garcia to COVID-19 by transferring 74 individuals into Farmville from other facilities with active COVID-19 cases.

59.     The federal defendants were aware of and did not address the deficiencies in medical care that Plaintiff Santos Garcia and other immigration detainees have been experiencing throughout the COVID-19 outbreak.

60.     The Farmville defendants also failed to protect Plaintiff Santos Garcia from COVID-19 exposure and infection.

61.     The Farmville defendants have provided Plaintiff Santos Garcia two reusable cloth masks and one N95 mask for the entirety of the COVID-19 crisis.  *See* Exhibit A, Decl. of Christian Alberto Santos Garcia ("Santos Garcia Decl.") ¶ 5.

62.     Plaintiff Santos Garcia cannot practice social distancing, as the dorm in which he is housed with between 50 to 80 other individuals has poor ventilation.  Santos Garcia Decl. ¶ 7. He sleeps in a bunk bed just inches from his fellow detainees.  *Id.*

63.     On or around June 21, 2020, Plaintiff Santos Garcia became sick.  Santos Garcia Decl. ¶ 9.  He developed a fever, body aches and pain, and an inability to sleep.  *Id.*  Plaintiff Santos Garcia reported these symptoms to Farmville personnel, but they failed to provide any medical care or COVID-19 testing.  *Id.* ¶ 10.  Instead, Farmville personnel told Plaintiff Santos Garcia that his dorm (No. 5) was "clean" from the COVID-19 virus.

64.     In or about that same week, during a routine security count of the detainees, Plaintiff Santos Garcia witnessed guards pepper spray detainees who were too weak to stand due to illness and exhibiting symptoms consistent with the known symptoms of COVID-19.  Santos Garcia Decl. ¶ 14.  Pepper spray has also been used in several other instances to quell detainees' protests of the deplorable conditions to which Defendants are subjecting them.[40]  The use of pepper

---

[40]  *See, e.g.*, Exhibit I, Decl. of Jorge Alexander Rivera Rodriguez, Detainee, Immigration Centers of America-Farmville ("Rivera Rodriguez Decl.") ¶¶ 2, 6–9 (describing deployment of pepper spray by Farmville's Chief Commander Garcia in response to detainees' expression of

spray on sick detained individuals—who in all likelihood have COVID-19—is particularly dangerous given that the facility lacks adequate ventilation,[41] and that one of COVID-19's signature symptoms is the inability to breathe properly and maintain sufficient oxygen levels.[42]

65.     Plaintiff Santos Garcia requested medical care on or around June 21, 2020, when he first began experiencing COVID-19 symptoms, but he was refused care.  Santos Garcia Decl. ¶ 10.  Plaintiff Santos Garcia asked for medicine during a daily temperature screening, but Defendants continued to house Plaintiff Santos Garcia in close quarters with up to 80 of his fellow detainees, where, among other things, detainees sleep inches apart from one another.  *Id.*

66.     Late in the evening of June 23, 2020, approximately two days after he first developed COVID-19 symptoms, Plaintiff Santos Garcia received his first dose of Tylenol.  Santos Garcia Decl. ¶ 16.  The Tylenol did not relieve any of his symptoms.  *Id.*

67.     Also on June 23, 2020, a person who Plaintiff Santos Garcia understood to be an ICE official visited his dorm and spoke with the detainees.  Santos Garcia Decl. ¶ 17.  This official

---

concerns about COVID-19 and peaceful refusal to return to their bunks where they would be inches apart from one another); Exhibit D, Decl. of Ismael Castillo Gutierrez ("Castillo Gutierrez Decl.") ¶ 15.  *Cf.* Crawford Decl. ¶¶ 32, 35, 42 (noting instances where pepper spray was used and Special Operations Unit was deployed).

[41] *See* Exhibit J, Decl. of Ashley Warmeling, Managing Attorney, Capital Area Immigrants' Right Coalition ¶ 9 ("Several [of my] clients at Farmville have recently expressed increased concerns with improper ventilation over the past several days.  These clients have shared that there are extended periods of time in which there is no air movement, as if the air conditioning unit is broken.  This lack of air movement has made it difficult for clients to breathe, and increases their fears of contracting COVID-19 from other people in their dorm who are coughing and showing symptoms."); *see also* Exhibit C, Decl. of Gerson Amilcar Perez Garcia ("Perez Garcia Decl.") ¶ 17 (describing "waves of dust blown into [his] cell through the vents"); Exhibit K, Decl. of Victor Quintanilla Gallegos ("Quintanilla Gallegos Decl.") ¶ 36 (describing dorm as "hot, with no air circulation").

[42] CDC, *Symptoms of Coronavirus*, *supra* note 5 (listing "[s]hortness of breath or difficulty breathing" as symptoms of COVID-19).

told Plaintiff Santos Garcia and others that everyone in the facility would probably be infected with COVID-19 but that this would not result in their release.  *Id.*

68.    On June 24 and 25, 2020, Plaintiff Santos Garcia continued to exhibit COVID-19 symptoms, including a fever, body pain, and headaches.  Santos Garcia Decl. ¶ 18.  Though Plaintiff Santos Garcia continued to receive Tylenol once every twelve hours, his condition did not improve.  *Id.*

69.    By June 26, 2020, Plaintiff Santos Garcia's symptoms had only worsened.  He continued to have a fever, body aches, and a headache.  Santos Garcia Decl. ¶ 19.  But he also developed a cough and had trouble breathing.  *Id.*  Yet he continued to receive only Tylenol, was never taken to see a doctor, did not receive medicine to help his cough, and did not have his oxygen levels monitored by staff despite his difficulty breathing.[43]

70.    On the morning of July 2, 2020, Plaintiff Santos Garcia, along with all of his fellow detainees in his dorm, was first tested for COVID-19—approximately 11 days after he started exhibiting symptoms.  Santos Garcia Decl. ¶¶ 20–21.  Farmville personnel did not indicate when the test results could be expected, nor did they explain what they planned to do when detainees test positive.  By then, Plaintiff Santos Garcia's fever had abated, but he was still exhibiting COVID-19 symptoms including cough, body pain, and trouble breathing.  *Id.* ¶ 20.

71.    On or about July 8, 2020, Plaintiff Santos Garcia was informed by Farmville personnel that he and his fellow detainees would not be provided the individual results of their COVID-19 tests.  Santos Garcia Decl. ¶ 22.  The same Farmville representative told Plaintiff Santos Garcia that the majority of people in his dorm—Dorm 5—had tested positive.  *Id.*  Plaintiff

---

[43]  Others detainees have also reported that they received only Tylenol while suffering from serious COVID-19 symptoms.  Castillo Gutierrez Decl. ¶ 13; Exhibit L, Decl. of Francois Toure ("Toure Decl.") ¶¶ 3, 9.

Santos Garcia also learned that all but a few individuals tested positive in Dorm 4.  *Id.*; *see also* Toure Decl. ¶ 8 (all but "2 or 3 people" in Dorm 4 tested positive for COVID-19).

72.     That same day, Defendants stopped providing Tylenol or any other form of palliative care to Plaintiff Santos Garcia and his fellow detainees.  Santos Garcia Decl. ¶ 23.

73.     Also on or about July 8, 2020, Farmville personnel began informing Plaintiff Santos Garcia that ICE planned to transfer a high number of COVID-positive individuals from Farmville to another ICE facility in Texas.  Santos Garcia Decl. ¶¶ 24, 26.

74.     In an apparent change of direction, during the evening of July 9, 2020—a full week after Plaintiff Santos Garcia was tested—he received news from an ICE official that he had tested positive for COVID-19.  Santos Garcia Decl. ¶ 25.

75.     Plaintiff Santos Garcia continues to experience COVID symptoms such as a cough and difficulty breathing.  Santos Garcia Decl. ¶ 27.

76.     The same ICE official informed Plaintiff Santos Garcia that the federal defendants plan to imminently transfer the majority of individuals, including many if not all COVID-positive detainees, to a facility in Texas.  Santos Garcia Decl. ¶ 26.

### 2.     Plaintiff Santos Salvador Bolanos Hernandez

77.     Defendants have failed to provide Plaintiff Bolanos Hernandez with adequate protection from COVID-19 and adequate medical care.

78.     The federal defendants exposed Plaintiff Bolanos Hernandez to COVID-19 by transferring 74 individuals into Farmville from other facilities with active COVID-19 cases.

79.     The federal defendants were aware of and did not address the deficiencies in medical care that Plaintiff Bolanos Hernandez and other immigration detainees have been experiencing throughout the COVID-19 outbreak.

80.     The Farmville defendants failed to protect Plaintiff Bolanos Hernandez against COVID-19 exposure and infection.

81.     Plaintiff Bolanos Hernandez started feeling sick on or about June 20, 2020. Exhibit B, Decl. of Santos Salvador Bolanos Hernandez ("Bolanos Hernandez Decl.") ¶ 5.  He developed a headache, body aches, and a cough, and believed he had a fever.  *Id.*

82.     Plaintiff Bolanos Hernandez put in a sick request, but the Farmville defendants did not send anyone to see him or give him any medicine for two days.  Bolanos Hernandez Decl. ¶ 6.

83.     Around that same time, Plaintiff Bolanos Hernandez—who is housed in Dorm 1— witnessed many fellow detainees fall ill.  Bolanos Hernandez Decl. ¶ 6.  Others in his dorm were exhibiting even worse symptoms, such as vomiting and losing consciousness in addition to a cough, fever, and body aches.  *Id.*  Despite this, the Farmville defendants delayed checking in on any of the detainees in Dorm 1 for days.  *Id.*

84.     When the Farmville defendants finally attended to Plaintiff Bolanos Hernandez on June 22, they took his and others' temperature by lining them up and pressing their foreheads against a glass window without cleaning the glass between temperature readings.  Bolanos Hernandez Decl. ¶ 7.  Farmville staff told people in Plaintiff Bolanos Hernandez's dorm that they would come back later that day with medicine, but they did not.  *Id.*

85.     That same day, some individuals in Plaintiff Bolanos Hernandez's dorm refused to stand up for their daily count because people were getting sick, were not provided testing or medication, and were not given any information about COVID-19.  Bolanos Hernandez Decl. ¶¶ 9–10.  Plaintiff Bolanos Hernandez witnessed guards with guns entering his dorm and "set[ting] off some kind of a bomb at the entrance of the dorm."  *Id.*  The guards then took a group of people out of the dorm and gave a disciplinary complaint to anyone who wanted to go to the bathroom.

*Id*. The following day, guards did not allow Plaintiff Bolanos Hernandez and others in his dorm to use the microwave, watch TV, or use phones, even to call their attorneys. *Id*. ¶ 11.

86.     Plaintiff Bolanos Hernandez was not tested for COVID-19 until early July, and he still has not received his test results. Bolanos Hernandez Decl. ¶ 12. He received a notice on July 14 that his test results were still pending. *Id.* He was tested again on July 16 and continues to wait for the test results. *Id.*

87.     Despite not getting his test results for COVID-19, Plaintiff Bolanos Hernandez started working in the kitchen last week and has witnessed symptomatic people working in the kitchen. Bolanos Hernandez Decl. ¶¶ 8, 13.

88.     Plaintiff Bolanos Hernandez and others in his dorm cannot practice social distancing because of the way their dorm is set up and the close proximity of their beds. Bolanos Hernandez Decl. ¶ 15. Detainees generally do not wear masks in the dorms. *Id*. ¶ 16.

89.     Although Plaintiff Bolanos Hernandez does not have a cough or fever anymore, he still suffers from headaches and teeth pain, which he did not have before he started experiencing COVID-19 symptoms. Bolanos Hernandez Decl. ¶ 14. More than a month after he first started showing symptoms, Plaintiff Bolanos Hernandez is still waiting to find out whether he has COVID-19. *Id.* ¶ 12.

### 3.     **Plaintiff Gerson Amilcar Perez Garcia**

90.     Defendants have failed to provide Plaintiff Perez Garcia with adequate protection from COVID-19 and adequate medical care.

91.     The federal defendants exposed Plaintiff Perez Garcia to COVID-19 by transferring 74 individuals into Farmville from other facilities with active COVID-19 cases.

92.     The federal defendants were aware of and did not address the deficiencies in medical care that Plaintiff Perez Garcia and other immigration detainees have been experiencing throughout the COVID-19 outbreak.

93.     On June 18, 2020, Plaintiff Perez Garcia developed a bad headache.  Perez Garcia Decl. ¶ 3.  He requested medical attention, but the Farmville defendants refused to provide it.

94.     By June 20, 2020, Plaintiff Perez Garcia's headache was worse, and he developed a fever, sore throat, persistent cough, body aches, and chills.  Perez Garcia Decl. ¶ 3.

95.     He did not receive medical attention until June 22, 2020, when the staff took his temperature and gave him Tylenol twice a day and a few pills for his cough.  Perez Garcia Decl. ¶ 4.  The Tylenol only temporarily reduced Plaintiff Perez Garcia's fever; it, along with body pains, continued to return as the Tylenol wore off.  *Id.*

96.     Plaintiff Perez Garcia began experiencing diarrhea on June 25, 2020, which continued for approximately 10 days.  Perez Garcia Decl. ¶ 4.  Around this time, he also lost his sense of smell and taste.  *Id.*  On June 26, 2020, he had a 105 degree fever.  *Id.* ¶ 5.  A few days later, he had a 102 degree fever.  *Id.*  He continued to have a cough, pain in his back where his lungs are located, trouble breathing, and nausea.  *Id.*  He also felt incredibly weak.  *Id.*

97.     Defendants failed to give Plaintiff Perez Garcia a COVID-19 test for days; instead they kept him in his dorm—Dorm 5—with 50 to 80 people, nearly all of whom were sick, for about six days.  Perez Garcia Decl. ¶ 6.

98.     Defendants moved Plaintiff Perez Garcia into isolation on June 24, 2020.  Perez Garcia Decl. ¶¶ 2, 7.  But he wasn't even truly isolated.  *Id.* ¶ 7.  Instead, Farmville staff placed Plaintiff Perez Garcia in a room with another man who was even sicker than Plaintiff Perez Garcia.

*Id.* This individual had a worse cough, and he did not cover his mouth when he coughed. *Id.* This scared Plaintiff Perez Garcia. *Id.*

99.     Plaintiff Perez Garcia was finally tested for COVID-19 on June 26, 2020, approximately eight days after he started showing symptoms. Perez Garcia Decl. ¶ 7.

100.    Plaintiff Perez Garcia faced horrible conditions in isolation. His cellmate coughed throughout the night and wheezed a lot. Perez Garcia Decl. ¶ 8. His cellmate was so sick that he would sometimes cry throughout the night. After hearing his cellmate struggle to breathe, Plaintiff Perez Garcia sometimes thought that his cellmate was about to die—this made Plaintiff Perez Garcia nervous and scared. *Id.*

101.    Farmville staff only gave Plaintiff Perez Garcia and his cellmate Tylenol and two blue pills for their cough. Perez Garcia Decl. ¶ 9. This did not help. *Id.* Plaintiff Perez Garcia continued to have breathing issues while in isolation. *Id.* ¶ 10.

102.    Farmville staff gave Plaintiff Perez Garcia a brown colored pill for about two days, but he did not know what this pill was for, and they stopped giving it to him even though his symptoms did not improve. Perez Garcia Decl. ¶ 14. For his diarrhea, Farmville staff gave Plaintiff Perez Garcia Gatorade approximately two times to treat dehydration, even though he had persistent diarrhea throughout his sickness. *Id.*

103.    On June 30, 2020, Defendants took Plaintiff Perez Garcia's cellmate to the hospital. Perez Garcia Decl. ¶ 11. The same day, Plaintiff Perez Garcia learned he had tested positive for COVID-19. *Id.* Defendants refused Plaintiff Perez Garcia's request to be taken to the hospital. *Id.* ¶¶ 12–13.

104.    The Farmville defendants have barely monitored Plaintiff Perez Garcia, despite isolating him and despite his positive test.  Since June 29, 2020, the Farmville defendants only gave him medicine and checked on him once a day.  Perez Garcia Decl. ¶ 13.

105.    Also on June 29, 2020, Plaintiff Perez Garcia put in a sick request to talk to a psychologist because he was feeling hopeless.  Perez Garcia Decl. ¶ 19.  Defendants have not allowed him to see a psychologist.  *Id.*

106.    One evening during his stay in isolation, Plaintiff Perez Garcia felt like he could not breathe for approximately one hour.  Perez Garcia Decl. ¶ 15.  He panicked, and he screamed to the guards for help while banging on the window of his cell.  *Id.*  He did this for about 10 minutes when he became so exhausted he had to stop.  *Id.*  Screaming like this made his breathing worse.  *Id.*  Defendants never responded to Plaintiff Perez Garcia's pleas for help.  *Id.* ¶ 16.

107.    Even when Plaintiff Perez Garcia can speak to the guards, it is not possible to communicate effectively because the guards do not speak Spanish and cannot understand him.  Perez Garcia Decl. ¶ 16.

108.    While in isolation, Plaintiff Perez Garcia was denied soap, and so he could not wash his hands.  Perez Garcia Decl. ¶ 17.  Plaintiff Perez Garcia also was forced to go four days without a shower.  *Id.*

109.    Plaintiff Perez Garcia also struggled with severe nausea and for many days was unable to keep much food in his system.  Perez Garcia Decl. ¶ 18.  He has lost forty pounds since he first got sick.  *Id.*

110.    Plaintiff Perez Garcia's symptoms continued for approximately two weeks.  Perez Garcia ¶ 13.

111.     On July 9, 2020, Plaintiff Perez Garcia was released from isolation and returned to Dorm 5.  Perez Garcia ¶ 2.  While he no longer has a fever, cough, or diarrhea, Plaintiff—to this day—continues to suffer from extreme weakness.  *Id.* ¶ 13.

### 4.     Plaintiff Ismael Castillo Gutierrez

112.     Defendants have failed to provide Plaintiff Castillo Gutierrez with adequate protection from COVID-19 and adequate medical care.

113.     The federal defendants exposed Plaintiff Castillo Gutierrez to COVID-19 by transferring 74 individuals into Farmville from other facilities with active COVID-19 cases.

114.     The federal defendants were aware of and did not address the deficiencies in medical care that Plaintiff Castillo Gutierrez and other immigration detainees have been experiencing throughout the COVID-19 outbreak.

115.     The Farmville defendants also failed to adequately protect Plaintiff Castillo Gutierrez from COVID-19.

116.     Plaintiff Castillo Gutierrez is housed in Dorm 7 with about 34 other detainees.  *See* Castillo Gutierrez Decl. ¶ 4.  He cannot practice social distancing because the detainees in Dorm 7 live very close together and sleep shoulder-to-shoulder in bunk beds with eight people.  *Id.* ¶ 12. He received a mask, but many detainees do not use the masks unless they are going to court.  *Id.* ¶ 11.

117.     Plaintiff Castillo Gutierrez started to feel sick on or about June 30, 2020.  *See* Castillo Gutierrez Decl. ¶ 5.  He developed a fever, body aches, and lost his senses of taste and smell.  *Id.* ¶ 8.  He could not sleep because every position he laid in hurt.  *Id.*

118.     Plaintiff Castillo Gutierrez exhibited these symptoms for at least four days before he was tested for COVID-19 on July 4, 2020, along with all of the other detainees in his dorm.

Castillo Gutierrez Decl. ¶ 5.  On July 7, 2020, he learned that he and everyone in his dorm had tested positive for COVID-19.  *Id.*

119.    For about six days, Plaintiff Castillo Gutierrez received Tylenol twice a day to treat his COVID-19 symptoms.  Castillo Gutierrez Decl. ¶ 13.  However, the infirmary stopped giving him Tylenol on July 15, 2020 because they said his treatment had ended, even though he is currently experiencing a lot of pain and is having trouble sleeping because of the pain.  *Id.* ¶ 14.

120.    Although Plaintiff Castillo Gutierrez no longer has a fever, he still has pain in his knees, headaches, stomach aches, and trouble sleeping.  Castillo Gutierrez Decl. ¶ 10.  He did not have these issues before he contracted COVID-19.  *Id.*  He still has not recovered his senses of taste and smell, and he has lost about 12 pounds since he became ill with COVID-19.  *Id.* ¶¶ 8–9.

121.    Plaintiff Castillo Gutierrez has remained in his dorm with other detainees for the entire time he has experienced COVID-19 symptoms.  Other detainees in Plaintiff Castillo Gutierrez's dorm are still sick and exhibiting COVID-19 symptoms.  Castillo Gutierrez Decl. ¶ 6.  Some are still coughing, and some still have head aches and body aches.  *Id.*

122.    On July 1, 2020—shortly after he became ill and before he was tested for COVID-19—Plaintiff Castillo Gutierrez was present when guards attacked detainees with pepper spray during morning count.  Castillo Gutierrez Decl. ¶ 15.  Some of the detainees had decided to talk to the chief commander to ask for better conditions, more medication, and an explanation of what was happening inside the facility.  *Id.*  The detainees were feeling sick, had not been tested for COVID-19, and did not know what was going on.  *Id.*[44]

---

[44]    *See also* Rivera Rodriguez Decl. ¶¶ 2, 6–9 (describing deployment of pepper spray by Farmville's Chief Commander Garcia in response to detainees' expression of concerns about COVID-19 and peaceful refusal to return to their bunks where they would be inches apart from one another).

123.    Plaintiff Castillo Gutierrez was in bed because he felt sick, but he saw what happened.  Castillo Gutierrez Decl. ¶ 15.  After the detainees confronted the chief commander, he left and came back with more guards.  *Id.*  The guards aggressively started to tell people to go back to their beds.  *Id.*  Someone in the dorm said "violence is not going to fix anything."  *Id.*  He then heard that the guards got approval that they could use pepper spray.  *Id.*  The guards then proceeded to pepper spray the detainees.  *Id.*  Plaintiff Castillo Gutierrez believes there was a camera that recorded everything that happened.  *Id.*

124.    Plaintiff Castillo Gutierrez believes that the guards used about four cans of pepper spray.  Castillo Gutierrez Decl. ¶ 16.  One person fainted.  *Id.*  They had to take him to the clinic and brought him back about two hours later.  *Id.*

125.    Although Plaintiff Gutierrez was in his bed, he felt the effects of the pepper spray, which spread throughout the dorm.  Castillo Gutierrez Decl. ¶ 17.  His chest hurt because of the spray, and he had to put water on his face to relieve the stinging.  *Id.*

126.    About 14 people were taken to isolation because when guards were pepper spraying them, they held up chairs to protect themselves.  Castillo Gutierrez Decl. ¶ 18.  They are still isolated, and the guards have said they will not bring them back.  *Id.*

127.    Plaintiff Castillo Gutierrez feels as though the guards are trying to intimidate him and fellow detainees.  Castillo Gutierrez Decl. ¶ 20.  A guard once told Plaintiff Castillo Gutierrez that he had no rights in detention.  *Id.*  He wants this intimidation to stop.  *Id.*

128.    Plaintiff Castillo Gutierrez's greatest concern is that he may still have COVID-19 or that he will get it again.  Castillo Gutierrez Decl. ¶¶ 10, 19.  He is worried that he may die if he does not receive medical care.  *Id.* ¶ 19.

\*   \*   \*

129.    Plaintiffs are not alone in their experiences of being exposed to, contracting, and suffering from COVID-19 at Farmville:  As of July 20, 2020, 315 current detainees and 26 employees at Farmville have tested positive for COVID-19.[45]

### B.    Plaintiffs Are At Risk Of Reinfection With COVID-19

130.    Not only are Defendants subjecting Plaintiffs to conditions that jeopardize their recovery, but Defendants are also exposing Plaintiffs to the risk of becoming reinfected with COVID-19.

131.    At present, scientists are unable to rule out the possibility that someone who has recovered from COVID-19 could become reinfected.  "In general, the unknowns of immune responses to SARS-CoV-2 currently outweigh the knowns.  We do not know how much immunity to expect once someone is infected with the virus, we do not know how long that immunity may last, and we do not know how many antibodies are needed to mount an effective response."[46]

132.    A small but growing number of cases suggest that reinfection with COVID-19 is possible.  There have been recent reports of presumed reinfection among patients who appeared to fully recover after their first infection in Colorado, New Jersey, New York, Tennessee, and Texas.[47]

---

[45]  ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 23; Letter from Sens. Warner and Kaine to Acting Sec'y Wolf and Acting Director Albence, *supra* note 25.

[46]  D. Clay Ackerly, *My Patient Caught COVID-19 Twice.  So Long to Herd Immunity Hopes?*, VOX (July 12, 2020), https://bit.ly/2BeBGqL.

[47]  *See, e.g.*, Jordan Chavez, *Colorado Woman Tests Positive for COVID-19 Twice*, 9NEWS (June 18, 2020), https://bit.ly/3fGJznU; Ackerly, *supra* note 46; Rich Condit et al., *This Week in Virology: Do, There Is No Try* (July 12, 2020), https://www.microbe.tv/twiv/; CNN Wire, *Family Furious After 87-year-old Mother Tests Positive Twice for COVID-19*, MY FOX8 (July 4, 2020), https://bit.ly/2ZIulsY; Meredith Yeomans, *Dallas Woman Battling Coronavirus, Again*, NBCDFW (June 15, 2020), https://bit.ly/32DdKbN.

133.     Additionally, one study published on June 16, 2020 found that 10 percent of nearly 1,500 COVID-positive patients registered undetectable antibody levels within weeks of first showing symptoms.[48]  The study's authors concluded that "after SARS-CoV-2 infection, people are unlikely to produce long-lasting protective antibodies against the virus."[49]

134.     A second study published June 18, 2010 in *Nature Medicine* found that COVID-19 patients typically lost their antibodies two to three months after recovering from the infection, especially among those who tested positive but were asymptomatic.[50]

135.     The CDC advises, "If you test positive or negative for COVID-19 on a viral or an antibody test, you still should take preventative measures to protect yourself and others.  We do not know yet if people who recover from COVID-19 can get infected again.  Scientists are working to understand this."[51]

136.     Even if not reinfected, many people infected with COVID-19 show either extended periods of symptoms or recurring bouts of symptoms, worsening dramatically even after they appear to have recovered.[52]

### C.     Defendants Have Denied Plaintiffs Proper Nutrition While They Suffer From COVID-19

137.     In addition to denying Plaintiffs adequate medical treatment, Defendants have denied Plaintiffs proper nutrition throughout the COVID-19 pandemic, including when they have been experiencing COVID-19 symptoms.

---

[48]   Amanda Heidt, *Studies Report Rapid Loss of COVID-19 Antibodies*, THE SCIENTIST (June 19, 2020), https://bit.ly/3jpObAW.

[49]   *Id.*

[50]   *Id.*

[51]   CDC, *Test for Past Infection* (updated June 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/testing/serology-overview.html.

[52]   *See, e.g.*, Ed Yong, *COVID-19 Can Last for Several Months*, The Atlantic (June 4, 2020), https://bit.ly/30t1ZlH.

138.    For the past few months, Farmville guards, not kitchen staff, have been in charge of preparing food at Farmville.  Santos Garcia Decl. ¶¶ 11–12.  Plaintiff Santos Garcia believes that this is due to staffing shortages caused by the COVID-19 pandemic.  *Id.* ¶ 12.

139.    Plaintiff Bolanos Hernandez is now working in the kitchen despite having exhibited COVID-19 symptoms and not yet receiving his COVID-19 test results.  Bolanos Hernandez Decl. ¶ 13.

140.    The Farmville defendants now serve Plaintiffs and other detainees inedible food, including expired milk, undercooked foods, and uncooked foods, such as raw rice, potatoes, and beans.  Santos Garcia Decl. ¶ 12; Bolanos Hernandez Decl. ¶ 17; *see also* Quintanilla Gallegos Decl. ¶ 18 (explaining that "[t]he detention center has been feeding [detainees] rotten food," such as "sour milk and rotting apples").  Plaintiff Bolanos Hernandez reports that he has been served expired milk around ten times since he has been at Farmville.  Bolanos Hernandez Decl. ¶ 17.

141.    Plaintiff Santos Garcia, Plaintiff Perez Garcia, and other detainees have also found bugs in their food.  For example, in the last month alone, Plaintiff Santos Garcia has been served food with bugs in it on three occasions.  Santos Garcia Decl. ¶ 11.  And Plaintiff Perez Garcia discovered worms in his food as recently as a few days ago.  Perez Garcia Decl. ¶ 35.  Unfortunately, he did not discover the worms—which were in beans served to him—until he had eaten nearly half of his meal.  *Id.* ¶ 24.

\*   \*   \*

142.    At bottom, Defendants failed to take adequate precautions to protect Plaintiffs and other detainees against infection from COVID-19.  As a result, Plaintiffs and the vast majority of detainees at Farmville have contracted the deadly virus.  Defendants have then failed to provide adequate medical treatment for Plaintiffs while they have experienced COVID-19 symptoms.

Defendants' continued disregard for the guidance of medical and public health officials and their failure to provide Plaintiffs with adequate medical care and nutrition jeopardizes Plaintiffs' recovery and makes it more likely that they will become reinfected with COVID-19 or will infect others.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of the Right to Substantive Due Process Under the Fifth Amendment
(Defendants Chad F. Wolf, ICE, Matthew T. Albence, Russell Hott)**

143.     Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

144.     Plaintiffs assert a claim for violations of their Fifth Amendment Due Process rights against Defendants Chad F. Wolf, ICE, Matthew T. Albence, Russell Hott (collectively, the "federal defendants").

145.     The Due Process Clause of the Fifth Amendment to the United States Constitution guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.

146.     The federal defendants violate this right to substantive due process when they fail to satisfy their affirmative duty to provide conditions of reasonable health and safety to the people they hold in their custody, and therefore violate the Constitution when they fail to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

147.     The federal defendants also violate the right to substantive due process when, acting with deliberate indifference, they subject civil detainees to objectively unreasonable risks to their health and safety, to cruel treatment, or to conditions of confinement that amount to punishment.

148.    The federal defendants are aware of the serious risk posed by COVID-19 and failed to take actions that could adequately protect Plaintiffs from contracting the virus or that would allow Plaintiffs to safely recover once they contracted the virus.

149.    The federal defendants subjected Plaintiffs to an unreasonable risk of contracting COVID-19, a potentially lethal disease for which there is no vaccine or cure.  Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, the federal defendants have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville.  The federal defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance.  The federal defendants have also failed to ensure that the Farmville defendants provided Plaintiffs and other detainees proper personal protective equipment, promptly tested the detainee population for COVID-19, and immediately isolated symptomatic detainees.

150.    In addition, the federal defendants have exacerbated the risk of COVID-19 infection by continuing to transfer detainees among detention facilities across the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers.  In particular, on June 2, 2020, the federal defendants transferred 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.  These individuals were not tested, quarantined, or properly screened before their arrival at Farmville, and 51 of them subsequently tested positive for COVID-19.

151.    Since Plaintiffs contracted COVID-19, the federal defendants have failed to ensure that the Farmville defendants are providing Plaintiffs with adequate medical treatment for their symptoms.  In so doing, the federal defendants have acted with deliberate indifference to serious and irreparable harm.

152.     The federal defendants also have failed to ensure that the Farmville defendants are providing Plaintiffs and other detainees with adequate, safe nutrition.  Instead, they have allowed the Farmville defendants to feed Plaintiffs food that was expired, undercooked, and infested with bugs.

153.     The current conditions at Farmville jeopardize Plaintiffs' recovery from COVID-19 and increase the risk that Plaintiffs could expose their fellow detainees to COVID-19, thus also endangering other detainees' health and wellbeing.  The federal defendants' actions in failing to ensure adequate conditions at Farmville also risk Plaintiffs being reinfected with COVID-19.

154.     The federal defendants have also acted with deliberate indifference by pressing forward with a plan to transfer Plaintiff Santos Garcia and other detainees (potentially including other Plaintiffs) while they are still recovering from COVID-19 and likely still COVID-19 positive.

155.     The current conditions also increase the chances that Plaintiffs will be reinfected with COVID-19.

156.     By subjecting Plaintiffs to these risks, the federal defendants are maintaining detention conditions that amount to punishment and are failing to ensure Plaintiffs' safety and health in violation of Plaintiffs' substantive due process rights.

157.     Absent judicial relief in the form of an injunction ordering the federal defendants to institute condition reforms, Plaintiffs are suffering—and will continue to suffer—irreparable harm.

## SECOND CAUSE OF ACTION

**Violation of the Right to Substantive Due Process Under the Fourteenth Amendment
Under 42 U.S.C. § 1983
(Defendants Jeffrey Crawford, Immigration Centers of America, Armor Correctional
Health Services)**

158.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

159.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' Fourteenth Amendment Due Process rights against Defendants Jeffrey Crawford, Immigration Centers of America, Armor Correctional Health Services (collectively, the "Farmville defendants").

160.    Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Westmoreland v. Brown*, 883 F. Supp. 67, 71 (E.D. Va. 1995) (quotation marks omitted).  To establish liability under Section 1983, Plaintiffs must show that the Farmville defendants, acting under color of law, violated Plaintiffs' federal constitutional rights, and thereby caused the complained of injury. *Coppage v. Mann*, 906 F. Supp. 1025, 1035 (E.D. Va. 1995).

161.    Here, Defendant ICE contracts with the Town of Farmville, which in turn contracts with Defendant ICA, for the operation of Farmville Detention Center.  Employees, agents, and officers of Defendant ICA, including Defendants Crawford and Armor Correctional Health Services, are therefore state or local actors and subject to suit under Section 1983, *see Richardson v. McKnight*, 521 U.S. 399, 413 (1997), independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

162.    Like the Due Process Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees persons in civil

immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.

163.    The Farmville defendants violate this right to substantive due process when they fail to satisfy their affirmative duty to provide conditions of reasonable health and safety to the people they hold in their custody, and violate the Constitution when they fail to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

164.    The Farmville defendants also violate the right to substantive due process when, acting with deliberate indifference, they subject civil detainees to objectively unreasonable risks to their health and safety, to cruel treatment, or to conditions of confinement that amount to punishment.

165.    The Farmville defendants are aware of the serious risk posed by COVID-19 and failed to take actions that could adequately protect Plaintiffs from contracting the virus or that would allow Plaintiffs to safely recover once they contracted the virus.

166.    The Farmville defendants subjected Plaintiffs to an unreasonable risk of contracting COVID-19, a potentially lethal disease for which there is no vaccine or cure.  Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, the Farmville defendants have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville.  The Farmville defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance.  The Farmville defendants have also failed to provide Plaintiffs and other detainees proper personal protective equipment, unreasonably delayed testing the detainee population for COVID 19, and failed to isolate symptomatic detainees, including Plaintiffs Santos Garcia, Bolanos-Hernandez, and

Castillo Gutierrez.  And even though the Farmville defendants ultimately isolated Plaintiff Perez Garcia, they waited several days after he exhibited COVID-19 symptoms to do so.

167.    In addition, the Farmville defendants exacerbated the risk of COVID-19 infection by continuing to accept mass transfers of detainees from detention facilities in other parts of the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers, and despite knowing that they do not have the capacity to properly isolate, quarantine, or screen incoming people.  In particular, on June 2, 2020, the Farmville defendants accepted a transfer of 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.  These individuals were not quarantined before their arrival at Farmville and were not adequately screened for COVID-19 infection, and 51 of them subsequently tested positive for COVID-19.

168.    Since Plaintiffs contracted COVID-19, the Farmville defendants have failed to provide Plaintiffs with adequate medical treatment for their symptoms.  In so doing, the Farmville defendants have acted with deliberate indifference to serious and irreparable harm.

169.    The Farmville defendants also have failed to provide Plaintiffs and other detainees with adequate, safe nutrition.  Instead, they have fed Plaintiffs food that was expired, undercooked, and infested with bugs.

170.    The current conditions at Farmville jeopardize Plaintiffs' recovery from COVID-19 and increase the risk that Plaintiffs could expose their fellow detainees to COVID-19, thus also endangering other detainees' health and wellbeing.  The Farmville defendants' actions also risk Plaintiffs being reinfected with COVID-19.

171.    The current conditions also increase the chances that Plaintiffs will be reinfected with COVID-19.

172.    By subjecting Plaintiffs to these risks, the Farmville defendants are maintaining detention conditions that amount to punishment and are failing to ensure Plaintiffs' safety and health in violation of Plaintiffs' substantive due process rights.

173.    The Farmville defendants are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability.  *See Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 694 (1978).  *Monell* establishes that municipal liability under section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights.  *Id.*; *see Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987).

174.    The Farmville defendants had a policy or custom of deliberate indifference to the deprivation of constitutional rights, and this policy or custom caused Plaintiffs' injury.  *See Westmoreland*, 883 F. Supp. at 76 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).  The Farmville defendants also failed to properly train their employees and staff about the risks of COVID-19 infections, what medical care is appropriate for preventing and treating COVID-19 infections and related injuries, and what nutrition is appropriate for individuals detained in Farmville.

175.    The Farmville defendants' failure to protect Plaintiffs from exposure to COVID-19 and failure to provide Plaintiffs with adequate medical care once they were infected constitutes official inaction that qualifies as an official policy or custom.  *See Milligan v. City of Newport News*, 743 F.2d 227, 229–41 (4th Cir. 1984).  This inaction resulted in Plaintiffs suffering from COVID-19 and being denied adequate medical care and nutrition in violation of the Fourteenth Amendment.

176.    Absent judicial relief in the form of an injunction ordering the Farmville defendants to institute condition reforms, Plaintiffs are suffering—and will continue to suffer—irreparable harm.

### THIRD CAUSE OF ACTION

**Violation of the Right to Substantive Due Process Under the Fifth Amendment
(Jeffrey Crawford, Immigration Centers of America, Armor Correctional Health Services)**

177.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

178.    In the alternative, should this Court find that the Farmville defendants were operating solely under color of federal law, Plaintiffs assert a claim for violations of their Fifth Amendment due process rights against the Farmville defendants.

179.    The Due Process Clauses of the Fifth Amendment to the United States Constitution guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.

180.    The Farmville defendants violate this right to substantive due process when they fail to satisfy their affirmative duty to provide conditions of reasonable health and safety to the people they hold in their custody, and violate the Constitution when they fail to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

181.    The Farmville defendants also violate the right to substantive due process when, acting with deliberate indifference, they subject civil detainees to objectively unreasonable risks to their health and safety, to cruel treatment, or to conditions of confinement that amount to punishment.

182.    The Farmville defendants are aware of the serious risk posed by COVID-19 and failed to take actions that could adequately protect Plaintiffs from contracting the virus or that would allow Plaintiffs to safely recover once they contracted the virus.

183.    The Farmville defendants subjected Plaintiffs to an unreasonable risk of contracting COVID-19, a potentially lethal disease for which there is no vaccine or cure.  Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, the Farmville defendants have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville.  The Farmville defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance.  The Farmville defendants also failed to provide Plaintiffs and other detainees proper personal protective equipment, unreasonably delayed testing the detainee population for COVID-19, and failed to isolate symptomatic detainees, including Plaintiffs Santos Garcia, Bolanos-Hernandez, and Castillo Gutierrez.  And even though the Farmville defendants ultimately isolated Plaintiff Perez Garcia, they waited several days after he exhibited COVID-19 symptoms to do so.

184.    In addition, the Farmville defendants have continued to accept mass transfers of detainees from detention facilities in other parts of the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers, and despite knowing that they do not have the capacity to properly isolate, quarantine, or screen incoming people.  In particular, on June 2, 2020, the Farmville defendants accepted a transfer of 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.  These individuals were not quarantined before their arrival at Farmville and were not adequately screened for COVID-19 infection, and 51 of them subsequently tested positive for COVID-19.

185.    Since Plaintiffs contracted COVID-19, the Farmville defendants have failed to provide Plaintiffs with adequate medical treatment for their symptoms.  In so doing, the Farmville defendants have acted with deliberate indifference to serious and irreparable harm.

186.    The Farmville defendants also have failed to provide Plaintiffs and other detainees with adequate, safe nutrition.  Instead, they have fed Plaintiffs food that was expired, undercooked, and infested with bugs.

187.    The current conditions at Farmville jeopardize Plaintiffs' recovery from COVID-19 and increase the risk that Plaintiffs could expose their fellow detainees to COVID-19, thus also endangering other detainees' health and wellbeing.  The Farmville defendants' actions also risk Plaintiffs being reinfected with COVID-19.

188.    The current conditions also increase the chances that Plaintiffs will be reinfected with COVID-19.

189.    By subjecting Plaintiffs to these risks, the Farmville defendants are maintaining detention conditions that amount to punishment and are failing to ensure Plaintiffs' safety and health in violation of Plaintiffs' substantive due process rights.

190.    Absent judicial relief in the form of an injunction ordering the Farmville defendants to institute condition reforms, Plaintiffs are suffering—and will continue to suffer—irreparable harm.

## FOURTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### (Defendants Chad F. Wolf, ICE, Matthew T. Albence, Russell Hott)

191.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

192.    The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

193.    Under the APA, a court "shall" "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right."  5 U.S.C. § 706(2)(A), (B).

194.    The PBNDS apply at all ICE-dedicated civil detention facilities, including Farmville.

195.    The PBNDS set mandates for medical care and food services, and require detention facilities to adhere to CDC guidelines and recommendations for prevention and control of infectious diseases.

196.    The federal defendants have failed to ensure that the Farmville defendants follow the PBNDS mandates for providing medical care.  Farmville detainees such as Plaintiffs do not have access to appropriate medical care.  The federal defendants have allowed the Farmville defendants to conduct inadequate testing, to implement insufficient precautions to prevent a rampant COVID-19 outbreak, and to provide inappropriate treatment and isolation to address the health risks that have spread throughout the facility.

197.    The federal defendants have also failed to ensure that the Farmville defendants follow the PBNDS mandates for providing food services.  Plaintiffs are being served food by the

Farmville defendants that is not sanitary or nutritious.  To the contrary, the food is often expired, undercooked, and infested with bugs.

198.    The federal defendants have also failed to ensure that the Farmville defendants have followed the PBNDS mandates to adhere to CDC guidelines and recommendations for prevention and control of COVID-19.  Farmville defendants have failed to follow the PBNDS mandates, and, as a result, individuals in the facility are not appropriately distanced, they remain packed densely in dorm rooms, and they do not have sufficient personal protective equipment—all contrary to CDC's guidelines for managing the COVID-19 pandemic.

199.    In addition, the federal defendants have failed to follow the PBNDS mandates to adhere to CDC guidelines and recommendations for prevention and control of COVID-19 and exacerbated the risk of COVID-19 infection by continuing to transfer detainees among detention facilities across the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers.  In particular, on June 2, 2020, the federal defendants transferred 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.  These individuals were not tested, quarantined, or properly screened before their arrival at Farmville, and 51 of them subsequently tested positive for COVID-19.

200.    The federal defendants' failure to follow the PBNDS and failure to ensure that the Farmville defendants follow the PBNDS is unlawful agency action.

201.    Plaintiffs are prejudiced by the federal defendants' failure to follow the PBNDS and failure to ensure that the Farmville defendants follow the PBNDS.  Plaintiffs have suffered and will continue to suffer irreparable injury because of this failure to follow the PBNDS.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

A.      Enter a declaration that Defendants' conduct violates the Fifth and Fourteenth Amendments to the United States Constitution and the APA and is therefore unlawful.

B.      Issue an injunction ordering Defendants to immediately reform conditions by instituting the following:

a.   Submitting to a third-party inspection, at Defendants' expense, of the facility's COVID-19 mitigation efforts, medical care plan, and food supply and preparation regimen;[53]

b.   Creating a plan, to be immediately submitted to the Court and overseen by a qualified public health expert, outlining specific mitigation efforts, in line with CDC guidelines to prevent, to the degree possible, contraction of COVID-19;

c.   Creating a plan, to be immediately submitted to the Court and overseen by a qualified public health expert, outlining specific efforts to provide proper medical care to detainees infected with COVID-19;

d.   Creating a plan, to be immediately submitted to the Court and overseen by a qualified public health expert, outlining specific efforts to provide proper nutrition to Plaintiffs and other detainees housed at Farmville;

C.      Issue an injunction ordering Defendants to abide by CDC guidelines and recommendations for prevention and control of infectious diseases, including by:

---

[53]   Plaintiffs respectfully provide for the Court's consideration the declaration of Dr. Homer D. Venters, MD, who has extensive experience working on COVID-19 responses in detention settings, which outlines a proposed methodology for a third-party inspection of Farmville. *See* Venters Decl. ¶¶ 5, 16-21 (describing proposed methods for proposed third-party inspection).

        a.   Prohibiting all transfers into and out of Farmville Detention Center, and specifically prohibiting Plaintiffs' transfer out of Farmville to another detention facility, until Defendants can demonstrate that such transfer will not endanger Plaintiffs or others' health and abides by CDC guidelines;

        b.   Instituting appropriate social-distancing measures throughout the facility;

        c.   Providing all detainees with adequate personal protective equipment, including sufficient effective masks, soap, and hand sanitizer;

D.     Issue an injunction prohibiting Defendants, their subordinates, agents, employees, and all others acting in concert with them from retaliating against Plaintiffs for having brought this suit;

E.     Retain jurisdiction and monitor Defendants' compliance with the above requirements by ordering Defendants to regularly update the Court of its progress implementing the Court's order;

F.     Award Plaintiffs their reasonable attorneys' fees and costs in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412, or under 42 U.S.C. § 1988(b), or any other statute; and

G.     Any other and further relief that this Court deems just, equitable, and proper.

Dated: July 21, 2020

Respectfully submitted,

By:      /s/Simon Sandoval-Moshenberg

Joseph D. West (Va. Bar No. 16834)
David Debold (*pro hac vice forthcoming*)
Naima L. Farrell (*pro hac vice forthcoming*)
Thomas J. McCormac IV
   (*pro hac vice forthcoming*)
Blair Watler (*pro hac vice forthcoming*)
Katherine King (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel: 202-955-8551
jwest@gibsondunn.com
ddebold@gibsondunn.com
nfarrell@gibsondunn.com
tmccormac@gibsondunn.com
bwatler@gibsondunn.com
kking@gibsondunn.com

*Pro bono counsel for Plaintiff Christian
Alberto Santos Garcia*

Simon Sandoval-Moshenberg
   (Va. Bar No. 77110)
Kristin Donovan (Va. Bar No. 92207)
Granville Warner (Va. Bar. No. 24957)
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Tel: 703-778-3450
simon@justice4all.org
kristin@justice4all.org
cwarner@justice4all.org

Sirine Shebaya (*pro hac vice forthcoming*)
Amber Qureshi (*pro hac vice forthcoming*)
NATIONAL IMMIGRATION PROJECT OF THE
   NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue, N.W., Suite 200
Washington, D.C. 20007
Tel: 617-227-9727
sirine@nipnlg.org
amber@nipnlg.org

*Pro bono counsel for Plaintiffs Santos
Salvador Bolanos Hernandez, Gerson
Amilcar Perez Garcia, and Ismael Castillo
Gutierrez*