# EXHIBIT F

# DECLARATION OF DR. HOMER D. VENTERS, M.D. REGARDING COVID-19 INSPECTION OF FARMVILLE DETENTION CENTER

I, Homer Venters, pursuant to 28 U.S.C.§ 1746, declare as follows:

## A. Background

1. I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, and testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

2. After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's twelve (12) jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints.

During this time, I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacts almost 1/3 of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks.

3. In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

4. Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States. I have also worked as a medical expert in cases involving correctional health since 2017 and I wrote and published a book on the health risks of jail (*Life and Death in Rikers Island*) that was published in early 2019 by Johns Hopkins University Press.

5. Since April 2020, I have worked exclusively on COVID-19 responses in detention settings. During this time I have conducted court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in the following settings:

   a. MDC Brooklyn (BOP), NY
   b. MCC Manhattan (BOP), NY
   c. FCI Danbury (BOP), CT
   d. Cook County Jail, IL
   e. Broome County Jail, IL
   f. Sullivan County Jail, NY
   g. Shelby County Jail, TN

6. I have also been invited to present COVID-19 guidance to several organizations including the National Academy of Sciences, the National Association of Counties and the American Medical Association.

7. A copy of my curriculum vitae is attached as **Exhibit A** to this report which includes my publications and a listing of depositions and testimony I have provided.

**B. Expert Assignment**

8. I have been retained by the National Immigration Project of the National Lawyers Guild to:

   a. Assess the need for an in-person inspection of Farmville Detention Center (FDC);

   b. Propose a methodology for in-person inspection of FDC;

   c. Submit a declaration reflecting my opinions.

**C. Information Reviewed**

- Declaration of Jeffrey Crawford, submitted in *Lizama Gutierrez v. Hott et al.*, No. 1:20-cv-712-LMB-IDD (E.D. Va.) (July 9, 2020), ECF No. 13-1.

- Declaration of Teresa Moore, M.D., submitted in *Lizama Gutierrez v. Hott et al.*, No. 1:20-cv-712-LMB-IDD (E.D. Va.) (July 9, 2020), ECF No. 13-2.

- Declaration of Ashley Warmeling, Managing Attorney, Capital Area Immigrants' Right Coalition, to be submitted in this case.

- Declaration of Gerson Amilcar Perez Garcia, Detainee, Immigration Centers of America—Farmville, to be submitted in this case.

- Declaration of Ismael Castillo Gutierrez, Detainee, Immigration Centers of America—Farmville, to be submitted in this case.

3

- ICE information regarding COVID-19[1]

**D. Status of COVID-19 outbreak at FDC**

9.     The Farmville Detention Center (FDC) is in the midst of a serious and substantial COVID-19 outbreak, with the majority of current detainees testing positive for COVID-19.[2] The extent of the outbreak in FDC creates special challenges for the ongoing response. First, there is a relatively small number of detained people who have not yet tested positive, and their status must be quickly assessed. If uninfected, they should be protected from infection, especially if they are at high risk for serious illness or death from COVID-19 infection.[3] Second, the high number of infections has likely overwhelmed the physical capacity, staffing and training for conducting large scale quarantine and medical isolation. Gaps in these practices will dramatically increase the likelihood that remaining uninfected staff and detainees will become infected with COVID-19. Third, the scope of this outbreak may also overwhelm the capacity of staff to identify infected patients who are developing serious illness or complications from COVID-19, thus increasing the risk that patients may present at late stage of deterioration and not only need higher levels of care, but also overwhelm local hospital resources. Finally, because of the need for medical isolation and quarantine for already identified patients, it is likely that intake screening and new admission housing area protocols are not effective at keeping newly admitted detainees separate from staff and other detainees who have COVID-19.

---

[1] https://www.ice.gov/coronavirus, accessed July 18, 2020.
[2] https://www.wric.com/news/taking-action/covid-19-cases-spike-at-farmville-ice-detention-center-after-transfers-from-florida-arizona/
[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html

E.  **Recent Updates to CDC Guidelines relevant to FDC**

10. In the past two months, the CDC has updated and modified its guidelines for COVID-19 response in detention settings several times, and some of these changes, as recent at July 14, 2020, are extremely relevant to the FDC response. For example, in its July 14th update, the CDC provides more detail about the conditions of medical isolation, and gives greater specificity about how medical isolation should be implemented in a manner that meets clinical needs and is not punitive.[4] Another update from this most recent guideline is identifying the need to affirmatively ask about individual symptoms of COVID-19 when screening detained people, not simply check temperatures. This reflects the reality that people may experience symptoms of COVID-19 for days before having an elevated temperature. In the July 7, 2020 and May 9, 2020 updates to CDC guidelines, the CDC gave new information about the potential use of asymptomatic testing in detention settings with ongoing transmission, exactly the status that FDC finds itself in. The past several rounds of CDC detention guidelines for COVID-19 response have also given more clarity about the role of social distancing, and how this is not simply a concept that detained people should follow, but reflects an infection control approach that individuals, groups and the facility operations must implement together. Finally, the CDC guidelines include a strong recommendation against transfers, which have the potential to increase the spread of COVID-19 between and among detention centers.

F.  **Rationale for conducting an in-person inspection of FDC**

11. Review of declarations obtained from Plaintiffs, including declarations submitted by the warden and medical director of FDC in different litigation, indicates that the facility is struggling to implement basic CDC guidelines regarding the identification of new cases, care of

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

people with COVID-19, quarantine and medical isolation practices, and basic infection control including sanitation, cleaning/disinfecting, and social distancing. My experience in other facility inspections is that administrators and staff may become overwhelmed with a quickly spreading outbreak and that there are often changes to workflows or practices that can significantly improve the safety of staff and detainees.

12. One area I have placed considerable emphasis on in my inspections is examination of the physical and workflow details of the intake screening process. In several facility inspections, I have identified questions that are missing from intake screening forms used by security staff, or areas of the intake process where asymptomatic detainees or staff may come into contact and which can be remedied. Moving some screening elements outside the building can assist with this challenge, as can designating some intake area pens for intake only, and assigning steady staff who are regularly tested in the new admission housing areas. The timing of COVID-19 testing in the new admission housing areas and analysis of the scenarios in which newly admitted detainees may come into physical contact with other detainees and staff who work on other units is an important aspect of my physical inspections. Several of the declarations I have reviewed by currently detained people indicate systemic concerns with the intake process that has been implemented at FDC. In the midst of a large-scale outbreak, such as being experienced by FDC, I would recommend cessation of all transfers into the facility until these processes and the elements below can be addressed by an outside expert. Given the current COVID-19 outbreak at the facility, I would also recommend all transfers out of the facility except for medical necessity, exigent circumstances, or release, as delineated in the CDC guidelines.

13. Physical inspection is also critical to observe and offer recommendations for how new COVID-19 cases are identified. For example, among the uninfected staff and detainees, a

daily check of temperature and asking about COVID-19 symptoms helps capture cases earlier than only conducting temperature checks. I have also made this recommendation in several facilities and the CDC has recently updated its own recommendations to make clear that symptom checks are a critical part of detainee screening. Several of the declarations I have reviewed by currently detained people indicate systemic concerns with the COVID-19 screening process that has been implemented at FDC, which appears to result in delayed identification of cases and increased transmission of the virus inside the facility.

14. Social distancing is another aspect of COVID-19 response that requires physical inspection to assess. I have been in several facilities with a daily census of 50%-75% but where social distancing was not being implemented. The reduction in census is essential to implementing social distancing but is not sufficient alone. Correctional staff must be trained to promote social distancing with detainees, and there must be a capacity for health staff to also communicate the same messages, and in languages understood by detainees. Supervisors must assist in situations where changes to workflow or operations could improve social distancing, including meal and medication access, sleeping arrangements and recreation. Finally, supervisors must utilize video review on a regular basis to perform quality assurance for social distancing efforts as well as mask wearing and cleaning/disinfecting routines. Several of the declarations I have reviewed by currently detained people indicate that social distancing has not been adequately implemented in FDC.

15. Finally, physical inspection by correctional health experts is warranted in this case to assess the extent to which basic health related activities are being impacted by the COVID-19 response. My experience in physically inspecting other facilities during the COVID-19 response is that access to chronic care, specialty care, dietary counseling and food preparation and mental

health services are all dramatically impacted, and there may not be a concerted effort underway to triage the patients at greatest risk for illness or death from interruption of these services. In some settings, I have recommended additional physician hours to compensate for a lack of accessible specialty care in the surrounding community. In other settings, I have recommended addition of outside nursing staff to focus solely on the daily COVID-19 screenings so that existing nursing staff can provide chronic care services that they are best equipped to deliver. I have also recommended a specific approach to chronic care encounters that includes a structured COVID-19 assessment for anyone who has a chronic health problem, to review the potential impact of COVID-19 infection on the specific health issue, such as asthma, diabetes or heart disease, and document ongoing symptoms in the recovery period. Interruption of basic health and nutritional services has been reported in several of the declarations I have reviewed from currently detained people at FDC and warrants immediate assessment.

### G. Proposed methods for in-person inspection of FDC

16. I believe that an in-person inspection of FDC is warranted, and I would utilize the following methodology to conduct such an inspection. The approach outlined below is designed to assess overall compliance with CDC guidelines and yield recommendations that can be quickly implemented by facility administrators and other stakeholders.

17. The inspection would focus on three questions:

   a. Do current practices in FDC adequately detect the number and severity of COVID-19 cases among staff and incarcerated individuals and respond in a manner consistent with CDC guidelines and other established clinical standards of care?

      b.  Do current practices in FDC adequately slow the spread of COVID-19 through the facility and between people — both staff and incarcerated individuals — in a manner consistent with CDC guidelines and other clinical standards of care?

      c.  Do current practices in FDC adequately identify and protect high-risk detained individuals from serious illness and death from COVID-19?

18.    In order to answer these questions, I would conduct a one-day physical inspection of the facility that followed the general approach of:

- Inspection of staff entry and screening area/process;
- Inspection of facility intake area, pens, bathrooms;
- Inspection of medical clinic, pharmacy and nursing areas;
- Inspection of cleaning/disinfecting storage rooms;
- Inspection of new admission hosing area(s);
- Inspection of at least one dorm and/or cell general population housing area for men and women;
- Inspection of any high-security housing areas;
- Inspection of any quarantine housing areas;
- Inspection of any medical isolation housing area.

19.    This order of inspection is designed to promote maximal infection control. In my 7 prior in-person COVID-19 facility inspections, I have utilized this approach so that the last area inspected is medical isolation, allowing a final series of PPE changes and then exit out of the building, without going to any new areas of the facility. I then return to my car and perform one additional PPE and clothing exchange. I am located in New York and have driven to/from each of my facility inspections and would do the same for an inspection of FDC. I obtained a negative

COVID-19 test after my last facility inspection, the Memphis (Shelby County) Jail and would propose to conduct this inspection the week of July 20, 2020.

20. During my inspection, I would engage in brief (2-8 minute) conversations with staff and detained people about their experiences during COVID-19 response. These conversations are designed to assess the extent to which facility policies are being implemented and discover whether or how workflow changes, additional resources and other changes can allow for a more effective COVID-19 response. I would focus my time on conversations with staff and detainees in medical isolation units, since these people have both general and specific insights into a wider range of COVID-19 response issues.

21. Based on the information I have reviewed, I believe that in-person inspection of the FDC facility is urgently warranted. I also believe that this inspection should be conducted by a correctional health expert with experience in conducting similar inspections elsewhere and in a manner that provides rapid feedback on findings and recommendations that relate to improving operational responses to COVID-19 in the facility. I am willing and prepared to conduct such an inspection the week of July 20, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 19th of July, in the year 2020, in the city of Port Washington, NY.

Dr. Homer Venters

_____