# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

RODRIGO LIZAMA GUTIERREZ, *et al.*,

        Petitioners-Plaintiffs,

v.   Civil Action No. 1:20-cv-712-LMB-IDD

RUSSELL HOTT, Immigration and
Customs Enforcement, Director of the
Washington Field Office, *et al.*,

        Respondents-Defendants.

## DECLARATION OF TERESA MOORE, M.D.

I, Teresa Moore, M.D., declare under penalty of perjury as follows:

    1.    I am of the age of majority, of sound mind, and make this declaration based upon my personal knowledge or, if so identified, upon my own information and belief.

    2.    I am presently employed by Armor Correctional Services, Inc. ("Armor") as the full-time Medical Director for Immigration Centers of America-Farmville ("ICA Farmville"). I have knowledge of the facts relating to the efforts undertaken at ICA Farmville by myself, my staff, Jeffrey Crawford, ICA Farmville's staff members, certain officials of the U.S. Immigration and Customs Enforcement ("ICE"), and others to address and prevent further spread of the novel coronavirus that causes COVID-19 within ICA Farmville's facility.

    3.    In my present position as Medical Director, I am employed on a full-time (at least 40-hours per week) basis to serve as the lead medical officer for ICA Farmville. I have held this position since May 23, 2017. When not physically present at ICA Farmville, I am available as needed on an on-call, 24-hour, 7-day per week basis. I am in frequent contact with ICA Farmville Director Jeffrey Crawford about every aspect of the facility's COVID-19 response.

4. From January through April of this year, Armor maintained and updated on a weekly basis a COVID-19 Response Plan. Since then, because the guidelines and plans have remained stable, Armor has updated the Response Plan only as needed and continues to do so. I have almost daily contact with Armor and review any updated guidelines and updates to the Response Plan as they become available. To the fullest extent possible, I have ensured that every aspect of the Response Plan is implemented at ICA Farmville.

5. In coordination with Mr. Crawford, I have helped educate the staff and detainees at ICA Farmville about the importance of hand washing, hand sanitization, hygiene, coughing etiquette, and social distancing consistent with CDC and Virginia Department of Health ("Health Department") guidelines for combating the spread of COVID-19. Medical and security staff are directed to remain six feet apart whenever possible, and I have reminded staff of this and received assistance from ICA Farmville leadership in enforcing it. Together with ICA Farmville staff, we have looked at options for reducing congestion with bunks and have advised detainees to stagger the direction they are sleeping in the bunks (alternating head to foot) so that their faces are as far apart as possible.

6. I requested that the staff at ICA Farmville increase the frequency with which they sanitize commonly touched areas (*e.g.*, doorknobs) with a disinfectant approved to treat for the novel coronavirus. I understand several gallons of such a cleaner were acquired and are in use as requested.

7. To date, all detainees have been issued three expired N95 masks. CDC guidelines indicate that such masks are appropriate for repeat use and even if expired to help reduce the spread of the novel coronavirus. In my professional medical opinion, I agree with the CDC guidance

concerning expired N95 masks. All detainees have also been given two cloth masks and two surgical masks.

8. Any claim that ICA Farmville is not adequately screening staff is false. Under my instructions and per CDC and Virginia Department of Health guidelines, every staff member is screened for temperature every time they enter the building. Further, ICA Farmville has strictly enforced these rules to prohibit employees from working until cleared per medical guidelines (addressed below), staying at home on paid leave whenever even a single symptom is shown, however low the risk is determined to be. Any staff that fail the screening—or if there exists any other reason to believe there is a risk of exposure—are required to stay home until they meet the following criteria, or until otherwise cleared by the Health Department:

a. Resolution of fever without the use of fever-reducing medications **and** improvement in respiratory symptoms **and** negative results of an FDA Emergency Use Authorized molecular assay for COVID-19 from at least two consecutive specimens collected more than 24 hours apart, or

b. At least 72 hours have passed since recovery defined as resolution of fever without the use of fever-reducing medications **and** improvement in respiratory symptoms **and** at least 7 to 10 days have passed since symptoms first appeared, unless a healthcare provider believes the individual can safely return sooner. Previously the criteria required only that at least 7 days had passed since symptoms first appeared, but CDC guidelines have changed.

9. I am frequently in contact, either directly or indirectly through my designee, with the Piedmont Health District of the Virginia Department of Health on a daily or close to daily basis to discuss any threats of coronavirus in the surrounding community as well as any screening and

3

response measures undertaken at ICA Farmville, both generally and with respect to specific detainees and staff members. In addition to reviewing mailings from the Health Department regarding important changes based on CDC recommendations, as well as updates provided by Armor, I also review, several times per week, any updates to CDC or Health Department guidance about COVID-19 and the epidemiological trends and data. Between January and mid-April 2020, I checked for CDC and Health Department guidelines daily, but I only do so on a weekly basis now that changes are not being made as frequently. I have an excellent direct working relationship with the Health Department as I have worked with the local health district on a regular basis for over 20 years.

10. Since January 2020, I have spoken with colleagues at Centra Southside Community ("Centra") several times to determine their bed capacity, intensive care unit ("ICU") bed capacity, and respirator capacity in the event of a major COVID-19 outbreak in the surrounding community. I have learned about Centra's current bed capacity, ICU bed capacity, and ventilator capacity and understand their capabilities to treat COVID-19 patients and their contingency plans in the event of a surge in demand for COVID-19 treatment. Centra is the hospital system that regularly serves our detainees whenever hospitalization is necessary. Currently, anyone who fails our prescreening procedures, which is done prior to their formal intake questionnaire completion, is sent to Centra and must be cleared and/or placed in quarantine for 14 days before entering the dorms. The prescreening procedures include:

   a. Taking temperature - at or above 99.1 degrees Fahrenheit fails screening;
   b. Answering "yes" to the question whether over the counter pain medications have been taken to address a fever or chill in the previous 24 hours;
   c. Severe headache;
   d. Shortness of breath;
   e. Chills;
   f. Sore throat;
   g. Cough;

4

      h. Nausea;
      i. Vomiting; or,
      j. Diarrhea.

Even a single "yes" response to any of the above results, in all instances, referrs the prescreened individual to Centra for evaluation. In each instance, such individuals are quarantined in isolation for 14 days or as otherwise directed by the Health Department and must be cleared before entering the dorms. After an intake clears the prescreening procedures, additional intake screening is conducted per standard practices. All positive COVID-19 test results are reported to the Health Department.

      11.    At ICE's request, on April 6, 2020, I provided a list of high-risk detainees based on age and preexisting medical conditions for further review and consideration. The list included any detainee over the age of 60 or with a known history of moderate or severe adult asthma, diabetes, HIV, hypertension, thyroid issues, hypoxemia, heart disease, epilepsy, cirrhosis, or kidney disease. I understand ICE is evaluating whether these detainees should be removed and cohorted to minimize risk of exposure. Though we have separately housed some of the most high-risk individuals, given spacing issues and classification and security risks, this has not been possible in all situations. We have transferred one very high-risk detainee with a condition causing immunocompromise to another facility.

      12.    ICA Farmville has a total of 14 medical beds, 3 negative-pressure rooms for individual isolation, and another 6 rooms which, although not negative-pressure, utilize solid walls and doors. CDC guidelines for correctional facility isolation has approved the use of such rooms as the second-best option for such isolation in correctional facilities, and has even approved less effective options which are not in use at ICA Farmville, such as rooms with solid walls but no solid doors. Though ICA Farmville initially was capable of isolating a detainee in a negative-

pressure isolation room or a non-negative pressure room as the need arose, there are not enough rooms to currently serve this purposes for all at-risk individuals or those with positive test results.

13. On April 1, I learned from the Piedmont Health District of the Virginia Department of Health that there were six new positive test results in Piedmont Health District (there are currently 1,023 cases). As a result, in April, I asked Mr. Crawford to see if further intakes could be stopped. The recommendation to eliminate further intakes was later supported by other officials at Armor, in part because the number of existing negative-pressure and solid-door / solid-wall rooms, which until then had been a sufficient number to isolate individual cases of symptomatic or potentially exposed individuals, would be too few to also quarantine all intakes in blanket fashion. ICE proposed a solution whereby any new intakes would be quarantined in individual cells at Caroline County, Virginia's facility for 14 days before further transfer to ICA Farmville. In my medical opinion, this solution would have reduced the risk of an outbreak from an infected person at pre-intake compared to the procedures previously in effect.

14. Initially the 14-day pre-intake quarantine at the Carolina facility and prescreening measures appeared to effectively reduce to risk of an outbreak at ICA Farmville. In late April, we had two positive cases that were discovered after they came in from Caroline County with a febrile individual. The febrile individual was sent to the hospital for testing after having a fever at prescreening. The other two detainees who traveled with him were tested on April 27 as a precaution. The febrile detainee tested negative, and the two that traveled with him were positive. We kept this contained with no other positive results related to these two cases.

15. In June, however, we received two large groups of detainees on the same day—one group from Arizona and one from Florida—who had not been isolated at the Caroline facility. After several detainees from Arizona tested positive during prescreening efforts, we tested the

6

whole intake cohorted dorm. Due to the large number of positive test results that occurred as a result of that testing, those with negative testing results were removed to another dorm to minimize their chance of further exposure; those with positive test results were quarantined together. When this large number of positive cases occurred, we opted to test the other group of detainees from Florida even though their 14-day period of quarantine was expired or almost expired. This testing before releasing the group into the general population was done to minimize the chance of spread to other detainees. The Florida group also had a large number of positive test results. We then put the positives from the Florida group in with the positives from Arizona and the negatives in with the negatives from Arizona.

16. In my professional medical opinion, ICA Farmville, Jeffrey Crawford, and our medical team are responding appropriately, reasonably, and to the best of their ability to the risk and threat of COVID-19 and have taken reasonable and appropriate measures to protect the detainee population and staff members at ICA Farmville from infection. To my knowledge, Mr. Crawford has done everything I have asked to support our efforts during the pandemic and, to my knowledge, has never refused any request of mine with respect to COVID-19 recommendations whenever feasible. Further, we are doing all that we can to isolate and monitor the sickest individuals, provide them with appropriate medical care, and refer them for hospitalization as needed. We continue to evaluate any patients with symptoms of illness. We treat less-ill individuals symptomatically and supportively and have completed testing of all detainees at ICA Farmville.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

This  9  day of July 2020.

*Teresa Moore*
Teresa Moore, M.D.

8