# Exhibit J

# DECLARATION OF ASHLEY I. WARMELING, ESQ.

I, Ashley I. Warmeling, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am a Managing Attorney with the Capital Area Immigrants' Rights (CAIR) Coalition. I oversee the universal representation programs in Washington, DC and Virginia. I am based out of the Washington, DC office. My practice focuses on removal defense of detained adult immigrants. I have represented clients detained by U.S. Immigration and Customs Enforcement (ICE) for more than two years; I have practiced immigration law for approximately four years.

2. All facts set forth herein are based on my personal knowledge, information, and belief, and if called upon to testify as to the contents of this Declaration, I could and would do so.

3. I represent individuals and supervise three other attorneys who represent individuals detained by ICE in Virginia, including at the ICA-Farmville Immigration Detention Center ("ICA-Farmville").

**I.     Current detention conditions at ICA-Farmville are not conducive to social distancing or compliance with CDC guidelines for COVID-19.**

4. Communal living is standard at ICA-Farmville. Individuals detained at the facility typically have between 40 to 85 other people in their dorm. I know of times at which the dorms are at capacity, and clients have reported that cots are brought into the dorms when there are not enough beds.

5. I have also received reports from clients that when the medical or segregation housing units are over capacity at ICA-Farmville, additional cots are placed in the facility in/out processing area, which is not intended to be a living area for immigrants. I currently have at least one client who was taken to an isolation cell because there was no room for him in the medical unit, and he continues to be held in an isolation cell against his wishes.

6. At ICA-Farmville, people share bunk beds. These people also share communal living spaces, which include essential spaces like areas to use phones and showers. Clients have shared that at the back of each dorm is a group seating area, which all people in the dorm use communally for meals and watching television. There are also communal bathrooms and showers located on the side of the dorm, which are open air. Depending on the size of the housing unit up to 85 people are using the same areas at the facility.

7. There are several shared spaces in these jails including hallways, where people must often wait in line together, such as the law library, in/out processing areas, attorney/client visitation rooms, the holding area outside of court video rooms, family visitation areas and medical units. The jail can put in place different protocols regarding which people

1

and/or housing units can be in which spaces and when. But it is impossible to eliminate all shared spaces for the people given that their sleeping and eating quarters are common areas.

8. In order to see a doctor, a person at ICA-Farmville generally needs to place a sick call request, something non-English speakers and people with low or no literacy tend to struggle with. It often takes several days to receive a response on a medical request, or it is ignored altogether and the person has to submit another sick call request. In speaking to clients who have recently felt sick, some of them are afraid to submit sick requests because they are worried about contracting COVID-19 in the waiting area of the medical unit. Therefore, they are not reporting symptoms nor getting treatment for those symptoms. ICA-Farmville subcontracts its medical provider through Armor Correctional Health Services.

II. **My clients in all dorms at ICA-Farmville have expressed worsening conditions over the past week, including lack of access to protective gear.**

9. Generally, there are few openings for fresh air to circulate in the jail due to security concerns. Several clients at Farmville have recently expressed increased concerns with improper ventilation over the past several days. These clients have shared that there are extended periods of time in which there is no air movement, as if the air conditioning unit is broken. This lack of air movement has made it difficult for clients to breathe, and increases their fears of contracting COVID-19 from other people in their dorm who are coughing and showing symptoms.

10. Clients have also expressed concern over the lack of access to protective gear. Several clients shared that they have only been given 2 masks over the past month, and that they have not been instructed on how to clean the masks. While these clients state that most everyone in their dorm has complied with wearing the masks, when a mask is lost or dirty these masks have not been replaced.

11. On Monday, June 22nd, we heard from multiple clients in Dorms 1 and 5 of ICA-Farmville that their dorm had been placed under "quarantine" due to COVID symptoms. Each of these clients reported that COVID symptoms had spread quickly over the weekend, and that the majority of people in their dorm had some form of COVID symptoms, including fevers, body aches, coughing, sore throat, diarrhea, and vomiting. In Dorm 1, several clients reported that one person had passed out from COVID symptoms and was taken out of the dorm by wheelchair. Farmville officials later came to get the man's belongings and no one in the dorm had seen him since. In Dorm 5, our client shared that at least two people had passed out from COVID symptoms. One person was escorted out by wheelchair, and the other was able to walk out of the dorm. Similarly, Farmville officials later came to collect their belongings. No one in either Dorm 1 or 5 has been informed of the status of these men, nor whether they have been hospitalized. Each client was very afraid about contracting COVID-19, or if they had symptoms, that their symptoms would worsen.

12. As of Monday, June 29th, no one in Dorm 1 or Dorm 5 has been tested for COVID-19. I am aware of at least three clients who tested positive for COVID-19, but each was tested only after they were removed from their dorms and taken either to the medical unit or the

hospital due to complications from the virus. None of these clients were recent transfers, as each had been detained in Farmville for several weeks. In addition, one of my direct representation clients was tested for COVID-19 on Friday, June 26th. He was in medical isolation at the time the test was taken, and the test came after his attorneys reached out to his Deportation Officer and requested that a test be given on multiple occasions. However, this client has not yet received his test results and was told it would take up to five days.

**III. I currently have three clients housed in Dorm 1 of ICA-Farmville, which is reportedly under quarantine. The conditions they have shared related to medical conditions and treatment are alarming. One of these clients is at high-risk of complication from COVID-19 and currently has symptoms but has not received adequate medical treatment.**

13. I currently have three clients in Dorm 1, and one of those clients has had COVID-19 related symptoms and is at high risk of complication on account of his underlying medical condition of high blood pressure. Prior to him contracting these symptoms, we identified him as a class member under *Friahat v. ICE*, and asked that he be released due to his underlying medical conditions. ICE denied this release request. This client was granted relief in the form of withholding of removal by an Arlington, Virginia Immigration Judge on April 28, 2020. However, the Department of Homeland Security has appealed that decision to the Board of Immigration Appeals. Even though this client won immigration relief, he continues to be detained at ICA-Farmville pending appeal.

14. This client has expressed symptoms of headaches and body aches, which started late last week. He submitted requests for medical treatment on Saturday, June 20th and another on Tuesday, June 23rd. It was not until the afternoon of June 23rd that he was finally given pills. He is not sure what the pills are, but he believes they are Tylenol. He was not taken to the medical unit to receive these pills; the pills were brought to him by ICA-Farmville staff in his dorm. As of the date of this declaration, he has not been tested for COVID-19. This client has expressed extreme fear of his symptoms worsening and not receiving adequate medical treatment.

15. All three of my clients in Dorm 1 have repeatedly raised health concerns about the rise in COVID-19 symptoms in their dorm, and their concern for the lack of response in medical treatment by ICA-Farmville staff. These clients estimate that there are somewhere between 50 and 60 people currently in Dorm 1, and they reported that nearly all bed spaces are filled. Each client shared that nearly everyone in the dorm had some form of symptoms, but only about 15 people in the dorm had particularly serious symptoms. Serious symptoms include vomiting, sweating from fever, extreme weakness and aches, and dizziness.

16. My clients in Dorm 1 reported that several people had submitted sick requests, including two of my clients, but that no one had been taken to the medical unit. On Tuesday, June 23rd, medical staff started coming to the dorm. Medical staff took temperatures of each detained person on Tuesday morning. In Dorm 1, the way in which this process occurred was to have everyone in the dorm line up in front of a window. There is a hole in the window where each detainee had to press his head against the glass to have their

temperature taken through the hole. No one wiped down the glass between each person, so each detained person had to press their face against the same piece of glass. Farmville guards had people in Dorm 1 do this process two or three times. Later in the week, this process changed, where guards had digital thermometers that were used without requiring people to press their heads against the window.

17. All people who reported COVID-19 related symptoms were given medication that they believe is Tylenol. A few clients have also reported receiving blue pills, which they believe are cough suppressants, in addition to Tylenol, depending on the severity of their symptoms. One client began receiving one "coffee" colored pill on or about Saturday June 29th, but he does not know what that pill is or what its effects are. This client asked for the officers to write down the names of his medication for his lawyer but the officers did not understand because he does not speak English.

18. On Tuesday, June 23rd, there was a video presentation for all people housed in Dorm 1. The person speaking was a woman who they believed to be the director of Farmville. In the video, she shared that 51 people at ICA-Farmville had tested positive for COVID-19, and two staff members had tested positive.[1]

19. People are especially concerned because the guards come and go, and they are worried that the guards might bring and spread the COVID-19 virus. There also continues to be new people brought to both detention centers; all clients have reported that people were transferred from out of state – including Florida and Arizona – as recently as June 1st.

**IV.    All three of my clients housed in Dorm 1 confirmed a use-of-force incident that occurred in the evening of June 22, 2020.**

20. On June 22, 2020, all three clients confirmed that an incident occurred in Dorm 1 involving retaliation of ICA-Farmville staff against a group of detained people who were protesting inadequate medical attention. All three clients shared that they had observed a group of about a dozen or so immigrants in their dorm who had peacefully protested the inadequate medical treatment happening in their dorm.

21. All three clients observed these protestors engaging in the following behavior: refusing to stand still during the period of "count," when detainees are expected to stand still in front of their bunk; and refusing to eat dinner that evening when meals were served in the dorm. None of my clients participated in these protests, but they observed the behavior of the other people in the dorm, and they were consistent in sharing that none of the behavior was violent in nature. This protest-related behavior occurred on June 22, 2020.

22. All three clients also confirmed that on the evening of June 22, 2020, between 8:30 and 9:30 pm, a use of force incident occurred in Dorm 1. One of my clients, an English speaker, was removed from the dorm immediately prior to the incident happening. He said that officials moved him and a small number of other people to an empty block. This client confirmed that the people who were temporarily removed from the dorm, including himself, were fluent in English.

---

[1] As of June 28, 2020, ICE has published that there are 50 confirmed cases of COVID-19 at ICA-Farmville. https://www.ice.gov/coronavirus

23. My English-speaking client asked the guards why they were being moved to another dorm, and he was told by an official that they had to 'handle a situation' in Dorm 1. As the client was escorted from Dorm 1 to an empty dorm, he observed shields in the hallway, which he characterized as riot gear. He remained in the empty dorm with about 4 other people from his dorm until after evening count. While he was in the other room, he heard a loud "bang." At approximately 11:00 pm, he and the other detained people were returned to Dorm 1, and he has remained there ever since.

24. My other two clients remained in Dorm 1 for the entire incident – neither of whom speak English as their native language. They observed that between 8:30 and 9:00 pm at night, a group of 7 or 8 guards entered their dorm from the back (not the normal entrance), and they had guns drawn. Neither client could confirm what kind of guns the officials held, other than to state that they were long barrel guns. As the Farmville guards entered, the two clients in Dorm 1 consistently shared that the guards threw something into the dorm that made a loud noise. The guards yelled loudly, in English and Spanish, that everyone needed to get in their beds and lay down.

25. Once the officials entered the dorm, still with guns drawn, they called out a series of numbers, which represented the bunk beds in which people slept. Each of the people called were expected to come forward. Between 10 and 12 people were called, all of whom were involved in the peaceful protest activities earlier that day. The entire group was removed from the dorm. None of those people have returned to Dorm 1 since the evening of June 22nd.

**V.     On June 23, 2020, I personally experienced an ICA-Farmville official refusing my client access to communicate with me as his attorney.**

26. I first learned of this incident on June 23rd at approximately 2:00 pm through a client call. The client was supposed to call an attorney who I supervise at 11:00 am. When he failed to do so, she became increasingly concerned. He finally called at 2:00 pm, and I was added to the call. The staff attorney and I spoke with the client for less than 5 minutes, in Spanish, asking about his symptoms and conditions in the detention center.

27. Approximately 5 minutes into our call, we could hear a woman's voice yelling in English in the background saying, "No calls, hang up the phone. No calls!" I asked my client, in Spanish, if the woman speaking to him was a guard at the jail. He confirmed for me and said he had to hang up the phone. I told the client, in Spanish, to repeat the word "lawyer" in English to the guard. I heard him do so, and the official continued to yell, "No calls, no – hang up the phone." At this point, I asked the client in Spanish to pass the phone to the guard. When the client did not respond, I began yelling in English, "Ma'am, this is an attorney call. Ma'am, this is an attorney call." At that point, the call was disconnected.

28. About 10 minutes later, the staff attorney and I received another call from the same client. We spoke for a very brief time in Spanish, at which point I again heard a female voice yelling in English, "Bar number. Bar number." I asked the client to pass the phone to the official, but when he did not do so, I started again yelling in English, "Ma'am, can

5

I talk to you? Ma'am, please pick up the phone." The guard then took the phone and addressed me in English.

29. Once the officer took the phone, I explained to her that this was an attorney call, and that he had a right to speak to me by phone. The official said that she was instructed to write down my bar number before the call continued. I gave her my full name, title, organization, and bar number. I then asked for her name, and she responded her name was Officer Gordon. She confirmed that the call was taking place from Dorm 1, and that she had received instructions from Farmville Operations that detainees in Dorm 1 were only allowed to make legal calls. She said that she was given direct instructions from Farmville Operations to interrupt every phone call to confirm bar numbers of the people on the other end of the line. She then returned the phone to my client, and we were able to resume the call.

30. When we finished speaking to that client, our English-speaking client in Dorm 1 asked to take the phone. Our Spanish-speaking client passed the phone to him, and we then had a conversation with our English-speaking client.

31. The English-speaking client in Dorm 1 shared his observation of what took place with the Spanish-speaking client during our call. He said that all privileges, including phone privileges, had been suspended all morning. Our client also shared that the director personally came to Dorm 1 around lunchtime on June 23rd and told all detained people in the dorm that their privileges would be suspended until they "settled down." An example she gave of this was telling people in the dorm that they needed to comply with instructions during "count," by standing still by their bunks.

32. The English-speaking client in Dorm 1 also said that right before the director entered their dorm, several people rushed to the phones to make calls to lawyers and loved ones as quickly as they could, to express concern for what was happening. However, our client shared that these calls were promptly cut by Farmville officials.

33. Our Spanish-speaking client was the first client to attempt to engage in an attorney call after the director had spoken to the dorm. Our English-speaking client observed the Farmville official approach the Spanish-speaking client, yell at him in English, "No calls, hang up the phone." He also observed our Spanish-speaking client saying, "Lawyer! Lawyer!" in English. Ultimately, our English-speaking client watched the officer take the phone from our Spanish-speaking client and hang up the phone. The English-speaking client said that after the call was disconnected, our Spanish-speaking client continued to repeat, "Lawyer, lawyer."

34. About 5 minutes later, our English-speaking client observed the official involved in the phone incident receive a separate phone call. Following that call, the official then permitted our Spanish-speaking client to contact us.

**VI.  I have one client housed in Dorm 5 of ICA-Farmville, which is also under quarantine. This client is suffering from severe COVID-19 symptoms and is not receiving adequate medical treatment, nor has he been tested for the virus.**

35. I also have a client currently housed in Dorm 5, which is another dorm that has been described as "under quarantine." Our client in Dorm 5 has reported that since Sunday, June 21st, the number of people in the dorm with intense COVID-19 symptoms has increased. He said that since Sunday evening, no one has been allowed to leave the dorm.

36. The client in Dorm 5 has had severe COVID-19 symptoms since Sunday June 20, 2020, but initially had mild symptoms starting Thursday June 18, 2020. On Monday, June 22nd, we had a private attorney call scheduled with this client at 1:30 pm. Approximately 30 minutes before the call was scheduled to begin, we were informed that the private call had been canceled and that the call would be taken from the dorm, which is not a confidential space.

37. At the time of the private call, our client in Dorm 5 called me and the staff attorney I supervise. The client confirmed he was speaking from the dorm, and shared concern that he was experiencing symptoms consistent with COVID-19. He said that he had a sore throat, body aches, and chills. He believed he had a fever, but at the time of our private call on June 22nd, he had not yet had his temperature taken. The client was coughing frequently throughout the call.

38. Following the private call, the staff attorney emailed our client's assigned Deportation Officer to advise him of our client's symptoms and to request that he be given prompt medical attention. I was copied on the email. We received a response from Supervisory Deportation Officer Trump indicating that the facility would give our client medical attention, and that all detainees at ICA-Farmville were to receive COVID tests by the end of the week.

39. On June 23rd, I spoke to this client again by phone. He indicated that his symptoms were worsening, and that he continued to have headaches, body aches, and feverish symptoms. He also said he had a severe headache and felt very dizzy. He said that earlier that morning, medical staff came to his dorm and took his temperature, as well as the temperatures of everyone else in the dorm. He said that he could not recall what his temperature was because he was having a difficult time focusing. He said that he was given 4 pills, all of which were Tylenol. He told the ICA-Farmville official taking his temperature that he needed medical attention, but that he has not been taken to the medical unit.

40. This client shared that in his dorm – Dorm 5 – almost the entire dorm has symptoms. He estimates that between 60 and 70 people are currently housed in his dorm, and that nearly every bed is full.

41. At about 8:30 pm on June 23rd, the same client called again with updates. He said that his body aches had worsened, but that the other symptoms had subsided. He shared that he was taken to the medical unit after our earlier call, where they took his blood pressure and his temperature. While in the medical unit, he was given 5 pills – 2 were Tylenol, but he was not sure what the other pills were. He took all pills at once. Since then, he had taken more pills every few hours. The last time he had taken medication was at approximately 6 pm that evening.

42. During the 8:30 pm, this client also shared that there were two people in his dorm who had passed out and were taken out of the dorm. He said that both of these people had been suffering extreme COVID symptoms, and that their symptoms had worsened as the day went on. These two men were taken out "by emergency." One was escorted out in a wheelchair, the other was able to walk out. Neither had returned to the dorm, and no information had been shared with my client regarding what had happened.

43. Our client also shared concerns about a lack of air movement in Dorm 5. He said that he believes it was an issue with the air conditioning that happened last weekend. He said that the air was off for extended periods at a time, during which time there was limited air circulation and the temperature grew quite hot. He said that at the time of our call, the air conditioning appeared to be on and air circulation was ok.

44. My client in Dorm 5 also expressed concerns about spoiled milk. He shared that he has been given sour milk over the last few days. As recently as this morning, June 25, 2020, this client called to share that he was once again served spoiled milk that was sour, and that other people in the dorm were also given the milk. While this client made clear that he does not see this as related to COVID-19, he said that it is increasing the frustration and anxiety within him and others in the dorm given all of the uncertainty.

45. At approximately 10:30 pm on Thursday, June 25th, this client called to inform us that he had been taken by Farmville officials from Dorm 5 and moved to an isolation cell with one other person. His medical treatment did not change, and none of his belongings were moved with him. At that point, the staff attorney working on the case (who I supervise) sent an email to the client's ICE Deportation Officer asking for an update and requesting that they give our client a COVID test. In response, the Deportation Officer indicated that a test "would be scheduled," and a short time later, our client's belongings were brought to him.

46. After that email correspondence, we received another call from our client informing us that at 4 am on the morning of Friday, June 26th, he his temperature was taken and he had a fever of nearly 105 degrees. In response to the fever, Farmville officials gave him only two Tylenol and two blue pills which he believes are cough suppressants. He was feeling very poorly, but he was not taken to either the medical unit or the hospital.

47. The client indicated that no Farmville officials had been to check on him or his cell mate in over four hours. He also stated that he had not yet received a test for COVID-19. In response, we once again reached out to the client's Deportation Officer to escalate this issue, and to demand that proper medical attention be given. This client told us he was given a test for COVID-19 later that day (Friday afternoon), and that he was told it would take up to 5 days to receive test results. On June 30th, this client received test results indicating that he had tested positive for COVID-19.

48. On Saturday, June 27th, the same client contacted us on several occasions with updates. He indicated that his fever had not peaked over 104 degrees, but that he was vomiting. He was very uncomfortable in the isolation cell, as there was little ventilation and there was a strong odor that made him nauseous. He also indicated that he was worried about sharing the cell with the other person because that person appeared to have more severe COVID symptoms than he did.

49. Late in the evening on June 27th, our client called to let us know that he was having trouble breathing. He said that one of the guards brought in an inhaler, but gave it to his cellmate. His cellmate used the inhaler, putting his mouth on it. After the cellmate put the inhaler down, our client saw that his name was written on it. He raised this issue to the Farmville guard, who checked our client's identification and the name on the inhaler and realized that our client was correct. The guard then told our client to use the inhaler. Our client said "no," because his cellmate had already used it. He said that he wanted a new inhaler. In response, the guard told him, "No, you need to use that inhaler. If you don't want it, then don't use it." He was not given a new inhaler.

50. On July 1, 2020, the same client called to inform us that he was still in isolation. His cellmate was taken to the hospital the night before because of COVID-19 symptoms, and our client was very frightened about his health and safety. Our client also indicated during this phone call that he did not have access to soap in the isolation room. He also said that he had only showered one time since entering the isolation unit on June 24th. His only shower was on Sunday, June 28th.

51. On June 30, 2020, clients confirmed to one attorney I supervise and one attorney I work with that no one has been tested yet in either Dorm 1 or 5. On July 1, 2020, a client confirmed to me that testing has happened in Dorm 1.

52. Multiple clients have told me that ICA-Farmville played a video last week which states that two guards at the facility have tested positive for COVID-19.

53. In the summer of 2019, ICA-Farmville had two rounds of quarantine due to a mumps outbreak. This is an illness for which there is a vaccine, and clients reported that they were refused vaccines even when they were requested. The detention center was placed under quarantine for several weeks. Initially, only a few dorms were affected, but as time went on, the quarantine was eventually extended to the entire detention center. This was a very difficult time for people who were detained. While none of my clients were diagnosed with the mumps, they reported that it was not handled well at the facility. Although Farmville ICA staff reported taking measures to quarantine detainees, the number of persons continued to rise over time.[2]

Executed this 1st day of July, 2020, in Washington, DC.

*/s/ Ashley Warmeling*_____
Ashley I. Warmeling, Esq.
1612 K Street, NW, Suite 204
Washington, DC 20006
Phone: (202) 866-9280
ashley.warmeling@caircoalition.org

---

[2] Mallory Noe-Payne, "Mumps Outbreak Grows at ICE Detention Center in Virginia," June 12, 2019, available at: https://www.wvtf.org/post/mumps-outbreak-grows-ice-detention-facility-virginia#stream/0