**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| CHRISTIAN ALBERTO SANTOS GARCIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:20-cv-00821 |
| CHAD F. WOLF, in his official capacity as Acting Secretary, U.S. Department of Homeland Security, *et al*., | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE CASE............................................................................. 3

   I.     COVID-19 Poses A Grave Risk Of Harm To Plaintiffs ....................... 3

   II.    Defendants Have Denied Plaintiffs Adequate Medical Care And Have
        Actively Endangered Their Health ....................................................... 7

        A.    Plaintiffs Were Exposed To And Contracted COVID-19 In
             Defendants' Care. ...................................................................... 7

        B.    Defendants Are Putting Plaintiffs At Risk Of Reinfection With
             COVID-19......................................................................... 11

        C.    Defendants Have Denied Plaintiffs Proper Nutrition While They
             Suffer From COVID-19. .......................................................... 12

ARGUMENT ..................................................................................................... 13

   I.     Plaintiffs Are Likely To Succeed On The Merits ................................ 14

        A.    Plaintiffs Are Likely To Succeed On The Merits Of Their
             Constitutional Claims............................................................... 14

             1.    Defendants have acted with deliberate indifference toward
                  Plaintiffs' medical care by exposing them to and failing to treat
                  them for COVID-19. .................................................... 15

             2.    Defendants are subjecting Plaintiffs to impermissible
                  punishment. ............................................................... 23

        B.    Plaintiffs Are Likely To Succeed On The Merits Of Their APA
             Claims. .................................................................................. 24

   II.    Plaintiffs Face Immediate And Irreparable Harm................................ 27

   III.   The Public Interest And Balance Of Equities Weigh Heavily In Favor Of
        A Preliminary Injunction ................................................................... 29

CONCLUSION.................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States ex rel. Accardi v. Shaughnessy,*
  347 U.S. 260 (1954).................................................................................27

*Ali v. U.S. Dep't of Homeland Sec.,*
  2020 WL 1666074 (S.D. Tex. Apr. 2, 2020) ..........................................17

*Amaya-Cruz v. Adducci,*
  2020 WL 1903123 (N.D. Ohio Apr. 18, 2020).........................................28

*Aziz v. Trump,*
  234 F. Supp. 3d 724 (E.D. Va. 2017) ......................................................28

*Banks v. Booth,*
  2020 WL 3303006 (D.D.C. June 18, 2020)...............................................21

*Barrientos v. CoreCivic, Inc.,*
  951 F.3d 1269 (11th Cir. 2020) ...............................................................24

*Basank v. Decker,*
  2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ...................................18, 28

*Bell v. Wolfish,*
  441 U.S. 520 (1979)............................................................................15, 23

*Brown v. Plata,*
  563 U.S. 493 (2011)..................................................................................29

*Castillo v. Barr,*
  2020 WL 1602864 (C.D. Cal. Mar. 27, 2020).........................................18

*Centro Tepeyac v. Montgomery Cty.,*
  722 F.3d 184 (4th Cir. 2013) ...................................................................29

*Colbruno v. Kessler,*
  928 F.3d 1155 (10th Cir. 2019) ...............................................................14

*Coreas v. Bounds (Coreas I),*
  2020 WL 1663133 (D. Md. Apr. 3, 2020) ...............................................17

*Coreas v. Bounds (Coreas II),*
  2020 WL 2201850 (D. Md. Apr. 30, 2020)..........................................20, 21

*Coreas v. Bounds (Coreas III)*,
   2020 WL 2292747 (D. Md. May 7, 2020) .......................................................20, 21

*Coronel v. Decker*,
   2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) .........................................................28

*Costa v. Bazron*,
   2020 WL 2735666 (D.D.C. May 24, 2020) ..............................................................21

*Darnell v. Pineiro*,
   849 F.3d 17 (2d Cir. 2017) ...................................................................................16

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ..............................................................................................15

*Diretto v. Country Inn & Suites by Carlson*,
   2016 WL 4400498 (E.D. Va. Aug. 18, 2016) ..........................................................30

*Duvall v. Dallas Cty*,
   631 F.3d 203 (5th Cir. 2011) ...............................................................................24

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ................................................................................................15

*Farmer v. Brennan*,
   511 U.S. 825 (1994) .........................................................................................15, 19

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..............................................................................................24

*Fofana v. Albence*,
   2020 WL 1873307 (E.D. Mich. Apr. 15, 2020) .......................................................28

*Gates v. Collier*,
   501 F.2d 1291 (5th Cir. 1974) ...............................................................................17

*Gayle v. Meade*,
   2020 WL 3041326 (S.D. Fla. June 6, 2020) ...........................................................22

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ................................................................................29

*Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y*,
   2020 WL 2598180 (D.N.H. May 21, 2020) .............................................................22

*Gordon v. Cty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ..............................................................................16

*Helling v. McKinney*,
      509 U.S. 25 (1993) ........................................................................................................17, 27

*Heyer v. U.S. Bureau of Prisons*,
      849 F.3d 202 (4th Cir. 2017) ...............................................................................................17

*Hutto v. Finney*,
      437 U.S. 678 (1978) ..............................................................................................................17

*Iko v. Shreve*,
      535 F.3d 225 (4th Cir. 2008) .........................................................................................16, 17

*Jackson v. Lightsey*,
      775 F.3d 170 (4th Cir. 2014) ...............................................................................................19

*Jamil v. Sec'y, Dep't of Def.*,
      910 F.2d 1203 (4th Cir. 1990) .............................................................................................27

*Juul Labs, Inc. v. Unincorporated Ass'ns Identified in Schedule A*,
      2018 WL 6606076 (E.D. Va. Dec. 17, 2018) ......................................................................30

*Kingsley v. Hendrickson*,
      576 U.S. 389 (2015) ..............................................................................................................16

*League of Women Voters of U.S. v. Newby*,
      838 F.3d 1 (D.C. Cir. 2016) .................................................................................................29

*Parrish ex rel. Lee v. Cleveland*,
      372 F.3d 294 (4th Cir. 2004) ...............................................................................................19

*Martin v. Gentile*,
      849 F.2d 863 (4th Cir. 1988). Civil .......................................................................14, 15, 23

*Menocal v. GEO Grp., Inc.*,
      320 F.R.D. 258 (D. Colo. 2017), *aff'd*, 882 F.3d 905 (10th Cir. 2018) ................................24

*Miranda v. Cty. of Lake*,
      900 F.3d 335 (7th Cir. 2018) ...............................................................................................16

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
      915 F.3d 197 (4th Cir. 2019) .........................................................................................28, 29

*Newsom ex rel Newsom v. Albemarle Cty. Sch. Bd.*,
      354 F.3d 249 (4th Cir. 2003) ...............................................................................................28

*Reyna v. Hott*,
      921 F.3d 204 (4th Cir. 2019) ...............................................................................................22

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ...............................................................13, 27, 29

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987) ........................................................................28

*Seth v. McDonough*,
    2020 WL 2571168 (D. Md. May 21, 2020)...............................................20, 21

*Thakker v. Doll*,
    2020 WL 1671563 (M.D. Pa. Mar. 31, 2020)............................................23, 30

*Thompson v. Commonwealth of Virginia*,
    878 F.3d 89 (4th Cir. 2017) ...........................................................................15

*Toure v. Hott*,
    2020 WL 2092639 (E.D. Va. Apr. 29, 2020) ..................................................18

*United States v. Heffner*,
    420 F.2d 809 (4th Cir. 1969) ..........................................................................27

*United States v. Morgan*,
    193 F.3d 252 (4th Cir. 1999) ..........................................................................27

*Valentine v. Collier*,
    2020 WL 1916883 (S.D. Tex. Apr. 20, 2020) .................................................17

*Valenzuela Arias v. Decker*,
    2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020)..................................................28

*Williamson v. Stirling*,
    912 F.3d 154 (4th Cir. 2018) .....................................................................14, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................13, 27

*Youngberg v. Romeo*,
    457 U.S. 307 (1982).......................................................................................15

*Zadvydas v. Davis*,
    533 U.S. 678 (2001).......................................................................................14

**Statutes**

5 U.S.C. § 702....................................................................................................24

5 U.S.C. § 706(2)(A)...........................................................................................24

**Other Authorities**

Amanda Heidt, *Studies Report Rapid Loss of COVID-19 Antibodies*, THE
      SCIENTIST (June 19, 2020), https://bit.ly/2ZJHouq .................................................................. 11

Camilo Montoya-Galvez, *Third Immigrant Detained by ICE Dies After
      Contracting the Coronavirus*, CBS NEWS (July 13, 2020),
      https://cbsn.ws/2DLiTEl .......................................................................................................... 4

Carolyn Y. Johnson et al., *Can You Get Coronavirus Twice? Doctors Are Unsure
      Even as Anecdotal Reports Mount*, WASH. POST (July 22, 2020),
      https://wapo.st/2OP6qSr ........................................................................................................... 4

CDC, *Coronavirus Disease 2019 (COVID-19): Cases in the US*,
      https://bit.ly/2SyyE6k (last visited July 21, 2020) .................................................................. 3

CDC, *Coronavirus Disease 2019 (COVID-19): Clinical Questions About COVID-
      19: Questions and Answers* (updated July 21, 2020), https://bit.ly/2y6X6Eh .......................... 4

CDC, *Coronavirus Disease 2019 (COVID-19): Social Distancing* (updated July
      15, 2020), https://bit.ly/2N4b5PF .......................................................................................... 4

CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-
      19) in Correctional and Detention Facilities* (July 14, 2020),
      https://bit.ly/3jg6ngw .................................................................................................... 4, 5, 26

CDC, *Test for Past Infection*, https://bit.ly/2ZT3dra (updated June 30, 2020) ........................... 12

CNN Wire, *Family Furious After 87-year-old Mother Tests Positive Twice for
      COVID-19*, MY FOX8 (July 4, 2020), https://bit.ly/3jlGhbO .................................................. 11

D. Clay Ackerly, *My Patient Caught COVID-19 Twice. So Long to Herd
      Immunity Hopes?* VOX (July 12, 2020), https://bit.ly/2CPXh9m ............................................ 11

Ed Yong, *COVID-19 Can Last for Several Months*, THE ATLANTIC (June 4, 2020),
      https://bit.ly/2WLcS14 ............................................................................................................. 12

Fed. Bureau of Prisons, *Updates to BOP COVID-19 Action Plan*,
      https://bit.ly/3eHwOYZ (updated Mar. 19, 2020) ............................................................. 5, 26

ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*,
      https://bit.ly/2YB9BBS (last visited July 20, 2020) ................................................... 4, 6, 9, 19

ICE, *Performance-Based National Detention Standards* (2011),
      https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf ....................... 5, 6

ICE, *Progress in Implementing 2011 PBNDS Standards* (Jan. 17, 2017),
      https://www.hsdl.org/?abstract&did=818058 .......................................................................... 24

Jenny Gathright, *After Transfers from Coronavirus Hotspots, Cases Spike at Farmville ICE Detention Facility*, DCist (June 29, 2020), https://bit.ly/3gncDkf ................................................................................................6

Jordan Chavez, *Colorado Woman Tests Positive for COVID-19 Twice* (Jun. 18, 2020), https://bit.ly/2WzD3ru; ..............................................................11

Laura Hawks et al., *COVID-19 in Prisons and Jails in the United States*, JAMA Internal Medicine (Apr. 28, 2020), https://bit.ly/3jpUncg .........................................4

Letter from Sens. Warner and Kaine to Acting Sec'y Wolf and Acting Director Albence (July 16, 2020), https://bit.ly/3h23SMW .....................................................6

Meredith Yeomans, *Dallas Woman Battling Coronavirus, Again*, NBCDFW (June 15, 2020), https://bit.ly/3hhJh7c .................................................................11

Priscilla Alvarez, *Immigrant Detainees Describe Deteriorating Conditions as Coronavirus Spreads in Facilities*, CNN (June 27, 2020), https://cnn.it/3eXYM3x .......................................................................................6

Rich Condit et al., *This Week in Virology: Do, There Is No Try* (July 12, 2020), https://www.microbe.tv/twiv/ ....................................................................11

Tammy La Gorce, *'Everybody Was Sick': Inside an ICE Detention Facility*, N.Y. TIMES (May 15, 2020), https://nyti.ms/2UUqF4F ..............................................3

Timothy Williams et al., *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 16, 2020), https://nyti.ms/3fwXKeT ..........................4

White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://bit.ly/3htCck2 ...........................................................................................3

## INTRODUCTION

The Fifth and Fourteenth Amendments of the U.S. Constitution guarantee persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.  Plaintiffs, four civil immigration detainees at the Farmville Detention Center in Virginia, have had their constitutional rights violated by Defendants' repeated and ongoing failure to prevent, detect, and treat COVID-19 in Farmville.  As a result, more than 80 percent of the individuals housed at Farmville, including Plaintiffs, have contracted COVID-19—a highly contagious and potentially deadly virus with no known cure.  This Court's immediate intervention is needed to halt this public health emergency and to prevent further irreparable harm.

This humanitarian crisis started in early June 2020, when Defendants Wolf, U.S. Immigration and Customs Enforcement ("ICE"), Albence, and Hott (collectively, "the federal defendants") transferred 74 individuals to Farmville from Florida and Arizona detention facilities—even though they knew those facilities were experiencing COVID-19 outbreaks, and despite the Centers for Disease Control and Prevention's ("CDC") recommendation against transfers unless medically necessary.  Defendants Crawford, Immigration Centers of America, LLC ("ICA"), and Armor Correctional Health Services, Inc. ("Armor") (collectively, "the Farmville defendants") accepted the 74 transferees into their facility, even though they knew that they did not have the capacity to quarantine, isolate, or adequately screen them at intake.  Fifty-one of the individuals who were transferred subsequently tested positive for COVID-19.

The virus spread like wildfire through Farmville.  As of July 20, at least 315 detainees—four out of every five housed within its walls—had tested positive for COVID-19.  Three Plaintiffs have tested positive; the fourth (who has suffered from COVID-19 symptoms) is still waiting for his results, weeks after he was tested.

The outbreak was the unsurprising result of unconstitutional conditions. Since the outset of the pandemic, Defendants have failed to follow CDC guidance to prevent and control the spread of COVID-19. Defendants have not enabled Plaintiffs to socially distance from their fellow detainees, who sleep inches apart from one another in packed dorm rooms; have not provided Plaintiffs with sufficient personal protective equipment ("PPE"), like masks and hand sanitizer; and have not taken steps to remedy the facility's poor ventilation system.

As the outbreak grows, Defendants have only compounded the problem. Plaintiffs were denied medical treatment for days after they started showing COVID-19 symptoms, and once they started to receive treatment, it was deficient. Three Plaintiffs received one dose of Tylenol every 12 hours. One eventually became so sick that he was placed into isolation, and even then he received only Tylenol and a few pills for his cough. Multiple Plaintiffs have remained in the general detainee population while they have COVID-19. And the Farmville defendants have denied Plaintiffs adequate nutrition, serving food that is expired, uncooked, or infested with bugs.

Although the federal defendants' decision to transfer individuals into Farmville precipitated the COVID-19 outbreak, they have now threatened to transfer Plaintiffs and other detainees to an unidentified detention facility in Texas—at grave risk to their health and the health of others they would encounter on the journey or upon arrival.

Defendants' failure to take adequate precautions exposed Plaintiffs to COVID-19. Now that Plaintiffs are suffering from the virus, Defendants' actions jeopardize their recovery and risk reinfection. As a result, Defendants have violated Plaintiffs' Fifth and Fourteenth Amendment rights to reasonable safety and to be free from punitive conditions of confinement. And because the federal defendants have failed to follow their own rules and CDC guidance concerning detention conditions, they have violated the Administrative Procedure Act ("APA").

Absent this Court's immediate intervention, Plaintiffs will be irreparably harmed by Defendants' ongoing failure to protect them from COVID-19 and to provide them with adequate medical treatment and nutrition.  Preventing constitutional violations while also minimizing the spread of a deadly virus is in the public interest.  Accordingly, this Court should enter a preliminary injunction ordering Defendants to reform the unconstitutional conditions of confinement at Farmville, to abide by all CDC guidelines to prevent the spread of COVID-19, and to stop all inter-facility transfers into and out of Farmville.  To identify necessary reforms, this Court should order a health inspection of the facility at the earliest possible date.

## STATEMENT OF THE CASE

### I.   COVID-19 POSES A GRAVE RISK OF HARM TO PLAINTIFFS

COVID-19 has reached pandemic status.  It is a highly contagious and potentially lethal disease, with no known vaccine or cure.  It mainly spreads through respiratory droplets, and both symptomatic and asymptomatic people can transmit it.  It can kill, permanently damage, and cause serious health problems for everyone—not just those who are medically vulnerable.

On March 13, 2020, when President Trump declared the COVID-19 outbreak a national emergency, there were approximately 1,600 confirmed cases of COVID-19 in the United States.[1] Since then, this number has exploded:  As of July 21, 2020, more than 3.7 million people in the United States have tested positive for the virus, and more than 140,000 have died.[2]

COVID-19 has proven particularly pernicious in enclosed, high-density environments like detention facilities, which have become "hotbeds for the virus."[3]  New infections and deaths in

---

[1]   White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://bit.ly/3htCck2.

[2]   CDC, *Coronavirus Disease 2019 (COVID-19): Cases in the US*, https://bit.ly/2SyyE6k (last visited July 21, 2020).

[3]   Tammy La Gorce, *'Everybody Was Sick': Inside an ICE Detention Facility*, N.Y. TIMES (May 15, 2020), https://nyti.ms/2UUqF4F.

prisons and jails "have soared in recent weeks," and the five largest known clusters of the virus in the United States are in correctional institutions.[4]

ICE facilities fare no better than prisons and jails.  As of July 20, 2020, ICE reported that more than 3,600 individuals in its custody have tested positive for the virus.[5]  Three individuals detained in ICE facilities have died in ICE custody because of COVID-19 complications.[6]  Public health officials have long warned that detention facilities were positioned to "become vectors in the pandemic because they are often overcrowded, unsanitary places where social distancing is impractical, bathrooms and day rooms are shared by hundreds of [people], and access to cleaning supplies is tightly controlled."[7]

Because COVID-19 poses particular risks inside detention facilities, the CDC has issued a special set of guidelines for detention facilities that call for more robust preventive measures than those that Americans are following in everyday life.[8]  The CDC guidelines instruct detention facilities to "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies . . . are on hand and available and have a plan in place to restock as needed."[9]

---

[4]  Timothy Williams et al., *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 16, 2020), https://nyti.ms/3fwXKeT.

[5]  *See* ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, https://bit.ly/2YB9BBS (last visited July 20, 2020).

[6]  *Id.*; Camilo Montoya-Galvez, *Third Immigrant Detained by ICE Dies After Contracting the Coronavirus*, CBS NEWS (July 13, 2020), https://cbsn.ws/2DLiTEl.

[7]  Williams, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, *supra* note 4; *see also* Laura Hawks et al., *COVID-19 in Prisons and Jails in the United States*, JAMA Internal Medicine (Apr. 28, 2020), https://bit.ly/3jpUncg (noting that "[p]rior viral epidemics have wrought havoc in carceral settings" because the "infrastructure of most prisons" is "conducive to spreading disease," so incarcerated people "will be at higher risk of exposure").

[8]  *See* CDC, *Coronavirus Disease 2019 (COVID-19): Clinical Questions About COVID-19: Questions and Answers* (updated July 21, 2020), https://bit.ly/2y6X6Eh; CDC, *Coronavirus Disease 2019 (COVID-19): Social Distancing* (updated July 15, 2020), https://bit.ly/2N4b5PF.

[9]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (July 14, 2020), https://bit.ly/3jg6ngw.

The CDC further instructs facilities to "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units."[10]

And, importantly, the CDC instructs facilities to "[l]imit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding."[11]   Other institutions have followed suit.  The Bureau of Prisons, for example, stopped all nonessential transfers between facilities in early March.[12]

Defendants have not.  In early June, the federal defendants transferred 74 detainees, without prior testing, to Farmville from Florida and Arizona facilities experiencing COVID-19 outbreaks.  The Farmville defendants chose to accept the transferees, knowing that they did not have the capacity to isolate or quarantine them upon arrival.  Fifty-one of these detainees tested positive for COVID-19 after they arrived.[13]  This transfer was in direct violation of Farmville's own safety precautions, which required isolating transferees for 14 days at an intermediary facility before coming to Farmville.[14]  It also contravened ICE's Performance-Based National Detention Standards ("PBNDS"), which provide that CDC "guidelines for the prevention and control of infectious and communicable diseases *shall be* followed" in detention centers.[15]  The PBNDS also contain "Medical Care" standards that require detention facilities to provide adequate screening,

---

[10]   *Id.*

[11]   *Id.*

[12]   Fed. Bureau of Prisons, *Updates to BOP COVID-19 Action Plan*, https://bit.ly/3eHwOYZ (updated Mar. 19, 2020).

[13]   Compl. Ex. G, Decl. of Jeffrey Crawford ("Crawford Decl.") ¶ 19.

[14]   *Id.* ¶¶ 19, 28–29; Compl. Ex. H, Decl. of Teresa Moore, MD ("Moore Decl.") ¶¶ 13–15.

[15]   ICE, *Performance-Based National Detention Standards* 258 (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf (emphasis added).

prevention, monitoring, treatment, and isolation measures to manage infectious diseases, and "Food Service" standards that require facilities to provide food that meets federal standards for quality, is prepared with high levels of sanitation, and is protected from insects and rodents.[16]

COVID-19 spread rapidly through Farmville after ICE imported it into the facility. As of July 20, 2020, at least 315 detainees—or more than *80 percent* of the overall detainee population—had tested positive for COVID-19.[17] At least six detainees have been hospitalized with severe symptoms.[18] And at least 26 employees have tested positive for the virus.[19]

That Farmville has emerged as a COVID-19 hotspot is not surprising. As set forth more fully below, Farmville is not providing adequate PPE, is not ensuring adequate social distancing, and is not providing sufficient medical treatment to its detainees.[20] Nor is Farmville equipped to handle the aftershocks of a COVID-19 outbreak. Farmville has only 14 medical beds and 9 isolation rooms to care for and quarantine sick detainees.[21] According to Farmville's Medical Director, there are not enough rooms currently available to isolate detainees for all at-risk individuals or those with positive test results.[22]

Defendants have placed and continue to place detainees at Farmville at near-certain risk of infection from COVID-19, and have failed to provide them with adequate treatment once infected.

---

[16]  *Id.* at 241–67, 272–321.

[17]  ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 5; *see also* Letter from Sens. Warner and Kaine to Acting Sec'y Wolf and Acting Director Albence (July 16, 2020), https://bit.ly/3h23SMW.

[18]  Crawford Decl. ¶ 43.

[19]  Letter from Sens. Warner and Kaine, *supra* note 17.

[20]  *See, e.g.*, Priscilla Alvarez, *Immigrant Detainees Describe Deteriorating Conditions as Coronavirus Spreads in Facilities*, CNN (June 27, 2020), https://cnn.it/3eXYM3x (highlighting alarming conditions at Farmville Detention Center); Jenny Gathright, *After Transfers from Coronavirus Hotspots, Cases Spike at Farmville ICE Detention Facility*, DCist (June 29, 2020), https://bit.ly/3gncDkf (same).

[21]  Moore Decl. ¶ 12.

[22]  *See id.*

## II.   DEFENDANTS HAVE DENIED PLAINTIFFS ADEQUATE MEDICAL CARE AND HAVE ACTIVELY ENDANGERED THEIR HEALTH

### A.   Plaintiffs Were Exposed To And Contracted COVID-19 In Defendants' Care.

Defendants failed to take adequate precautions to protect Plaintiffs and other Farmville detainees against infection from COVID-19.  As a result, all four Plaintiffs were exposed to and have experienced COVID-19 symptoms.  Three Plaintiffs have tested positive and one (who has suffered from COVID-19 symptoms) continues to wait for his test results.  Defendants' failure to provide medical care has caused Plaintiffs to suffer needlessly, and Defendants are jeopardizing Plaintiffs' recovery by failing to rectify conditions at Farmville.

**i.  *Failure To Protect Plaintiffs From Contracting COVID-19.***  In addition to recklessly transferring detainees from COVID-19-positive facilities to Farmville—thereby dramatically increasing the likelihood that Plaintiffs would be exposed to the virus—Defendants have failed to provide Plaintiffs with adequate protection from COVID-19.  Defendants have not ensured that Plaintiffs receive sufficient personal protective equipment ("PPE"), like masks, hand sanitizer, and other cleaning supplies.  The Farmville defendants distributed limited facemasks to Plaintiffs and other detainees, but not enough to last for many months.  For example, Plaintiff Santos Garcia received two cloth masks and one N95 mask for the entirety of the COVID-19 crisis.[23]  Farmville staff are not taking adequate steps to ensure that detainees use masks, and many do not use them unless they are going to court, thus further endangering Plaintiffs.[24]

---

[23]   Compl. Ex. A, Decl. of Christian Alberto Santos Garcia ("Santos Garcia Decl.") ¶ 6.  To be sure, Defendant Crawford tells a different story regarding mask distribution.  But even if he is correct (he is not), distributing two N95 masks in April, one N95 mask on June 27, and cloth masks at some unspecified time, Crawford Decl. ¶¶ 26, 37, is not sufficient PPE for individuals forced to sleep inches apart in a crowded dormitory with poor ventilation.  Indeed, Santos Garcia was already COVID-19-positive when he purportedly received a third N95 mask.

[24]   Compl. Ex. D, Decl. of Ismael Castillo Gutierrez ("Castillo Gutierrez Decl.") ¶ 11.

Defendants have also made it impossible for Plaintiffs and other detainees to practice social distancing, as they are housed in dorms with up to 80 other individuals that have poor ventilation and where they sleep inches from their fellow detainees.[25]  After Plaintiffs and other detainees began exhibiting COVID-19 symptoms, Defendants continued to house them in their dorms, risking further spread of the virus.[26]  For example, after becoming sick with a headache, body aches, and cough, Plaintiff Bolanos Hernandez continued to be housed in Dorm 1 with other detainees exhibiting even worse symptoms, such as vomiting and losing consciousness.[27]

Defendants also significantly delayed testing Plaintiffs for COVID-19 after they began exhibiting symptoms.[28]  Plaintiff Santos Garcia was not tested until July 2, 2020, approximately 11 days after he first developed symptoms, and he did not learn he had tested positive until a week later on July 9, 2020.[29]  Plaintiff Bolanos Hernandez also was not tested for several days after he began showing symptoms, and he has been waiting for nearly a month to learn his results.[30]

Defendants' failure to take adequate precautions to protect Plaintiffs and other detainees against infection with COVID-19 had catastrophic results across the facility:  By July 8, 2020, the majority of detainees in Dorms 4 and 5 had tested positive for COVID-19, and *all* detainees in

---

[25]  Santos Garcia Decl. ¶ 7; Castillo Gutierrez Decl. ¶¶ 4, 12; Compl. Ex. C, Decl. of Gerson Amilcar Perez Garcia ("Perez Garcia Decl.") ¶ 6; Compl. Ex. B, Decl. of Santos Salvador Bolanos Hernandez ("Bolanos Hernandez Decl.") ¶ 15.

[26]  *See* Santos Garcia Decl. ¶ 10; Bolanos Hernandez Decl. ¶¶ 5, 15; Perez Garcia Decl. ¶ 6; Castillo Gutierrez Decl. ¶ 6.

[27]  Bolanos Hernandez Decl. ¶ 6.  The conditions are no better for detainees who are moved into isolation.  Plaintiff Perez Garcia was moved into isolation but placed in a room with another man who was even sicker than Perez Garcia.  Perez Garcia Decl. ¶ 7.  His cellmate was so sick that he coughed—and sometimes cried—throughout the night.  *Id.* ¶ 8.  While in isolation, Perez Garcia was denied soap and was forced to go four days without a shower.  *Id.* ¶ 17.

[28]  *See* Santos Garcia Decl. ¶¶ 20-21; Bolanos Hernandez Decl. ¶¶ 6, 12; Perez Garcia Decl. ¶ 7; Castillo Gutierrez Decl. ¶ 5.

[29]  Santos Garcia Decl. ¶¶ 20-21, 25.

[30]  *See* Bolanos Hernandez Decl. ¶¶ 6, 12.

Dorm 7 had tested positive for COVID-19.[31]   And as of July 20, 2020, 315 detainees and 26 Farmville employees have tested positive for COVID-19.[32]

    **ii.** *Failure To Treat Plaintiffs After Developing COVID-19 Symptoms.*   All four Plaintiffs developed symptoms of COVID-19 in late June 2020, including fever, body aches, and coughs.[33] Plaintiffs Perez Garcia and Castillo Gutierrez both lost their sense of smell and taste, and Perez Garcia also suffered from severe diarrhea and nausea.[34]

    Although Plaintiffs were exhibiting hallmark symptoms of COVID-19, the Farmville defendants failed to provide medical care to Plaintiffs for days after they first became ill.  Plaintiff Santos Garcia received his first dose of Tylenol two days after he first began exhibiting symptoms, and Perez Garcia received his first dose four days after developing symptoms, forcing Plaintiffs to suffer through the symptoms of COVID-19 without treatment.[35]  Plaintiff Bolanos Hernandez also exhibited symptoms for two days before any Farmville staff came to check on him.[36]

    Farmville personnel simultaneously exacerbated the impact of COVID-19 on the detained population and risked COVID-19-positive detainees' recoveries by using pepper spray on detainees who were too ill to respond to the staff's orders or who were seeking answers by peacefully protesting the deplorable conditions to which they were being subjected.[37]

---

[31]  Santos Garcia Decl. ¶ 22; Castillo Gutierrez Decl. ¶ 5.

[32]  ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 5; *see* Letter from Sens. Warner and Kaine, *supra* note 17.

[33]  *See* Santos Garcia Decl. ¶ 9; Bolanos Hernandez Decl. ¶ 5; Perez Garcia Decl. ¶ 3; Castillo Gutierrez Decl. ¶ 5.

[34]  Perez Garcia Decl. ¶¶ 4, 18; Castillo Gutierrez Decl. ¶ 8.

[35]  Santos Garcia Decl. ¶ 16; Bolanos Hernandez Decl. ¶ 5; Perez Garcia Decl. ¶ 4.

[36]  Bolanos Hernandez Decl. ¶ 7.

[37]  Santos Garcia Decl. ¶ 14; Castillo Gutierrez Decl. ¶¶ 15–20; *see also* Compl. Ex. I, Decl. of Jorge Alexander Rivera Rodriguez ¶¶ 2, 6–9 (describing deployment of pepper spray by Farmville's Chief Commander Garcia in response to detainees' expression of concerns about COVID-19 and peaceful refusal to return to their bunks where they would be inches apart from

As their symptoms worsened, Plaintiffs continued to receive inadequate medical treatment. Plaintiffs Santos Garcia and Castillo Gutierrez received only one dose of Tylenol every 12 hours, which did not relieve their symptoms.[38]   The Farmville defendants did not monitor Santos Garcia's oxygen levels even though he was having trouble breathing.[39]   Although Plaintiff Perez Garcia was moved into isolation, but he still only received Tylenol twice a day and two blue pills for his cough, as well as a brown pill for about two days, which did not improve his symptoms.[40]   For his diarrhea, Farmville staff gave Perez Garcia Gatorade approximately two times to treat dehydration, even though he had persistent diarrhea throughout his sickness.[41]   Farmville staff also have not permitted Perez Garcia to speak with a psychologist, though he requested to do so on June 29, 2020 because he was feeling hopeless.[42]   The Farmville defendants eventually stopped providing even minimal palliative care to Plaintiffs even though Plaintiffs had not fully recovered from their symptoms.[43]

**iii. *Potential Transfer Of COVID-19-Positive Detainees.*** To make matters worse, despite more than 80 percent of the overall detainee population suffering from COVID-19, ICE or Farmville staff told Plaintiff Santos Garcia and his fellow detainees that ICE plans to transfer a high number of COVID-19-positive individuals from Farmville to another ICE facility in Texas.[44] Such a transfer runs directly contrary to CDC guidelines and would seriously endanger not only Plaintiffs' health but the health of the public.

---

one another).  *Cf.* Crawford Decl. ¶¶ 32, 35, 42 (noting instances where pepper spray was used and Special Operations Unit was deployed).

[38]   Santos Garcia Decl. ¶ 18; Castillo Gutierrez Decl. ¶ 5.

[39]   Santos Garcia Decl. ¶ 19.

[40]   Garcia Perez Decl. ¶¶ 4, 9 14.

[41]   *Id*. ¶ 14.

[42]   *Id*. ¶ 19.

[43]   *See* Santos Garcia Decl. ¶ 23; Castillo Gutierrez Decl. ¶ 13.

[44]   Santos Garcia Decl. ¶ 26.

### B.      Defendants Are Putting Plaintiffs At Risk Of Reinfection With COVID-19.

Not only are Defendants subjecting Plaintiffs to conditions that jeopardize their recovery, but they are also putting Plaintiffs at risk for reinfection with COVID-19.  At present, scientists are unable to rule out the possibility that someone who has recovered from COVID-19 could become reinfected.[45]  "In general, the unknowns of immune responses to SARS-CoV-2 currently outweigh the knowns.  We do not know how much immunity to expect once someone is infected with the virus, we do not know how long that immunity may last, and we do not know how many antibodies are needed to mount an effective response."[46]

A small but growing number of cases suggest that reinfection with COVID-19 is possible.  There have been recent reports of presumed reinfection among patients who appeared to fully recover after their first infection in Colorado, New Jersey, New York, Tennessee, and Texas.[47]  Two studies published in June found that 10 percent of nearly 1,500 COVID-19-positive patients registered undetectable antibody levels within weeks of first showing symptoms, that "after SARS-CoV-2 infection, people are unlikely to produce long-lasting protective antibodies against the virus," and that COVID-19 patients typically lost their antibodies two to three months after recovering from the infection, especially among those who tested positive but were asymptomatic.[48]  This is likely why the CDC advises the following:  "If you test positive or

---

[45]   Carolyn Y. Johnson et al., *Can You Get Coronavirus Twice? Doctors Are Unsure Even as Anecdotal Reports Mount*, WASH. POST (July 22, 2020), https://wapo.st/2OP6qSr.

[46]   D. Clay Ackerly, *My Patient Caught COVID-19 Twice.  So Long to Herd Immunity Hopes?* VOX (July 12, 2020), https://bit.ly/2CPXh9m.

[47]   *See* Jordan Chavez, *Colorado Woman Tests Positive for COVID-19 Twice*, 9NEWS (Jun. 18, 2020), https://bit.ly/2WzD3ru; Ackerly, *supra* note 46; Rich Condit et al., *This Week in Virology: Do, There Is No Try* (July 12, 2020), https://www.microbe.tv/twiv/; CNN Wire, *Family Furious After 87-year-old Mother Tests Positive Twice for COVID-19*, MY FOX8 (July 4, 2020), https://bit.ly/3jlGhbO; Meredith Yeomans, *Dallas Woman Battling Coronavirus, Again*, NBCDFW (June 15, 2020), https://bit.ly/3hhJh7c.

[48]   Amanda Heidt, *Studies Report Rapid Loss of COVID-19 Antibodies*, THE SCIENTIST (June 19, 2020), https://bit.ly/2ZJHouq.

negative for COVID-19 on a viral or an antibody test, you still should take preventative measures to protect yourself and others.  We do not know yet if people who recover from COVID-19 can get infected again.  Scientists are working to understand this."[49]

Even if not reinfected, many people infected with COVID-19 show either extended periods of symptoms or recurring bouts of symptoms, worsening dramatically even after they appear to have recovered.[50]  Thus, the need for precautionary measures and medical care and attention goes well beyond the immediate period during which individuals are first symptomatic.

### C.    Defendants Have Denied Plaintiffs Proper Nutrition While They Suffer From COVID-19.

In addition to denying Plaintiffs adequate medical treatment, Defendants have denied Plaintiffs proper nutrition throughout the COVID-19 pandemic, including when they have been experiencing COVID-19 symptoms.  For the past few months, guards who are not trained in food preparation have been in charge of preparing food at Farmville.[51]  Plaintiff Santos Garcia believes that this is due to staffing shortages caused by the COVID-19 pandemic.[52]  Symptomatic people were also working in the kitchen, and Plaintiff Bolanos Hernandez is currently working in the kitchen despite not yet having received his COVID-19 test result.[53]

The Farmville defendants have served Plaintiffs and other detainees inedible food, including expired milk, undercooked foods, and uncooked foods, such as raw rice, potatoes, and beans.[54]  Plaintiffs Santos Garcia, Perez Garcia, and other detainees have found bugs in their food.

---

[49]   CDC, *Test for Past Infection*, https://bit.ly/2ZT3dra (updated June 30, 2020).

[50]   *See, e.g.*, Ed Yong, *COVID-19 Can Last for Several Months*, THE ATLANTIC (June 4, 2020), https://bit.ly/2WLcS14.

[51]   Santos Garcia Decl. ¶¶ 11-12.

[52]   *Id.* ¶ 12.

[53]   Bolanos Hernandez Decl. ¶¶ 8, 13.

[54]   *Id.* ¶ 17; Santos Garcia Decl. ¶ 12; Compl. Ex. K, Decl. of Victor Quintanilla Gallegos ¶ 18 (Farmville "has been feeding [detainees] rotten food," such as "sour milk and rotting apples").

Santos Garcia has been served food with bugs in it on at least three occasions in the last month alone.[55]  And just recently, Perez Garcia discovered worms in beans that were served to him.[56]  Unfortunately, by the time he discovered the worms, he had eaten nearly half of his meal.[57]

\* \* \*

Plaintiffs seek a preliminary injunction requiring Defendants to immediately improve conditions at Farmville pursuant to a health inspection, and enjoining all transfers in and out of Farmville until Defendants demonstrate that transfer will not endanger Plaintiffs' or others' health.

## ARGUMENT

Plaintiffs satisfy the four requirements for issuance of a preliminary injunction because: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent a preliminary injunction; (3) the balance of equities favors entering the injunction; and (4) a preliminary injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020).

Plaintiffs are likely to succeed on the merits because Defendants have acted with deliberate indifference to their medical care and have subjected them to conditions that amount to unconstitutional punishment and a violation of the APA:  Defendants exposed Plaintiffs to a life-threatening infectious disease and are now jeopardizing their recovery (and will expose them to reinfection) by subjecting them to deplorable conditions.  The federal defendants' plan to transfer Plaintiff Santos Garcia and other detainees (perhaps including other Plaintiffs) to another facility while they are still suffering from COVID-19 puts them and the public at further risk.

---

[55]  *Id.* ¶ 11.
[56]  Perez Garcia Decl. ¶ 35.
[57]  *Id.* ¶ 24.

Absent this Court's intervention, Plaintiffs will be irreparably harmed by Defendants' continued failure to provide for their health and safety.  There is also an overwhelming public interest in limiting the spread of COVID-19, both to minimize further infections and to reduce the strain on overburdened healthcare systems.  Finally, the balance of equities weighs heavily in favor of Plaintiffs, whose health and lives are at stake at this very moment.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs' current detention in conditions that expose them to COVID-19 and now imperil their recovery violates their due process rights under the Fifth and Fourteenth Amendments.[58] Separately, the federal defendants' failure to ensure adherence to their own binding medical care and food services standards violates the APA.

### A. Plaintiffs Are Likely To Succeed On Their Constitutional Claims.

Defendants' failure to provide Plaintiffs with adequate medical care and their subjecting Plaintiffs to punitive detention conditions violate Plaintiffs' due process rights under the Fifth Amendment to the U.S. Constitution.  *See Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988). Civil immigration detainees are entitled to at least the same due process protections as pretrial detainees.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  And "such detainees possess at least the same rights as convicted prisoners" under the Eighth Amendment's prohibition against cruel and unusual punishment.  *Williamson v. Stirling*, 912 F.3d 154, 176 (4th Cir. 2018) (describing

---

[58] Plaintiffs assert a claim for violation of their Fifth Amendment due process rights against the federal defendants, Compl. ¶¶ 143–57, and a claim for violation of their Fourteenth Amendment due process rights against the Farmville defendants pursuant to 42 U.S.C. § 1983, *id.* ¶¶ 158–76.  (In the alternative, Plaintiffs assert a claim for violation of their Fifth Amendment due process rights against the Farmville defendants, if this Court finds that the Farmville defendants were operating under color of federal law.  *Id.* ¶¶ 177–90.)  Courts analyze detention conditions claims against state officials under the due process clause of the Fourteenth Amendment in the same way they analyze claims against federal officials under the due process clause of the Fifth Amendment.  *See, e.g.*, *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019).  For ease, the following analysis refers only to the Fifth Amendment.

Eighth Amendment as "a floor for detainee rights"); *see also Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("*A fortiori*, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."); *id*. at 535 n.16 ("Due process requires that a pretrial detainee not be punished.").

The government violates a civil detainee's Fifth Amendment rights when it acts with deliberate indifference with respect to a detainee's medical care or when it subjects the detainee to conditions that amount to punishment. *See Martin*, 849 F.2d at 871; *see also Wolfish*, 441 U.S. at 535–37 & n.16.  Here, Defendants are doing both.

### 1. Defendants have acted with deliberate indifference toward Plaintiffs' medical care by exposing them to and failing to treat them for COVID-19.

The government has a duty to provide conditions of reasonable health and safety to the people in its custody.  Indeed, an affirmative exercise of governmental power which "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety— . . . transgresses the substantive limits on state action set by the Eighth Amendment." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982)).

"[A] pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs'" under the Eighth Amendment. *Martin*, 849 F.2d at 871.  A plaintiff may make such a showing where prison officials are "maintaining inhumane conditions of confinement or [are] failing to render medical assistance." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97 (4th Cir. 2017).  The alleged deprivation must be "sufficiently serious" and prison officials must "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Traditionally, the determination of the severity of the medical need is an objective inquiry, and whether the official knew of and disregarded the risk to the detainee's health and safety is subjective. *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Recently, however, the Supreme Court in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), held that a detainee asserting an excessive force claim under the due process clause of the Fourteenth Amendment need establish only that the official acts were "*objectively* unreasonable," and not that the officers were "*subjectively* aware that their use of force was unreasonable." *Id.* at 392.

The Fourth Circuit has not had an opportunity to decide if this new objective-only standard applies to deliberate indifference claims under the Fifth Amendment, but several courts have held that there is no meaningful analytical difference between the claims Plaintiffs raise here and those at issue in *Kingsley*. *See, e.g.*, *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (holding that "medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*"); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (explaining that "logic dictates extending the objective deliberative indifference standard . . . to medical care claims"); *Darnell v. Pineiro*, 849 F.3d 17, 33–35 (2d Cir. 2017) ("After *Kingsley*, it is plain that punishment has no place in defining the *mens rea* element of a pretrial detainee's claim under the Due Process Clause. Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.").

Accordingly, Plaintiffs contend that *Kingsley* applies equally here, and the question of whether the official knew of and disregarded the risk to Plaintiffs' health and safety is an objective

one.  Nevertheless, out of an abundance of caution, and because this issue remains unsettled in the Fourth Circuit, Plaintiffs' argument below proceeds under the old subjective standard.

**i.**  An objectively "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko*, 535 F.3d at 241).  Communicable diseases present a substantial risk of serious harm to prisoners or detainees.  *See, e.g.*, *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974) (holding that conditions of confinement violated the Constitution where "[u]nsanitary conditions [we]re rampant" and "[s]ome inmates with serious contagious diseases [we]re allowed to mingle with the general prison population").  Thus, the objective prong is satisfied when, for example, the government crowds inmates into cells with others who have "infectious maladies," "even though the possible infection might not affect all of those exposed." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

There is no doubt that Plaintiffs have satisfied the first prong here:  Exposure to COVID-19—a life-threatening disease with no vaccine or cure—is a sufficiently serious medical need.  Indeed, courts around the country, including in this Circuit, have recognized that "the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk" and "[p]risons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."  *Coreas v. Bounds* (*Coreas I*), 2020 WL 1663133, at *2, *9 (D. Md. Apr. 3, 2020); *see also Valentine v. Collier*, 2020 WL 1916883, at *10 (S.D. Tex. Apr. 20, 2020) ("The risk of COVID-19 is obvious. . . . [W]e are seeing COVID-19 spread like wildfire in prisons, jails, and detention facilities[.]").[59]

---

[59]  *See also Ali v. U.S. Dep't of Homeland Sec.*, 2020 WL 1666074, at *5 (S.D. Tex. Apr. 2, 2020)

Plaintiffs are COVID-19 positive (or are still waiting for their test results) and are facing an ongoing risk of harm to their health and safety because of the COVID-19 outbreak at Farmville. Plaintiffs each began developing symptoms of COVID-19 several weeks ago, including fever, aches, coughing, and breathing issues. *See, e.g.*, Santos Garcia Decl. ¶¶ 9, 19. Defendants delayed testing each Plaintiff, though all but one ultimately tested positive for COVID-19 (Plaintiff Bolanos Hernandez is waiting for his test results). Bolanos Hernandez Decl. ¶ 12. Though Plaintiffs' conditions have improved, they continue to suffer from the effects of COVID-19, such as having a lingering cough, breathing issues, headaches, and weakness. *Id.* ¶ 14; Santos Garcia Decl. ¶ 27; Perez Garcia Decl. ¶ 27; Castillo Gutierrez Decl. ¶ 10. Plaintiffs' conditions may worsen again at any moment. Thus, the substantial risk to Plaintiffs' health and safety is not just "speculative and a mere possibility," but has become a reality. *Toure v. Hott*, 2020 WL 2092639, at *14 (E.D. Va. Apr. 29, 2020).[60] Defendants have clearly failed to protect Plaintiffs and their fellow detainees from exposure to the serious risk of COVID-19. At least 315 detainees—or more

---

("[I]ndividuals housed within detention centers nonetheless remain particularly vulnerable to infections."); *Castillo v. Barr*, 2020 WL 1502864, at *2 (C.D. Cal. Mar. 27, 2020) ("Because of the highly contagious nature of the coronavirus and the, relatively high, mortality rate of COVID-19, the disease can spread uncontrollably with devastating results in a crowded, closed facility, such as an immigration detention center."); *Basank v. Decker*, 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious.").

[60] In *Toure*, a court in this District declined to release medically vulnerable individuals detained at Farmville Detention Center. 2020 WL 2092639, at *2. *Toure* is inapposite here because this action for declaratory and injunctive relief is not a habeas petition and does not seek release but rather only conditions reforms; the legal issues and claims for relief are therefore fundamentally different in this case. Moreover, at the time of the *Toure* court's decision on April 29, 2020, there were no confirmed cases of COVID-19 at Farmville—a fact the court interpreted to mean that Farmville had "adequately and successfully protected" the people detained at the facility. *Id.* at *2, *13 ("Farmville ha[s], thus far, adequately and successfully protected Plaintiffs. Farmville's success is most apparent because it has returned no positive COVID-19 tests despite having occasion to test symptomatic detainees."). The current circumstances are dramatically different and illustrate how the facility has failed at protecting those in its custody.

than *80 percent* of the detainee population—have tested positive for COVID-19.[61]

For the same reasons, if Plaintiffs successfully recover from COVID-19, their risk of reinfection is also a serious medical need that satisfies the objective prong of the inquiry.

**ii.** "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837). A plaintiff can show knowledge if the risk is well-documented and the official had exposure to that information. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).

There is no dispute here that Defendants are aware of the risk that COVID-19 poses, particularly to vulnerable populations such as immigration detainees. *See, e.g.*, Crawford Decl. ¶ 4 (stating that Farmville first received coronavirus protocol on January 27, 2020).

Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, Defendants have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville. Defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance. *See, e.g.*, Bolanos Hernandos Decl. ¶ 15. Defendants also failed to provide Plaintiffs and other detainees proper PPE, unreasonably delayed testing the detainee population for COVID-19, and failed to isolate symptomatic detainees, including Plaintiffs. *See, e.g.*, *id.* ¶¶ 6–7, 12, 16. Defendants have compounded these failures to mitigate or control the risk of COVID-19 by refusing to treat individuals, such as Plaintiffs, who became infected with COVID-19. *See, e.g.*, *id.* ¶ 7.

For example, when Plaintiff Santos Garcia developed a fever and body aches, Defendants

---

[61]   ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 5; Letter from Sens. Warner and Kaine, *supra* note 17.

19

refused his request for medical care.  Santos Garcia Decl. ¶¶ 9–10.  After two days of suffering, Farmville staff finally gave him a dose of Tylenol once every 12 hours—an amount that is not sufficient to address his symptoms.  *Id.* ¶¶ 16, 18.  But crucially, Defendants unreasonably delayed testing Plaintiff Santos Garcia for COVID-19, and they continued to house him in a dormitory with up to 80 other people, despite the fact that he was exhibiting common symptoms of COVID19.  *Id.* ¶ 7.  Farmville staff treated Plaintiff Perez Garcia similarly:  He was initially denied any medical care and eventually received only Tylenol twice a day and a few pills for his cough.  Perez Garcia Decl. ¶¶ 3–4.  And while he was ultimately isolated, the Farmville defendants waited days to remove him from his dorm while he was symptomatic.  *Id.* ¶¶ 3–7.  The other Plaintiffs report similar experiences.  Bolanos Hernandez Decl. ¶¶ 5–7; Castillo Gutierrez Decl. ¶¶ 5, 8, 13–14.

The current conditions—including the denial of treatment to Plaintiffs' fellow detainees—jeopardize their own recovery from COVID-19 (which is still ongoing) and also increase the risk that Plaintiffs could expose their fellow detainees to COVID-19, thus also endangering their health and wellbeing.  They also increase the chances that Plaintiffs will be reinfected with COVID-19.  *See* Compl. ¶¶ 130–36.[62]

Other courts in this Circuit have recently granted temporary restraining orders or preliminary injunctions after concluding that defendants recklessly disregarded the health and safety of detainees exposed to COVID-19 in facilities with similar conditions to Farmville.  *See Seth v. McDonough*, 2020 WL 2571168, at *12–13 (D. Md. May 21, 2020); *Coreas v. Bounds (Coreas II)*, 2020 WL 2201850, at *2 (D. Md. Apr. 30, 2020); *Coreas v. Bounds (Coreas III)*, 2020 WL 2292747, at *1 (D. Md. May 7, 2020).

---

[62]  For this reason, the Court should reject any attempt by Defendants to argue that this case will become moot if Plaintiffs fully recover.  *See* Compl. ¶¶ 130-36, 142.

In *Seth*, for example, after dozens of detainees and staff at a correctional facility tested positive for COVID-19, and dozens of others were exposed or showing symptoms, the court granted plaintiffs' motion for a temporary restraining order and preliminary injunction.  2020 WL 2571168, at *2.  The facility's director "knew that she had a substantial COVID-19 outbreak in the Facility, and yet had only tested twenty detainees.  The remaining population, many of whom were highly symptomatic, were kept in close quarters with other detainees and staff.  And although [the director] implemented monitoring protocols, they were transparently ineffective."  *Id.* at *12 (footnote omitted).  The court concluded that the director "exhibited a reckless disregard for provision of basic care" and thus, "at a minimum," "recklessly disregarded the health and safety of the detainees exposed to COVID-19."  *Id.* at *12–13; *see also Coreas II*, 2020 WL 2201850, at *1–2 (granting preliminary injunction where detainees were housed in close quarters, defendants failed to implement social distancing measures (including those recommended by the CDC), and there were COVID-19-positive individuals); *Coreas III*, 2020 WL 2292747, at *1 (similar).

Even where "efforts have been made to improve conditions," courts are still issuing preliminary injunctions on the basis of deliberate indifference where detainees have "difficulties with obtaining medical care," "social distancing is still inadequately enforced," and "aspects of sanitation [ ] have not improved" because defendants "fail[ed] to take comprehensive, timely, and proper steps to stem the spread of the virus."  *Banks v. Booth*, 2020 WL 3303006, at *7–12 (D.D.C. June 18, 2020); *see also Costa v. Bazron*, 2020 WL 2735666, at *5–11 (D.D.C. May 24, 2020).

Plaintiffs here have similarly demonstrated that Defendants recklessly disregarded the risk that COVID-19 poses to their health and safety, and thus they have established a likelihood of success on the merits of their deliberate indifference claims.  Indeed, unlike the petitioners in *Seth* and *Coreas II*, the substantial risk to Plaintiffs' health and safety is not just imminent—Plaintiffs

*are* COVID-19 positive and are suffering from symptoms due to Defendants' failure to mitigate or control the risk of an outbreak at the overcrowded and unsanitary facility. A preliminary injunction is therefore warranted to order Defendants to alleviate this ongoing harm.

 **iii.** Defendants' threatened transfer of Plaintiffs from Farmville to a facility in Texas (against explicit CDC guidance to the contrary) while they are recovering from COVID-19, *see* Santos Garcia Decl. ¶¶ 24, 26, is separate evidence of their deliberate indifference to their medical needs. Forcing Plaintiffs to undergo a nearly 1,500-mile journey while they are suffering from COVID-19 is a needlessly reckless act. Indeed, at least one district court has held that "[t]ransferring detainees without first screening them for COVID-19 or providing any protective equipment is not only a violation on ICE's authority, it is a violation of [detainees'] constitutional rights." *Gayle v. Meade*, 2020 WL 3041326, at *19 (S.D. Fla. June 6, 2020). And another has observed that "[t]ransferring detainees without first confirming they are COVID-negative is unnecessarily risky to the detainee, those transferred alongside the detainee, and the receiving facility." *Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y*, 2020 WL 2598180, at *3 (D.N.H. May 21, 2020).

 This Court should reach the same conclusion. At minimum, it should enter a preliminary injunction enjoining transfers into or out of Farmville until the CDC revises its guidelines. *See Reyna v. Hott*, 921 F.3d 204, 210 (4th Cir. 2019) (finding that 8 U.S.C. § 1252 does not strip federal courts of jurisdiction to review ICE transfer decisions); *see* Compl. Ex. F, Decl. of Dr. Homer D. Venters, MD Regarding COVID-19 Inspection of Farmville Detention Center ¶ 12 (recommending "cessation of all transfers into" and "out of the facility" except as "delineated in the CDC guidelines").

## 2.  Defendants are subjecting Plaintiffs to impermissible punishment.

To establish that a particular condition or restriction of detention constitutes impermissible punishment under the Due Process Clause, a plaintiff must show either (1) an expressed intent to punish; or (2) a lack of a reasonable relationship to a legitimate governmental purpose, from which an intent to punish may be inferred.  *See Wolfish*, 441 U.S. at 538; *Martin*, 849 F.2d at 870.  Absent an explicit intent to punish, a court "must evaluate the evidence and ascertain the relationship between the actions taken against the detainee and the custodian's supporting rationale." *Williamson*, 912 F.3d at 178.  "That inquiry turns on whether the actions taken may validly be attributed to an alternative, nonpunitive rationale, and whether they appear excessive in relation to the alternative purpose assigned."  *Id*. (quotation marks omitted).

Here, Plaintiffs' detention is excessive of any legitimate interest Defendants have in their confinement and lacks a reasonable relationship to a legitimate government purpose.  Indeed, the detention conditions described above serve *no* legitimate government purpose and are not reasonably related to the enforcement of immigration laws.  Hundreds of detainees at Farmville have tested positive for COVID-19.  Defendants have been derelict in their duties to prevent or control the spread of the virus.  They maintain overcrowded dorms that do not allow for proper social distancing, fail to provide sufficient PPE, unreasonably delay testing individuals for COVID-19, and fail to isolate and treat those who do test positive.  Contemporaneously with these conditions, Defendants have also denied Plaintiffs adequate nutrition, serving raw and undercooked food and food infested with bugs.

Defendants' contingent interest in effectuating Plaintiffs' removal (which in the case of Plaintiffs Santos Garcia and Bolanos Hernandez depends on DHS winning reversal of an Immigration Judge's order on appeal, *see* Compl. ¶¶ 11–12) does not justify subjecting Plaintiffs to these conditions and the significant harm that might result from them.  *See Thakker v. Doll*,

2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020) ("[U]nsanitary conditions, which include overcrowding and a high risk of COVID-19 transmission, are [not] rationally related to that legitimate government objective."); *see also Duvall v. Dallas Cty*, 631 F.3d 203, 207 (5th Cir. 2011) (accepting parties' stipulation that no "legitimate governmental purpose was served by the allowance of the MRSA infection to be present in the . . . [j]ail").

*   *   *

For these reasons, Plaintiffs likely will succeed on the merits of their constitutional claims.

**B.      Plaintiffs Are Likely To Succeed On The Merits Of Their APA Claims.**

The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A fundamental principle of administrative law is that an "agency must follow its own rules." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 549 (2009). Here, the federal defendants (DHS, ICE, Wolf, Albence, and Hott)—who are subject to the APA, *see* 5 U.S.C. § 702—have not followed the binding standards for providing medical treatment and food services to detainees that are published in ICE's Performance-Based National Detention Standards ("PBNDS"). That failure violates the APA.

"The PBNDS are designed to ensure a safe and secure detention environment that meets detainees' basic needs and is consistent with applicable legal requirements." *Barrientos v. CoreCivic, Inc*., 951 F.3d 1269, 1272 (11th Cir. 2020). They establish a set of "mandatory requirements to which a facility is bound." ICE, *Progress in Implementing 2011 PBNDS Standards* 5 (Jan. 17, 2017), https://www.hsdl.org/?abstract&did=818058. "[P]rivate contractor[s] operating an ICE detention facility" are also "subject to, and required to follow, the [PBNDS]." *Barrientos*, 951 F.3d at 1272; *see also Menocal v. GEO Grp., Inc*., 320 F.R.D. 258,

262 (D. Colo. 2017) (discussing PBNDS "mandate[s]"), *aff'd*, 882 F.3d 905 (10th Cir. 2018). Three sections of the PBNDS are relevant here.

*First* is the "Medical Care" standard. *PBNDS* at 257. This standard "ensures that detainees have access to appropriate and necessary medical . . . health care, including emergency services," and under it, "[d]etainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment." *Id.* There are many granular requirements that facilities must follow to meet these overarching goals, such as a requirement that the facility have a "plan that address[es] the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting," and a requirement that 24-hour emergency medical services be available to all detainees. *Id.* at 261. But Farmville detainees such as Plaintiffs do not have access to appropriate medical care. Defendants have not conducted adequate testing, have not implemented sufficient precautions to prevent a COVID-19 outbreak, and are not ensuring that Farmville is providing appropriate treatment and isolation to address the health risks that have spread throughout the facility. *See, e.g.*, Santos Garcia Decl. ¶¶ 6, 10, 16, 20–21; Bolanos Hernandez Decl. ¶ 6; Perez Garcia Decl. ¶¶ 4, 9–13, 19; Castillo Gutierrez Decl. ¶¶ 13–14.

*Second* is the "Food Service" standard, which ensures that detainees are provided a "nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation." *PBNDS* at 228. Food served to detainees, such as milk products, "shall meet federal standards for quality," and food "shall be protected from dust, insects and rodents, . . . and other sources of contamination." *Id.* at 235–36. But Plaintiffs are being served food that is not sanitary or nutritious. To the contrary, the food is often expired or undercooked. Santos Garcia Decl. ¶ 12;

Bolanos Hernandez Decl. ¶ 17.  And—even more appallingly—multiple Plaintiffs have found bugs in their food.  Santos Garcia Decl. ¶ 11; Perez Garcia Decl. ¶ 35.

  ***Third*** is a requirement that CDC "guidelines for the prevention and control of infectious and communicable diseases shall be followed."  *PBNDS* at 258.  CDC guidelines, in turn, provide that gatherings should be limited to 50 people or fewer, warn that a high density of individuals within a confined area risks increasing the risk of spreading the virus, and recommend that individuals remain 6 feet away from one another.  CDC guidance also calls for *more robust* protections in detention facilities than in society at large, because "[m]any opportunities exist for [COVID-19] to be introduced into a correctional or detention facility."  CDC, *Interim Guidance*, *supra* note 9.  Here again, Defendants have fallen woefully short.  Individuals in the facility are not appropriately distanced, they remain packed densely in dorm rooms, and they do not have sufficient personal protective equipment.  *See* Santos Garcia Decl. ¶ 7; Bolanos Hernandez Decl. ¶¶ 15–16; Perez Garcia Decl. ¶¶ 6–7, 17; Castillo Gutierrez Decl. ¶¶ 4, 6, 11–12.

  In addition, the CDC has instructed detention facilities to "[l]imit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding."  CDC, *Interim Guidance*, *supra* note 9.  For this reason, the Bureau of Prisons stopped nearly all transfers in March 2020.  Fed. Bureau of Prisons, *Updates to BOP COVID-19 Action Plan*, *supra* note 12.  But in early June, ICE transferred 74 individuals from Arizona and Florida facilities that were experiencing COVID-19 outbreaks into Farmville.  Crawford Decl. ¶ 28.  And now ICE threatens to repeat this shell game, informing Plaintiffs that they plan to transfer a high number of COVID-19-positive individuals from Farmville to another ICE facility in Texas.  Santos Garcia Decl. ¶¶ 24, 26.

Defendants violated the APA by failing to follow the PBNDS's scriptures.  "An agency of the government must scrupulously observe rules, regulations, or procedures which it has established.  When it fails to do so, its action cannot stand and courts will strike it down."  *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969).  This principle of administrative law stretches back to *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and "[t]he *Accardi* doctrine, as it has come to be known, has since been applied in a variety of contexts."  *United States v. Morgan*, 193 F.3d 252, 266–67 (4th Cir. 1999) (holding that *Accardi*'s principles "apply equally" in "the prison context" and collecting cases); *see also Jamil v. Sec'y, Dep't of Def.*, 910 F.2d 1203, 1208 (4th Cir. 1990) ("[A]n affected [agency] employee may require the agency to follow the procedures which it itself has promulgated.").

The doctrine's application is straightforward here.  ICE issued binding rules that govern how it and the facilities it contracts with provide medical care and food services, and commits the agency to following CDC guidelines for handling infectious diseases.  The federal defendants failed to follow those rules at every step of the way, leading to a facility overrun by COVID-19.  Because the federal defendants "failed to follow [their] own stated policies," Plaintiffs are likely to succeed on the merits of their APA claim.  *Roe v. Dep't of Def.*, 947 F.3d 207, 218 (4th Cir. 2020) (finding plaintiffs were likely to succeed on the merits of their APA claim based on an "allegation that the Air Force failed to follow its own stated policies" in making "individualized determinations about each servicemember's fitness for service").

## II.   PLAINTIFFS FACE IMMEDIATE AND IRREPARABLE HARM

Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  A party need not show that the threatened harm has already occurred, though Plaintiffs have plainly done so here.  *See McKinney*, 509 U.S. at 33 (explaining that an inmate "could successfully complain about demonstrably unsafe drinking water without waiting for an attack of

dysentery").  Applying these principles, several courts recently have found that the elevated risk of infection that detainees face at ICE facilities constitutes irreparable harm warranting issuance of a preliminary injunction.[63]  This Court should, too, because Plaintiffs face two distinct harms.

*First*, "[a]s a matter of law, the threat of [a constitutional] violation in and of itself constitutes irreparable harm."  *Aziz v. Trump*, 234 F. Supp. 3d 724, 737 (E.D. Va. 2017) (citing *Newsom ex rel Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).  As already discussed, Plaintiffs' constitutional rights are irreparably violated every day.  Defendants' ongoing violation of their constitutional due process rights is itself a sufficient harm to justify a preliminary injunction.  *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987).

*Second*, Plaintiffs face a heightened health risk because of the conditions at Farmville. COVID-19 has infiltrated and spread within Farmville.  Defendants failed to mitigate or control the risks of COVID-19 by conducting or accepting mass transfers into the facility, and by maintaining an overcrowded and unsanitary facility.  Plaintiffs have contracted the virus already or have exhibited symptoms while awaiting test results, and they have each suffered from the symptoms associated with the disease.  This harm is more than "actual and imminent," as required to support a preliminary injunction.  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019).  The harm has manifested, and current conditions jeopardize Plaintiffs' recovery and risk exposing them to reinfection.  Moreover, the federal defendants' threat to transfer Plaintiffs (against explicit CDC guidance) while they are still recovering from COVID-19 demonstrates further irreparable harm.

---

[63]  *See, e.g.*, *Amaya-Cruz v. Adducci*, 2020 WL 1903123 (N.D. Ohio Apr. 18, 2020); *Fofana v. Albence*, 2020 WL 1873307 at *7–9, *11 (E.D. Mich. Apr. 15, 2020); *Valenzuela Arias v. Decker*, 2020 WL 1847986 at *1, *6–7 (S.D.N.Y. Apr. 10, 2020); *Coronel v. Decker*, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Basank*, 2020 WL 1481503, at *4.

Given that the virus is highly contagious and easily communicable, the risk that Plaintiffs will continue to be exposed to COVID-19 remains real. And the risks of continued exposure are severe. COVID-19 is a life-threatening disease with no cure or vaccine, and Defendants are not providing adequate medical treatment for those who test positive. Simply by virtue of where they are living and the conditions Defendants are imposing on them, Plaintiffs are at significant risk of serious illness or death. *See Brown v. Plata*, 563 U.S. 493, 519–20 (2011) ("Crowding also creates unsafe and unsanitary living conditions that hamper effective delivery of medical . . . health care" and "may prevent immediate medical attention necessary to avoid suffering, death, or spread of disease."). This Court need not force Plaintiffs to that precipice before issuing relief. To the contrary, the Fourth Circuit has expressly rejected arguments "that preliminary injunctions should issue only at the last minute." *Mountain Valley Pipeline*, 915 F.3d at 217.

### III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION

The public interest and balance of the equities—two factors that "merge when the government is the party opposing a stay," *Roe*, 947 F.3d at 230 (quotation marks omitted)—overwhelmingly favor entry of a preliminary injunction.

***First***, "upholding constitutional rights surely serves the public interest." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quotation marks and citation omitted). And the government "is in no way harmed by the issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quotation marks omitted). Similarly, "[t]here is generally no public interest in the perpetuation of unlawful agency action" that violates the APA. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

***Second***, the public has an interest in minimizing the spread of COVID-19 and ensuring

individual and community health and safety.  Avoiding "potentially serious health consequences for the public" is squarely in the public interest.  *Juul Labs, Inc. v. Unincorporated Ass'ns Identified in Schedule A*, 2018 WL 6606076, at *2 (E.D. Va. Dec. 17, 2018) (granting motion for temporary restraining order).  Everyone benefits from improved conditions inside the facility because preventing an uncontrollable outbreak in Farmville will also reduce the risk of an uncontrollable outbreak in the immediate Farmville community.  "Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest," and granting relief here would be "one step further in a positive direction."  *Thakker*, 2020 WL 1671563, at *9.  For the same reason, enjoining the transfer of Plaintiffs to a separate facility is also in the public interest, as it prevents exposing individuals outside of Farmville to a COVID-19 positive person.

**Finally**, the public interest and the balance of equities "is clearly in remedying dangerous or unhealthy situations and preventing the further spread of disease."  *Diretto v. Country Inn & Suites by Carlson*, 2016 WL 4400498, at *4 (E.D. Va. Aug. 18, 2016).  Whatever minimal interest Defendants may assert in continuing to deny Plaintiffs adequate medical care and nutrition, it is outweighed by the serious risk of illness (and, potentially, death) that Plaintiffs—not to mention other detainees, Farmville staff, and the public at large—face from COVID-19 if Defendants are permitted to maintain conditions in violation of Plaintiffs' constitutional due process rights.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction, and order Defendants to immediately reform conditions at Farmville through a plan to be implemented pursuant to the results of a health inspection, to reform the unconstitutional conditions of confinement at Farmville, to abide by all CDC guidelines to prevent the spread of COVID-19, and to halt all inter-facility transfers into and out of Farmville.

Dated: July 23, 2020                    Respectfully submitted,

                                        By:      *s/Simon Sandoval-Moshenberg*

Joseph D. West (Va. Bar No. 16834)      Simon Sandoval-Moshenberg
David Debold (*pro hac vice forthcoming*)     (Va. Bar No. 77110)
Naima L. Farrell (*pro hac vice forthcoming*)  Kristin Donovan (Va. Bar No. 92207)
Thomas J. McCormac IV                   Granville Warner (Va. Bar. No. 24957)
   (*pro hac vice forthcoming*)         LEGAL AID JUSTICE CENTER
Blair Watler (*pro hac vice forthcoming*)  6066 Leesburg Pike, Suite 520
Katherine King (*pro hac vice forthcoming*)  Falls Church, VA 22041
GIBSON, DUNN & CRUTCHER LLP             Tel: 703-778-3450
1050 Connecticut Avenue, N.W.           simon@justice4all.org
Washington, D.C. 20036-5306             kristin@justice4all.org
Tel: 202-955-8551                       cwarner@justice4all.org
jwest@gibsondunn.com
ddebold@gibsondunn.com
nfarrell@gibsondunn.com                 Sirine Shebaya (*pro hac vice forthcoming*)
tmccormac@gibsondunn.com                Amber Qureshi (*pro hac vice forthcoming*)
bwatler@gibsondunn.com                  NATIONAL IMMIGRATION PROJECT OF THE
kking@gibsondunn.com                        NATIONAL LAWYERS GUILD
                                        2201 Wisconsin Avenue, N.W., Suite 200
*Pro bono counsel for Plaintiff Christian*  Washington, D.C. 20007
*Alberto Santos Garcia*                 Tel: 617-227-9727
                                        sirine@nipnlg.org
                                        amber@nipnlg.org

                                        *Pro bono counsel for Plaintiffs Santos*
                                        *Salvador Bolanos Hernandez, Gerson*
                                        *Amilcar Perez Garcia, and Ismael Castillo*
                                        *Gutierrez*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on this date, I uploaded the foregoing, along with all attachments thereto, to this Court's CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.

Also on this date, I mailed (certified U.S. mail, return receipt requested) the foregoing, along with all attachments thereto, to the following Defendants:

Chad Wolf
Matthew Albence
Russell Hott
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
Office of the General Counsel
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

Jeffrey Crawford, Superintendent, Farmville Detention Center
Immigration Centers of America, LLC
508 Waterworks Road
Farmville, VA 23901

Immigration Centers of America, LLC
SERVE:  Russell B. Harper, R/A
7113 Three Chopt Road, Suite 210
Richmond, VA 23226

Armor Correctional Health Services, Inc.
SERVE: CT Corporation System, R/A
4701 Cox Rd Ste 285
Glen Allen, VA 23060-6808

Also on this date, I mailed (U.S. mail, postage paid) and e-mailed the foregoing, along with all attachments thereto, to the following counsel, whom I believe to be counsel for the Defendants:

Dennis C. Barghaan, Jr., Assistant Chief, Civil Division
U.S. Attorney's Office for the Eastern District of Virginia, Alexandria Div.
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314
dennis.barghaan@usdoj.gov
*Counsel for Defendants Wolf, Albence, Hott, and U.S. Immigration and Customs Enforcement*

John M. Erbach
SPOTTS FAIN, P.C.
411 E. Franklin Street, Suite 600
Richmond, VA 23219
jerbach@spottsfain.com
*Counsel for Defendants Crawford and Immigration Centers of America, LLC*

Edward J. McNelis, III
SANDS ANDERSON
1111 E Main St, Suite 2400
Richmond, VA 23219
emcnelis@sandsanderson.com
*Counsel for Defendant Armor Correctional Health Services, Inc.*

Dated: July 23, 2020                     Respectfully submitted,

                                         By:    *s/ Simon Sandoval-Moshenberg*
                                         Simon Sandoval-Moshenberg
                                            (Va. Bar No. 77110)
                                         LEGAL AID JUSTICE CENTER
                                         6066 Leesburg Pike, Suite 520
                                         Falls Church, VA 22041
                                         Tel: 703-778-3450
                                         simon@justice4all.org