**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**CHRISTIAN ALBERTO SANTOS
GARCIA,** *et al.***,**

      **Plaintiffs,**

**v.**                                                          **Case No.: 1:20-cv-00821**

**CHAD F. WOLF,** *et al.***,**

      **Defendants.**

**JEFFREY CRAWFORD'S AND ICA FARMVILLE'S MEMORANDUM IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Defendants Jeffrey Crawford ("Crawford") and Immigration Centers of America-Farmville, LLC (incorrectly identified in the Complaint as Immigration Centers of America, LLC) ("ICA Farmville") (collectively the "Farmville Defendants"), by counsel, submit the following as their Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (the "Motion" or "Mot."):

## INTRODUCTION

COVID-19 is a very serious illness that is not to be taken lightly.  Indeed, Crawford and his staff at ICA Farmville—in collaboration with the facility's full-time Medical Director, Teresa Moore, M.D. ("Dr. Moore") and her employer, Defendant Armor Correctional Services, Inc. ("Armor")—have taken this illness seriously from the very beginning, implementing measures and tracking best-practices to combat the illness since mid-January of this year.  What Plaintiffs[1] seek here amounts to nothing less than imposing strict liability whereby a constitutional violation would be found whenever a global pandemic finds its way into a detention center.  On the facts here, no

---

[1] Plaintiff Gerson Amilcar Perez Garcia was released from ICA Farmville's custody on July 31, 2020. His claims are therefore moot.

such constitutional standards have been violated, and to find otherwise and implement the preliminary injunction requested would effectively amount to a conclusion that nothing Crawford or ICA Farmville could have done would have satisfied constitutional standards.  In other words, Plaintiffs ask this Court to simply substitute its judgment—and those of Plaintiffs' private expert— for how to run such a facility in stark contrast with United States Supreme Court precedent prohibiting courts from doing so in the face of the efforts thoroughly laid-out in Crawford's declaration ("Crawford Declaration," attached as **Exhibit A**).  On the facts presented, given the extraordinary relief requested—which includes a mandatory positive injunction—Plaintiffs' Motion should be denied.

## FACTS[2]

Plaintiffs' Motion relies on inaccurate information regarding ICA Farmville.  Such inaccuracies include, without limitation, the following:

- The allegation that ICA Farmville has failed to implement appropriate measures in response to the coronavirus pandemic is false.  (Mem. of Law in Supp. of Pls.' Mot. ("Pls.' Mem. of Law") at 2, 7-8, 25.)  ICA Farmville has implemented extensive measures to promote the health and wellbeing of its detainees and staff in light of the global health crisis. (Crawford Decl. ¶¶ 3(a)-(d), 3(f)-(g), 3(i), 3(o), 4-6, 8-11, 13-17, 19-22, 24-25, 27, 30, 32-33, 35, 39.)

---

[2] "[T]he likelihood of success that must be shown for a mandatory preliminary injunction is the existence of a clear and convincing probability of success.  Thus, if there is doubt as to the probability of plaintiff's ultimate success, a request for preliminary mandatory relief must be denied."  *Cornwell v. Sachs*, 99 F. Supp. 2d, 695, 704 (E.D. Va. 2000) (citations and internal quotation marks omitted).  On this record, there can be little doubt that Plaintiffs fail to meet this standard.  Crawford presents a declaration based on direct knowledge, while Plaintiffs provide speculative declarations lacking proper foundation and based on unreliable hearsay.

- The allegation that ICA Farmville's testing is inadequate is false. (Pls.' Mem. of Law at 8, 18-20, 23, 25.)  At all times during the pandemic, ICA Farmville has tested detainees as required by Virginia Department of Health ("Health Department") guidelines and, since June 22, 2020, ICA Farmville has tested every detainee as expeditiously as possible. (Crawford Decl. ¶¶ 3(b), 3(g), 35, 46.)

- The allegations that detainees are not receiving medical treatment or care for days is false. (Pls.' Mem. of Law at 2, 9.)  Likewise, the allegation that detainees are not given over-the-counter medications for days is false.  (Pls.' Mem. of Law at 9, 20.)  Each detainee is evaluated by a medical professional once a day and given over-the-counter medications upon request.  (Crawford Decl. ¶ 3(c).)

- The allegation that ICA Farmville detainees have insufficient access to personal protective equipment, like masks and hand sanitizer, is false.  (Pls.' Mem. of Law at 2, 6-7, 19, 23.) Likewise, the allegation that detainees have only received one N95 mask is demonstrably false, as each detainee—including Plaintiffs here—signed for the two N95 masks provided in April.  (Pls.' Mem. of Law at 7; Crawford Decl. ¶ 27.)  Contrary to these statements, soap and hand sanitizer are readily available to all, and the facility has posted signs explaining the importance of hand-washing and sanitizing as a means of reducing the spread of the novel coronavirus in both English and Spanish.  (Crawford Decl. ¶¶ 3(d), 15(b), 15(q), 21, 32.)  Additionally, every detainee has been provided with four (4) N95 masks, two cloth masks, and two surgical masks for individual use with signs posted in the dorms explaining the purpose and use of these masks in English and Spanish.  (Crawford Decl. ¶¶ 3(d), 20, 25, 39.)  Cloth masks were provided on a schedule that permits them to be washed with all other clothing every three (3) days.  (Crawford Decl. ¶ 3(d).)

- The allegations concerning the density of conditions at Farmville ICA are false.  (Pls.' Mem. of Law at 19, 22-23, 28.)  Each dorm houses between 42 and 100 detainees and is between 2270 and 5058 square feet in total space.  Thus, there is a little more than 50 square feet per detainee in each dorm when the facility is at 100% capacity.  (Crawford Decl. ¶ 3(e).)  Currently, the facility is at less than fifty percent capacity, thereby permitting at minimum 100 square feet per detainee.  (Crawford Decl. ¶ 3(e).)

- The allegation that ICA Farmville did not have the capacity to adequately screen the 74 transferees it received from Florida and Arizona facilities is false.  (Pls.' Mem. of Law at 1.)  All 74 transferees were screened at intake and cohorted from the rest of the facility's general population.  (Crawford Decl. ¶ 3(f).)

- The allegation that ICA Farmville has unreasonably delayed testing its detainees and informing them of their test results is false. (Pls.' Mem. of Law at 8, 18-20, 23.)  Since June 22, 2020, ICA Farmville has tested its detainees in an expeditious manner and has not unreasonably delayed providing detainees their test results, which take several days to receive from the Bio Reference Lab.  (Crawford Decl. ¶¶ 3(b), 3(g).)

- The allegation that ICA Farmville guards, not kitchen staff, have been preparing food for the detainees is false. (Pls.' Mem. of Law at 12.)  Because some detainees have chosen not to serve food during the pandemic, detention staff have assisted in the serving line, but have not aided in the preparation of the food. (Crawford Decl. ¶ 3(h).)

- The allegation that detainees exhibiting COVID-19 symptoms are permitted to work in the kitchen is false.  (Pls.' Mem. of Law at 12.)  All detainee workers are screened for any COVID-related symptoms prior to being permitted to work.  (Crawford Decl. ¶ 3(i).)

- The allegations that detainees are served inedible, expired, undercooked, and/or uncooked food is false.  (Pls.' Mem. of Law at 2, 12, 23, 25.)  Likewise, the allegation that there are insects in the food is false.  (Pls.' Mem. of Law at 2, 12-13, 23, 26.)  Since January 1, 2020, out of the approximate 325,895 meals served, the facility has received 42 food complaints from detainees, representing an approximately 0.01% complaint rate. (Crawford Decl. ¶ 45.)  None of the complaints involved allegations of insects in the food. (Crawford Decl. ¶ 45.)  Most of the complaints involved requests for special food accommodations, larger portions, or allegations of expired food.  (Crawford Decl. ¶ 45.)

- The allegation that ICA Farmville guards deployed pepper spray on detainees who were too weak to stand is false.  (Pls.' Mem. of Law at 9.)  Pepper spray is deployed only when necessary to diffuse potentially violent and dangerous situations in accordance with the facility's policies and ICE Detention Standards.  (Crawford Decl. ¶¶ 3(l), 34, 44.)

- The allegation that the ICA Farmville facility lacks adequate ventilation is false.  (Pls.' Mem. of Law at 2, 8.)  There are no known issues with the facility's HVAC system or overall ventilation.  (Crawford Decl. ¶ 3(n).)

The Crawford Declaration dispels the false allegations set forth above and corrects the record.  It is adopted herein as Crawford's evidence in opposition to the Motion together with any evidence offered by the other Defendants.

Under Crawford's leadership and in constant coordination with Dr. Moore, ICA Farmville began to take steps to prepare for the threat of COVID-19 on January 27, 2020—six weeks before any confirmed case in Virginia.  (Crawford Decl. ¶ 4.)   ICA Farmville has adopted extensive measures to reduce the threat of COVID-19 infection as much as possible.

ICA Farmville is fortunate to have a highly skilled, highly experienced, full-time physician as its Medical Director, Dr. Moore.  (Crawford Decl. ¶ 2.)  She has worked with the Piedmont Health District of the Health Department throughout the last 20 years.   She checks for updates on guidance from public health officials, such as the Health Department and the Center for Disease Control and Prevention ("CDC"), several times per week.   Dr. Moore has an excellent working relationship with Crawford and has received everything she has requested from him to support the efforts to protect ICA Farmville's detainees and staff from COVID-19.

Crawford and Dr. Moore have implemented a number of prescreening measures for intakes, including temperature screens, questions about the use of over-the-counter medication for chills or fever, and a host of symptoms identified as indicators of COVID-19.  (Crawford Decl. ¶ 15(s).)  Even a single positive response to any indicator has strictly resulted in sending intakes to the hospital until cleared, followed by isolation for the periods and under the terms prescribed by the CDC and the Health Department.  (Crawford Decl. ¶ 24.)

Despite the initial success of the intake protocols to prevent any COVID-19 infections, in April, Dr. Moore asked Crawford to determine whether further intakes could be stopped due to her concerns over reported cases of COVID-19 exposure in the local community.  (Crawford Decl. ¶ 19.)  Crawford raised these concerns with United States Immigration and Customs Enforcement ("ICE"), explaining that though the number of existing negative-pressure and solid-door / solid-wall rooms had been sufficient to isolate individual cases of symptomatic or potentially-exposed individuals, there may be too few rooms to also quarantine all intakes, regardless of symptoms, in blanket fashion in the event of a large influx of transferees.  (Crawford Decl. ¶ 19.)  ICE proposed a solution to which Dr. Moore and her colleagues at Armor agreed—since April 17, before any new intakes arrive at ICA Farmville, they must first be quarantined for 14 days at Caroline County,

Virginia's facility, which has a sufficient number of individual cells to accommodate such individual quarantine.  (Crawford Decl. ¶ 19.)

Staff are screened every single time they enter the building with the same temperature scans and symptom screenings that intakes undergo.  (Crawford Decl. ¶ 4(e).)   If any employee fails screening, he or she is sent home with pay and not allowed to return until one of the following sets of conditions are met: (1) resolution of fever without the use of fever-reducing medications **and** improvement in symptoms, or (2) at least 24 hours have passed since recovery defined as resolution of fever without the use of fever-reducing medications **and** improvement in symptoms **and** at least 10 days have passed since symptoms first appeared, unless a healthcare provider believes the individual can safely return sooner.  (Crawford Decl. ¶¶ 4(f), 4(q), 16.)  These measures have been strictly enforced by ICA Farmville for all staff.  (Crawford Decl. ¶¶ 4(e), 4(q), 5, 16, 33.)

Crawford also has implemented a number of other efforts to reduce foot traffic in and out of ICA Farmville, such as alternating administrative shifts.  (Crawford Decl. ¶ 17.)  He cancelled all volunteer programs as soon as the first known case of COVID-19 was identified in the surrounding community.  (Crawford Decl. ¶ 8.)  Per ICE direction, all social visitation has been cancelled. (Crawford Decl. ¶ 9.)  ICA Farmville further cancelled any program that might interfere with efforts to maintain as much social distancing as possible.  (Crawford Decl. ¶ 15(i).)  Each dorm's space provides approximately 50 square feet per detainee, sufficiently allowing detainees to stay greater than six feet apart.  (Crawford Decl. ¶ 3(e).)

Crawford also has ensured that ICA Farmville is adequately equipped to disinfect the facility appropriately and to offer other protections many in the surrounding community do not have.  In early March, Crawford approved the purchase of several gallons of an EPA-approved cleaning solution that disinfects coronavirus.  (Crawford Decl. ¶ 10.)  The facility uses that cleaning solution and another specialized cleaning solution in addition to ordinary cleaning

solution in the showers, toilets, sinks, and commonly touched items such as doorknobs several times a day. (Crawford Decl. ¶ 10.) Crawford also ensured that ICA Farmville has extra toilet paper and styrofoam food service trays so that the facility will not be without in the event of a shortage. (Crawford Decl. ¶ 9.) There is plenty of soap and hand sanitizer for all. (Crawford Decl. ¶ 3(d).) And, probably most importantly, Crawford successfully procured four N95 masks for each detainee's and staff member's personal use, in addition to two cloth masks and two surgical masks. (Crawford Decl. ¶¶ 3(d), 27, 39.)

The specific measures and examples of strict implementation of COVID-19 protocols is set forth in the Crawford Declaration, which establishes that ICA Farmville has implemented appropriate measures to reduce the risk of spreading the virus and to address the medical needs of those who contract it.

Between January and mid-April 2020, several dorms were quarantined and staff sent home due to individuals exhibiting COVID-19 symptoms and/or failing screenings. (Crawford Decl. ¶ 5.) Among those individuals, six detainees and one staff member were tested for COVID-19 per the Health Department guidelines and each of their tests were negative. (Crawford Decl. ¶ 5.)

Despite successfully implementing appropriate sanitization, protection, and screening measures, ICA Farmville had its first COVID-19 cases in late April. (Crawford Decl. ¶ 27.) The two detainees who tested positive had been transferred from the Caroline Facility after their 14-day isolation period and were asymptomatic. (Crawford Decl. ¶ 28.) Upon learning that they were positive for the virus, ICA Farmville isolated the two detainees and they remained in isolation until they tested negative in two consecutive tests administered two days apart. (Crawford Decl. ¶ 28.)

Following the discovery of those two cases in late April, ICA Farmville did not have any other detainees test positive until early June 2020. (Crawford Decl. ¶ 30.) The second group of positive cases were among a group of 74 detainees that ICE transferred from Florida and Arizona

on June 2, 2020.   (Crawford Decl. ¶¶ 29-30.)   Because the Caroline Facility could not accommodate such a large group, the detainees were sent directly to ICA Farmville rather than first undergoing the usual 14-day isolation period at the Caroline Facility.  (Crawford Decl. ¶ 29.) Prior to their transfer, ICE informed Crawford that there were no active cases at the Arizona facility and that there were very few cases at the Florida facility.  (Crawford Decl. ¶ 29.)  ICA Farmville did not attempt to exercise its right to refuse the transfer of the 74 detainees because there was no indication that ICA Farmville could not accommodate the needs of those detainees at the time and, even if it had refused to accept the transfer, those transferees would have been temporarily housed at ICA Farmville while ICE found a suitable alternative location, which could have taken weeks. (Crawford Decl. ¶ 29.)  Such a right only exists when ICA Farmville cannot accommodate the needs of a detainee, which did not then appear to be the case. (Crawford Decl. ¶ 28.)[3]

During the intake prescreening of the 74 detainees, one detainee with COVID-19 symptoms was identified by ICA Farmville's medical staff and sent to the hospital where he later tested positive. (Crawford Decl. ¶ 30.)  Based on this result, ICA Farmville tested all 74 detainees that were part of this transfer group, 51 of which were COVID-19 positive.  (Crawford Decl. ¶ 30.) ICA Farmville immediately cohorted the detainees who tested positive in a previously-vacant dorm and isolated the individuals that tested negative in another vacant dorm, keeping both groups separate from the facility's general population.  (Crawford Decl. ¶ 30.)  None of the 74 transferees who arrived on June 2 have exhibited or required hospitalization as a result of serious COVID-19 symptoms. (Crawford Decl. ¶ 30.)

On June 22, 2020, following the positive COVID-19 test results of an asymptomatic detainee in Dorm 4, ICA Farmville began testing all of its detainees at its own expense.  (Crawford

---

[3] At this time, ICA Farmville is not accepting additional detainees into its facility. (Crawford Decl. ¶ 54.)

Decl. ¶ 35.)   ICA Farmville's medical staff screens detainees for COVID-19 symptoms daily, including taking their temperature. (Crawford Decl. ¶ 3(c).)  As of August 5, 2020, ICA Farmville has conducted 858 tests of detainees.  (Crawford Decl. ¶¶ 46, 50.)  Each detainee has been tested at least once and they were at that time being retested on an ongoing basis pursuant to then-current CDC guidelines.  (Crawford Decl. ¶ 50.)  As of August 6, 2020, there are 261 detainees who are currently positive for COVID-19 and 38 who are currently negative for COVID-19.  (Crawford Decl. ¶ 50.)  There are no employees who are currently positive for COVID-19.  (Crawford Decl. ¶ 51.)

## ARGUMENT

"The standard for granting either a TRO or a preliminary injunction is the same." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). The moving parties—Plaintiffs here—must make a "clear showing" that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of the preliminary relief requested; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Winter v. NRDC*, 555 U.S. 7, 20, 22 (2008). "Courts considering whether to impose preliminary injunctions must separately consider each *Winter* factor." *Toure v. Hott*, No. 1:20-cv-395, 2020 U.S. Dist. LEXIS 78638, at *12 (E.D. Va. Apr. 29, 2020) (O'Grady, J.) (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)).

It is established that "preliminary injunctions are ***extraordinary remedies*** involving the exercise of a very far-reaching power to be granted only ***sparingly*** and ***in limited circumstances***." *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (emphasis added). Indeed, granting a preliminary injunction requires that a district court order a party to act, or refrain from acting, in a certain way despite having an incomplete record. *Hughes Network Sys. v. Interdigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). As the Fourth Circuit has cautioned,

10

"the danger of a mistake in this setting is substantial." *Id.* Preliminary injunctions create other problems as well. For example, because the decision on a preliminary injunction motion is an appealable order, *see* 28 U.S.C. § 1292(a)(1), "preliminary injunctions often lead to repetitive litigation as the claim is litigated and appealed for purposes of the preliminary injunction, and then again for purposes of the final decision on the merits." *Hughes Network Sys.*, 17 F.3d at 693-94.

Because of these concerns, the Fourth Circuit and other courts have explained that preliminary injunctive relief may be granted only upon a clear showing that the plaintiff is entitled to such relief. *See, e.g.*, *Accident, Injury & Rehab. v. Azar*, 943 F.3d 195, 201 (4th Cir. 2019) ("Because a preliminary injunction affords temporary relief *before trial* of the type that can be granted permanently *after trial*, it is an extraordinary remedy and may be granted only upon a clear showing that the plaintiff is entitled to such relief.") (emphasis in original) (internal quotation marks omitted). This high standard applies where the request for preliminary injunctive relief purports to serve the ordinary purpose of preliminary injunctions—to preserve the relative positions of the parties, protect the status quo, and prevent irreparable harm during the pendency of a lawsuit such that the court's ability to render a meaningful judgment on the merits is preserved. *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013); *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012). But where, as here, plaintiffs do not seek preliminary injunctive relief for its generally intended purpose but instead seek the ***even more extraordinary*** and ***disfavored*** relief of a "mandatory" injunction, the standard becomes ***even more exacting***, and plaintiffs must make a ***heightened showing*** of the four *Winter* factors. *See Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances."); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)) (noting that "[m]andatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the

situation demands such relief"); *Vollette v. Watson*, No. 2:12cv231, 2012 U.S. Dist. LEXIS 103322, at *9 (E.D. Va. July 24, 2012) (explaining that the *Winter* standard "becomes even more exacting" when plaintiffs seeks mandatory injunctive relief).

In their Motion, Plaintiffs request that the Court step in and order Crawford and ICA Farmville to "immediately reform" their facility and completely overhaul the plan currently in place—though ever evolving—to address the nationwide pandemic and response to COVID-19. This would have the effect of injecting judicial intervention into a situation where Armor and Dr. Moore, in coordination with the CDC, the Virginia Department of Health, and local hospitals, continue to respond to the medical situation in real time. The requested injunction would interfere with the good-faith efforts of these medical professionals to provide the needed clinical response to the COVID-19 infections at ICA Farmville. Because Plaintiffs cannot muster a regular showing—let alone a heightened showing—of the four factors required to secure a preliminary injunction under *Winter*, the Court should deny the Motion.

I.     **Plaintiffs Fail to Clearly Establish a Likelihood of Success on the Merits of Their Constitutional Claims Against Crawford and ICA Farmville.[4]**

As against Crawford and ICA Farmville, Plaintiffs allege violations of their Fourteenth Amendment substantive due process rights pursuant to 42 U.S.C. § 1983 (Compl. ¶¶ 158-176)—and, alternatively, violations of their Fifth Amendment substantive due process rights (Compl. ¶¶

---

[4] Plaintiffs assert a claim against the Federal Defendants (ICE, Wolf, Albence, and Hott) under the Administrative Procedure Act ("APA"). (Compl. ¶¶ 8, 191-201; Pls.' Mem. of Law at 24-27.) Because the APA claim is not directed against the Farmville Defendants, they do not address the likelihood of Plaintiffs' success on the merits of the claim in this memorandum. Nevertheless, to the extent a response to the APA claim is required, the Farmville Defendants adopt and incorporate herein by reference the position of the United States Attorney's Office, on behalf of the Federal Defendants, pursuant to Federal Rule of Civil Procedure 10(c), and further oppose the claim to the extent it is based on inaccurate facts challenging the conditions at ICA Farmville and Crawford and ICA Farmville's response to the ongoing pandemic.

177-190)—asserting that the conditions of their confinement violate their constitutional right to reasonable safety and amount to unlawful punishment.[5]  It remains an unsettled area of law whether immigration detainees such as Plaintiffs here are afforded constitutional protections coextensive with those afforded U.S. Citizens.  *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 521-22 (2003) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules [as to aliens] that would be unacceptable if applied to citizens.") (citation and internal quotation marks omitted); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (explaining that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes").   However, Crawford assumes for the sake of argument—but without conceding—that constitutional due process applies to Plaintiffs such that they have a right to reasonable safety and to be free of conditions that amount to punishment.  *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (explaining that due process under the Fifth Amendment "requires that a pretrial detainee not be punished").  Regardless, as the Crawford Declaration demonstrates, there is nothing about ICA Farmville that could rise to such a level in any case, let alone under the current COVID-19 nationwide health emergency.  The measures in place to protect the detainees fall far short of deliberate indifference and do not otherwise amount to unconstitutional punishment.

---

[5] Crawford, as a privately employed individual, and ICA Farmville, as a government contractor, do not concede that they are bound by the due process requirements in the same manner as state actors. For the sake of argument, and because the actions taken here clearly comport with constitutional standards of due process, these Defendants evaluate the issue through the constitutional lens.  Whether bound by the constitutional standards or not, it is ICA Farmville's and Crawford's practice to implement and follow policies and practices that meet or exceed those standards.  But by addressing these standards here, Crawford and ICA Farmville do not waive their right to challenge whether they are legally bound by such standards, if necessary, later in this case.

**A.** **Crawford's and ICA Farmville's actions do not rise to the level of deliberate indifference.**

Plaintiffs contend that the Farmville Defendants violated Plaintiffs' substantive due process rights under the Fourteenth Amendment by failing to provide them with proper medical care and otherwise failing to adequately manage the risk of COVID-19 at the facility. (Compl. ¶¶ 158-176; Pls.' Mem. of Law at 14-22.) As the Fourth Circuit has explained, such claims are governed by the Eighth Amendment deliberate indifference standard. *See, e.g.*, *Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001) (explaining that condition-of-confinement and inadequate-medical-treatment claims in the Fourth Circuit are governed by the deliberate indifference standard); *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 1999) (same); *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992) (holding that the deliberate indifference standard applies to pretrial detainees' due process claims brought under 42 U.S.C. § 1983).

"Deliberate indifference requires a showing that the defendants actually knew of and ***disregarded*** a substantial risk of serious injury to the detainee or that they actually knew of and ***ignored*** a detainee's serious need for medical care." *Young*, 238 F.3d at 575-76 (emphasis added); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[A] prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.") Stated differently, "[t]he deliberate indifference standard is a two-pronged test: (1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard the substantial risk to the inmate's health or safety." *Thompson v. Commonwealth*, 878 F.3d 89, 97-98 (4th Cir. 2001) (citing *Farmer*, 511 U.S. at 834, 837-38); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (explaining that the first prong is "objective" while the second is "subjective" and must show that the official acted with a "sufficiently culpable state of mind").

Importantly, deliberate indifference is "a higher standard for culpability than mere negligence or even civil recklessness." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Young*, 238 F.3d at 575 ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.") (internal quotations omitted). Indeed, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. Accordingly, the controlling question in deliberate indifference cases is *not* whether defendants—such as the Farmville Defendants—could have taken additional or different precautions "but whether they *disregard[ed]* an excessive risk to . . . health or safety." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 309 (4th Cir. 2004); *accord Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

As to the first "objective" prong, the Farmville Defendants began implementing measures to address COVID-19 as early as January 2020, six weeks before anyone in Virginia tested positive for COVID-19, and has since implemented additional cohorting, sanitation, testing, and treatment measures.  (Crawford Decl. ¶¶ 3-4, 8-10, 26, 35.) However, the extent of the disease's severity—and whether a risk of reinfection exists—is beyond the Farmville Defendants' knowledge or expertise. They therefore defer to medical professionals, including Dr. Moore and Armor, as to any substantive allegations relating to the illness.

Pursuant to the second "subjective" prong, the only question that remains is whether Crawford and ICA Farmville knew of and *disregarded* the risk of harm posed by COVID-19 or ignored Plaintiffs' need for medical care.[6] Under the facts presented and set forth in Crawford's

---

[6] Plaintiffs also cite an alleged threat to transfer Plaintiffs from ICA Farmville to a Texas facility as evidence of deliberate indifference to Plaintiffs' medical needs. (Pls.' Mem. of Law at 2, 22.) Because these allegations appear directed toward the Federal Defendants (*see* Compl. ¶¶ 73, 76, 154)—and because decisions to transfer detainees into and out of their facility fall outside of the Farmville Defendants' control and authority—the Farmville Defendants defer to, and adopt and incorporate herein, the position of the Federal Defendants in response to these allegations. On

Declaration, one cannot conclude that Crawford and ICA Farmville acted unconstitutionally by doing their absolute best in the face of a global pandemic.

Since January, Crawford and ICA Farmville have taken numerous actions to protect detainees from the virus, including the adoption of rigorous screening procedures for individuals entering the facility; implementation of increased sanitation practices and protocols to ensure social distancing; posting of educational flyers promoting best practices to combat the spread of the virus; training of staff regarding virus detection, prevention, and treatment; prohibition of non-attorney visits; and distribution of personal protective equipment ("PPE"), including four (4) N95 masks, two cloth masks, and two surgical masks for individual use. (Crawford Decl. ¶¶ 3, 4, 6, 8-11, 13, 15, 16, 19-21, 24, 27, 39.) ICA Farmville also has enacted a system of determining which of its detainees face heightened risk from COVID-19 and separately housed some of the most high-risk individuals. (Crawford Decl. ¶¶ 4(d), 22.) And while detainees—including Plaintiffs Santos Garcia and Castillo Gutierrez—have tested positive for COVID-19 at the facility in the past, this Court must focus on the response efforts and actions taken by Crawford and ICA Farmville in the face of COVID-19 and *not* on any results. *See*, *e.g.*, *Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*" (emphasis added).); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (stating that "the 'wantonness' of conduct" does not "depend[] upon its effect upon the prisoner"); *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) (holding that "the resulting harm of increasing [COVID-19] infection" does not alone establish "a culpable state of mind"); *Wilson v. Williams*, 961 F.3d 829, 843 (6th Cir. 2020) (rejecting the contention that the Bureau of Prisons ("BOP") "was deliberately indifferent to

---

information and belief, however, the Farmville Defendants understand that no such transfers will occur.

petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").   Crawford and ICA Farmville clearly have acted with extraordinary care to mitigate detainees' risk of contracting and spreading COVID-19, falling far short of the deliberate indifference standard.

The Sixth Circuit recently faced a similar situation in *Wilson v. Williams*.   There, even though "fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died," the Sixth Circuit held that because the BOP "took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, [and] quarantining new inmates," "[the] argument that the BOP's response to the COVID19 virus has been so ineffective as to constitute deliberative indifference fail[ed]" with respect to a "medically-vulnerable subclass."   961 F.3d at 840-43; *see also Swain*, 961 F.3d at 1289 ("We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.'").

Plaintiffs cite three cases to suggest that other courts in this Circuit have granted preliminary injunctions under similar circumstances and regarding "facilities with similar conditions to Farmville." (Pls.' Mem. of Law at 20.) However, even a cursory review of those cases demonstrates that the conditions challenged therein are unlike those at Farmville. For instance, in all three cases—two of which involve the same proceeding—the courts noted that testing was woefully inadequate. *See Seth v. McDonough*, No. 8:20-cv-01028, 2020 U.S. Dist. LEXIS 89694, at *37 (D. Md. May 21, 2020) (noting that facility's director "knew that she had a substantial COVID-19 outbreak in the facility, and yet had only tested twenty detainees"); *Coreas v. Bounds (Coreas II)*, No. TDC-20-0780, 2020 U.S. Dist. LEXIS 81900, at *7 (D. Md. Apr. 30, 2020) ("Although [one of the facilities] has, through ICE, certified that it would test any

17

individuals with COVID-19 symptoms, it has not actually tested anyone to date . . . ."); *Coreas v. Bounds (Coreas III)*, No. TDC-20-0780, 2020 U.S. Dist. LEXIS 80951, at *15, 18 (D. Md. May 7, 2020) (citing the facility's refusal and unwillingness to test for COVID-19 as "highly probative on the issue of deliberate indifference") Here, however, ICA Farmville has tested all of its detainees, some of whom—including Plaintiff Castillo-Gutierrez—have been tested multiple times. (Crawford Decl. ¶¶ 35, 46, 48.) And though the cases relied upon by Plaintiffs cite inadequate medical staff,[7] overcrowding, and a lack of social distancing protocols in support of injunctive relief,[8] those factors are simply not present at Farmville. To the contrary, ICA Farmville has the benefit of a highly skilled medical professional, Dr. Moore, who, along with her employer, keeps abreast of any updated guidance provided by the CDC and Health Department.  (Crawford Decl. ¶ 26.)  Moreover, the facility remains at under 50% capacity—allowing for plenty of distance between detainees—has implemented and posted throughout the facility social-distancing protocols, has staggered meals and time in recreation spaces, has reassigned detainees' bunks where possible to provide more space, and has arranged detainees' bunks so that detainees sleep head to foot. (Crawford Decl. ¶¶ 3(d), 3(e), 15(i), 50).  Simply put, the measures taken at ICA Farmville to address the pandemic fall far short of deliberate indifference, and the Motion should be denied.

---

[7] *See, e.g.*, *Seth*, 2020 U.S. Dist. LEXIS 89694, at *6 (describing "medical staff wholly unfamiliar with how the virus presents, ill-equipped to identify COVID-19 symptoms, and uninformed as to how to conduct proper contact tracing or isolation procedures to stop the spread of this highly infectious virus").

[8] *See Coreas II*, 2020 U.S. Dist. LEXIS 81900, at *7; *Coreas III*, 2020 U.S. Dist. LEXIS 80951, at *18.

**B.**     **The conditions at ICA Farmville do not constitute punishment.**

While pretrial and civil detainees have a Fifth Amendment due process right to be free from "conditions" that "amount to punishment of the detainee," *Bell*, 441 U.S. at 535, conditions that are simply an "incident of some other legitimate governmental purpose" do not qualify as punishment." *Id.* at 538. "Absent a showing of an expressed intent to punish," imposed conditions do not inflict punishment so long as they are "reasonably related to a legitimate governmental objective." *Id.* at 538-39. *See also Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 252 (4th Cir. 2005) (quoting *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) ("[T]o establish that a particular condition or restriction of his confinement is constitutionally impermissible 'punishment,' the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective."). "Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell*, 441 U.S. at 539.

Here, Plaintiffs do not assert that the condition of their detention is the byproduct of an express intent to punish on the part of Crawford, ICA Farmville, or any other Defendant. Accordingly, to prevail, Plaintiffs must show that their detention "is not rationally related to an alternative governmental interest." *Slade*, 407 F.3d at 252. But that showing has not and cannot be made, as it is established that "preventing detained aliens from absconding and ensuring that they appear for removal proceedings is a legitimate governmental objective." *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 U.S. Dist. LEXIS 47891, at *6 (W.D. Wash. Mar. 19, 2020). *See also Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("Detention during [removal] proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made."); *Demore*,

538 U.S. at 523 ("[D]etention during deportation proceedings [is] a constitutionally valid aspect of the deportation process.  As we said more than a century ago, deportation proceedings would be vain if those accused could not be held in custody pending the inquiry into their true character.") (citations and internal quotation marks omitted); *Njuguna v. Staiger*, No. 6:20cv00560, 2020 U.S. Dist. LEXIS 111666, at *21 (W.D. La. June 3, 2020) ("Petitioner has identified no instances where the government's goal of detaining a particular detainee became unattainable due to COVID-19 risk factors and continued detention. A reasonable relation therefore exists, and thus does not, without more, amount to punishment."); *Jorge V.S. v. Green*, No. 20-3675 (SDW), 2020 U.S. Dist. LEXIS 69596, at *16 (D.N.J. Apr. 21, 2020 ("[I]mmigration detention is clearly reasonably related to a legitimate government interest . . . to ensure [removable aliens] . . . attend [their] proceedings while also ensuring they are not a danger to the community in the meantime."). Moreover, the fact that Plaintiffs are being detained during the outbreak of a global pandemic does not, alone, render their detention excessive or a punishment for Fifth Amendment purposes.  *See Dawson*, 2020 U.S. Dist. LEXIS 47891, at *6 ("Plaintiffs do not cite to authority, and the court is aware of none, under which the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak—even one as serious as COVID-19.").

Further, as is discussed above (*see supra* section I.A.) and fully set forth in Crawford's Declaration, Plaintiffs' allegations that the conditions at Farmville amount to unconstitutional punishment are divorced from reality and should be disregarded. For example, Plaintiffs cite overcrowding and the inability of detainees to distance themselves (Pls.' Mem. of Law at 23), but the facility is under 50% capacity, thereby permitting at least 100 square feet per detainee, (Crawford Decl. ¶¶ 3(e), 50).  Plaintiffs also cite inadequate nutrition, namely the service of inedible food (Pls.' Mem. of Law at 23), but over the past eight months the facility has experienced only a 0.01% complaint rate associated with the food being served. (Crawford Decl. ¶ 45.) Indeed,

in June the Office of Detention Oversight ("ODO") reported that its inspection of the Farmville facility identified no deficiencies in food service. (Crawford Decl. ¶ 31.)

Plaintiffs have made no effort to acknowledge or grapple with the legitimate governmental interests underlying their detention or otherwise clearly show that they are likely to succeed on the merits of their claim that the conditions of their confinement constitute impermissible punishment. Accordingly, the Motion should be denied.

## II.   Plaintiffs Fail to Clearly Establish a Likelihood of Irreparable Harm Absent an Injunction.

Plaintiffs cite two harms they allegedly will face in the absence of mandatory, preliminary injunctive relief. First, though Plaintiffs correctly note that the denial of a constitutional right may itself constitute irreparable harm for purposes of equitable jurisdiction, *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987), as explained above, Plaintiffs have failed to establish a likelihood of success on the merits of their claim that they have been denied a constitutional right and, thus, also have not clearly established irreparable harm stemming from such a denial. *Toure*, 2020 U.S. Dist. LEXIS 78638, at *40.

Second, Plaintiffs argue that they face a heightened health risk because COVID-19 is present at the Farmville facility and, more specifically, the current conditions "jeopardize Plaintiffs' recovery and risk exposing them to reinfection." (Pls.' Mem. of Law at 28.) The Farmville Defendants do not dispute that COVID-19 is a serious illness not to be taken lightly and, in that regard, understand and appreciate Plaintiffs' concerns, especially given the many unknowns associated with the new illness. However, when determining whether a mandatory preliminary injunction should be issued, the inquiry is *not* "whether the plaintiffs have shown that the virus poses a danger to the inmates in the abstract—it undoubtedly does—but rather whether they have shown that they will suffer irreparable injury '*unless the injunction issues*.'" *Swain*, 961 F.3d at

1292 (emphasis added); *see also Winter*, 555 U.S. at 22 (requiring plaintiffs to demonstrate "that irreparable injury is likely in the absence of injunction"). Moreover, under *Winter*, "possibility of irreparable harm" is insufficient to warrant the extraordinary relief of a preliminary injunction. *Id.* Instead, in addition to showing that it is *likely*, Plaintiffs must show the harm to "be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002). Because Plaintiffs have not clearly demonstrated that irreparable harm is likely in the absence of the extreme relief requested, the Motion should be denied.

In their Motion [Dkt. No. 6], Plaintiffs ask the Court to issue a mandatory preliminary injunction—on a limited, incomplete record—ordering Defendants to, among other requests, submit to an inspection at the Farmville facility by **an expert of Plaintiffs' choosing**, at Defendants' expense, and create a plan, consistent with CDC guidelines, to be approved by the Court and **overseen by Plaintiffs' expert** that outlines Defendants' efforts to address Plaintiffs' concerns over medical care and proper nutrition. (Mot. at 1-2.) Yet Plaintiffs fail to acknowledge what measures are currently in place at the facility to address COVID-19 and, importantly, the efforts the Farmville Defendants already have taken to ensure compliance with all CDC guidelines. And while Plaintiffs cite the need for an independent expert to examine the facility, the CDC and Department of Health have already planned a site assessment of the facility. (Crawford Decl. ¶ 49.)

Moreover, though COVID-19 first appeared at the facility in late April 2020—and though Plaintiffs Santos Garcia and Castillo Gutierrez tested positive for the virus in early July (Crawford Decl. ¶ 48)—at this point in time the risk of *reinfection* appears speculative and not scientifically established, though the Farmville Defendants defer to the scientific community and medical professionals, including Dr. Moore and Armor, in that regard. Similarly, while Plaintiffs cite

concerns over their ability to recover at the facility after a positive test result, such concerns, though understandable, do not amount to the "actual and imminent" harm required by *Winter*. To be sure, Plaintiffs Santos Garcia and Castillo Gutierrez themselves are currently exhibiting no COVID-19 symptoms. (Crawford Decl. ¶ 48.) In fact, no detainees at the facility have exhibited COVID-19-related symptoms since July 10 and—based on updated CDC guidance as implemented by Dr. Moore and Armor—all detainees currently housed at Farmville have been cleared of COVID-19. (Crawford Decl. ¶¶ 52-53.)

Despite Plaintiffs' contrary suggestions, the conditions at Farmville are not only improving daily, but the protocols adopted and implemented at the facility appear to have already significantly lowered the risk of harm. Under these circumstances, it remains unclear how granting Plaintiffs the extraordinary relief requested—especially at this stage in the proceedings and under current conditions—is necessary to prevent Plaintiffs from suffering the harm they fear. The Motion should be denied.

## III. Plaintiffs Fail to Clearly Establish that the Public Interest and Balance of Equities Weigh in Their Favor.

The third and fourth *Winter* factors that Plaintiffs must clearly demonstrate are that the balance of equities tips in their favor and that an injunction is in the public interest. Where the Government is a party, these two factors merge. *Toure*, 2020 U.S. Dist. LEXIS 78638, at *42; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

In their Motion, Plaintiffs seek a Court-ordered overhaul of how the Farmville Defendants, the Federal Defendants, and Armor and Dr. Moore are running the Farmville facility and managing the COVID-19 pandemic. In essence, Plaintiffs ask the Court to substitute its judgment and that of Plaintiffs' private expert, Dr. Venters, for those of public health officials, medical professionals, and detention facility officials—who face and respond to the ever-evolving situation in Farmville

23

in real time and on a daily basis—on how to address the pandemic and ensure that the clinical needs of detainees are being met. The Court cannot issue such injunctive relief, however, without raising significant separation of powers concerns and stripping Defendants of their inherent and necessary ability to fluidly manage the facility and guard and protect its detainees.

The Supreme Court has cautioned that federal courts must tread lightly when it comes to questions of managing detention facilities. In *Turner v. Safley*, for example, the Court explained:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are ***peculiarly within the province of the legislative and executive branches of government***. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, ***and separation of powers concerns counsel a policy of judicial restraint***.

482 U.S. 78, 84-85 (1987) (emphasis added). The Court similarly recognized in *Procunier v. Martinez* that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and that the problems in such facilities "are not readily susceptible of resolution by decree." 416 U.S. at 404-05. Although Plaintiffs here are held in a civil immigration detention center, not a prison, "the same concerns regarding institutional competence and the separation of powers apply here. Indeed, these concerns apply all the more here given that ICE must address the impact of a novel pandemic affecting the entire nation and must do so across the entire civil immigration detention system." *C.G.B. v. Wolf*, No. 20-cv-1072, 2020 U.S. Dist. LEXIS 96482, at *81 (D.D.C. June 2, 2020); *see also Swain*, 961 F.3d at 1293-94 (explaining that public interest is also advanced by leaving discretionary matters to officials, who are best equipped to make decisions regarding the safety and health of detainees in the face of COVID-10, and noting that "government officials have a keen interest in maintaining the necessary flexibility to react quickly in response to new information about the virus").

The primary remedies that Plaintiffs seek are extremely intrusive measures that, if granted, would saddle Defendants with tremendous burdens and significantly hinder the Farmville Defendants' ability to shift to new realities on the ground, adapt to updated guidance from Dr. Moore and Armor and public health officials, and react to new information about the virus as it becomes available.  Though the public interest certainly is served by protecting the detainees and staff at Farmville, as well as the entire community, from COVID-19 and its possible consequences, the public interest also commands respect for federalism and comity.

These last two *Winter* factors dictate that the Court should approach intrusion into the core activities of the Farmville facility with caution. Therefore, and because the power to issue a preliminary injunction, *especially a mandatory one*, should be sparingly exercised, the Court should deny the Motion.

<u>CONCLUSION</u>

For the reasons explained above and those detailed in the Crawford Declaration, Crawford and ICA Farmville ask this Court to deny the Motion. Crawford further adopts and incorporates herein the response of the Federal Defendants and Defendant Amor pursuant to Federal Rule of Civil Procedure 10(c).

Respectfully Submitted,

**JEFFREY CRAWFORD**

**and**

**IMMIGRATION CENTERS OF AMERICA-FARMVILLE, LLC**

25

Dated: August 6, 2020                              /s/ *Patricia B. Turner*
                                         John M. Erbach (VSB No. 76695)
                                         Email: jerbach@spottsfain.com
                                         Patricia Bugg Turner (VSB No. 72775)
                                         Email: pturner@spottsfain.com
                                         Kasey L. Hoare (VSB No. 92289)
                                         Email: khoare@spottsfain.com
                                         SPOTTS FAIN, P.C.
                                         411 E. Franklin Street, Suite 600
                                         Richmond, VA 23219
                                         (804) 697-2000 (Telephone)
                                         (804) 697-2100 (Facsimile)
                                         *Counsel for Defendants Jeffrey Crawford and*
                                         *Immigration Centers of America-Farmville, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed on this 6th day of August

2020, using the Court's CM/ECF electronic filing system, thereby notifying all counsel of record.

> _/s/ Patricia B. Turner_
> John M. Erbach (VSB No. 76695)
> Email: jerbach@spottsfain.com
> Patricia Bugg Turner (VSB No. 72775)
> Email: pturner@spottsfain.com
> Kasey L. Hoare (VSB No. 92289)
> Email: khoare@spottsfain.com
> SPOTTS FAIN, P.C.
> 411 E. Franklin Street, Suite 600
> Richmond, VA 23219
> (804) 697-2000 (Telephone)
> (804) 697-2100 (Facsimile)
> _Counsel for Defendants Jeffrey Crawford and_
> _Immigration Centers of America-Farmville, LLC_