**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| CHRISTIAN ALBERTO SANTOS GARCIA, | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:20-cv-821-LMB-JFA |
| | ) | |
| CHAD F. WOLF, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____

**FEDERAL DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

YURI S. FUCHS
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3872
Fax:    (703) 299-3983
Email:  yuri.fuchs@usdoj.gov

*Counsel for Federal Defendants*

**INTRODUCTION**

The COVID-19 pandemic has sadly weaved its way into the fabric of life across the United States, and an ever growing amount of individuals in our nation find themselves increasingly exposed to this highly contagious virus month after month despite the efforts of the federal government, local governments, and our civic institutions to mitigate the spread of this noxious pathogen—which sadly has not gone away and may not go away for the foreseeable future.

But in the midst of this pandemic, Federal Defendants and officials at the Farmville Detention Center ("ICA Farmville") have taken extensive and prompt measures to mitigate the spread of COVID-19 and its harm at the facility.  Among other steps, officials have instituted widespread testing, ensured extensive cleaning of the facility, provided PPE and hand sanitizers to staff and detainees, provided medical treatment to detainees, and enforced social distancing measures in line with the Centers for Disease Control and Prevention's ("CDC") Interim Guidance for detention facilities.  In addition, officials had previously sought to forestall the risk of COVID-19's spread through cohorting and screening of detainees suspected to have the disease. Unfortunately though, Plaintiffs found themselves among those individuals exposed to COVID-19 in late June 2020 and early July 2020 when there was a localized outbreak at ICA Farmville while similar outbreaks raged across the country.  Defendants' actions sadly could not avoid the emergence of COVID-19 at ICA Farmville, but they were reasonable proactive and preventative measures to a changing situation—one that Federal Defendants continue to find ways of addressing as it unfolds with the guidance and help of the CDC.

Plaintiffs fault these measures and now seek to superimpose the judgment of their own expert for that of the officials on the ground and public health officials.  In particular, they seek the extraordinary and disfavored relief of a mandatory injunction, that would judicially-mandate that Plaintiffs' own selected and retained expert be allowed to inspect ICA Farmville and then oversee,

with this Court's guidance, the facility's day-to-day work, including efforts at social distancing, proper medical care, and nutrition—all of which the facility has existing measures regarding.  The Court should not countenance this relief because Plaintiffs cannot make the clear showing that they are entitled to such an injunction against the Federal Defendants—one that the Supreme Court has rejected in the detention context.

First, Plaintiffs have not shown a likelihood of success on the merits in order to obtain an injunction.  Plaintiffs have not demonstrated that the Federal Defendants have subjected them to punishment or have been deliberately indifferent to their medical needs as part of their substantive due process claims.  Rather, the steps taken at ICA Farmville have been reasonable responses to the risk of COVID-19 and have sought to provide proper medical precautions, medical treatment, and nutrition for the detainees there as recognized in a declaration that Plaintiffs themselves attached as an exhibit to their own Complaint.  *See generally* ECF No. 1-7.  Plaintiffs' remaining Administrative Procedure Act ("APA") claim is otherwise not cognizable, and, even if it were, it must also be dismissed because of the reasonable measures taken at ICA Farmville.

Second, it is unlikely that Plaintiffs have shown irreparable harm.  Lamentably, Plaintiffs were exposed to and fell ill to COVID-19, but their own declarations suggest that this harm— Plaintiffs' exposure and their symptoms—has largely passed since they were first infected well over a month ago.  Meanwhile, Plaintiffs' suggestion that they could be reinfected is speculative at the moment and therefore insufficient to show irreparable harm.

Lastly, mandatory injunctive relief here would not be in the public interest.  Federal Defendants have been able to take proactive and preventative measures to address the harms of COVID-19 with flexibility to modify them dynamically as new facts and realities have emerged. Plaintiffs' requested injunction would scythe at that dynamism, impose the judgment of a private expert over that of public health officials, and inject the Court into the micro-management of health

and safety measures at a detention facility.  The public interest does not favor this outcome.

For all these reasons, the Federal Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction.

## FACTUAL BACKGROUND

### I.    The Plaintiffs.

Three of the four Plaintiffs are presently detained in ICA Farmville during the pendency of their removal proceedings.  Immigration and Customs Enforcement ("ICE") has no plans to transfer any of these individuals to a facility in Texas despite Plaintiffs' hearsay contentions to the contrary. *Compare* ECF No. 1 ¶ 9 ("Compl.") *and* ECF No. 7 at 9 ("Mem.") *with* Ex. 1 ¶¶ 4, 29, 41, 48 ("Mullan Decl.").

**Plaintiff Christian Alberto Santos Garcia** is a 23-year-old citizen of El Salvador.  *See* Compl. ¶ 11; Mullan Decl. ¶ 5.  Plaintiff is currently in removal proceedings as the Department of Homeland Security ("DHS") has appealed a December 9, 2019 decision by an Immigration Judge that granted Plaintiff Santos Garcia's application for withholding of removal and application for protection under the Convention Against Torture.  Mullan Decl. ¶ 28.  Briefing on the appeal is complete.  Mullan Decl. ¶ 28.

**Plaintiff Santos Salvador Bolanos Hernandez** is a 35-year-old citizen of El Salvador. Compl. ¶ 12; Mullan Decl. ¶ 30.  Plaintiff is currently in removal proceedings as DHS has appealed an April 28, 2020 decision that granted Plaintiff Santos Garcia's application for withholding of removal.  Mullan Decl. ¶¶ 39-40.  Those proceedings are currently stayed pending appeal, and the Board of Immigration Appeals has yet to issue a briefing schedule.  Mullan Decl. ¶ 40.  Plaintiff tested negative for COVID-19 on July 16, 2020.  ECF No. 30-1 ¶ 48 ("Crawford Decl.").

**Plaintiff Gerson Amilcar Perez Garcia** is a 27-year-old citizen of Honduras who was granted asylum on July 30, 2020 and released from ICA Farmville on July 31, 2020.  Compl. ¶ 13; Mullan Decl. ¶¶ 41, 47.[1]

**Plaintiff Ismael Castillo Gutierrez** is a 43-year-old citizen of Honduras.  Compl. ¶ 14; Mullan Decl. ¶ 49.  Plaintiff is currently in removal proceedings where he filed an application for asylum, withholding of removal, and protection under the Convention Against Torture on June 22, 2020.  Mullan Decl. ¶ 59.  An individual hearing on that application is set for August 14, 2020. Mullan Decl. ¶ 63.

## II.     Plaintiffs' Current Detention at Farmville

As demonstrated by the numerous declarations attached to Defendants' respective papers, ICA Farmville—as additionally guided by ICE itself—has duly prepared for the pandemic, is vigilantly monitoring the unfolding situation, and taking proactive and appropriate precautions to safeguard the lives and well-being of the detainees.

ICA Farmville is a dedicated ICE detention facility that is subject to and complies with the Performance-Based National Detention Standards ("PBNDS"), which provide ICE's national detentions standards regarding detainees' health and food needs, among others.  Mullan Decl. ¶ 66.

With respect to detainees' specific health needs, clinical services at ICA Farmville are provided under contract by Armor Correctional Health Services, Inc. ("ACHS").  Since the onset of COVID-19 in the United States, ICE epidemiologists (which are part of a separate ICE component dedicated exclusively to the health and needs of ICE detainees, known as ICE Health Services Corps ("IHSC")) have been tracking the outbreak, regularly updating infection

---

[1] Consequently, the substantive due process and APA claims are moot as to Plaintiff Perez Garcia because "[a] [detainee]'s transfer or release from a particular prison generally moots his claims for injunctive and declaratory relief with respect to his conditions of confinement there." *Nicholson v. Boakye*, 2017 WL 3331775, at *2 (W.D. Va. Aug. 4, 2017); *see also Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007).

prevention and control protocols, and issuing guidance to ACHS staff for the screening and management of potential exposure among detainees. ICE's pandemic plan, which ICHS started to implement in January 2020, provides specific guidance for biological threats such as COVID-19. Most recently, in July 2020, ICE released the third version of its COVID-19 Pandemic Response Requirements ("PRR"), which sets forth expectations and assists ICE detention facility operators in mitigating the risks of COVID-19. ICE has also paid particular attention to detainees who might be at higher risk to COVID-19, specifically those who are over the age of 60 or are immunocompromised, and implemented identification and additional case monitoring for those individuals. This attention is consistent with ICE's broader evaluation of its detained population and its compliance with the nationwide injunction from *Fraihat v. ICE*, 19-cv-01546 (C.D. Cal.), which has led ICE to release over 900 medically at risk individuals since the outbreak of COVID-19 after evaluating their immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns. Mullan Decl. ¶¶ 64, 75-77.

In monitoring COVID-19 at ICA Farmville, ACHS itself is in daily contact with the Piedmont District of the Virginia Department of Health (the health district in which Farmville is located), and ACHS makes decisions on cohorting and isolation in consultation with them. When a dorm is placed on cohorting protocol, that dorm is placed on restricted movement and isolated from other dorms while detainees in that dorm are subject to increased medical monitoring. In testing for COVID-19, ACHS is also following guidance issued by the CDC to safeguard those in its custody and care. During intake medical screenings of detainees, comprehensive health assessments are based on detainee statements and a direct medical screening. Those detainees that present symptoms compatible with COVID-19 are placed in isolation, where they will be tested. If testing is positive, they will remain isolated and treated. In case of any clinical deterioration, they will be referred to a local hospital. In cases of known exposure to a person

5

with confirmed COVID-19, any asymptomatic detainees are placed in dorms, which are cohorted with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee), and are monitored daily for fever and symptoms of respiratory illness.  Symptomatic individuals are referred to a medical provider for evaluation.  All detention staff are screened for COVID-19 symptoms and exposure prior to entering the facility as well.  ACHS is also educating staff on an ongoing basis, focused on providing education at shift changes to ensure that all staff are covered.  It is currently unknown if a person can be reinfected with COVID-19 more than once, but the determination of whether reinfection occurs is to be made on a case-by-case basis in consultation with infectious disease and public health experts.  Mullan Decl. ¶¶ 78, 81-85.

Additional proactive measures to prevent the spread of COVID-19 at ICA Farmville have also been taken, including: (1) implementing daily, increased cleaning such that ICA Farmville is cleaned and sanitized approximately every four hours; (2) educating detainees about the spread of COVID-19 and taking preventative measures to avoid the disease; (3) providing detainees and staff members each with soap, hand sanitizers, three N95 masks, two surgical masks, and two cloth masks; (4) encouraging all detainees to engage in social distancing to the maximum extent practicable; and (5) suspending visitation to the facility since March 13, 2020 to mitigate against spread from the outside.  Mullan Decl. ¶¶ 79-80, 86-87.

These proactive and preventative measures have continued and been increased as COVID-19 has generally spread throughout the United States; indeed, the facility has extensively increased its preventive measures in response to the recent uptick in COVID-19 cases.  When 74 detainees were transferred to ICA Farmville on June 2, the facility performed pre-intake screening, tested all 74 detainees, and cohorted the 51 positive cases it discovered in a previously vacant dorm away from the general population at the facility.  All 74 detainees were quarantined from the general population

while they were being tested, and none exhibited serious symptoms or required hospitalization  As a result of new COVID-19 cases the facility has discovered through testing, ICA Farmville tested all of its detainees (in some cases re-testing detainees), has instituted contact tracing of staff, is providing additional hand wash stations for detainees, and is distributing additional PPE for all detainees and staff.  Moreover, ICA Farmville has also instituted social distancing measures in line with the CDC's Interim Guidance, sent detainees with serious symptoms of COVID-19 for treatment at local hospitals, and otherwise provided for daily access to medical evaluations and over-the-counter medications upon request in the event that detainees are experiencing less severe symptoms of COVID-19.  Currently, the facility is at less than half of its capacity and is continuing to retest detainees where clinically necessary, with some 38 detainees already testing negative for COVID-19 and 138 results still pending.  *See* Crawford Decl. ¶¶ 3(c), 3(d), 15(i), 29-30, 35, 42, 50.

More recently, in light of new COVID-19 cases, the CDC has agreed to visit the facility and will conduct an assessment of existing infection prevention and control measures related to COVID-19, with a target date of on or about August 7, 2020.  Mullan Decl. ¶ 88.

With respect to the detainees' nutritional needs, ICA Farmville's kitchen is run by Trinity Services Group ("Trinity").  The kitchen itself is cleaned on a constant, daily basis and food service workers (volunteer detainees) are given a physical and medical screening before they can begin work in the kitchen.  Detention officers at ICA Farmville do not cook or engage in food production, which is done either by volunteer detainee workers or Trinity staff.  Food preparation and the available diet for detainees at ICA Farmville are subject to strict controls regarding:  the menu; the use of leftover products—which may not be served unless 24 hours within their initial preparation; food temperature; cleaning; and pest control.  Detainees can report or file grievances regarding issues with their food.  Since January 1, 2020, there have been 42 total food grievances at the facility, many of which regard requests for special food accommodations and larger portions and none of

which have detailed allegations of insects in detainees' food.  While there were 16 allegations of expired food, 11 of those related to grievances regarding expired milk that appears to have arisen on July 21 and July 22, 2020 as a result of milk supply issues with milk received from the Virginia Department of Corrections.  Mullan Decl. ¶¶ 69-74; Crawford Decl. ¶ 45.

## ARGUMENT

### I.    Plaintiffs Fail to Show that They Satisfy the Four Factors to Justify Injunctive Relief.

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances."  *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).  In order to obtain a preliminary injunction, Plaintiffs must make a "clear showing" of each of the four factors: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in their favor; and (4) that the public interest favors the requested equitable relief.  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

"Ordinarily, preliminary injunctions are issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *See Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012).  Plaintiffs here, however, do not seek a preliminary injunction for its generally intended purpose—to maintain the status quo.  Instead, Plaintiffs seek the extraordinary and *disfavored* relief of a "mandatory" injunction asking this Court to appoint their own expert to oversee the implementation of their requested conditions at ICA Farmville.  *See* ECF No. 6 ("Mot."); *see also Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances.").  To obtain this extraordinary and disfavored relief, courts require "a heightened showing of the four factors."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 (10th Cir. 2009); *Vollette v. Watson*, 2012 WL

3026360, at *3 (E.D. Va. July 24, 2012) (explaining that the *Winter* standard "becomes even more exacting" for mandatory injunctive relief).  Plaintiffs cannot muster a regular showing—let alone a heightened showing—of the four factors required for a preliminary injunction under *Winter*.

    A.    <u>Factor 1: Plaintiffs cannot show they are likely to succeed on the merits.</u>

No injunction should issue to Plaintiffs because they cannot establish that they have a "clear and convincing probability of success" on the merits.  *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000).  As to their constitutional claims, Plaintiffs cannot show that the Federal Defendants have been deliberately indifferent to their medical needs or that their conditions represent constitutionally improper "punishment."  Moreover, Plaintiffs do not have a cognizable APA claim based on Federal Defendants' alleged non-compliance with the PBNDS.[2]

        **1.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Fifth Amendment Claims.**

Plaintiffs assert two theories under the Fifth Amendment's Due Process clause to justify the extraordinary and disfavored relief of a mandatory injunction.  First, Plaintiffs argue that Federal Defendants have been deliberately indifferent to their serious medical needs.  Mem. at 15-22.  And second, Plaintiffs assert that Federal Defendants are subjecting them to impermissible punishment.  Mem. at 23-24.

Whether Plaintiffs' Fifth Amendment due process rights are commensurate in scope with

---

[2] In assessing Plaintiffs' claims, the Court should not consider or should otherwise assign minimal weight to a number of their hearsay declarations.  For instance, Plaintiff Santos Garcia's declaration asserts that he "hear[d] from Farmville personnel that ICE planned to transfer the majority of people at Farmville to another ICE facility in Texas."  ECF No. 1-1 ¶ 24. More glaringly, the declaration of Ashley I. Warmeling is entirely hearsay and hearsay-upon-hearsay, relying on information provided to counsel by unnamed "clients" regarding the conditions at ICA Farmville. *See generally* ECF No. 1-10.  The Court should discount or refuse to consider this evidence as a result. *See Bank of Am. Inv. Servs., Inc. v. Byrd*, 2009 WL 10184606, at *7 (E.D. Va. June 15, 2009) (noting that "the fact that the affidavit is based on hearsay is a factor in determining the evidentiary weight of the affidavit"); *Albritton v. Johnson*, 2008 WL 8178123, at *1 (E.D. Va. Apr. 2, 2008) (concluding that "the court cannot consider plaintiff's affidavit as evidence to support [his] motion for a preliminary injunction" because it was primarily comprised of hearsay).

the rights of other civil detainees as a matter of substantive due process is far from clear.  *See Demore v. Kim*, 538 U.S. 510, 521 (2003*)* ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").  Regardless, Plaintiffs are unlikely to succeed on the merits of their substantive due process claims because the alleged conditions do not constitute deliberate indifference on the part of the Federal Defendants and are not unlawful punishment.  In fact, Plaintiffs' claims improperly ask this Court to intercede and micro-manage the affairs of ICA Farmville despite the well-settled admonition that "[f]ederal courts sit not to supervise prisons." *Cruz v. Beto*, 405 U.S. 319, 321 (1972).

### a.   Plaintiffs have not demonstrated deliberate indifference to their serious medical needs.

Plaintiffs first argue that their detention violates their due process rights under the Fifth Amendment because Federal Defendants have acted with deliberate indifference towards their medical care.  *See* Mem. at 15.  The Fourth Circuit evaluates substantive due process deliberate indifference claims under the same rubric that it applies to Eighth Amendment deliberate indifference claims.  Consequently, a plaintiff "makes out a due process violation if he shows deliberate indifference to serious medical needs . . . because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (internal quotations omitted); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that governmental officials not be deliberately indifferent.").

As the Fourth Circuit has held, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Shover v. Chestnut*, 798 F. App'x 760, 762 (4th Cir. 2020) (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)).  "The deliberate indifference standard is a two-pronged test:  (1) the prisoner must be exposed to a substantial risk of serious harm, and (2)

10

the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson v. Virginia*, 878 F.3d 89, 97-98 (4th Cir. 2017). Thus, Plaintiffs must show that Federal Defendants had "actual knowledge of the risk of harm to the inmate" and that they "must also have recognized that [their] actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).[3]

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994) (adopting "subjective recklessness as used in the criminal law . . . as the test for 'deliberate indifference' under the Eighth Amendment"). It is "a very high standard" because "the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96. A deliberate indifference claim is reserved for those actions or treatments that are "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Christian v. Wright*, 2011 WL 10621667, at *2 (E.D. Va. Nov. 9, 2011) (O'Grady, J.) (alteration in original) (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)). Put simply, the mere fact that a detainee suffers a medical difficulty does not equate to deliberate indifference. *See, e.g., Clark-Murphy*

---

[3] Plaintiffs' argument proceeds on what they deem "the old subjective standard," Mem. at 17, agreeing that this is the applicable standard for the second step of a deliberate indifference claim. Nonetheless, Plaintiffs suggest that the second step of their deliberate indifference claim might be an objective inquiry, drawing on *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), to claim that "the question of whether the official knew of and disregarded the risk to Plaintiffs' health and safety is an objective one." Mem. at 16-17. Because Plaintiffs have explicitly premised their actual argument on the familiar *Farmer* standard, this aside is immaterial to deciding their claim. However, Plaintiffs' musings are incorrect in any event. Contrary to Plaintiffs' suggestion that the state of the law is "unsettled," Mem. at 16, post-*Kingsley*, the Fourth Circuit has continued to adhere to settled precedent and the two-pronged *Farmer* test in evaluating pretrial detainees' claims that their serious medical needs were ignored under the lens of deliberate indifference. *See, e.g., Shover*, 798 F. App'x at 761. Moreover, other courts of appeals have rejected *Kingsley*'s application in similar claims of deliberate indifference to detainees' medical needs. *See, e.g., Swain v. Junior*, 2020 WL 3167628, at *5 n.4 (11th Cir. June 15, 2020). Federal Defendants also submit that an objective standard would not change the outcome based on the numerous and exhaustive measures taken at ICA Farmville.

*v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006) (holding that detainee could not establish deliberate indifference through application of "res ipsa loquitor").

Leaving aside whether or not the existence of positive COVID-19 cases at ICA Farmville satisfies the first element despite measures taken by facility staff to isolate and treat detainees testing positive for COVID-19, *see* Crawford Decl. ¶¶ 28-30, 40, 42, 46-48, and despite Plaintiffs themselves no longer showing symptoms associated with COVID-19, *see infra* Part I.B., it is unnecessary for this court to assess whether the first element is met because Plaintiffs cannot satisfy the second element of the deliberate indifference standard. *See Toure v. Hott*, 2020 WL 2092639, at *13 (E.D. Va. Apr. 29, 2020).[4] The fact that ICE has taken significant affirmative steps to mitigate the risk of COVID-19, by itself, decisively refutes any assertion that ICE officials have acted with *deliberate* indifference to the risk of COVID-19 at ICA Farmville. Defendants, both at the government and facility level, have issued guidance and worked together to develop best practices for the health and safety of the detainees in custody. *See, e.g.*, Mullan Decl. ¶¶ 75-87.

Federal Defendants have been monitoring the potential reach of COVID-19 since January 2020, and have gone to great lengths to implement procedures and cohorting protocols, with the guidance of their own medical experts, to protect detainees in their care and to provide additional

---

[4] Plaintiffs brush aside *Toure*, claiming that it is inapposite to the current case because it was a habeas petition, involved different legal issues, and involved no confirmed COVID-19 cases yet at ICA Farmville. *See* Mem. at 18 n.60. None of these distinctions are availing though, and *Toure* is directly relevant to this Court's analysis. The petitioners-plaintiffs in *Toure*, like Plaintiffs, did move for injunctive relief and brought deliberate indifference claims related to the conditions of confinement at ICA Farmville in light of COVID-19 that were decided by Judge O'Grady. *See Toure*, 2020 WL 2092639, at *13-*14. Moreover, while there were no COVID-19 cases at the time *Toure* was decided, Judge O'Grady's decision actually declined to rule on whether the objective substantial risk of harm prong was met and concluded, based on the preventative measures taken at the facility, that "[p]laintiffs ha[d] failed to clearly establish the subjective prong." *Id.* at *13. On this point, Judge O'Grady highlighted numerous measures adopted by Farmville in the wake of the pandemic, including its ability to "multiply [its] treatment capabilities." *Toure*, 2020 WL 2092639, at *12. In the months since that decision, ICA Farmville has adopted even more extensive measures, such as the full testing and re-testing of all of its detainees. *See* Crawford Decl. ¶ 46.

monitoring of detainees that are particularly vulnerable by virtue of their age or immune status. Mullan Decl. ¶¶ 75-78. Federal Defendants have instituted procedures to isolate and/or contain any alien with a suspected or confirmed case of COVID-19 from the rest of the general population, and the facility has taken even more drastic steps in response to the recent rise in cases at ICA Farmville. Mullan Decl. ¶¶ 81-84; Crawford Decl. ¶¶ 28-30, 32, 50. Moreover, Defendants have taken additional measures in Farmville—in step with the CDC's recommendations—to mitigate the spread of COVID-19 by temporarily suspending visitation, thoroughly cleaning ICA Farmville every four hours, and issuing protective equipment and multiple masks to every detainee and staff member. Mullan Decl. ¶¶ 79-80, 86-87; *see Aslanturk v. Hott*, 2020 WL 2465663, at *134 (E.D. Va. May 8, 2020) (holding that officials at Caroline detention facility were not deliberately indifferent through similar measures of isolating detainees, repeated cleaning, and suspension of visitation); *see also Toure*, 2020 WL 2092639, at *13 (same as to Caroline and ICA Farmville). Plaintiffs may find some of these measures unsatisfactory, but their disagreement and that of their expert with otherwise reasonable preventative and proactive measures does not provide them with a constitutional right to substitute the judgment of Plaintiffs' chosen expert for that of Federal Defendants and public health officials. *See United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) ("The mere possibility of a change in treatment based on the professional judgment of a prison's medical team simply does not give rise to an Eighth Amendment violation."); *Kiernan v. McKinley*, 2009 WL 2175639, at *2 (E.D. Va. July 20, 2009) (Brinkema, J.) (same); *see also Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) (stating that, as to adequacy of medical treatment in prisons, "courts will not intervene upon allegations of mere negligence, mistake or difference of opinion").

Defendants' attention to the medical needs of *all* detainees, including medical care to detainees showing signs of illness, coupled with the preventative steps taken by ICE in response to the pandemic, clearly show that Federal Defendants have not been deliberately indifferent to

Plaintiffs' health needs.  *See Farmer*, 511 U.S. at 844 ("A prison official's duty under the Eighth

Amendment is to ensure *reasonable* safety.") (quotation omitted) (emphasis added); *Brown*, 240 F.3d

383, 390 (4th Cir. 2001) (defendant "avoids liability [on a deliberate indifference claim] if he

responded reasonably to the risk of which he knew").

Plaintiffs argue that "[d]espite knowing the substantial risk to Plaintiffs' and other detainees'

health and safety, Defendants have disregarded this risk by failing to mitigate or control the risk of

exposure to COVID-19 at Farmville."  Mem. at 19.  But what matters in the deliberate indifference

analysis is not that Plaintiffs were exposed to COVID-19 but rather whether Federal Defendants

adopted reasonable measures to stem that risk, which they did.  *See Swain*, 961 F.3d at 1287 ("First,

and most obviously, the district court erred in relying on the increased rate of infection. . . . '[p]rison

officials who actually knew of a substantial risk to inmate health or safety may be found free from

liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*.' . . . A

resulting harm thus cannot alone establish a culpable state of mind.") (emphasis in original); *see also*

*Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) ("The BOP's steps to prevent and mitigate

COVID-19 spread . . . are likely reasonable responses to this serious risk.").

Plaintiffs further allege that Defendants are deliberately indifferent because they maintain an

overcrowded facility, have not provided PPE, unreasonably delayed the testing of the detainee

population, have not provided medical treatment, transferred 74 detainees to the facility without

providing proper precautions, and are going to transfer Plaintiffs to a facility in Texas.  Mem. at 1,

19-22.  For one, many of these contentions are not well-taken as a factual matter.  ICA Farmville

has, among other measures:  instituted social distancing measures in line with CDC guidance for

detention facilities, provided PPE to detainees, sent detainees with serious symptoms for treatment

at local hospitals and otherwise provided for daily access to medical evaluations and over-the-

counter medications upon request, and provided testing of all detainees.  Crawford Decl. ¶¶ 3(d),

15(i),[5] 20, 40, 42, 50.  Plaintiffs' contention that 74 detainees were transferred to Farmville in early

June 2020 "even though [Defendants] knew that they did not have the capacity to quarantine,

isolate, or adequately screen them at intake," Mem. at 1, is also incorrect.  To the contrary, ICA

Farmville had the capacity accommodate this transfer at the time, engaged in pre-intake screening of

detainees, and subsequently isolated the transferred detainees away from the general population.

Crawford Decl. ¶¶ 29-30.[6]  Moreover, Plaintiffs themselves are not going to be transferred to a

facility in Texas despite Plaintiff Santos Garcia's hearsay declaration stating otherwise.  Mullan Decl.

¶¶ 4, 29, 41, 48.  In reviewing the measures put in place at ICA Farmville, it is clear that the facility is

not at all like the facilities identified by Plaintiffs as involving "similar conditions."  *See* Mem. at 20-

21; *see Seth v. McDonough*, 2020 WL 2571168, at *12–13 (D. Md. May 21, 2020) (involving a facility

where "no formal plan exists to continue in some orderly fashion, the provision of PPE, cleaning

supplies, and social distancing measures" and where there was a "combination of simultaneously

undertesting, failing to isolate and provide basic medical attention to COVID-19 symptomatic

detainees, and ignoring high-risk detainees"); *Coreas v. Bounds*, 2020 WL 2201850, at *2 (D. Md. Apr.

30, 2020) (alleging no "social distancing protocols" or testing at a facility).

For another, caselaw both prior and during COVID-19 has made clear that the "test for

deliberate indifference requires *reasonable* action."  *Toure*, 2020 WL 2092639, at *13; *see also Makdessi v.*

*Fields*, 789 F.3d 126, 132 (4th Cir. 2015) ("[O]fficials are . . . obligated to take *reasonable* measures to

---

[5] The Crawford Declaration lists a number of operations modified at ICA Farmville in order to maximize social distancing, which largely track the CDC's own interim guidance for detention facilities.  *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (last updated July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("CDC Interim Guidance").

[6] In fact, Virginia's two Senators—whose July 16, 2020 letter Plaintiffs partly rely on to establish the facts on the ground, *see, e.g.*, Mem. at 6—recognized that "Farmville ICA appears to have followed appropriate quarantine measures" with regards to the early June 2020 transfer.  Letter from Sens. Warner and Kaine to Acting Sec'y Wolf (June 26, 2020), https://www.kaine.senate.gov/press-releases/warner-and-kaine-call-for-ice-to-stop-transferring-detainees-amid-covid-19-crisis.

guarantee inmate safety.") (emphasis added).  Although Plaintiffs find fault with the current

measures instituted to prevent, mitigate, and treat the spread of COVID-19, Federal Defendants'

obligations under substantive due process is to take the reasonable measures available to them, not

eradicate this sadly, as of yet, incurable disease wholesale.  *See Swain*, 961 F.3d at 1289 ("We simply

cannot conclude that, when faced with a perfect storm of a contagious virus and the space

constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their

best.'"); *Wilson*, 961 F.3d at 840-41 ("As of April 22, fifty-nine inmates and forty-six staff members

tested positive for COVID-19, and six inmates died . . . while the harm imposed by COVID-19 on

inmates . . . 'ultimately [is] not averted,' the BOP has 'responded reasonably to the risk' and

therefore has not been deliberately indifferent.");, *see also Gonzalez v. Ahern*, 2020 WL 3470089, at *7

(N.D. Cal. June 25, 2020) ("[D]elays in processing testing or communication lapses [regarding

COVID-19] rise to the level of reckless disregard."); *Benavides v. Gartland*, 2020 WL 1914916, at *5

(S.D. Ga. Apr. 18, 2020) ("[T]he Constitution does not require that detention facilities reduce the

risk of harm to zero.").  Because Federal Defendants have responded reasonably to the risk posed

COVID-19, Plaintiffs' deliberate indifference claim likely fails on the merits.

### b.  The Plaintiffs' alleged conditions are not "punishment."

The Federal Defendants are not subjecting Plaintiffs to detention conditions that amount to

"punishment" in violation of the Fifth Amendment.  To succeed on this alternate theory, Plaintiffs

must show that the particular conditions were either: "(1) imposed with an expressed intent to

punish or (2) not reasonably related to a legitimate nonpunitive governmental objective."  *Williamson

v. Stirling*, 912 F.3d 154, 174 (4th Cir. 2018) (quoting *Slade v. Hampton Roads Regional Jail*, 407 F.3d

243, 251 (4th Cir. 2005)).

Plaintiffs have not contended that the Defendants are intentionally punishing them.  Thus, it

is incumbent upon Plaintiffs to show that the allegedly unconstitutional condition of their detention

is not "reasonably related to a legitimate governmental objective,"—i.e., the condition is "arbitrary or purposeless." *Bell v. Wolfish*, 441 U.S. 441 U.S. 520, 539 (1979). Because, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. Similarly, if an imposed condition is an "incident" of "some other legitimate governmental purpose" it does not amount to punishment. *Id.* at 538. The Supreme Court has thus cautioned lower courts that whether a condition amounts to punishment does not hinge on "a court's idea of how best to operate a detention facility." *Id.*

Plaintiffs' continued detention is consistent with a legitimate government objective, which has been expressly recognized by the Supreme Court. The Supreme Court has recognized the Government's legitimate interest in protecting the public and preventing aliens from absconding by detaining aliens pending their immigration proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836-37 (2018); *Demore*, 538 U.S. at 520-522; *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001). Nor is detention pending removal an "excessive" means of achieving those interests. The Supreme Court has repeatedly affirmed detention as a "constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523 (listing cases). And courts in this district have held that such detention, even during COVID-19, "is reasonably related to the legitimate government interested of preventing [detained aliens] of absconding and ensuring [their] appearance for . . . removal proceedings." *Aslanturk*, 2020 WL 2465663, at *11. In short, Plaintiffs simply cannot ignore the Supreme Court's holdings about the legitimacy of civil immigration detention because of the pandemic.

Plaintiffs recognize and do not appear to contest that interest, *see* Mem. at 23, but assert that their alleged conditions are not reasonably related to that interest because of Defendants' alleged failure to provide for social distancing, PPE, testing, treatment, and adequate nutrition. Plaintiffs' theory of a lack of a reasonable relationship appears to be an attempt to circumvent the high bar in

deliberate indifference claims by presenting their deliberate indifference claims in the mask of an unlawful punishment claim.[7]  Nonetheless, as previously discussed, Plaintiffs' contentions regarding alleged faulty measures are not well-taken in light of the actual conditions at ICA Farmville.  *See supra* Part I.A.1.a.  In fact, the declaration by Jeffrey Crawford that Plaintiffs appended to their own Complaint, and which Plaintiffs rely on in establishing the conditions at ICA Farmville, goes through a litany of the measures taken by the facility to provide for social distancing, PPE, testing, and treatment.  *See generally* ECF No. 1-7.  These measures are sufficient to find that the conditions of Plaintiffs' detention are an "incident" of the "legitimate governmental purpose" underpinning Plaintiffs' detention.  *Bell*, 441 U.S. at 538; *see A.S.M. v. Warden, Stewart Cty. Det. Ctr.*, 2020 WL 2988307, at *5 (M.D. Ga. June 3, 2020) (rejecting a substantive due process claim to condition of confinement at an immigration detention facility in light of COVID-19 where "Respondents ha[d] taken extensive and reasonable measures to reduce the risk of coronavirus spread").[8]

Otherwise, Plaintiffs' disagreements about the efficacy of these measures would invite the Court to become a prison administrator during the course of outbreaks even though the Supreme Court has explicitly warned against this.  *See Cruz*, 405 U.S. at 321.  Accordingly, other courts assessing similar preventative measures by detention facilities—such as "screening and intake procedures, enhanced cleaning regimens, social distancing policies, and efforts to educate detainees on COVID-19 prevention"—have cautioned that "decisions about whether a restriction or condition is merited are 'peculiarly within the province and professional expertise of corrections

---

[7] Plaintiffs' theory effectively suggests that a detainee could bring an unlawful punishment claim if any denial of some form of treatment is not necessary for the purpose of his detention.
[8] Plaintiffs' reliance on *Thakker v. Doll*, 2020 WL 1671563 (E.D. Pa. Mar. 31, 2020) on this claim, *see* Mem. at 23-24, is unavailing in light of the Federal Defendants' actions to mitigate the spread of COVID-19 into the facilities (e.g., frequent cleaning, screening protocols, testing, treatment, etc.), which were not found to have occurred in *Thakker*.  *See, e.g.*, *Buleishvili v. Hoover*, 2020 WL 1911507, at *5 (M.D. Pa. Apr. 20, 2020) ("For these reasons, we reject the suggestion that we—or any court— should apply *Thakker* wholesale to grant relief in COVID-19 habeas cases.").

officials.'" *Benavides v. Gartland*, 2020 WL 3839938, at *6 (S.D. Ga. July 8, 2020) (quoting *Bell*, 441

U.S. at 540 n.23) (rejecting plaintiffs-petitioners unlawful punishment claim).[9]  In short, because

Plaintiffs' detention is reasonably related to the Government's legitimate purpose in detaining them

pending removal proceedings, Plaintiffs' punishment claim likely fails on the merits.

> 2.      **Plaintiffs' APA Claim Is Not Cognizable or Otherwise Fails on the Merits.**

Plaintiffs' remaining claim against Federal Defendants, *see* Compl. ¶¶ 191-201, asserts that

Federal Defendants' alleged failure to provide medical treatment and food service to detainees in

accordance with ICE's PBNDS violates the APA.  *See also* Mem. at 24-27.  Plaintiffs' argument is

that:  the APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A);

the doctrine set out by *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (the "*Accardi*

doctrine") allows for suit to direct agencies to follow their own procedures; and Federal Defendants

have failed to abide by the "Medical Care" and Food Service" standards in ICE's own standards for

treating immigration detainees.  *See id.*  However, Plaintiffs' claim is neither cognizable under the

APA nor is it meritorious even if Plaintiffs could state a claim.

First, Plaintiffs' APA claim is not cognizable because Plaintiffs do not challenge final agency

---

[9] To the extent this Court is inclined to accept Plaintiffs' contentions regarding the status of COVID-19 measures and nutrition at ICA Farmville, the *Benavides* decision is instructive on why Plaintiffs still cannot state a likelihood of success on the merits.  In *Benavides*, the Court recognized that petitioners-plaintiffs' allegations of limited social distancing, access to cleaning supplies, and mitigation measures at a detention facility "contrast[ed] sharply with declarations from both the Acting ICE Field Office Director and the Interim Facility Administrator for the [facility] identifying a number of measures taken to protect detainees from exposure to COVID-19."  2020 WL 3839938, at *6.  The court concluded that this conflicting version of the facts was insufficient to show a likelihood of success on Plaintiffs' unlawful punishment claim.  *Id.*  Notably, as in this action, the plaintiffs-petitioners in *Benavides* appended a declaration from Dr. Homer Venters, *see* ECF No. 1-6, which similarly relied on detainees' declarations for his assessment of conditions at the facility and "opine[d] on an ideal response to Coronavirus, rather than a constitutionally adequate one." 2020 WL 3839938, at *7.  The *Benavides* court gave little weight to Dr. Venters' declaration as should this Court.

action which the Court can review under the APA and because the *Accardi* doctrine does not permit Plaintiffs to compel the agency enforce *substantive* rights regarding medical care and food service. And second, even assuming that Plaintiffs' APA claim were cognizable, Federal Defendants have abided by the PBNDS.  Thus, Plaintiffs are not likely to succeed on the merits of their APA claim.

### a.  Plaintiffs' APA Claim is not cognizable.

While Plaintiffs seek to challenge and force Federal Defendants' compliance with the PBNDS under the APA, the APA does not provide them with a right of action in this particular circumstance because they:  a) are not challenging final agency action required to bring an APA claim; and b) are bringing an *Accardi* claim to enforce substantive rights under the PBNDS.

i.       Although the APA provides a right of action set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), there must be "final agency action" for suit under the APA.  5 U.S.C. § 704; *see also Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (noting that the APA provides review "as long as the action is a 'final agency action for which there is no other adequate remedy in a court.'").  However, "[w]hile a single step or measure is reviewable, an on-going program or policy is not, in itself, a 'final agency action' under the APA."  *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001).  As such, "[w]hen challenging agency action—whether it be a particular action or a failure to act altogether—the plaintiff must . . . identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations."  *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).  Plaintiffs thus cannot bring suit under the APA when they do not challenge a discrete measure but rather seek "wholesale improvement of [a] program by court decree."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Here, Plaintiffs' challenge to Federal Defendants' compliance with the PBNDS is not cognizable "final agency action" for suit under the APA.  Plaintiffs do not challenge a discrete

decision not to follow the PBNDS or any other specific decision, but rather they seek to force Federal Defendants into following these standards as Plaintiffs see fit.  This is just the sort of "programmatic attack" that the Supreme Court has rejected as allowing for suit under the APA; indeed, the Fourth Circuit has expressly held that this type of claim is improper because under the APA courts may "review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management." *City of New York*, 913 F.3d at 432.  *City of New York* is particularly instructive.  There, plaintiffs filed suit against the Department of Defense seeking to force its "more thorough compliance" with a background check system.  *Id.* at 427.  The court correctly concluded that plaintiffs brought a "broad programmatic attack" because they sought to enforce the agency's compliance with its statutory mandate.  *Id.* at 433.  Notably, the Fourth Circuit recognized that plaintiffs' requested remedy reinforced this conclusion as they were "ultimately asking for . . . a judicial decree making the assistance of the federal government more useful to them than it [was]."  *Id.* at 435.

So too here.  Plaintiffs' APA claim is seeking what Plaintiffs deem more thorough compliance with the PBNDS, and—through asking the court to appoint their expert to inspect and monitor ICA Farmville—is asking the Court to grant this compliance to Plaintiffs' liking.  This is not a cognizable APA claim.  Indeed, a number of recent decisions have rejected similar APA claims whereby plaintiffs sought to have ICE enforce its standards to the plaintiffs' liking amidst COVID-19.  *See Rosa v. McAleenan*, 2019 WL 5191095, at *20 (S.D. Tex. Oct. 15, 2019) (rejecting plaintiffs' challenge to ICE's compliance with its National Standard of Transport, Escort, Detention, and Search Standards on how to transport detainees); *see also C.G.B. v. Wolf*, 2020 WL 2935111, at *22 (D.D.C. June 2, 2020) (rejecting plaintiffs' APA claim premised "on ICE's alleged failure to implement the PRR in the various detention facilities," as "allegations of 'general deficiencies in

[ICE's] compliance' with the PRR," which "lack the specificity requisite for agency action.").

ii.    Plaintiffs also do not have a cognizable APA claim because *Accardi* does not extend to this particular situation.  As the Fourth Circuit has recognized, the *Accardi* doctrine allows relief in instances involving "an agency's failure to afford an individual *procedural* safeguards required under its own regulations."  *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999) (emphasis added); *see also Lopez v. FAA*, 318 F.3d 242, 246 (D.C. Cir. 2003) (holding that *Accardi* "require[s] agencies to abide by internal, *procedural* regulations") (emphasis added).  Plaintiffs are not seeking to enforce procedural safeguards; rather, they are bringing a claim to have Federal Defendants comply with the PBNDS in the manner with which Plaintiffs request, specifically as to providing medical and nutritional care.  *See* Mem. at 25-26.  This is not simply asking the Court to enforce a procedural right in an agency's rules or regulations, but instead asking the agency to guarantee substantive rights to Plaintiffs of what their conditions will be like.  *Accardi* does not stretch this far.  This is because "*Accardi* is rooted . . . in notions of *procedural* due process" and "[i]t is not readily apparent that . . . substantive guidelines on how ICE should operate its detention facilities, fall[] 'within the ambit of those agency actions to which the [*Accardi*] doctrine may attach.'"  *C.G.B.*, 2020 WL 2935111, at \*34 (citation omitted); *see also Otero v. Kelly*, 2017 WL 3049356, at \*6 (D. Ariz. July 18, 2017) ("*Accardi* only applies to agency *procedures* that are intended to confer a substantive benefit on an individual.") (emphasis added).  As such, courts have concluded that "because *Accardi* does not create substantive rights, [plaintiffs] cannot rely on the APA to enforce the government's adherence to CDC guidelines or its own internal guidance [on how to handle the COVID-19 crisis]."  *D.A.M. v. Barr*, 2020 WL 4218003, at \*13 (D.D.C. July 23, 2020).  The same is true of Plaintiffs' APA claim.

### b.    Plaintiffs cannot demonstrate that Federal Defendants have failed to comply with the PBNDS.

In any event, Plaintiffs cannot demonstrate a likelihood of success on the merits of their APA claim because Federal Defendants have made reasonable efforts to comply with the PBNDS

and the CDC Interim Guidance for detention facilities and ICA Farmville is itself in compliance

with the PBNDS.  *See* Mullan Decl. ¶ 66.  Recent decisions assuming that one could assert an APA

claim similar to that of Plaintiffs have recognized that an agency does not have to perfectly apply

these standards and guidelines to avoid APA liability.  *See, e.g.*, *C.G.B.*, 2020 WL 2935111, at *32

n.39.  Moreover—as to the CDC Interim *Guidance*—the fact that a facility's "transfer policies,

quarantine procedures, or other protective measures might not conform absolutely with CDC

Guidance is not a basis to conclude that it violates that guidance," and courts have found that the

inquiry is whether defendants "are making reasonable efforts to comply with CDC Guidance and

reduce risks that detainees are exposed to COVID-19."  *Benavides*, 2020 WL 3839938, at *11.

      Plaintiffs fault Federal Defendants for not complying with the Medical Care Standard from

the PBNDS, the Food Service Standard from the PBNDS, and the CDC's Interim Guidance for

detention facilities, which they assert is incorporated by reference into the PBNDS.  None of these

contentions is persuasive, and, at best, there is conflicting evidence on all of them.  As to the

Medical Care Standard, Plaintiffs assert that Federal Defendants have not conducted adequate

testing, have not implemented sufficient precautions to prevent a COVID-19 outbreak, and are not

ensuring that ICA Farmville is providing appropriate treatment and isolation to address the health

risks that have spread throughout the facility.  Mem. at 25.  But a declaration by Defendant Jeffrey

Crawford from a prior litigation that Plaintiffs themselves appended to their Complaint establishes

that ICA Farmville has tested all of its detainees, instituted screening and cohorting systems in an

attempt to prevent the spread of the disease, provides PPE and routine cleaning, has isolated and

cohorted positive cases, and provides daily medical monitoring while sending detainees with more

serious symptoms to the hospital.  ECF No. 1-7 ¶¶ 3(d), 10, 15(g), 15(i), 20, 27, 29, 30, 43, 44.  In

addition, the PBNDS directs ICE detention facilities to maintain plans to address the management

of infectious and communicable diseases and to work in coordination with public health

authorities—measures that ICA Farmville has undertaken as well.  *See* ICE, *Performance-Based National Detention Standards* 261 (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf ("PBNDS Standards"); *see also* Crawford Decl. ¶ 4.

As to the Food Service Standard, which is aimed at ensuring that detainees are provided a "nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation," PBNDS Standards at 228, Plaintiffs assert that Federal Defendants have also denied them adequate nutrition, claiming that ICA Farmville serves raw and undercooked food as well as food infested with bugs.  Mem. at 25-26.  But Federal Defendants have presented evidence that this is not the case.  The evidence shows that:  Plaintiffs are being served a common fare menu with sufficient caloric value and special dietary restrictions; food preparation at ICA Farmville is subject to strict controls regarding its temperature, preparation, and cleaning; there have been no complaints regarding food infestation; and recent compliance inspections of ICA Farmville found no deficiencies with the Food Service standard,  Mullan Decl. ¶¶ 67, 69-74; Crawford Decl. ¶ 31.

Lastly, Plaintiffs assert that Defendants have flouted CDC guidelines—incorporated into the Medical Care Standard of the PBNDS, *see* PBNDS Standards at 258—because there is insufficient social distancing at ICA Farmville, insufficient PPE, and ICE's past and alleged proposed future transfer of detainees runs against the CDC's Interim Guidance for detention facilities.  *See* Mem. at 26.  Although Plaintiffs paint the CDC's Interim Guidance as if it were binding, the "CDC Guidance itself suggests that it was not intended to be followed with rigid precision."  *Benavides*, 2020 WL 3839938, at *11.  In fact, the document says in bold letters that "[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."  CDC Interim Guidance.  Thus, it is not clear that the Interim Guidance, even if incorporated into the PBNDS, places any binding internal mandate upon ICE facilities.  But even if it does, Federal Defendants have taken reasonable efforts to comply with it.

As to Plaintiffs' assertion that ICA Farmville has not instituted sufficient social distancing as per the Interim Guidance, the guidance recognizes that "social distancing is challenging to practice in correctional and detention environments" and, as a result, instructs facilities to "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons . . . and to minimize mixing of individuals from different housing units" while noting that "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff" and that "[n]ot all strategies will be feasible in all facilities." *Id.* In turn, the Interim Guidance suggests a number of example strategies to maximize social distancing, which include, among others: enforcing increased space in holding cells and waiting lines; staggering recreation and meal times; limiting the size of group activities; reassigning bunks; arranging bunks to allow for sleeping head to foot; rearranging scheduled movements to minimize mixing of individuals from different housing areas; and designating a space near housing units for medical care. *Id.* ICA Farmville has adopted all of the aforementioned strategies. Crawford Decl. ¶ 15(i).

Likewise, Plaintiffs' argument that Federal Defendants have violated the Interim Guidance by transferring detainees is not borne out by the flexible standards set out by that guidance. The Interim Guidance does not tell detention facilities to stop transfer, stating "[i]f *possible*, avoid transferring *infected* individual(s) to another facility" but recognizing that transfers may be "necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding." CDC Interim Guidance (emphasis added). It then offers suggestions for transferring detainees including that detainees should be screened for COVID-19 and that a receiving facility can quarantine or isolated positive cases. *Id.* In accordance with that guidance, the 74 detainees that were transferred on June 2, 2020 to ICA Farmville were screened and isolated from the general population upon arrival. Crawford Decl. ¶¶ 28-29. In addition, while Plaintiffs assert that there will be a future transfer of detainees out of the facility to Texas based on

Plaintiff Santos Garcia's inadmissible hearsay assertions, *see* Mem. at 26, that assertion is not true.

In sum, even assuming Plaintiffs have a cognizable APA claim, this claim would likely fail on the merits given Federal Defendants' reasonable efforts at compliance with the PBNDS.

B.      Factor 2: Plaintiffs cannot show they will be irreparably harmed absent an injunction.

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added).   Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) ("The plaintiff must make a clear showing of irreparable harm and the required irreparable harm must be neither remote nor speculative, but actual and imminent.").   Importantly, irreparable harm does not exist where, even if actual harm has occurred, that harm has passed and is unlikely to recur. *See Brown v. Holloway*, 2013 WL 2237787, at *1 (W.D. Va. May 21, 2013) ("Brown's claim regarding the 2012 Ramadan fast cannot constitute imminent or irreparable harm, as the 2012 fast has passed and he does not allege that denial of participation in 2012 will preclude him from participation in the future.").

In support of their assertion of irreparable harm, Plaintiffs assert that the violation of their constitutional rights constitutes irreparable harm as does their "heightened health risk because . . . COVID-19 has infiltrated and spread within Farmville" and they have already contracted the virus. Mem. at 28.  As to the first contention, Plaintiffs' constitutional rights, as previously discussed, are not being violated.  *See* Part I.A.1.  As to the second contention, no one would try to downplay Plaintiffs' unfortunate experiences in contracting COVID-19 or diminish Plaintiffs' serious fears regarding the virus.  Yet, irreparable harm absent a preliminary injunction likely does not exist because the harm for Plaintiffs has already passed.  *See Brown*, 2013 WL 2237787, at *1.  That is, Plaintiffs have already been infected with the disease and are either recovering or have recovered.  *See* Mem. at 28

26

(noting Plaintiffs are "recovering from COVID-19"). Indeed, Plaintiffs' declarations discuss symptoms from over a month ago,[10] with some Plaintiffs admitting that they were feeling better at the time their declarations were signed in mid-July.[11] Subsequent follow-up shows that Plaintiff Bolanos Hernandez tested negative for COVID-19 on July 16, and Plaintiffs' Santos Garcia and Castillo Gutierrez are not currently exhibiting COVID-19 symptoms. Crawford Decl. ¶ 48.

Plaintiffs, however, express a fear that they will be re-exposed to and re-infected by COVID-19, Mem. at 29, but it is currently unknown what the duration of antibody protection is and if a person can be re-infected with COVID-19. Mullan Decl. ¶ 85. In fact, while there are anecdotal stories regarding individuals being re-infected, clinicians have counseled that cases of re-infection have not been "unambiguously demonstrated" and that perceived cases of re-infection may be due to a "drawn-out course of infection," the result of false positives, or prompted "by recent studies suggesting that [COVID-19] antibody levels plummet" after infection despite the fact that this decline is normal.[12] Thus, Plaintiffs' fear of harm through re-infection—although one understandably shared by many—is not sufficiently actual and imminent to represent irreparable harm.

Plaintiffs' circumstances are in much like those of the immigration detainees in *Alcantara v. Archambeault*, 2020 WL 2773765 (S.D. Cal. May 26, 2020), where the court found irreparable harm lacking to support a preliminary injunction. There, plaintiffs had brought suit against their facility as

---

[10] Based on an analysis of data by the World Health Organization, individuals with mild symptoms from COVID-19 including cough, fever, body aches, fatigue, sore throat, and headache, take on average two weeks to recover from the virus. *See* James Gallagher, *Coronavirus: How long does it take to recover?*, BBC (May 1, 2020), https://www.bbc.com/news/health-52301633.

[11] Plaintiff Santos Garcia's declaration updates that he stopped feeling a fever as of July 2 after symptoms in late June. ECF No. 1-1 ¶¶ 20-21. Plaintiff Bolanos Hernandez also describes symptoms in late June and, as of his declaration signed on July 18, stated that he was feeling better. ECF No. 1-2 ¶¶ 6, 14. And Plaintiff Castillo Gutierrez describes symptoms from June 28 to July 7 from COVID-19 with no further update as of his declaration signed on July 16. ECF No. 1-4 ¶¶ 7-8.

[12] *See* Apoorva Mandavilli, *Can You Get Covid-19 Again? It's Very Unlikely, Experts Say*, New York Times (July 22, 2020), https://www.nytimes.com/2020/07/22/health/covid-antibodies-herd-immunity.html.

it dealt with its own increase of COVID-19 cases that numbered some 160 at one time. *Id.* at *2. However, the Court noted that at the time of its decision, the infection rate had lowered and the facility had instituted a number of new policies and practices such as cohorting, screening, increased sanitation, and handing out PPE. *Id.* Acknowledging that it had previously found irreparable harm to grant a temporary restraining order, the court found irreparable harm lacking to grant a preliminary injunction because "conditions ha[d] now changed, and reflect[ed] a lesser risk that [detainees] will contract the virus." *Id.* at *4. In particular, it found irreparable harm lacking because of these conditions and because "three of [the] four [plaintiff subclass members] ha[d] already contracted the coronavirus and recovered." *Id.* The same is true for Plaintiffs here.

C.   Factors 3 & 4: The balance of equities and the public interest favor the Federal Defendants.

Two strong considerations tilt the balance of equities and the public interest in favor of Federal Defendants against the issuance of a preliminary injunction. First is the well-settled and significant public interest in enforcement of United States immigration laws. *See Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."). This interest necessarily includes the Government's measures to detain and transport aliens as part of removal proceedings.[13] Plaintiffs' request to constrict Federal Defendants' flexible response to the COVID-19 pandemic at ICA Farmville and to constrict Federal Defendants' authority to transfer detainees, *see* Mem. at 30, would impinge on that interest. *See, e.g., Sasso v. Milhollan*, 735 F. Supp. 1045, 1049 (S.D. Fla. 1990) (denying injunction seeking to prohibit transfer of a detainee finding that "[i]t would jeopardize the orderly and efficient administration of this country's immigration laws").

---

[13] Plaintiffs' current detention is part of that interest as Plaintiffs are detained pending their removal proceedings and because Immigration Judges found that two of them would be a danger to the community if released. *See* Mullan Decl. ¶¶ 20, 36.

Second is the similarly well-settled interest that courts generally should avoid managing the affairs of detention centers.   Courts—including the Fourth Circuit—have repeatedly been reticent to order preliminary injunctive relief in this context, particularly when plaintiffs, like in this case, are requesting relief would that bind detention facilities to certain measures.   *See Taylor*, 34 F.3d at 269 ("Even where there has been a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators."); *Pevia v. Pierce*, 2019 WL 3717812, at *2 (D. Md. Aug. 7, 2019) (same). The Supreme Court itself has recognized that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government," and all of which "counsel a policy of judicial restraint" when intervening in the administration of a detention facility.   *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).

These concerns apply with equal force against the issuance of a preliminary injunction here. Federal Defendants aver that the measures they have undertaken have balanced their interests in immigration detention as well as the health and safety of detainees while, importantly, allowing orderly medical processes and protocols to be implemented by the facility's and ICE's own expert professionals.   *See Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982) (urging judicial deference and finding presumption of validity regarding decisions of medical professionals concerning conditions of confinement).   But granting a preliminary injunction whereby Federal Defendants must create and bind themselves to a plan overseen by Plaintiffs' own selected expert, *see* Mot. at 1, would delay implementation of those and additional preventative measures that may be proposed in conjunction with the reasoned judgment of the CDC, either following its inspection of ICA Farmville or otherwise. Mullan Decl. ¶ 88.   Courts dealing with similar conditions of confinement claims seeking to bind prison administrators to certain measures amidst the spread of COVID-19 have recognized this very

point.  *See Swain*, 961 F.3d at 1293 ("[T]he same public interest just as doubtlessly favors a proper allocation of public-health resources—an allocation that politically accountable (and often local) officials are best equipped to make."); *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (staying a preliminary injunction "because the district court's order interferes with the rapidly changing and flexible system-wide approach that [the prison system had] used to respond to the pandemic so far").

Plaintiffs argue that the public interest tilts in their favor given the public's interest in minimizing the spread of COVID-19, ensuring individual and community health, and in remedying a dangerous or unhealthy situation and preventing further spread of the disease.  *See* Mem. at 29-30. However, Federal Defendants' measures at ICA Farmville—which largely follow with the CDC's Interim Guidance for detention facilities—are already aimed at achieving Plaintiffs' stated goals.  Thus, the public interest does not counsel subjecting Federal Defendants to the judgment of Plaintiffs' expert and binding them to come up with and abide by other, different measures.  But even if the current steps being taken at ICA Farmville were not in the interests of ensuring individual and community health, the CDC is already taking steps to inspect the facility and may, as a public health agency, propose its own solutions.  Mullan Decl. ¶ 88.  Granting Plaintiffs' injunction would interfere with this process and supervene the judgment of their expert for the reasoned judgment of public health officials.  Although Plaintiffs regrettably have had to endure COVID-19 and may believe that alternative efforts like the ones they propose could work better in mitigating COVID-19, the touchstone of this Court's inquiry is whether Federal Defendants' efforts in the face of COVID-19 constitute "reasonable action."  *Toure*, 2020 WL 2092639, at *13.  Because the Federal Defendants' efforts have been, a preliminary injunction should not issue.

## CONCLUSION

For the foregoing reasons, the Federal Defendants would respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction.

Dated: August 6, 2020

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:    /s/_____

YURI S. FUCHS
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3872
Fax:    (703) 299-3983
Email: yuri.fuchs@usdoj.gov
*Counsel for Federal Defendants*

31

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this 6th day of August, 2020, I have electronically filed the foregoing using the CM/ECF system.


_____/s/_____
Yuri S. Fuchs
Assistant U.S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3872
Fax: (703) 299-3983
Email: yuri.fuchs@usdoj.gov
*Counsel for Federal Defendants*