**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**CHRISTIAN ALBERTO SANTOS GARCIA,** *et al.*

        *Plaintiff,*

**v.**                             **Civil Action No. 1:20-CV-00821 (LMB/JFA)**

**CHAD F. WOLF, in his official capacity as
Acting Secretary, U.S. Department of Homeland
Security,** *et al.*

        *Defendants.*

## DEFENDANT ARMOR CORRECTIONAL HEALTH SERVICES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant Armor Correctional Health Services, Inc. ("Armor") by counsel, submit the following as their Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (the "Motion").

## INTRODUCTION

For the past six months, Armor's medical staff has worked alongside Defendants Crawford and Immigration Centers of America-Farmville, LLC (collectively the "Farmville Defendants") to mitigate the risk of COVID-19 to detainees at Farmville Correctional Center ("Farmville"). Despite these efforts, three of the four Plaintiffs have tested positive for COVID-19 during their detention. However, under the care of Armor's medical personnel, it is undisputed that each Plaintiff has been tested for COVID-19, each receives daily medical care, and none have required hospitalization.

It is also undisputed that in some cases detainees at other facilities have successfully petitioned for their release due to the risks associated with COVID-19. But these Plaintiffs are not

1

asking for their release. Instead, they demand a series of injunctions that would determine who may be detained at Farmville, the manner in which medical care is provided to all detainees, and the quality of cafeteria food. To compel these sweeping changes, Plaintiffs have filed a Complaint against three groups of Defendants that are affiliated with Farmville. The first group includes Defendants Wolf, U.S. Immigration and Customs Enforcement, Albence, and Hott (collectively the "Federal Defendants"). The second group includes Farmville Defendants. Finally, Armor has been sued for its role as the medical contractor at Farmville.

Based on this relationship, Plaintiffs assert two causes of action against Armor. First, Claim II alleges that Armor, along with the Farmville Defendants, have violated Plaintiffs' Fourteenth Amendment due process rights to adequate medical care for COVID-19. (*See* ECF No. 1, ¶¶ 177-90.) Similarly, Claim III asserts that Plaintiffs' confinement under these circumstances violates their Fifth Amendment due process rights. (*See id.* ¶¶ 170-90.)

As part of that action, Plaintiffs have filed a Motion for Preliminary Injunction ("Motion"), which demands that all Defendants: (1) "immediately reform conditions at Farmville through a plan to be implemented pursuant to the results of a health inspection [by an individual chosen by Plaintiffs]"; (2) "reform the unconstitutional conditions of confinement at Farmville"; (3) "abide by all CDC guidelines to prevent the spread of COVID-19"; and (4) "halt all inter-facility transfers into and out of Farmville." (ECF No. 7, p. 38 of 41).

This relief cannot be properly granted. As the record demonstrates, Plaintiffs have not met their burden of showing that: (1) they are likely to prevail against Armor on the merits; (2) they are likely suffer irreparable harm unless the Motion is granted; (3) the balance of equities are in their favor; and (4) the injunctions serve the interests of the public. Moreover, these injunctions are radically beyond what this Court considers at this stage of the proceedings.

## FACTS

From January through April 2020, Armor maintained and updated on a weekly basis a COVID-19 Response Plan at ICA Farmville. Since then, Armor has updated the Response Plan in conformity to changes in guidance published by the Centers for Disease Control ("CDC"). The most recent update was July 31, 2020 in response to the July 22, 2020 update to the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*. The Armor COVID-19 response plans are even more cautious and restrictive than the CDC guidelines with the goal being to protect the detainees and the staff that interacts with them.  (Moore Decl. ¶ 4, attached herein as Exhibit A.)

As part of this response, Armor has helped educate the staff and detainees about the importance of hand washing, hand sanitization, hygiene, coughing etiquette, and social distancing consistent with CDC and Virginia Department of Health ("Health Department") guidelines for combating the spread of COVID-19.  Medical and security staff are directed to remain six feet apart whenever possible.  Detainees have been advised to stagger the direction they are sleeping in the bunks (alternating head to foot) so that their faces are as far apart as possible.  *Id.* ¶ 5.

Additionally, all detainees have been issued three expired N95 masks (in accordance with CDC guidelines), two cloth masks and two surgical masks.  *Id.* ¶ 7.  Also, to protect detainees from community exposure, every staff member is screened for temperature every time they enter the building and are denied entry if they are experiencing symptoms of Covid-19.  Any staff that fail the screening—or if there exists any other reason to believe there is a risk of exposure—are required to stay home on paid leave until they meet certain criteria, or until otherwise cleared by the Health Department.  *Id.* ¶ 8.

Armor remains in contact with the Piedmont Health District of the Virginia Department of Health to discuss any risks and spread of coronavirus in the surrounding community as well as any screening and response measures undertaken at Farmville.  Likewise, Armor continuously reviews CDC and Health Department recommendations and guidance. In fact, the CDC is even scheduled to visit  Farmville in the next week.  *Id.* ¶¶ 9, 11.

Importantly, Armor does not have the authority to act on any detainee's request to transfer in or out of Farmville. *Id.* ¶ 11.  Prior to June 2020, Armor staff collaborated with Farmville's staff to conduct COVID-19 prescreening on all arriving detainees. Prescreening was conducted in the Sally Port before entering the facility.  Anyone who failed the prescreening procedures was sent to Centra Southside Community Hospital to be cleared and/or placed in quarantine for 14 days before entering the dorms.  *Id.*  In April, ICE proposed a solution whereby any new intakes would be quarantined in individual cells at Caroline County, Virginia's facility for 14 days before further transfer to ICA Farmville.  *Id.* ¶ 14.  However, in June, Farmville received two large groups of detainees on the same day—one group from Arizona and one from Florida—who had not been isolated at the Caroline facility. Several detainees from Arizona tested positive during prescreening efforts.  Thus, in response, Armor tested the whole intake cohorted dorm.  Due to the large number of positive test results, those with negative test results were removed to another dorm to minimize their chance of further exposure, while those with positive test results were quarantined together. Armor then tested the Florida group, which also had a large number of positive test results. Positives from the Florida group were put in with the positives from Arizona. Conversely, the negatives from Florida were housed with the negatives from Arizona.  *Id.* ¶ 16.

Armor is doing all that it can to isolate and monitor the sickest individuals, provide them with appropriate medical care, and refer them for hospitalization as needed.  Armor continues to

evaluate any patients with symptoms of illness, treating less-ill individuals symptomatically and supportively and have completed testing of all detainees at Farmville.  *Id.* ¶ 17.  Further, workflow changes were implemented to safeguard the detainees including following Armor's COVID-19 response plan with red, yellow, and green zones.  Green is no suspected COVID-19.  Yellow is suspected COVID-19.  Red is confirmed COVID-19.  When possible, patients were seen by medical staff in the order of green, yellow and red.  *Id.* ¶ 24.

   If a detainee reports symptoms to an officer between nursing evaluations, the detainee is immediately evaluated by a nurse to decide if he should be medically isolated, if transfer to a hospital for evaluation is required, or if treatment is needed.  *Id.* ¶ 25.  Social distancing has been implemented as feasible.  Correctional officers have been trained to promote social distancing among detainees, and health staff have also communicated the same messages in languages understood by the detainees. Additional staff in the form of CNAs and agency nurses have been brought into ICA Farmville over the past months to assist with temperature screenings and symptom screenings and to assist in routine nursing duties. Through those efforts, all  detainees have been tested for COVID-19.  And all detainees who were negative have been retested. *Id.* ¶ 26.

   ICA Farmville currently has a total of 14 medical beds, 3 negative-pressure rooms for individual isolation, and another 6 rooms which, although not negative-pressure, utilize solid walls and doors. CDC guidelines for correctional facility isolation has approved the use of such rooms as the second-best option for such isolation in correctional facilities, and has even approved less effective options which are not in use at Farmville, such as rooms with solid walls but no solid doors. Though ICA Farmville initially was capable of isolating a detainee in a negative-pressure

isolation room or a non-negative pressure room as the need arose, there are not enough rooms to currently serve this purpose for all at-risk individuals or those with positive test results. *Id.* ¶ 13.

## Medical Care and Treatment

At all relevant times herein, Armor medical staff screened Plaintiffs on a daily basis for Flu/Coronavirus symptoms (hereinafter "Symptom Screening"). During these evaluations, Plaintiffs' vital signs were recorded, including temperature and oxygen saturation levels, and they were interviewed as to the presence of any Covid-19 symptoms, including fever, headache, sore throat, chills, cough, and diarrhea. Due to Farmville's large population, Armor wanted to ensure that any necessary supportive care treatment would be readily available to the plaintiffs should they develop such symptoms.  Therefore, standing orders were entered to expedite the dispensment of certain supportive care treatments. For example, if a detainee complained of one or more symptoms at a Symptom Screening, the nursing staff was authorized to immediately dispense Extra Strength Tylenol (500 or 1000 mg), a daily multivitamin, Pepto-Bismol, and Guaifenesin (an expectorant to help loosen congestion in the chest and throat) without obtaining a new physician order.  Further, once a detainee developed symptoms of Covid-19 or identified they had been exposed to someone with Covid-19 or a person "under investigation" for Covid-19, a Covid-19 test was ordered for the detainee, and daily monitoring of the detainee's vitals and symptoms continued.  Moore Decl. ¶ 26.[1]

## STANDARD OF REVIEW

In general, "[p]relminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.)*, 333 F.3d 517, 524

---

[1] The specific details of Plaintiffs' medical care is discussed in more detail below.

(4th Cir. 2003) (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)). To meet that burden, moving parties must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20  (2008); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

However, because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. (emphasis added); *see also  Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994) ("It is well-established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities."). Finally, this Court's aversion toward granting preliminary injunctions is even greater when the moving party seeks mandatory injunctions, as is the case here. *Id*. at 270 n. 2.

## ARGUMENT

## I.   PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS AGAINST ARMOR (CLAIM II AND III)

As a medical provider, Armor's role in this case is limited to providing medical care and protecting inmates from risks harm for infections, like COVID-19. Typically, the constitutionality of such conduct is evaluated under the deliberate indifference standard. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (holding that prison officials violated the Eighth Amendment by treating inmates with deliberate indifference to their serious medical needs).

The Fourth Circuit has applied this standard to claims of inadequate medical care to detainees as well.  *See, e.g.*, *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("In any case, we

need not resolve whether [the plaintiff] was a pretrial detainee or a convicted prisoner because the standard in either case is the same--that is, whether a government official has been deliberately indifferent to any [of his] serious medical needs."); *see also Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001) (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)) (applying the deliberate indifference standard to a defendant's alleged failure-to-protect a detainee from a substantial risk of harm).[2]

In Claims II and III, Plaintiffs contend that Armor treated Plaintiffs with deliberate indifference to their medical needs and the risks associated with COVID-19, thereby violating Plaintiffs due process rights under the Fourteenth and Fifth Amendments.[3] However, as discussed below, the care that these Plaintiffs have received, including preventative measures to protect the health and safety of all detainees, does not amount to deliberate indifference.

---

[2] Instead of the deliberate indifference standard, Plaintiffs advise this Court to apply the objective reasonableness standard from *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), an excessive force case. However, neither Supreme Court nor the Fourth Circuit has endorsed this move. Rather, the holding in *Kingsley* addresses only excessive force cases. *Id.* at 396. ("In deciding whether the force deliberately used is, constitutionally speaking, 'excessive,' should courts use an objective standard only, or instead a subjective standard that takes into account a defendant's state of mind? It is with respect to *this* question that we hold that courts must use an objective standard.") (emphasis in original). Similarly, the Fourth Circuit has explained the impact of *Kingsley* as follows: "the Supreme Court has extended the Fourth Amendment's objective reasonableness standard to excessive force claims by pre-trial detainees." *Brooks v. Johnson*, 924 F.3d 104, n.4. (4th Cir. 2019). Without support from either Supreme Court or the Fourth Circuit, Plaintiffs argue that the Fourth Circuit may eventually join the minority of sister Circuits that have extended *Kingsley* into the realm of medical cases. (*See* ECF No. 7, p. 24 of 41). But assuming such a change in the law should occur, such change will not assist Plaintiffs to demonstrate they are likely to prevail on the merits.

[3] In the Complaint, Plaintiffs make passing reference to Armor bearing corporate liability, *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978), for failing to train their staff (*See* ECF No. 1, ¶ 173). However, in the Motion for a Preliminary Injunction, they do not argue that Armor has any deficient training protocols. Therefore, they have not met their burden of clearly showing that they are likely to prevail on the merits of that theory. Armor reserves the right to rebut and correct that allegation when the issue is ripe.

Additionally, Plaintiffs claim that their detention is unconstitutional based on the risks to inmate health and safety, including nutrition and exposure to harm from COVID-19. Armor submits that it is not a proper party to that claim as it does not participate in the act of detaining these individuals. However, Plaintiffs' conditions of confinement claim would fail for other substantive reasons. Namely, the extensive measures that Armor has taken to protect detainees and staff at Farmville cannot reasonably be construed as punishment. *See Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018) (quoting *Slade v. Hampton Roads Reel Jail*, 407 F.3d 243, 251 (4th Cir. 2005) ("[T]o prevail on a substantive due process claim, a pretrial detainee must show unconstitutional punishment by proving that the challenged conditions were either '(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred.'"))

Taken together, because Plaintiffs are unlikely to prevail under a theory of (A) deliberate indifference; or (B) unconstitutional conditions of confinement, this Motion should be denied. *Winter,* 555 U.S. at 20 (explaining a preliminary injunction should not be granted unless the movants clearly show they are likely to prevail on the merits of their underlying claims).

### A. Deliberate Indifference Claims

An official acts with deliberate indifference where he actually knows about and disregards "a substantial risk of serious injury to the detainee or [a] detainee's serious need for medical care." *Young*, 238 F.3d at 576-77 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Put differently, "[t]he deliberate indifference standard is a two-pronged test: (1) the prisoner must be exposed to a 'substantial risk of serious harm,' and (2) the prison official must know of and disregard the substantial risk to the inmate's health or safety." *Thompson v. Commonwealth*, 878 F.2d 89, 97-98 (4th Cir. 2001) (citing *Farmer*, 511 U.S. at 834, 837-38).

9

Accordingly, a plaintiff cannot prove deliberate indifference by showing that a defendant's conduct was merely negligent. Rather "[t]o establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), overruled on other grounds by *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124 (4th Cir. 2020); *accord Farmer*, 511 U.S. at 844 (explaining that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Plaintiffs contend that Armor violated their due process rights to adequate medical care and safety through deliberate indifference in two principle respects: (1) failing to protect Plaintiffs from contracting COVID-19 (*see* ECF No. 7, pp. 7-9); and (2) failing to treat Plaintiffs after they developed COVID-19 symptoms (*see id*. at 7-9; 11-12). The record does not support a finding that Plaintiffs are likely to prevail on these bases.

1. ***Armor did not fail to protect Plaintiffs from risk of infection with deliberate indifference***

As discussed above, starting in January, Armor began developing a COVID-19 Response Plan, which is regularly updated to reflect changes in CDC guidelines. To protect the detainees at ICA Farmville and the staff that interacts with them, Armors guidelines are even more restrictive than the CDC's based on the specific risks at Farmville. Additionally, Armor's medical director at Farmville, Dr. Moore, has trained her staff to implement the extensive protocols, with targeted measures toward preventing infected staff from entering the facility and infected detainees from spreading COVID-19. More specifically, she requested that the staff at ICA Farmville increase the frequency with which they sanitize commonly touched areas (*e.g.*, doorknobs) with proper

disinfectants. Also, to ensure detainees would have adequate access to hospital care, Dr. Moore began coordinating extensively with her contacts at Centra in January to ensure detainees would have access to adequate ICU and ventilator support, if the need arose. By early February, Armor had fully implemented its enhanced screening protocols to identify any possible symptoms related to coronavirus. (*See* ECF No. 30-1, Crawford Decl. ¶ 6.)  Flyers placed in the lobby at that time asked visitors to report trips overseas to then-affected countries and offered hand sanitizer, gloves and masks to visitors. Masks were then also available for staff and detainees in the event needed, but they were not then deemed necessary for the entire population of staff and detainees.

Armor staff collaborated with ICA's staff to conduct COVID-19 prescreening on all arriving detainees. The prescreening procedures included: taking temperature - at or above 99.1 degrees Fahrenheit fails screening; answering "yes" to the question whether over the counter pain medications have been taken to address a fever or chill in the previous 24 hours; severe headache; shortness of breath; chills; sore throat; cough; nausea; vomiting; or, diarrhea. Until April, no detainees tested positive for COVID-19; and through June only two had.

In early June, two groups of new detainees from Arizona and Florida arrived at Farmville. Both groups were quarantined into two groups, separate from the general population for 14 days. After pre-screening COVID-19 tests revealed that several detainees in the Arizona group tested positive, Armor and ICA coordinated to have the entire Arizona group quarantined. The positives and negatives were segregated; and then the same was done with the Florida group. As June progressed, Armor, with the assistance of ICA staff, took extensive measures to test and segregate positive detainees based on current CDC guidance and collaboration with the Virginia Department of Health. As of August, Armor and ICA have performed over 850 COVID-19 tests, including testing multiple individuals more than once. Meanwhile non-emergent specialty care is available

to detainees via telemedicine and agency nurses have been brought into ICA Farmville over the past months to assist with temperature and symptom screenings of all detainees, including Plaintiffs.

Because these efforts cannot amount to disregarding Plaintiffs' risk of contracting COVID-19, Plaintiffs are unlikely to prevail against Armor for allegedly failing to protect them. *See Young*, 238 F.3d at 575-76 (requiring that the unconstitutional failure to protect a detainee amount to disregard). To the extent that Plaintiffs disagree with the adequacy of these measures, those differences in opinion are not enough to establish a constitutional violation. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (explaining that a prisoner's disagreement with medical personnel over the course of his treatment does not make out a cause of action).

While other courts have found that, in certain cases the preventative measures taken by officials merited an injunction, Armor's efforts have far exceeded those of the defendants in those cases. *See Seth v. McDonough*, No. 8:20-cv-01028, 2020 U.S. Dist. LEXIS 89694, at *37 (D. Md. May 21, 2020) (noting that facility's director "knew that she had a substantial COVID-19 outbreak in the facility, and yet had only tested twenty detainees"); *Coreas v. Bounds (Coreas II)*, No. TDC-20-0780, 2020 U.S. Dist. LEXIS 81900, at *7 (D. Md. Apr. 30, 2020) ("Although [one of the facilities] has, through ICE, certified that it would test any individuals with COVID-19 symptoms, it has not actually tested anyone to date . . . ."); *Coreas v. Bounds (Coreas III)*, No. TDC-20-0780, 2020 U.S. Dist. LEXIS 80951, at *15, 18 (D. Md. May 7, 2020) (citing the facility's refusal and unwillingness to test for COVID-19 as "highly probative on the issue of deliberate indifference").

Conversely, numerous federal courts have found that similar measures to those undertaken by Armor cannot demonstrate deliberate indifference. *See Duvall v. Hogan*, 2020 U.S. Dist. LEXIS 107915, at *39-40 (D. Md. June 19, 2020) (collecting cases) (explaining that the measures that do

not demonstrate deliberate difference include: educating staff and detainees about proper safety measures, frequent temperature checks, quarantining new detainees, equipping staff with PPE, using hand sanitizers, cleaning areas, and segregating positive detainees from negative ones). Moreover, courts have noted that failing to implement some measures that could reasonably abate the risk of infection to detainees is not enough to demonstrate deliberate indifference.  *Id*. at *42 (citing *Hallinan v. Scarantino*, No. 5:20-HC-2088-FL, 2020 U.S. Dist. LEXIS 103409, at *16 (E.D.N.C. June 11, 2020); *see also Swain v. Junior*, 961 F.3d 1276 (holding that "the district court erred in relying on the increased rate of infection" as the basis for establishing deliberate indifference); *Wilson v. Williams*, 961 F.3d 829 (6th Cir. June 9, 2020) (rejecting the contention that the "defendant was deliberately indifferent to detainees health and safety because [its] actions have been ineffective at preventing the spread of COVID-19"). Under this well-reasoned standard, Plaintiff is not likely to prevail on this claim.

### 2. *Armor has not treated Plaintiffs' COVID-19 symptoms with deliberate indifference.*

Deliberate indifference can only be established by demonstrating that the defendant "consciously disregarded" a plaintiff's significant risk of serious injury. *See Farmer*, 511 U.S. at 834. Significantly, a detainee's disagreement with medical personnel over the course of his treatment does not make out a cause of action.  *See Harris v. Murray*, 761 F. Supp. 409, 414 (4th Cir. 1990) ("Disagreements between an inmate and a physician over treatment do not state a claim under § 1983."). Setting such disagreements aside, here, the medical records show that Armor and its medical staff did not consciously disregard Plaintiffs' medical needs.

Plaintiffs were screened by a nurse on a daily basis for any Covid-19 symptoms. Temperatures and oxygen saturation levels were checked, and the detainees were interviewed to identify any symptoms or exposure to someone with Covid-19.  Once exposure or a symptom was

reported, the Plaintiffs were tested for Covid-19 and, where appropriate, as in the case of Mr. Perez Garcia, isolated in medical housing for two weeks. Further, Armor made certain supportive care treatments readily available for the Plaintiffs should they have reported any symptoms. Tylenol, expectorants, Pepto-Bismol and a multivitamin were readily available to be dispensed by the nurses who performed the daily Symptom Screenings. All of the care described above was designed and implemented to achieve full recovery and mitigate any potential long-term effects from infection. Indeed, the course of care that each Plaintiff received individually demonstrates specific attention to their needs.

    a.  <u>Plaintiff Santos Garcia</u>

To begin, Mr. Santos Garcia's complaints set forth in Plaintiffs' Complaint are expressly contradicted by his medical records.[4]  Contrary to Plaintiffs' Complaint (¶¶ 63, 65, 68, 69, 70, 75), Mr. Santos Garcia did <u>not</u> have a fever, body aches, pain, cough or difficulty breathing in June or July 2020, nor did Armor fail to provide him medical care or Covid-19 testing.  Mr. Santos Garcia was monitored on a daily basis from June 22 through August 1. He did not once have a fever or report any Covid-19 symptoms. His oxygen levels were excellent and his lungs were clear.  On June 28 Mr. Santos Garcia reported being exposed to someone with Covid-19; therefore, a Covid-19 test was ordered. While Mr. Santos Garcia tested positive for Covid-19, he remained and has continues to remain asymptomatic.  (*See* Moore Dec. ¶¶ 28-38.)

    b.  <u>Plaintiff Bolanos Hernandez</u>

Mr. Bolanos Hernandez has been tested twice for Covid-19 and remains negative. On June 28 Mr. Bolanos Hernandez reported having been exposed to someone with Covid-19. As a result,

---

[4]    To the extent the factual allegations of the Complaint and Plaintiffs' Motion are contradicted by the Plaintiffs' medical records, those allegations are denied.

he was tested for Covid-19 and was monitored on a daily basis from June 25 through July 30. He has remained afebrile, had excellent oxygen saturation levels, and reported no symptoms of Covid-19. Mr. Bolanos Hernandez has only reported having headaches in connection with tooth-pain, and stomachaches related to constipation and gas. (*See* Moore Dec. ¶¶ 39-54.)

c.   Plaintiff Perez Garcia

On June 22, 2020, Mr. Perez Garcia submitted a Sick Call Request with complaints of body aches, fever, sore throat and a cough. He was seen that same day, but he was afebrile. The next day he was examined for an Urgent Care Assessment. He was provided Tylenol for his fever and aches, an antihistamine (CTM), and an expectorant to help with his cough. On June 25 Mr. Perez Garcia reported a fever and shortness of breath. Based on these symptoms, he was relocated to medical housing to remain under observation for two weeks. Albuterol (a nebulizer to help with his breathing), Gatorade, a TB screening, a chest x-ray ("CXR") to check if he had pneumonia, Mucinex, and Tylenol were ordered. He tested positive for Covid-19, and daily monitoring continued. His lungs were clear, and by July 8 Mr. Perez Garcia reported no symptoms of Covid-19, demanding he be returned to the general population. (*See* Moore Dec. ¶¶ 55-64).[5]

d.   Plaintiff Castillo Gutierrez

Mr. Castillo Gutierrez' complaints set forth in Plaintiffs' Complaint are expressly contradicted by his medical records. Contrary to Plaintiffs' Complaint (¶¶ 117, 120, 121), Mr. Castillo Gutierrez did not have fever, aches, headaches or stomach aches in July 2020. Although Mr. Castillo Gutierrez tested positive for Covid-19, he was asymptomatic. Nevertheless, he was

---

[5] Contrary to Plaintiffs' Complaint ( ¶ 96), Mr. Perez Garcia did not have a 105 degree fever on June 26 or on any other date while at Farmville.  Mr. Perez Garcia's temperature was taken five times on June 26, which ranged from 98.1 to 102.9.  See SA 351, 367-69.

monitored on a daily basis and he reported no Covid-19 symptoms.  His temperature and oxygen saturation levels were normal, and his lungs were clear. (*See* Moore Dec. ¶¶ 65-69).

Critically, Plaintiffs have no expert opinion showing that any of this treatment breached the standard of care. As such, they ask this Court to assume, without the aid of knowing the threshold for negligent treatment for each Plaintiff's medical needs, that the care described above was so grossly inadequate as to evince deliberate indifference. *Cf. Young*, 238 F.3d 575  (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").

Therefore, based on this record, Plaintiffs have not met the "rigorous standard" of establishing deliberate indifference. *See King v. United States*, 536 Fed. Appx. 358, 362 (2013) (quoting *Grayson*, 195 F.3d at 695-96) ("[T]he Constitution's protection of rights does not provide a remedy for mere errors in judgment, 'even though such errors may have unfortunate consequences.'"). As such, Plaintiffs have failed to clearly show that they are likely to prevail on their claims that their COVD-19 treatment amounted to deliberate indifference.

### B.   Armor is not punishing Plaintiffs through their detention.

Due process under the Fifth Amendment "requires that a pretrial detainee not be punished." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). A court "evaluating the constitutionality of conditions or restrictions of pretrial detention" must first determine "whether those conditions amount to punishment of the detainee." *Id*. at 535. "[T]o prevail on a substantive due process claim, a pretrial detainee must show unconstitutional punishment by proving that the challenged conditions were either (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018) (citations and quotation marks

omitted). Where "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Wolfish*, 441 U.S. at 539. Here, because Plaintiffs do not allege that any Defendant had an express intent to punish, they ask this Court to draw the inference that such intent exists anyway

As a threshold matter, Armor's penological interest in Plaintiffs' detention in this case is unclear from the Motion. Likewise, in their Complaint, Plaintiffs' describe Armor as a corporation "that contracts with Defendant's ICA to provide health care services to detainees at Farmville Detention Center." (ECF No. 1, ¶ 21.)  Meanwhile, the Supreme Court has recognized the federal government's interest in detaining individuals like Plaintiffs', who are awaiting immigration proceedings.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836-37 (2018); *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001). Accordingly, the Federal Defendants and Farmville Defendants are better suited to address how Plaintiffs' detention is reasonably related to the legitimate government objectives. Therefore, Armor adopts their well-reasoned arguments in its responses as well. (*See* ECF No. 30, pp. 19-21 of 27; ECF No. 31, pp. 17-20 of 33.) For those same reasons, Plaintiffs are unlikely to prevail on the claims that Armor is violating their due process rights under *Bell v. Wolfish*.

## II. The Proposed Injunctions Are Unwarranted Because Plaintiffs Have Not Shown They Face an Imminent Risk of Injury Without Such Relief.

Plaintiffs have not clearly shown that they are likely to suffer an irreparable injury absent their proposed injunctions. Consequently, they are not entitled to this relief.  *See Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (holding that, for the risk of harm to merit a preliminary injunction, it must "be neither remote nor speculative, but actual and imminent.").

First, Plaintiffs have not shown that they likely face any imminent risk under Armor's medical care without their requested relief. They point to the possible risk of reinfection as one harm. But, for their support of that contention, Plaintiffs' submit that "[a] small but growing number of cases suggest that reinfection with COVID-19 is possible." (ECF No. 7, p. 19 of 41.) In response to those suspicions, Dr. Moore has explained that "there is research suggesting that people are misinterpreting lingering symptoms or failed antibody counts as evidence of reinfection." (Moore Decl. ¶ 27.) Conversely, Plaintiffs' Motion does not contain evidence that any of these Plaintiffs face a likely risk of infection. Thus, the Court is left to guess about how significant the risk of reinfection is to Plaintiffs. *See Zuniga v. University Health System*, 71 F. App'x 293, 293-94 (5th Cir. 2003) (per curiam) (affirming the denial of a preliminary injunction where an inmate submitted no medical opinion showing that he would suffer irreparable harm if he were not granted the requested relief).

However, even assuming the risk is possible as Plaintiffs say, a threat that is merely possible is not sufficient to obtain this preliminary injunction.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Therefore, Plaintiffs have not met their burden of showing that the requested relief is merited.

Similarly, there is no factual support for the claim that Plaintiffs should not be transferred under their current conditions because it risks their health. Plaintiffs claim that such transfers would run contrary to CDC guidelines, but provide no evidence that transfers are likely to endanger their health. Conversely, Dr. Moore explained that, "[a]s a matter of practice, Armor medical staff

18

will not request the transfer of detainees out of Farmville absent necessity, exigent circumstances, or release as delineated in the CDC guidelines." (Moore Decl., ¶ 26(a)). Also, "Farmville is not accepting additional detainees." (*Id.*, ¶ 11.)

Finally, Plaintiffs' claims about the need for adequate nutrition are not factually supported. (*See* Crawford Decl. ¶ 31) (explaining that, in June the Office of Detention Oversight reported that its inspection of the Farmville facility identified no deficiencies in food service). And, to the extent that Armor is involved in Plaintiffs' nutrition, Dr. Moore implemented a standing order to provide daily vitamins to all detainees exhibiting COVID-19 symptoms, regardless if they have tested positive. (*Id.* ¶ 26(n)). Meanwhile, Plaintiffs have not shown that their diets are likely to cause them harm.

In sum, none of Plaintiffs' proposed injunctions meet this Court's standard for being necessary to avoid an imminent risk of injury. As such, this Motion should be denied.

### III.   The Balance of the Equities and Public Policy Considerations Do Not Justify this Relief.

Because Plaintiffs seek their injunctions against the federal government along with Armor, the last two factors can properly be evaluated together. *Roe v. United States DOD*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken v. Holde*r, 556 U.S. 418, 435 (2009)) ("The final factors, the balance of the equities and the public interest, 'merge' when the government is the party opposing the preliminary injunction.").

While all parties can agree that the public has an interest in the health of detainees at Farmville, that interest is not best served by the relief requested. Plaintiffs will not benefit from the Court's heavy hand in the daily operations of Armor's medical staff at Farmville. While Plaintiffs' proposed inspector has his concerns and ideas about how to reform Farmville, his own declaration shows that he does not know which reforms are necessary. (*See* Moore Decl. ¶ 26)

(listing areas where Dr. Venter's suspicions about medical care at Farmville are inaccurate or incomplete).

Moreover, the interference proposed by Plaintiffs into Armor's operations is not likely to help Plaintiffs or any detainees. As Dr. Moore explained:

> Plaintiffs' proposed injunctions are not likely to help Armor deliver care to patients at Farmville. We are already working with the Virginia Department of Health to optimize protocols. We are already following CDC guidelines in our practices at Farmville, and, in some cases, exceeding those guidelines. We are also going to meet with CDC officials when they come to Farmville in the coming week to discuss our protocols, as we continue to provide the best possible care and conditions to the detainees. Further, as medical providers, we need the flexibility to use our medical judgment to respond to the health and safety needs of our patients and staff.

(*Id.* ¶ 72.)

By hamstringing Armor's delivery of medicine in favor of the unknown recommendations of Dr. Venters, Plaintiffs ask this Court to set aside its long-standing deference to medical providers like Dr. Moore. *See Taylor*, 34 F.3d at 268 ("It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities."); *see also Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (Roberts, C.J., concurring) ("Our constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties, there latitude 'must be especially broad.'") (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905) and *Marshall v. United States*, 414 U.S. 417, 427 (1974)). Such a result is clearly not in the public's interest.

## **CONCLUSON**

For the forgoing reasons, Armor asks that Plaintiffs' Motion for a Preliminary Injunction

be denied.

Respectfully submitted,

**ARMOR CORRECTIONAL HEALTH
SERVICES, INC.**

_____/s/  Christopher F. Quirk_____
Christopher F. Quirk, VSB #88238
Edward J. McNelis, III, VSB #34003
Sands Anderson PC
1111 East Main Street, Suite 2400
Richmond, Virginia 23219
Telephone:  (804) 648-1636
Facsimile:  (804) 783-7291
cquirk@sandsanderson.com
emcnelis@sandsanderson.com
*Counsel for Armor Correctional Health
Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of August 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/EMC system, which will send notification of such filing (NEF) to the following:

Granville Clayton Warner
Kristin Fisher Donovan
Simon Yehuda Sandoval Moshenberg
Legal Aid Justice Center
6066 Leesburg Pike
Falls Church, VA 22041
(703) 778-3450
Fax: (703)-778-3454
cwarner@justice4all.org
kristin@justice4all.org
simon@justice4all.org
*Counsel for Plaintiff*

Joseph Dominick West
Gibson Dunn & Crutcher LLP
1050 Connecticut Ave NW
Washington, DC 20036-5306
(202) 995-8500
jwest@gibsondunn.com
*Counsel for Plaintiff*

John Michael Erbach
Patricia Bugg Turner
Spotts Fain PC
411 E. Franklin St.
Suite 600
Richmond, VA 23219
(804) 697-2000
Fax: (804) 697-2088
jerbach@spottsfain.com
pturner@spottsfain.com
*Counsel Defendants Jeffrey Crawford and Immigration Centers of America, LLC*

Yuri Fuchs
US Attorney's Office (Alexandria)
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
Yuri.Fuchs@ysdoj.gov
*Counsel for Defendants Chad F. Wolf, U.S. Immigration and Customs Enforcement, Matthew T. Albence and Russell Hott*

    /s/  Christopher F. Quirk
Christopher F. Quirk, VSB #88238
Edward J. McNelis, III, VSB #34003
Sands Anderson PC
1111 East Main Street, Suite 2400
Richmond, Virginia 23219
Telephone: (804) 648-1636
Facsimile: (804) 783-7291
cquirk@sandsanderson.com
emcnelis@sandsanderson.com
*Counsel for Armor Correctional Health Services, Inc.*

22