**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| CHRISTIAN ALBERTO SANTOS GARCIA, *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>CHAD F. WOLF, in his official capacity as Acting Secretary, U.S. Department of Homeland Security, *et al.*,<br><br>　　　　*Defendants*. | Case No. 1:20-cv-00821 |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

ARGUMENT ......................................................................................................................... 6

    I.     Plaintiffs Are Likely To Succeed On The Merits ................................................. 7

          A.     Defendants Have Violated Plaintiffs' Constitutional Rights. ................... 7

                  1.     Defendants have acted with deliberate indifference toward Plaintiffs' medical care by exposing them to and failing to treat them for COVID-19. ................................................................ 7

                  2.     Defendants are subjecting Plaintiffs to impermissible punishment. ................................................................................... 18

          B.     Defendants Have Violated The APA. ...................................................... 20

                  1.     Federal Defendants' actions are reviewable "agency action." ................................................................................................. 20

                  2.     The *Accardi* principle applies here. ............................................ 22

                  3.     Defendants have violated their own policies. .............................. 24

    II.    Plaintiffs Face Immediate And Irreparable Harm ............................................... 27

    III.    The Public Interest And Balance Of Equities Weigh Heavily In Favor Of A Preliminary Injunction ................................................................................... 29

CONCLUSION ...................................................................................................................... 30

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)......................................................................................20

*Alcantara v. Archambeault*,
    --- F. Supp. 3d ----, 2020 WL 2773765 (S.D. Cal. May 26, 2020)....................28, 29

*Arias v. Decker*,
    2020 WL 2306565 (S.D.N.Y. May 8, 2020) ........................................................18

*Bailey v. United States*,
    568 U.S. 186 (2013)......................................................................................17

*Banks v. Booth*,
    2020 WL 3303006 (D.D.C. June 18, 2020)........................................................18

*Basank v. Decker*,
    2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) .....................................................18

*Benavides v. Gartland*,
    2020 WL 3839938 (S.D. Ga. July 8, 2020) ........................................................24

*Brown v. Plata*,
    563 U.S. 493 (2011)......................................................................................30

*C.G.B. v. Wolf*,
    2020 WL 2935111 (D.D.C. June 2, 2020)....................................................23, 24

*Centro Tepeyac v. Montgomery Cty.*,
    722 F.3d 184 (4th Cir. 2013) ...........................................................................29

*City of New York v. U.S. Dep't of Defense*,
    913 F.3d 423 (4th Cir. 2019) ...........................................................................21

*Cornwell v. Sachs*,
    99 F. Supp. 2d 695 (E.D. Va. 2000) ...............................................................6, 7

*D.A.M. v. Barr*,
    2020 WL 4218003 (D.D.C. July 23, 2020)..........................................................23

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ..................................................................23

**TABLE OF AUTHORITIES**

*(continued)*

Page(s)

*Darnell v. Pineiro,*
   849 F.3d 17 (2d Cir. 2017).................................................................................8

*Dep't of Homeland Security v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020)..............................................................................20, 24

*Fanin v. U.S. Dep't of Veterans Affairs,*
   572 F.3d 868 (11th Cir. 2009) ........................................................................21

*Fed. Defs. of N.Y, Inc. v. Fed. Bureau of Prisons,*
   954 F.3d 118 (2d Cir. 2020).............................................................................24

*Fraihat v. U.S. Immigration & Customs Enforcement,*
   --- F. Supp. 3d ---, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020)..........................22

*Gallagher v. N.Y. State Bd. of Elections,*
   --- F. Supp. 3d ---, 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020) ............................9

*Gayle v. Meade,*
   2020 WL 2086482 (S.D. Fla. Apr. 30, 2020) ..........................................23, 24, 26

*Gordon v. Cty. of Orange,*
   888 F.3d 1118 (9th Cir. 2018) ..........................................................................8

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.,*
   822 F.3d 709 (4th Cir. 2016) ...........................................................................12

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.,*
   193 F. Supp. 3d 556 (E.D. Va. 2016) .................................................................6

*Helling v. McKinney,*
   509 U.S. 25 (1993)..........................................................................................17

*Heyer v. U.S. Bureau of Prisons,*
   849 F.3d 202 (4th Cir. 2017) ............................................................................8

*Holden v. Finch,*
   446 F.2d 1311 (D.C. Cir. 1971).........................................................................23

*Hyatt v. U.S. Patent & Trademark Office,*
   110 F. Supp. 3d 644 (E.D. Va. 2015) ...........................................................21, 22

*Jackson v. Lightsey,*
   775 F.3d 170 (4th Cir. 2014) .............................................................................9

*Kingsley v. Hendrickson,*
   576 U.S. 389 (2015)..........................................................................................7

**TABLE OF AUTHORITIES**

*(continued)*

Page(s)

*Meyers v. Stubblefield*,
    2008 WL 565775 (E.D. Mo. 2008)...................................................................................11

*Miranda v. Cty. of Lake*,
    900 F.3d 335 (7th Cir. 2018) .........................................................................................8

*Pimentel-Estrada v. Barr*,
    2020 WL 3118489 (W.D. Wash. June 3, 2020).............................................................18

*Rosa v. McAleenan*,
    2019 WL 5191095 (S.D. Tex. Oct. 15, 2019).................................................................22

*Service v. Dulles*,
    354 U.S. 363 (1957)......................................................................................................22

*Seth v. McDonough*,
    2020 WL 2571168 (D. Md. May 21, 2020)....................................................................17

*Shover v. Chestnut*,
    798 F. App'x 760 (4th Cir. 2020) ...................................................................................8

*South Carolina v. United States*,
    907 F.3d 742 (4th Cir. 2018) ........................................................................................20

*Torres v. U.S. Dep't of Homeland Sec.*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ........................................................................22

*Toure v. Hott*,
    2020 WL 2092639 (E.D. Va. Apr. 29, 2020) ............................................................16, 17

*Turner v. Safley*,
    482 U.S. 78 (1987)........................................................................................................30

*United States v. Haynes*,
    961 F.2d 50 (4th Cir. 1992) ............................................................................................8

*United States v. Morgan*,
    193 F.3d 252 (4th Cir. 1999) ........................................................................................22

*United States v. Winston*,
    850 F.3d 677 (4th Cir. 2017) ..........................................................................................8

*Velesaca v. Decker*,
    2020 WL 2114984 (S.D.N.Y. May 4, 2020) .................................................................23

*Wall v. Wade*,
    741 F.3d 492 (4th Cir. 2014) ........................................................................................12

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Wilkinson v. Legal Servs. Corp.*,
    27 F. Supp. 2d 32 (D.D.C. 1998) ............................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .........................................................................................................6

*Zaya v. Adducci*,
    2020 WL 1903172 (E.D. Mich. Apr. 18, 2020) .....................................................17

**Other Authorities**

Antonio Olivo, *House Committee Seeks Records in Coronavirus Outbreak Inside
    Virginia Immigrant Detention Center*, WASH. POST (Aug. 7, 2020) ....................4, 5

Carolyn Y. Johnson et al., *Can You Get Coronavirus Twice? Doctors Are Unsure
    Even as Anecdotal Reports Mount*, WASH. POST (July 22, 2020) .........................28

CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-
    19) in Correctional and Detention Facilities (July 22, 2020)*,
    https://bit.ly/3jg6ngw ...........................................................................................25, 29

Dean Mirshahi, *Canadian Detainee at Farmville ICE Facility, A Detention Center
    Struggling With COVID-19 Outbreak, Dies After Contracting Virus*, ABC 8
    NEWS (Aug. 7, 2020), https://bit.ly/2CekxhB ......................................................28

Elizabeth Magill, *Agency Self-Regulation*, 77 Geo. Wash. L. Rev. 859 (2009) ...........23

Fed. Bureau of Prisons, *Updates to BOP COVID-19 Action Plan* (Mar. 19, 2020),
    https://bit.ly/3eHwOYZ ......................................................................................13, 29

ICE, *ICE Guidance on COVID-19: Detainee Statistics* (last visited Aug. 9, 2020),
    https://bit.ly/2YB9BBS .............................................................................................4

Jenny Gathright, *After Transfers From Coronavirus Hotspots, Cases Spike At
    Farmville ICE Detention Facility*, DCIST (June 29, 2020),
    https://bit.ly/2XEF6ez ..............................................................................................12

Letter from Gov. Northam to Pres. Trump (July 22, 2020),
    https://bit.ly/2PGhq5a ................................................................................................5

Letter from Gov. Northam to Va. Cong. Delegation (May 14, 2020),
    https://bit.ly/30I1PIH ................................................................................................5

Letter from Sens. Warner and Kaine to Acting Sec'y Wolf (June 26, 2020),
    https://bit.ly/3kvuSaf................................................................................................11

Letter from Sens. Warner and Kaine to Pres. Trump (July 29, 2020),
    https://bit.ly/3fFngyh ................................................................................................5

**TABLE OF AUTHORITIES**

*(continued)*

Page(s)

Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained*,
   VOX (June 12. 2020), https://bit.ly/3ir4Cfi ............................................................................28

Lois Parshley, *What Happens If COVID-19 Symptoms Don't Go Away?  Doctors
   Are Trying to Figure It Out*, VOX (July 14, 2020), https://bit.ly/2XIUlTR ...........................28

Mica Rosenberg et al., *U.S. Immigration Officials Spread Coronavirus With
   Detainee Transfers*, REUTERS (July 17, 2020) ...............................................................3, 4, 11

**INTRODUCTION**

With 339 confirmed COVID-19 cases and counting, Farmville is experiencing the nation's largest COVID-19 outbreak inside an immigration detention center.  This public health crisis is of Defendants' own making:  In early June, they transferred 74 detainees from detention centers with confirmed COVID-19 cases to Farmville without adequate precautions, in violation of their own policies.   Nearly 90 percent of Farmville's detainees subsequently contracted this highly contagious and potentially fatal disease.   And on August 5, 2020, a 72-year-old man who contracted COVID-19 at Farmville died as a direct result of Defendants' unconscionable actions.

Defendants ask this Court to look the other way while people are dying.  They maintain that the actions they undertook to prevent the spread of COVID-19 were "reasonable," and that the care they have provided detainees is adequate.  In support, they rely on numerous policies they purport to have adopted to prevent a COVID-19 outbreak, but they concede that they failed to follow those rules when it came to detainee transfers.  And while they claim to have implemented preventative measures like social distancing, they cannot refute Plaintiffs' direct evidence that detainees continue to live in close quarters and sleep in bunk beds inches apart from one another.  Nor do they sufficiently rebut Plaintiffs' firsthand reports of specific instances when Defendants failed to promptly and adequately test, isolate, and care for individuals suffering from COVID-19 symptoms, or to provide detainees with safe, healthy food.

Defendants' actions violate Plaintiffs' constitutional rights and the APA and are causing Plaintiffs irreparable harm.  Not only is one Plaintiff still actively suffering from COVID-19 symptoms without adequate medical care, but all Plaintiffs are at a heightened risk of COVID-19 infection or reinfection because of Defendants' continued failure to implement sufficient measures to prevent the spread of the virus.

1

This Court's immediate intervention is needed to address the ongoing public health emergency at Farmville and to prevent further irreparable harm to Plaintiffs and other detainees. Plaintiffs ask this Court to order three reasonable forms of relief:  *First*, Plaintiffs ask the Court to enjoin transfers in and out of Farmville to curtail the spread of COVID-19.  Defendants' reckless transfer of detainees from COVID-19-positive facilities to Farmville precipitated the massive outbreak that Farmville is experiencing today.  Not only is Plaintiffs' request to halt such transfers consistent with the CDC's guidance and Armor's Medical Director's recommendation, but ICA Defendants and Armor now agree that transfers should cease.

*Second*, Plaintiffs ask the Court to order an in-person inspection of the facility to be conducted on the earliest possible date by a third-party public health expert.  This is a necessary first step for the Court to understand what is really happening behind the facility's closed doors. Defendants' vague assertions that they have taken reasonable precautions to prevent and manage the spread of COVID-19 and have provided adequate care to detainees does not square with the undisputed fact that nearly 90 percent of the people housed at Farmville have contracted COVID-19 on Defendants' watch and one person has died, or with the direct, firsthand evidence that Plaintiffs have provided of detainees suffering needlessly in Defendants' care.

*Finally*, Plaintiffs ask the Court to order Defendants to undertake conditions reforms in line with the results of the public health inspection.

## BACKGROUND

While Defendants' papers may give the impression that there are many disputed facts, a closer examination reveals that the parties agree on the key facts surrounding Plaintiffs' allegations.  Defendants' new facts are incomplete or contradictory.

I. Defendants explain that in April 2020, concerned about likely increased exposure to COVID-19 in the community, Armor's Medical Director recommended to Defendant ICA that they eliminate transfers into Farmville, "in part because the number of existing negative-pressure and solid-door / solid-wall rooms . . . would be too few to also quarantine all intakes in blanket fashion" in the event of a large influx of transferees.  Moore Decl., ECF No. 32-1 ¶ 14.  Indeed, Dr. Moore explained that "there are not enough rooms to currently serve [as isolation rooms] for all at-risk individuals or those with positive test results."  *Id.* ¶ 13.  Federal Defendants, ICA Defendants, and Armor then agreed to a policy whereby any new intakes would be quarantined for 14 days in a separate facility.  Crawford Decl., ECF No. 40-1 ¶ 19; Moore Decl. ¶ 14.

On June 2, 2020, due to an "operational need of ICE," Federal Defendants transferred 74 detainees from Florida and Arizona directly to Farmville "rather than first undergoing the usual 14-day isolation period at the Caroline Facility"—a flagrant violation of the policy Defendants had establish two months earlier.  Crawford Decl. ¶ 29.  ICA Defendants accepted the transfer despite learning from Defendant ICE that there were active cases of COVID-19 at the Florida facility, and despite the fact that ICE's own data shows that there were confirmed cases of COVID-19 at the Arizona facility as well.  *Id.*[1]  Although Farmville had the right to refuse the transfer, Defendant Crawford claims he chose not to do so because it would have been "impractical" and "there were no facts to indicate that ICA Farmville could not accommodate these transferees."  *Id.* ¶¶ 19, 29.

Defendants admit that during pre-intake screening, 51 of the 74 transferred detainees tested positive for COVID-19.  Crawford Decl. ¶ 30; Fed. Br. at 6.  ICA Defendants assert that none of the 74 transferred detainees were exposed to the general population while positive for COVID-19.

---

[1] *See* Mica Rosenberg et al., *U.S. Immigration Officials Spread Coronavirus With Detainee Transfers*, REUTERS (July 17, 2020), https://reut.rs/31txvjS ("ICE data shows that the day before the transfers, two of the three centers where the detainees came from had reported cases.").

Crawford Decl. ¶ 30.  But this assertion is belied by reports that other detainees had contact with the transferees when they first arrived.  Rosenberg et al., *supra* note 1.  And ICA Defendants admit they did not begin contact tracing or assigning staff to the same dorms and locations throughout the facility until June 22, 2020, after several detainees in non-transferee dorms tested positive for COVID-19, and even then, only when it would be "practical."  Crawford Decl. ¶¶ 34–35.

Defendants also agree that shortly after this transfer, COVID-19 began to spread rapidly through Farmville.  To date, there have been 339 confirmed cases of COVID-19 at Farmville— "the nation's largest coronavirus outbreak inside a detention center."[2]  And just last week, one Farmville detainee died from COVID-19-related complications on August 5, 2020 after being admitted to the hospital on July 10, 2020, Crawford Decl. ¶ 47—one of four detainee deaths at ICE facilities across the country, *see* ICE, *ICE Guidance on COVID-19*, *supra* note 2.

**II.**  Defendants also introduce some new facts, but those facts are either incomplete or contradictory.  ICA Defendants now claim that "no detainees at the facility have exhibited COVID-19-related symptoms since July 10" and "all detainees currently housed at Farmville have been cleared of COVID-19."  ICA Br., ECF No. 30, at 23 (citing Crawford Decl. ¶¶ 48, 52–53). But this statement raises more questions than it answers:  Defendants elsewhere say that only 38 detainees have currently tested negative, and that 138 test results are still pending.  Fed. Br., ECF No. 31, at 7; Crawford Decl. ¶ 50.  And Defendants also acknowledge that a Farmville detainee died just last week, after suffering from COVID-19.  Crawford Decl. ¶ 47.  Additionally, while Plaintiff Santos Garcia reported feeling better, he has not been re-tested for COVID-19; Plaintiff Castillo Gutierrez is still suffering from COVID-19 symptoms, including chest pain, issues

---

[2]  Antonio Olivo, *House Committee Seeks Records in Coronavirus Outbreak Inside Virginia Immigrant Detention Center*, WASH. POST (Aug. 7, 2020), https://wapo.st/31vBsom; ICE, *ICE Guidance on COVID-19: Detainee Statistics* (last visited Aug. 9, 2020), https://bit.ly/2YB9BBS.

breathing, diarrhea, lost appetite, nausea, and headaches, and has not yet received the results of his second COVID-19 test; and Plaintiff Bolanos Hernandez was told he does not have COVID-19, but is still experiencing headaches and jaw pain.  *See* Crawford Decl. ¶¶ 48, 52; Suppl. Castillo Gutierrez Decl. ¶¶ 3–5, Ex. A; Suppl. Bolanos Hernandez Decl. ¶¶ 2, 4, Ex. B.

The ICA Defendants also tout (at 20–21) that the Farmville facility was inspected in early June 2020 by the Office of Detention Oversight ("ODO"), and that no major violations were uncovered.  Crawford Decl. ¶ 31.  The ICA Defendants, however, fail to mention that ODO conducted a "remote inspection of the facility" due to the pandemic.  ODO Compliance Inspection (June 8–11, 2020) at 5, Ex. C.  They also fail to note that ODO found several deficiencies in the facility's grievance system, including with respect to documentation.  *Id.* at 10.

Finally, Defendants report that the CDC will conduct an assessment of infection prevention and control measures at Farmville at the request of the Virginia Department of Health.  Fed. Br. at 7; Mullan Decl., ECF No. 31-1 ¶ 88; ICA Br. at 22; Crawford Decl. ¶ 49; Armor Br., ECF No. 32, at 4, 20.  But the CDC's inspection on August 4, 2020 was cancelled, and Plaintiffs do not know if or when the visit will be rescheduled.  Crawford Decl. ¶ 49.  Defendants also do not say what the scope of this planned inspection would be, how long the CDC will take to issue a report, if Plaintiffs and the public will have access to the report, whether the CDC plans to issue recommendations, and whether Defendants will be bound (or would agree to be bound) by the recommendations (if any) resulting from this inspection.[3]  *Cf.* Suppl. Venters Decl. ¶ 21, Ex. D

---

[3]  The planned CDC inspection is the result of immense pressure from community groups and elected officials.  *See, e.g.*, Letter from Sens. Warner and Kaine to Pres. Trump (July 29, 2020), https://bit.ly/3fFngyh; Letter from Gov. Northam to Pres. Trump (July 22, 2020), https://bit.ly/2PGhq5a; Letter from Gov. Northam to Va. Cong. Delegation (May 14, 2020), https://bit.ly/30I1PIH.  Defendants rebuffed the Virginia Department of Health's previous attempts to assist with testing.  Olivo, *supra* note 2.  The House Committee on Homeland Security recently requested records related to the outbreak, citing concerns about how it has been handled.  *Id.*

(discussing potential limitations of a CDC inspection as compared to an expert inspection).

## ARGUMENT

This Court should grant Plaintiffs' request for injunctive relief because Plaintiffs have demonstrated that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm absent a preliminary injunction; (3) the balance of equities favors entering the injunction; and (4) a preliminary injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). None of Defendants' arguments alters this outcome.

The Federal Defendants (at 8–9) and ICA Defendants (at 2 n.2) contend that Plaintiffs' request for mandatory injunctive relief must meet a heightened standard of review. However, not all of the relief Plaintiffs seek is mandatory: To prevent further spread of COVID-19, Plaintiffs first ask this Court to enjoin transfers into and out of the facility. This request "to maintain the status quo" is a quintessential request for prohibitive relief, which is subject to a less exacting standard. *See Cornwell v. Sachs*, 99 F. Supp. 2d 695, 703 (E.D. Va. 2000) (emphasis omitted).

In any event, the "extraordinary circumstances" at issue here support Plaintiffs' request for mandatory injunctive relief. *See Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 566 (E.D. Va. 2016), *aff'd*, 700 F. App'x 251 (4th Cir. 2017). "[T]he facts and law clearly support" Plaintiffs, and Plaintiffs have made a "strong showing of irreparable injury" if the Court does not act now. *Id.* Specifically, if the Court does not grant Plaintiffs' request for an inspection and related conditions reforms, Plaintiffs will continue to suffer from inadequate medical treatment and risk of reinfection with a deadly virus.

Moreover, the mandatory injunctive relief that Plaintiffs seek is modest and reasonable: In light of the public health crisis unfolding behind closed doors, Plaintiffs ask this Court to order an in-person inspection of the facility by Dr. Homer Venters, a public health expert with decades of

correctional health experience and extensive experience with COVID-19 specifically, *see* Suppl. Venters Decl. ¶ 2 & Ex. A, so that the Court can determine what reforms are needed.  Defendants repeatedly claim that the Plaintiffs are asking this Court to supervene their judgment and order sweeping reforms of the facility, but that is simply not the case.  Plaintiffs have experienced inhumane and unconstitutional conditions at Farmville.  They ask the Court to order expert review of these conditions and then to order reforms consistent with what the investigation reveals.

I.      **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

This Court should grant Plaintiffs' request for injunctive relief because they have shown a "clear and convincing probability of success" on the merits.  *See Cornwell*, 99 F. Supp. 2d at 704.

A.      **Defendants Have Violated Plaintiffs' Constitutional Rights.**

Defendants contend that they took reasonable steps to prevent the spread of COVID-19, and that they have provided Plaintiffs with proper care.  But the facts show otherwise.  As a result, Defendants have violated Plaintiffs' Fifth and Fourteenth Amendment due process rights.

1.      **Defendants have acted with deliberate indifference toward Plaintiffs' medical care by exposing them to and failing to treat them for COVID-19.**

Defendants' reckless exposure of Plaintiffs to COVID-19 and failure to properly treat them once they fell ill demonstrates deliberate indifference toward Plaintiffs' medical care.

i.      *The objective standard in* Kingsley *applies to Plaintiffs' claims.*

Federal Defendants claim (at 11 n.3) that Plaintiffs "agree[]" the objective standard in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) does not apply.  But Plaintiffs said the opposite: "*Kingsley* applies equally here, and the question of whether the official knew of and disregarded the risk to Plaintiffs' health and safety is an objective one."  Mot. at 16-17.  To be sure, Plaintiffs briefed deliberate indifference under the pre-*Kingsley* (and more difficult) subjective standard.  But Plaintiffs squarely argued that this Court should apply *Kingsley* when assessing their claims.

Federal Defendants then reluctantly contest *Kingsley*'s applicability, claiming that the issue is somehow "settled" in the Fourth Circuit because a panel of the Circuit has applied the subjective standard in a later *un*published decision.  Fed. Br. at 11 n.3 (citing *Shover v. Chestnut*, 798 F. App'x 760, 761 (4th Cir. 2020) (per curiam)).  But that decision did not address *Kingsley*.  *See Shover*, 798 F. App'x at 761–62.  Moreover, it is black-letter law that an unpublished decision has no precedential value and cannot "settle" circuit law.  *See United States v. Haynes*, 961 F.2d 50, 53 (4th Cir. 1992).  And though a Fourth Circuit panel is bound by the court's prior published decisions, that is not true when a prior decision conflicts with a later Supreme Court decision.  *See, e.g.*, *United States v. Winston*, 850 F.3d 677, 683 (4th Cir. 2017).  Thus, *Kingsley*'s applicability to deliberate inference claims remains an open question in this Circuit, which this Court can and should resolve in Plaintiffs' favor, alongside a growing number of courts of appeals.  *See, e.g.*, *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (applying *Kingsley* in deliberate indifference context); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (same); *Darnell v. Pineiro*, 849 F.3d 17, 33–35 (2d Cir. 2017) (same).

Armor attempts (at 8 n.2) to grapple with the merits of *Kingsley*'s applicability, reading the decision narrowly to apply only to excessive force claims.  But Armor does not (and cannot) explain why *Kingsley*'s logic should not apply to deliberate indifference claims brought by pretrial detainees, like Plaintiffs' claims here.  *See, e.g.*, *Gordon*, 888 F.3d at 1124–25 (explaining that "logic dictates extending the objective deliberat[e] indifference standard . . . to medical care claims").  The Court should reject Armor's argument and apply *Kingsley* here.

    ii.   *Defendants concede that Plaintiffs have a serious medical need.*

To establish a claim of deliberate indifference to serious medical needs, Plaintiffs must show (1) that the alleged deprivation is a "serious medical need," *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017), and (2) that Defendants (or, under *Kingsley*, a reasonable person

in Defendants' position) "know[] of and disregard[] an excessive risk to inmate health or safety," *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quotations omitted).   None of the Defendants contests that Plaintiffs have satisfied the first prong:  their exposure to COVID-19 and risk of reinfection is a serious medical need.[4]

   iii. *Defendants knew of and disregarded an excessive risk to Plaintiffs' health.*

  Defendants' own evidence, along with Plaintiffs' evidence that Defendants do not dispute, establishes that Defendants knew of and disregarded an excessive risk to Plaintiffs' heath.

  As for the knowledge component:  Defendants' papers establish that they knew of the seriousness of COVID-19 and the unique risk it posed to detainees in their custody and care.  For example, Federal Defendants explain (at 5) that ICE began implementing a pandemic plan in January 2020.  ICA Defendants confirm (at 15) that they "began implementing measures to address COVID-19" during the same time.  And Armor says it "maintained and updated on a weekly basis a COVID-19 Response Plan at ICA Farmville" beginning in January 2020.  Armor Br. at 3.

  Thus, having admitted that they were aware of the risk posed by COVID-19 and that such risk was sufficiently serious under prong one, Defendants rest their entire defense on one argument—that they acted reasonably in response to this risk.  But the evidence establishes that, despite being aware of the excessive risk that COVID-19 posed to Plaintiffs, Defendants deliberately disregarded this risk time and again, with disastrous results.

---

[4]  Federal Defendants decline (at 12) to argue against this first prong; they skip directly to the second prong.  ICA Defendants assert (at 15) that they do not have the "knowledge or expertise" to argue on the first prong, and other than reciting the standard (at 9), Armor ignores the first prong. Because they have failed to contest this point, the Court should consider it conceded.  *See Gallagher v. N.Y. State Bd. of Elections*, --- F. Supp. 3d ---, 2020 WL 4496849 at *20 n.4 (S.D.N.Y. Aug. 3, 2020) (concluding at preliminary injunction stage that defendants' "failure to respond to Plaintiff's substantial argument can be taken as a concession on the case's applicability").

A.   *Accepting Transfer of 74 Detainees from Facilities with Known COVID-19 Cases*.

Federal Defendants' transfer and ICA Defendants' acceptance of 74 transferees in violation of

their own protocols is sufficient on its own to show profound deliberate indifference.   ICA

Defendants admit that, as early as April 2020, they and Armor recommended eliminating further

"intakes," i.e., transfers into Farmville, citing the facility's lack of capacity to "quarantine all

intakes in blanket fashion in the event of a large influx of transferees."   Crawford Decl. ¶ 19;

Moore Decl. ¶ 14.   In response, Federal Defendants and ICA Defendants agreed to quarantine

incoming transfers at a separate facility "for 14 days before further transfer to ICA Farmville."

Crawford Decl. ¶ 19.   This is undisputed evidence that all Defendants were aware of a risk to the

detainee population at Farmville posed by incoming transfers as early as April 2020.

Notwithstanding this knowledge—and a policy created to mitigate it—Federal Defendants

initiated and ICA Defendants accepted a transfer of 74 detainees from facilities in Florida and

Arizona (where COVID-19 outbreaks were occurring) without quarantining the transferees at the

separate facility in early June.   Crawford Decl. ¶ 29; Moore Decl. ¶ 16; Fed. Br. at 15 (adopting

wholesale ICA Defendants' and Armor's explanation of events).

Defendants freely admit this occurred, asserting that this deviation from their policy was

somehow appropriate because "there was no indication that ICA Farmville could not accommodate

the needs of these transferees."   Crawford Decl. ¶ 29; Fed. Br. at 15.   But Defendants cannot

explain how this could be true.   Dr. Moore had previously warned that the facility lacked capacity

to "quarantine all intakes in blanket fashion in the event of a large influx of transferees."   Crawford

Decl. ¶ 19.   ICA Defendants admit Federal Defendants gave them "less than 24 hours' notice" to

prepare for this transfer, and that Federal Defendants told ICA Defendants that there were

COVID-19 cases at the Florida facility (and in reality there were confirmed cases at the Arizona

facility also).  *Id.* ¶ 29; Rosenberg et al., *supra* note 1.  And though they acknowledge they had the "right to refuse" this transfer, ICA Defendants claim they did not do so because it would have been "impractical."  Crawford Decl. ¶ 29.  ICA Defendants' disregard of a policy designed to protect detainees from a lethal virus is strong evidence of their deliberate indifference.  *See, e.g.*, *Meyers v. Stubblefield*, 2008 WL 565775, at *4 (E.D. Mo. 2008) (finding that "failure to abide by prison policies, coupled with the knowledge that the purpose of those policies is to protect the safety and well-being of the inmates, would be sufficient to support a finding of deliberate indifference").  In an apparent change of heart, ICA Defendants now claim that, as of August 6, "ICA Farmville is not accepting new detainees."  Crawford Decl. ¶ 54.  But what changed?  Why was it "impractical" to refuse to accept transferees in June, but acceptable to do so now?  They do not say.

As ICA Defendants acknowledge, 51 of the 74 transferees tested positive for COVID-19 after their arrival at Farmville.  Crawford Decl. ¶ 30.  Undeterred by this critical fact, Defendants claim they appropriately managed this outbreak because they quarantined all 74 detainees in a previously-vacant dorm as of June 2, 2020.  *Id.*; Fed. Br. at 15.  But ICA Defendants had not yet implemented a policy of "assigning its staff to the same dorms," which they would do 20 days later—and only when it was "practical."  Crawford Decl. ¶ 35.  This means Farmville staff were free to move about the facility, likely spreading COVID-19 from the 74 "quarantined" transferees throughout the facility.  *See* Suppl. Venters Decl. ¶ 13.[5]  As of July 20, 315 detainees—over 80

---

[5]  Federal Defendants (at 15 n.6) selectively cite to Senators Warner and Kaine's June 26, 2020 letter to demonstrate that Farmville "appears to have followed appropriate quarantine measures."  But the letter criticized the June 2 transfer, as the rest of the sentence makes clear:  "While Farmville ICA appears to have followed appropriate quarantine measures, it seems the decision to transfer detainees between facilities has instead resulted in over 50 positive COVID-19 cases at Farmville ICA."  Letter from Sens. Warner and Kaine to Acting Sec'y Wolf (June 26, 2020), https://bit.ly/3kvuSaf.  When the Senators authored the letter, Defendants had only just begun large-scale testing.  Days later the public learned of the devastating outbreak inside the facility.

percent of the population—tested positive for COVID-19.  *See* Compl. ¶ 44.  It is difficult to imagine a more glaring example of deliberate indifference.

B.  *Planning to Transfer Infected Detainees*.  Defendants also acted with deliberate indifference by pressing forward with a plan to transfer COVID-19-positive individuals from Farmville to another ICE facility in Texas.  *See* Santos Garcia Decl., ECF No. 1-1 ¶¶ 24, 26.

Federal Defendants do not deny the existence of this plan.  Instead, they call the allegation "hearsay," (though hearsay is admissible evidence at this stage of the proceeding, and Defendants themselves rely at least in part on hearsay declarations),[6] and narrowly disclaim any *future* intent to transfer *only* Plaintiffs: "Plaintiffs *themselves* are not going to be transferred to a facility in Texas." Fed. Br. at 15 (emphasis added); *see id.* at 3 ("[ICE] has no plans to transfer any of *these individuals* to a facility in Texas" (emphasis added)); Mullan Decl. ¶¶ 4, 29, 41, 48 (disclaiming intent to transfer Plaintiffs).  But Federal Defendants do not once deny that such a plan existed in July 2020, nor do they put forth evidence to dispute Plaintiff Santos Garcia's account.

The Court should not credit this sleight of hand:  Denouncing only future plans to transfer Plaintiffs specifically without addressing Plaintiffs' core allegation does not rebut Plaintiffs' claim. Indeed, that Defendants approved this plan in the first place is evidence of deliberate indifference. Their purported decision to abandon the plan now is no more than voluntary cessation in the face of potential liability and does not moot Plaintiffs' challenge.  *See Wall v. Wade*, 741 F.3d 492, 497

---

Jenny Gathright, *After Transfers From Coronavirus Hotspots, Cases Spike At Farmville ICE Detention Facility*, DCIST (June 29, 2020), https://bit.ly/2XEF6ez.

   [6]   Hearsay is admissible at the preliminary injunction stage.  *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *vacated and remanded on other grounds by Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017).  Contrary to Defendants' suggestions, ICA Br. at 2 n.2, Fed. Br. at 9 n.2, Plaintiffs' declarations primarily rely on their direct knowledge of events they personally experienced.  In any event, Defendants' own declarations are replete with hearsay, as Mullan concedes.  Mullan Decl. ¶ 3 (explaining his declaration is based on "information conveyed to [him] by other law enforcement officials," among other things).

(4th Cir. 2014) (policy change via defendant's memorandum did not moot challenge).

Besides, Federal Defendants' denials only go so far:  While they claim they will not transfer Plaintiffs out of Farmville, they say nothing of their plans regarding incoming transfers (the cessation of which Plaintiffs request in their motion).  But the transfer of detainees *into* Farmville is even more problematic.   Indeed, the transfer of 74 detainees to Farmville from areas experiencing COVID-19 outbreaks precipitated the disastrous outbreak at Farmville.

Despite this history, Federal Defendants balk at the suggestion that their authority to transfer detainees—during a global pandemic—should be "constrict[ed]."  Fed. Br. at 28.  Armor goes further, suggesting (at 18) there is "no factual support" that transferring Plaintiffs—who are *recovering* from COVID-19—"risks their health," and that there is "no evidence that transfers are likely to endanger their health."[7]  But these statements contradict Armor's Medical Director who recommended "eliminat[ing] further intakes" in April 2020, Moore Decl. ¶ 14, and cannot be reconciled with Plaintiffs' expert, or common sense.   Suppl. Venters Decl. ¶ 19 ("transfer . . . should be avoided in the recovery period").[8]

C. *Failing to Implement Social Distancing, Adequate Testing, Isolation, and to Provide Adequate Treatment.*  Plaintiffs' complaint and motion detail Defendants' failures to implement adequate precautionary measures, delays in testing, and failure to isolate and adequately treat

---

[7]  ICA Defendants, though disclaiming responsibility for transferring individuals into or out of the facility, assert "on information and belief" that "no such transfers will occur."  ICA Br. at 15 n.6.  But the claim that ICA Defendants do not have responsibility for transfers contradicts Crawford's statements that "ICA Farmville has the right to refuse transfer of anyone whose needs cannot be accommodated at our facility," Crawford Decl. ¶ 29, and that "ICA Farmville is not accepting new detainees at this time," *id.* ¶ 54.  If "decisions to transfer detainees into and out their facility fall outside of [ICA Defendants'] control and authority," ICA Br. at 15 n.6, then how can they refuse new transfers as of August 6, Crawford Decl. ¶ 54?  Both statements cannot be true.
[8]  Fed. Bureau of Prisons, *Updates to BOP COVID-19 Action Plan* (Mar. 19, 2020), https://bit.ly/3eHwOYZ (halting nearly all transfers among its facilities since March 2020).

Plaintiffs.  *See* Mot. 7–13; Compl. ¶¶ 35–142.  Defendants primarily respond with broad denials and by describing general policies they allegedly established, but Defendants fail to introduce evidence to show that those policies were carried out with respect to Plaintiffs.

On social distancing, ICA Defendants claim detainees have plenty of space, touting that the facility is "under 50% capacity" and that detainees have "at least 100 square feet per detainee." ICA Br. at 20 (citing Crawford Decl. ¶¶ 3(e), 50).  Even if this math is correct, the argument ignores the practical reality of living in a detention facility dorm with upwards of 100 individuals, as detainees are not free to live within a mythical 100 square foot bubble.  *See, e.g.*, Suppl. Castillo Gutierrez Decl. ¶ 2 ("Social distancing still remains impossible."); Suppl. Bolanos Hernandez Decl. ¶ 6 ("There is no social distancing in my dorm."); Suppl. Venters Decl. ¶ 15 ("average amount of space per detainee is immaterial"); *cf.* Crawford Decl. ¶ 23 (Dr. Moore warned Crawford that shift commanders did not know how to enforce social distancing protocols).

Defendants' claim about the bunk beds is similarly misguided—they contend that they are "reassign[ing] bunks" to provide more space, but in the same breath admit they are doing so only "where possible."  ICA Br. at 18; Crawford Decl. ¶ 15(i)(vi); *cf.* Suppl. Bolanos Hernandez Decl. ¶ 6 (noting there have been no bed reassignments in his dorm).  Plaintiffs sleep shoulder-to-shoulder in bunk beds with eight people.  Castillo Gutierrez Decl., ECF No. 1-4 ¶ 12; Santos Garcia Decl. ¶ 7 (noting he sleeps "inches" from others).  This has remained true since Defendants filed their brief.  *See* Suppl. Bolanos Hernandez Decl. ¶ 6 ("The bunk beds are still in the same place and they are secured to the floor so it is impossible for them to move the bunk beds.").

On testing, Defendants boast that "since June 22, 2020, ICA Farmville has tested every detainee as expeditiously as possible."  ICA Br. at 3 (citing Crawford Decl. ¶ 3(b)); Fed. Br. at 7; Armor Br. at 5.  But this misses the point.  Defendants acted with deliberate indifference by

unreasonably *delaying* testing, not by failing to test at all.  *See* Suppl. Venters Decl. ¶ 8.  Plaintiff

Santos Garcia started showing symptoms on June 21, 2020, but was not tested until July 2, and did

not learn he tested positive until July 9.  Crawford Decl. ¶ 48; Santos Garcia Decl. ¶¶ 9; 20–21.[9]

Plaintiff Castillo Gutierrez first exhibited symptoms around June 28, 2020, but was not tested until

July 4, and did not learn he tested positive until July 7.  Castillo Gutierrez Decl. ¶¶ 5, 8.  Plaintiff

Bolanos Hernandez was also not tested until early July, was retested on July 16, and did not learn

of his negative result until July 30.  Bolanos Hernandez Decl. ¶ 12.

As to isolation, Federal Defendants claim (at 13) they "have instituted procedures to isolate

and/or contain any alien with a suspected or confirmed case of COVID-19 from the rest of the

general population," but they do not introduce evidence to show that the policy was carried out

with respect to Plaintiffs other than Perez Garcia (who was placed in a room with a detainee who

was sicker than he was, Perez Garcia Decl. ¶ 7), nor do they deny that the other Plaintiffs remained

in their dorms while exhibiting COVID-19 symptoms.  *See, e.g.*, Santos Garcia Decl. ¶¶ 10–11

(explaining that he "continued to live with other detainees in Dorm 5" even after he "started to feel

sick").  Armor does not take such an absolute position, saying only that it is doing "all that it can

to isolate and monitor the sickest individuals."  Armor Br. at 4.  In fact, Armor admits that not all

symptomatic detainees are isolated because Farmville does not have the capacity to do so.  *See id.*

at 5–6 ("there are not enough rooms" to "isolat[e] a detainee in a negative-pressure isolation room

or a non-negative pressure room . . . for all at-risk individuals or those with positive test results").

As to treatment, Defendant Armor states that "it is undisputed that each Plaintiff has been

---

[9]  Dr. Moore concedes Santos Garcia reported not feeling well on June 21.  Moore Decl. ¶ 28.
Although she denies he exhibited a fever or COVID-19 symptoms during subsequent checks, *id.*
¶¶ 29–30, this does not square with the contemporaneous accounts that Mr. Santos Garcia provided
to counsel or with his sworn declaration, Santos Garcia Decl. ¶¶ 9–10, 15–20, 27.

tested for COVID-19, each receives daily medical care, and none have required hospitalization."
Armor Br. at 1.  But this is very much in dispute, and a blanket denial is not contradictory evidence.
Indeed, Plaintiffs Santos Garcia and Bolanos Hernandez requested but were denied medical
treatment for at least two days after developing symptoms.  Santos Garcia Decl. ¶¶ 10, 16; Bolanos
Hernandez Decl., ECF No. 1-2 ¶ 6.  When Plaintiffs did receive treatment, it was minimal:  one
dose of Tylenol and/or Pepto Bismol once every twelve hours.  Santos Garcia Decl. ¶ 18; Castillo
Gutierrez Decl. ¶ 13; Suppl. Castillo Gutierrez Decl. ¶¶ 4, 6–7.  Though Plaintiffs may not have
been hospitalized, Plaintiff Perez Garcia's requests to be taken to the hospital were refused, and
Defendants offer no explanation for this denial.  Perez Garcia Decl., ECF No. 1-3 ¶¶ 12–13.[10]

*     *     *

For these reasons, many of the supposed factual discrepancies raised by Defendants are not
discrepancies at all, as they are not responsive to Plaintiffs' specific allegations.  Nevertheless, if
the Court has any doubt as to these facts, it should order an expert inspection of the facility.

D. *The Vast Majority of Cases Involving Preliminary Injunctions Based on Similar Facts Favor Plaintiffs' Position.*  Defendants' attempt to distinguish other cases in which courts have ordered preliminary injunctions based on similar facts fails.

Defendants rely extensively on *Toure v. Hott*, 2020 WL 2092639 (E.D. Va. Apr. 29, 2020).
*See, e.g.*, Fed. Br. at 12, 13, 15, 30; ICA Br. at 10, 21, 23.  But as this Court has already recognized,
that case involved a habeas petition challenging only the fact of petitioners' confinement and
seeking release as the sole remedy.  *See* Order (ECF No. 27).  The factual circumstances at
Farmville were also dramatically different when the *Toure* court evaluated those plaintiffs' claims
and relied on the absence of positive cases to find that Defendants took reasonable measures.  *See*

---

[10]  Plaintiffs agree that Plaintiff Perez Garcia's claims became moot on his release.

*Toure*, 2020 WL 2092639, at *13 ("Farmville ha[s], thus far, adequately and successfully protected Plaintiffs.  Farmville's success is most apparent, because it has returned no positive COVID-19 tests despite having occasion to test symptomatic detainees.").  Now that zero positive cases have turned into hundreds of positive cases, Defendants "must take the bitter with the sweet." *Bailey v. United States*, 568 U.S. 186, 206 (2013) (Scalia, Ginsburg & Kagan, JJ., concurring).  Officials "may be deliberately indifferent to the exposure of inmates to a serious, communicable disease" before anyone is infected, *Helling v. McKinney*, 509 U.S. 25, 33 (1993), and the fact that Farmville has progressed well past that point makes the indifference more glaring.  *See also, e.g.*, *Zaya v. Adducci*, 2020 WL 1903172, *5 (E.D. Mich. Apr. 18, 2020) (finding petitioner established likelihood of success on the merits, notwithstanding the lack of an outbreak, because "outbreaks have occurred across the country in state jails, federal prisons, and ICE detention centers alike").

Defendants also attempt to distinguish Plaintiffs' authorities by arguing that testing was deficient in those cases.  *See, e.g.*, ICA Br. at 17–18; Fed. Br. at 15; Armor Br. at 12.  Setting aside Defendants' own testing failures, Defendants still cannot meaningfully distinguish Plaintiffs' authorities on the ground that they involve "woefully inadequate" testing.  ICA Br. at 17.  For example, while inadequate testing was a concern in *Seth v. McDonough*, 2020 WL 2571168 (D. Md. May 21, 2020), the court made "clear" that it "draws this conclusion [of deliberate indifference] not on lack of available testing alone, for that is a universal shortcoming." *Id.* at *13. The court acknowledged that "the Facility appears at present to be complying with most of the applicable CDC guidelines," but found the protocols "transparently ineffective." *Id.* at *6, *12. Even with proper measures in place, the court was concerned with long-term sustainability and emphasized that "no formal plan exists to continue in some orderly fashion, the provision of PPE, cleaning supplies, and social distancing measures . . . for the life of the pandemic." *Id.* at *13.

In *Banks v. Booth*, 2020 WL 3303006 (D.D.C. June 18, 2020), the court recognized that the defendants were "testing any resident to be transferred," "test[ing] any cell mate of an inmate who tests positive and all new residents upon intake," and "continu[ing] to test those inmates who report positive for COVID-19 symptoms." *Id.* at *19. The court nonetheless found deliberate indifference because other measures were "inadequately enforced," including social distancing and "timely access to health care." *Id.* at *8–12. As it explained, "better policies mean little if they are not correctly implemented in practice." *Id.* at *9; *see also Arias v. Decker*, 2020 WL 2306565, at *9 (S.D.N.Y. May 8, 2020) ("Respondents' assurance that the [jail] is 'testing its entire population using rapid antibody screening' provides no solace.") (citation omitted).

Other courts have found that measures Defendants claim to have in place—"isolating detainees who report symptoms . . . providing soap and hand sanitizer to inmates, and increasing the frequency and intensity of cleaning jail facilities"—are "patently insufficient" in practice. *Basank v. Decker*, 2020 WL 1481503, *5 (S.D.N.Y. Mar. 26, 2020). Even if "detention facilities are below their full capacity, the appropriate capacity . . . during a pandemic obviously differs enormously from its appropriate capacity under ordinary circumstances." *Id.*; *Pimentel-Estrada v. Barr*, 2020 WL 3118489, at *7 (W.D. Wash. June 3, 2020) ("ICE's guidance for responding to the pandemic, as applied at the [facility], is insufficient to prevent the infiltration of the coronavirus," because "social distancing remains impossible" and "cleaning is inconsistent").

## 2. Defendants are subjecting Plaintiffs to impermissible punishment.

Defendants are subjecting Plaintiffs to unconstitutional punishment because the unreasonable exposure to and lack of adequate treatment for COVID-19, as well as the lack of adequate nutrition, have no reasonable relationship to a legitimate government purpose.

Defendants respond with a truism, that "preventing detained aliens from absconding and ensuring that they appear for removal proceedings is a legitimate government objective." ICA Br.

18

at 19 (quotations omitted); Fed Br. at 17 (same).  But this isn't responsive to Plaintiffs' claim.  It cannot be the case, as ICA Defendants contend (at 19), that Plaintiffs can never show that there is no legitimate government purpose to their *conditions* of confinement because of the government's interest in having Plaintiffs appear at their immigration hearings.  The government's interest in securing Plaintiffs' whereabouts is not carte blanche to mistreat them with impunity.

Defendants' attempts to demonstrate they did not unreasonably expose Plaintiffs to and fail to adequately treat Plaintiffs for COVID-19 fail for the reasons set forth above.  Nor do Defendants credibly dispute Plaintiffs' claims about improper nutrition.  Federal Defendants claim that there have been no formal, written complaint of "food infestation," but do admit that there have been formal complaints about expired milk, expired food, and undercooked food—each of which Plaintiffs attested to in their declarations.  Crawford Decl. ¶ 45; Mullan Decl. ¶ 74; Santos Garcia Decl. ¶ 11; Perez Garcia Decl. ¶ 35; Suppl. Castillo Gutierrez Decl. ¶ 11; Suppl. Bolanos Hernandez Decl. ¶ 7.  And Federal Defendants ignore the evidence that multiple Plaintiffs have found bugs and worms in their food, Santos Garcia Decl. ¶ 11; Perez Garcia Decl. ¶ 35, even if they have not submitted a written complaint.[11]

ICA Defendants similarly discount Plaintiffs' allegations about food, relying on their claim that (in their judgment) there have not been many formal complaints.  ICA Br. at 5.  Yet, ICA Defendants admit there have been 42 food complaints just this calendar year, including for serving "expired food."  Crawford Decl. ¶ 45.  Thus, rather than cast doubt on Plaintiffs' allegations, Defendants' evidence corroborates Plaintiffs' claims.  Finally, ICA Defendants assert (without evidence) that symptomatic detainees are not permitted to work in the kitchen.  ICA Br. at 4.  But

---

[11]  Contrary to Federal Defendant's suggestion (at 17-18), Plaintiffs are not shoehorning their deliberate indifference arguments into this claim.  In light of Defendants' COVID-19 failures, Plaintiffs' nutrition-based claim is cognizable under a stand-alone improper punishment theory.

Plaintiff Bolanos Hernandez forcefully disputes this account.  Bolanos Hernandez Decl. ¶¶ 8, 13.

**B.    Defendants Have Violated The APA.**

Foundational administrative law principles require agencies and agency officials to follow

their own policies, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and Federal

Defendants have not followed CDC guidance or the Medical Care and Food Service standards in

ICE's Performance-Based National Detention Standards ("PBNDS").   Federal Defendants hide

behind two doctrinal shields to evade this Court's review, arguing first that there is no cognizable

"agency action" and second that the *Accardi* doctrine does not extend to the directives at issue

here.  Neither prevents this Court from applying the APA, which establishes a "basic presumption

of judicial review" to "promote[ ] agency accountability."  *Dep't of Homeland Security v. Regents

of Univ. of Cal.*, 140 S. Ct. 1891, 1905, 1909 (2020).  Once applied, the APA violation is evident.

**1.  Federal Defendants' actions are reviewable "agency action."**

Plaintiffs have identified "specific and discrete governmental conduct" that violated the

agency's own policies (Fed. Br. at 20), and thus the APA.  In *South Carolina v. United States*, 907

F.3d 742 (4th Cir. 2018), a statute "required that [an agency] take a discrete action: if [the agency]

failed to meet [a] production objective, it was obligated to remove not less than one metric ton of

defense plutonium from South Carolina." *Id.* at 755.  The agency "failed to achieve" the objective,

and the Fourth Circuit concluded the agency's "failure to comply with" the statutory obligation

"entitled South Carolina to relief under" the APA.  *Id.*   Similarly here, Plaintiffs challenge

reviewable, specific, discrete conduct.  For example, the PBNDS require following CDC guidance,

and CDC guidance prohibits inter-facility transfers except in certain narrow circumstances:

Defendants' transfer of detainees from Arizona and Florida facilities violated their own rules.

That Federal Defendants violated the PBNDS and CDC guidance many times over makes

the violations *worse*, not *unreviewable*.  As the Fourth Circuit has confirmed, "ongoing failures to

carry out discrete obligations can be subject to review.  Government deficiencies do not become non-reviewable simply because they are pervasive."  *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 433 (4th Cir. 2019); *see Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 875, 877 (11th Cir. 2009) (holding that a court could review nine separate alleged agency violations because "the ban on generalized attacks does not prevent a plaintiff from bringing a handful of specialized challenges to specific 'final agency actions' that, if successful, would have a broad impact on the agency's program").  Federal Defendants' ongoing, pervasive failures to carry out the discrete obligations set forth in the PBNDS constitute agency action subject to judicial review.

Federal Defendants claim (at 21) that *City of New York* is "instructive," and so it is.  In *City of New York*, municipalities that had access to an Executive Branch background check database complained that the Department of Defense was not fully reporting information to the Attorney General.  913 F.3d at 426–27.  The Fourth Circuit said it could not review the claim:  Overhauling the inter-agency information-sharing system was the "sort of public policy problem that" would require a "broad programmatic undertaking" to fix, and which Congress specifically delegated to the "executive branch."  *Id.* at 433.  Nobody pointed to a *particular* decision to share or not share information that was unlawful, so "a discrete action [was] wholly lacking."  *Id.*  *City of New York* involved just the sort of "agency decisions that courts have found do *not* constitute [reviewable] agency actions"—suits in which plaintiffs contend an agency failed to do something that "plaintiffs assert would better meet a broad, unspecific policy mandate."  *Hyatt v. U.S. Patent & Trademark Office*, 110 F. Supp. 3d 644, 651 (E.D. Va. 2015) (concluding that an agency's "decision to issue or deny a patent with respect to plaintiff's 80 patent applications" was reviewable agency action).

In this case, there is no "broad, unspecific policy mandate" that Plaintiffs seek to enforce according to their own lights, which would "require a court to make a substantive policy

determination about what specific agency action would best serve broad congressional goals."
*Hyatt*, 110 F. Supp. 3d at 651.  Instead, Plaintiffs' APA claim asks this Court to ensure that Federal

Defendants comply with the narrow, specific directives set forth in their own policies, a task that

is well within the judicial role.  Put simply, "there is a final agency decision" where plaintiffs

"alleged . . . non-compliance with the PBNDS."  *Torres v. U.S. Dep't of Homeland Sec.*, 411 F.

Supp. 3d 1036, 1069 (C.D. Cal. 2019); *see also Fraihat v. U.S. Immigration & Customs*

*Enforcement*, --- F. Supp. 3d ---, 2020 WL 1932570, at *23 (C.D. Cal. Apr. 20, 2020) ("A final

relevant decision is ICE's apparent failure to enforce compliance with its policy documents.").[12]

## 2.  The *Accardi* principle applies here.

Federal Defendants acknowledge they must follow their own "procedural" rules, but seek

to carve out an APA-free zone when "substantive rights" are on the line.  Fed. Br. at 22.  No such

limitation exists.  Although the Fourth Circuit has identified the *Accardi* doctrine as requiring an

agency to follow the "procedural safeguards" the agency provides, *United States v. Morgan*, 193

F.3d 252, 266 (4th Cir. 1999), neither it nor the Supreme Court has said agencies need follow *only*

their procedural rules.  To the contrary, the Supreme Court has held that when agency regulations

subjected an agency official to both "substantive standards" *and* "procedural requirements," the

official "could not, so long as the Regulations remained unchanged, proceed without regard to"

the "more rigorous *substantive and procedural* standards" the agency had adopted.  *Service v.*

*Dulles*, 354 U.S. 363, 388 (1957) (emphasis added).  Although Federal Defendants point to two

Judge Cooper decisions observing that it "is not readily apparent that" an agency's "substantive

---

[12]  *Rosa v. McAleenan*, 2019 WL 5191095 (S.D. Tex. Oct. 15, 2019) is not, as Federal Defendants claim (at 21), to the contrary.  *Rosa* did *not* conclude that agency action was unreviewable; it concluded that a different set of ICE guidance did "not have the force of law or create legal rights." 2019 WL 5191095, at *20.  Here, nobody disputes that the PBNDS are more than a mere "policy statement" with "[n]o legal consequences."  *Id.*

guidelines" "fall[ ] within the ambit of" the *Accardi* doctrine, *C.G.B. v. Wolf*, 2020 WL 2935111, at *34 (D.D.C. June 2, 2020) (quotation omitted); *see D.A.M. v. Barr*, 2020 WL 4218003, at *13 (D.D.C. July 23, 2020) (same), that dicta is incorrect, and cannot be followed here.  Cases like *Dulles* have not been overruled *sub silentio*; they remain binding, and neither *C.G.B.* nor *D.A.M.* grapple with them.  The *Accardi* principle is alive and well, and requires agency compliance with *all* of their own policies.  That is why "courts apply the *Accardi* doctrine to both . . . self-regulatory measures [that] impose[] *substantive or procedural* limitations."  Elizabeth Magill, *Agency Self-Regulation*, 77 Geo. Wash. L. Rev. 859, 877 (2009) (emphasis added) (collecting cases); *see also Holden v. Finch*, 446 F.2d 1311, 1315 (D.C. Cir. 1971) (noting the "unexceptionable" principle that an agency could not act "in violation of any *procedural or substantive* rights accruing by reason of" "additional protections" adopted by the agency (emphasis added)).

No matter what label the Federal Defendants try to slap on them, the PBNDS fit comfortably within the *Accardi* rubric.  The PBNDS "set forth the medical care that must be provided to individuals in immigration detention," and "[i]t is abundantly clear that ICE is required to comply with CDC's guidelines pursuant to its own regulations and policy statements."  *Gayle v. Meade*, 2020 WL 2086482, at *5–6 (S.D. Fla. Apr. 30, 2020) (rejecting "ICE's argument that the *Accardi* doctrine is inapplicable" to PBNDS and finding that ICE failed to follow social-distancing requirements during COVID-19 pandemic); *see also Damus v. Nielsen*, 313 F. Supp. 3d 317, 336, 341 (D.D.C. 2018) ("Plaintiffs have demonstrated a likelihood of success on the merits of their *Accardi* claim that Defendants are not abiding by their own policies and procedures" because ICE was no longer conducting "individualized parole determinations"); *Velesaca v. Decker*, 2020 WL 2114984, at *11 (S.D.N.Y. May 4, 2020).  The Second Circuit, too, has rejected the import of Federal Defendants' logic in an analogous context.  When plaintiffs alleged that the

Bureau of Prisons' "cancellation of inmate-attorney visits at the [facility] violates the [APA]," the court explained that plaintiffs had standing to challenge the cancellation because under *Accardi*, "agencies are generally required to follow their own regulations." *Fed. Defs. of N.Y, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 122, 130 (2d Cir. 2020). That conclusion could not have been possible unless the Bureau's regulations on inmate-attorney visits—every bit as "substantive" as the PBNDS, Fed. Br. at 22—were regulations that *Accardi* forces Defendants to follow.

### 3.  Defendants have violated their own policies.

Federal Defendants—seeking to further distance themselves from their own governing standards—claim that they need make only "reasonable efforts to comply with" CDC guidance and the PBNDS, rather than *actually* complying with their own standards. Fed. Br. at 22–23. Defendants set the bar too low, relying on one case in which the plaintiffs "concede[d]" that the agency did not have to "achieve 100 percent compliance," *C.G.B.*, 2020 WL 2935111, at *32 n.39, and another in which the court excused "technical or de minimis" "violations of CDC Guidance, such as mistakes on screening forms," *Benavides v. Gartland*, 2020 WL 3839938, at *11 (S.D. Ga. July 8, 2020). The case before this Court, of course, does not deal with inadvertent, harmless, "technical," or "de minimis" slip-ups. Plaintiffs' ability to survive a pandemic depends on the care provided by Defendants, as the recent tragic death of a Farmville detainee painfully illustrates. "[P]articularly when so much is at stake, [ ] 'the Government should turn square corners in dealing with the people.'" *Regents of the Univ. of California*, 140 S. Ct. at 1909. "For this reason, the [Supreme] Court" has, in applying the *Accardi* doctrine, "stated that strict compliance with the regulation was required." *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 53 (D.D.C. 1998) (collecting cases). Put simply, "ICE's purported 'substantial compliance' [standard] does not pass muster under the *Accardi* doctrine." *Gayle*, 2020 WL 2086482, at *6.

Under the proper standard—or even assuming *arguendo* that Federal Defendants' more

pliable standard applies—the evidence demonstrates that Defendants have not complied with CDC guidance, the Medical Care PBNDS standard, or the Food Service PBNDS standard.

*CDC Guidance.*   Federal Defendants have violated multiple aspects of CDC guidance, which the PBNDS require Federal Defendants to follow.   Federal Defendants contest their noncompliance with respect to only two CDC standards.

*First*, Defendants transferred 74 individuals from other detention facilities to Farmville in the middle of the COVID-19 pandemic.  Federal Defendants point out that the CDC says to "avoid transferring *infected* individuals to another facility," and that transfers may be "necessary" for certain narrow reasons like medical evaluations, security concerns, or clinical care.  Fed. Br. at 25. Federal Defendants claim that they followed that guidance because the transferred detainees "were screened and isolated from the general population upon arrival."  *Id.* (citing Crawford Decl. ¶¶ 28– 29).  That's a non-starter:  The violation was *the transfer itself*, not what Defendants did with the transferred detainees.   Federal Defendants do *not* claim that the transferred individuals were not "infected"—nor could they, given that 51 of the 74 transferees "tested positive."  Crawford Decl. ¶ 30.  (In any event, the CDC guidance does not prohibit transferring only "infected" individuals, as Federal Defendants suggest; instead, it instructs facilities to "[s]uspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities.")[13]   And Federal Defendants do *not* claim that one of the CDC's narrow exceptions that authorize transfers was satisfied—nor could they, given that ICE transferred them "due to an operational need of ICE," Crawford Decl. ¶ 29, a reason not endorsed by the CDC.

*Second*, Federal Defendants claim compliance with CDC's social-distancing mandates

---

[13]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (July 22, 2020), https://bit.ly/3jg6ngw.

simply because "ICA Farmville has adopted" a variety of "strategies." Fed. Br. at 25. But *adopting* strategies is different from *complying* with them, which is the critical question under *Accardi*. And "ICE has flouted its own guidelines by, inter alia, failing to ensure that each detainee practices social distancing." *Gayle*, 2020 WL 2086482, at *5 (finding that defendants unlawfully placed beds "only two feet apart, when they should be six feet apart under the CDC's guidelines"). As in *Gayle*, detainees are still sleeping far less than six feet apart. Suppl. Bolanos Hernandez Decl. ¶ 6. Defendants' evidence does not refute this. Although Crawford claims the facility has "r[e]assign[ed] bunks," that has only occurred "where possible," and turning detainees around so they "sleep head to foot" does not mean the detainees are farther apart. Crawford Decl. ¶ 15(i)(vi).

**Medical Care.** Federal Defendants claim they have complied with PBNDS Medical Care standards with respect to testing, screening, providing PPE, and monitoring detainees. Fed. Br. at 23. But Plaintiffs waited up to 11 days after exhibiting symptoms to be tested, Santos Garcia Decl. ¶¶ 20–21, 25, waited up to four days to receive any treatment, *id.* ¶ 16; Bolanos Hernandez Decl. ¶ 5; Perez Garcia Decl. ¶ 4, and received woefully inadequate treatment once sick. If a nearly 90 percent infection rate, multiple hospitalizations, and one death (to date) is the result of compliance with PBNDS and CDC guidance, one wonders whether non-compliance could look any worse.

**Food Service.** Finally, Federal Defendants claim (at 24) that they "have presented evidence" that they are in compliance with the Food Service standard because "food preparation at ICA Farmville is subject to strict controls" and "there have been no complaints regarding food infestation." Being subject to strict controls, of course, says nothing about compliance. Although Federal Defendants claim that there have been no formal complaints of "food infestation," ODO's recent remote inspection (at 10) found flaws in Farmville's grievance system, and this hyper-technical defense ignores the evidence that multiple Plaintiffs have found bugs and worms in their

food, Santos Garcia Decl. ¶ 11; Perez Garcia Decl. ¶ 35.  Moreover, Federal Defendants concede that there have been formal complaints about expired milk, expired food, and undercooked food—each of which is a violation of the PBNDS.  Crawford Decl. ¶ 45; Mullan Decl. ¶ 74.

## II.   PLAINTIFFS FACE IMMEDIATE AND IRREPARABLE HARM

Plaintiffs will continue to suffer irreparable harm absent this Court's intervention.  Castillo Gutierrez is still exhibiting COVID-19 symptoms, Bolanos Hernandez remains at great risk of initial infection, and Santos Garcia and Castillo Gutierrez (assuming he recovers) are at risk of reinfection.  Thus, any suggestion that such harm has "passed" is sadly mistaken.  Fed. Br. at 26.

Plaintiff Castillo Gutierrez is still suffering from COVID-19.  As recently as August 4, 2020, he experienced diarrhea, nausea, headaches, and loss of appetite.  Suppl. Castillo Gutierrez Decl. ¶ 4.  The next day, he experienced shortness of breath, chest pain, and extreme difficulty breathing, to the point he felt that he was suffocating.  *Id.*  On August 7, he reported his symptoms to Farmville medical staff, and was given Pepto Bismol and acetaminophen.  *Id.* ¶ 6.  Neither helped him feel better.  *See id.* ¶¶ 6–8.  Castillo Gutierrez has observed others in his dorm who continue to exhibit symptoms and are forced to self-medicate because the Farmville Defendants fail to provide adequate care.  *Id.* ¶ 9.  That the Defendants do not know these facts, *see* Crawford Decl. ¶ 48 ("Plaintiff Castillo Gutierrez [is] not currently exhibiting COVID-19 symptoms"); Fed. Br. at 27 (same), serves to underscore the irreparable harm they are inflicting on Plaintiffs.

Plaintiff Bolanos Hernandez is at risk of contracting COVID-19.  His most recent COVID-19 test was over three weeks ago, and he only recently received the news that this test was negative.  Suppl. Bolanos Hernandez Decl. ¶ 2.  Bolanos Hernandez now faces the frightening possibility that he is at high risk of becoming infected as he continues to live in close quarters with other detainees in a facility ravaged by the disease.  Given that nearly ninety percent of the population at Farmville has already tested positive for COVID-19 and one man has died, Bolanos

Hernandez faces an imminent and irreparable risk of infection and harm.[14]

Plaintiff Castillo Gutierrez (who is still symptomatic) has not received the results of a second COVID-19 test, Suppl. Castillo Gutierrez Decl. ¶¶ 3–5, and Plaintiff Santos Garcia has not been re-tested at all, *see* Crawford Decl. ¶¶ 48, 52.   Thus, in Plaintiff Santos Garcia's case, it is unclear if he continues to carry this disease and if it could return.   What is more, it is possible that both will experience lifelong impacts of their exposure to the disease.[15]   Moreover, a growing body of evidence suggests that the Plaintiffs are susceptible to reinfection.[16]   Armor relies (at 18) on Dr. Moore to cast doubt on this development, Moore Decl. ¶ 27, but Dr. Moore does not claim expertise in epidemiology, and she is a fact (not expert) witness in this proceeding.   In any event, her conclusion that "people are misinterpreting lingering symptoms or failed antibody counts as evidence of reinfection" is based on a single article.   *Id.* ¶ 27 n.2.

Finally, Federal Defendants rely (at 27–28) on *Alcantara v. Archambeault*, --- F. Supp. 3d ----, 2020 WL 2773765 (S.D. Cal. May 26, 2020), to support their argument that recovery from COVID-19 means Plaintiffs cannot demonstrate irreparable harm.   Putting aside the fact that Plaintiff Castillo Gutierrez has not yet recovered and Plaintiff Bolanos Hernandez remains at risk of initial infection, the *Alcantara* court was not so bold:  Though it acknowledged that the recovery

---

[14]   Dean Mirshahi, *Canadian Detainee at Farmville ICE Facility, A Detention Center Struggling With COVID-19 Outbreak, Dies After Contracting Virus*, ABC 8 NEWS (Aug. 7, 2020), https://bit.ly/2CekxhB.

[15]   *See* Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained*, VOX (June 12. 2020), https://bit.ly/3ir4Cfi ("[M]any COVID-19 patients . . . are finding their recovery takes far longer than the two weeks the [WHO] says people with mild cases can expect."); Lois Parshley, *What Happens If COVID-19 Symptoms Don't Go Away?  Doctors Are Trying to Figure It Out*, VOX (July 14, 2020), https://bit.ly/2XIUlTR (describing doctor's experience of COVID-19 symptoms 14 weeks after presumed infection); *id.* ("It's not necessarily just the sickest patients who experience long-term symptoms, but often people who weren't even initially hospitalized.").

[16]   Carolyn Y. Johnson et al., *Can You Get Coronavirus Twice?  Doctors Are Unsure Even as Anecdotal Reports Mount*, WASH. POST (July 22, 2020), https://wapo.st/2OP6qSr; Mot. at 11–12.

of plaintiffs "*may* lessen the likelihood they will be reinfected," the court did so by relying on the "current conditions" of the facility at issue, which were dramatically different than current conditions at Farmville.  *Id.* at *4 (emphasis added).  That facility was operating at an overall capacity of "thirty-eight percent," "all but four subclass members" were housed in units "without any positive cases," and the remaining four were housed in a unit at "twelve percent capacity." *Id.*

## III.   THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION

Defendants' colossal mismanagement of their response to the COVID-19 pandemic has irreparably harmed Plaintiffs, who will continue to suffer absent a preliminary injunction. Intervention by this Court is in the public interest, not only because upholding constitutional rights serves such interest, *see Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013), but because Defendants' actions jeopardize the public at large, which remains susceptible to community spread from the facility.  Lives are literally at stake, as just last week a Farmville detainee died as a direct result of Defendants' conduct.  Crawford Decl. ¶ 47.

Federal Defendants demur (at 28) that there is a public interest in the "enforcement of [U.S.] immigration laws," including by detaining immigrants during removal proceedings.  But this is a red herring, since Plaintiffs are not asking this Court to order their release.

Federal Defendants next insinuate (at 28) that any restriction on their ability to transfer detainees is against the public interest.  Not so.  The CDC has said otherwise, instructing detention facilities to "[l]imit transfers of incarcerated/detained persons" during the COVID-19 pandemic. CDC, *Interim Guidance*, *supra* note 12.  And the Federal Bureau of Prisons concurs; it suspended nearly all of its transfers since March 2020.  Fed. Bureau of Prisons, *supra* note 8.  Even ICA Defendants and Armor agree:  ICA Defendants have indicated they will no longer accept new transfers, Crawford Decl. ¶ 54, and Armor's Medical Director and "other officials at Armor"

have—since April—concluded that "further intakes" should be "eliminate[d]," Moore Decl. ¶ 14.

Finally, Federal Defendants claim it is in the public interest for courts to avoid managing the affairs of detention centers and "judicial restraint" is required.  Fed. Br. at 29 (citing *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)).  But the Supreme Court has recognized that while "[c]ourts must be sensitive to the . . . need for deference to experienced and expert prison administrators," they "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).

Rather than engage in this debate, ICA Defendants and Armor both attack a straw man, incorrectly claiming Plaintiffs' seek "the Court's heavy hand in the daily operations of Armor's medical staff," Armor Br. at 19, and to "overhaul" the facility's operations, ICA Br. at 23.  Instead, Plaintiffs seek an injunction ordering the cessation of transfers into and out of the facility, a third-party inspection of the facility, with recommended reforms to follow.  These requests are hardly a "heavy hand," but are proportional and tailored to respond to Defendants' failings.

At bottom, both ICA Defendants and Armor suggest this Court's intervention will make matters worse (and so not in the public interest)—but fail to explain how that could be possible.  Under Defendants' leadership, Farmville has already experienced the worst COVID-19 outbreak of any immigration detention facility in the nation.  This Court's intervention is manifestly appropriate and in the public interest.

## CONCLUSION

Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction, and order a halt to all inter-facility transfers into and out of Farmville and an immediate health inspection to take place within 7 days.  Should this Court order the inspection, Plaintiffs will submit a proposed order detailing the process and scope of the inspection.

Dated: August 10, 2020                    Respectfully submitted,


                                          By:    *s/Kristin Donovan*
Joseph D. West (Va. Bar No. 16834)        Simon Sandoval-Moshenberg
David Debold (*pro hac vice*)                (Va. Bar No. 77110)
Naima L. Farrell (*pro hac vice*)         Kristin Donovan (Va. Bar No. 92207)
Thomas J. McCormac IV                     Granville Warner (Va. Bar. No. 24957)
    (*pro hac vice*)                      LEGAL AID JUSTICE CENTER
Blair Watler (*pro hac vice*)             6066 Leesburg Pike, Suite 520
Katherine King (*pro hac vice*)           Falls Church, VA 22041
GIBSON, DUNN & CRUTCHER LLP               Tel: 703-778-3450
1050 Connecticut Avenue, N.W.             simon@justice4all.org
Washington, D.C. 20036-5306               kristin@justice4all.org
Tel: 202-955-8551                         cwarner@justice4all.org
jwest@gibsondunn.com
ddebold@gibsondunn.com
nfarrell@gibsondunn.com                   Sirine Shebaya (*pro hac vice*)
tmccormac@gibsondunn.com                  Amber Qureshi (*pro hac vice*)
bwatler@gibsondunn.com                    NATIONAL IMMIGRATION PROJECT OF THE
kking@gibsondunn.com                          NATIONAL LAWYERS GUILD
                                          2201 Wisconsin Avenue, N.W., Suite 200
*Pro bono counsel for Plaintiff Christian*   Washington, D.C. 20007
*Alberto Santos Garcia*                   Tel: 617-227-9727
                                          sirine@nipnlg.org
                                          amber@nipnlg.org


                                          *Pro bono counsel for Plaintiffs Santos*
                                          *Salvador Bolanos Hernandez, Gerson*
                                          *Amilcar Perez Garcia, and Ismael Castillo*
                                          *Gutierrez*

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this date, I uploaded the foregoing, along with all attachments thereto, to this Court's CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.

Dated: August 10, 2020                    Respectfully submitted,

                                          By:     _s/ Kristin Donovan_
                                          Kristin Donovan
                                             (Va. Bar No. 92207)
                                          LEGAL AID JUSTICE CENTER
                                          6066 Leesburg Pike, Suite 520
                                          Falls Church, VA 22041
                                          Tel: 703-778-3450
                                          kristin@justice4all.org