# EXHIBIT D

## SECOND DECLARATION OF DR. HOMER VENTERS, M.D.

I, Homer Venters, pursuant to 28 U.S.C. § 1746, declare as follows:

### A. Background

1.      This declaration supplements my declaration dated July 19, 2020, in the action *Santos Garcia v. Wolf*, No. 1:20-cv-00821 (E.D. Va.).

2.      As I explained more extensively in my prior declaration, and as set forth in my CV attached hereto as Exhibit A, I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, and testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

3.      Since April 2020, I have worked exclusively on COVID-19 responses in detention settings and have conducted court-ordered inspections of several detention facilities to assess the adequacy of their COVID-19 responses. Since my initial declaration, I have been named as the independent health monitor of the Santa Barbara County Jail and also named to the COVID-19 monitoring panel (McPherson) for Connecticut State Prison system.

### B. Material and Information Reviewed

4.      I have reviewed the following material in preparing this declaration:

- Declaration of Dr. Teresa Moore, submitted in this case (ECF No. 32-1).

- Declaration of James Mullan, submitted in this case (ECF No. 31-1)

- Declaration of Jeffrey Crawford, submitted in this case (ECF No. 30-1)

- Declaration of Christian Alberto Santos Garcia, submitted in this case (ECF No. 1-1)

- Declaration of Santos Salvador Bolanos Hernandez, submitted in this case (ECF No. 1-2)

- Supplemental Declaration of Santos Salvador Bolanos Hernandez, to be submitted in this case.

- Declaration of Gerson Amilcar Perez Garcia, submitted in this case (ECF No. 1-3)

- Declaration of Ismael Castillo Gutierrez, submitted in this case (ECF No. 1-4)

- Supplemental Declaration of Ismael Castillo Gutierrez, to be submitted in this case.

**C. Findings**

5.      As I reported in my initial declaration, my assessment of the COVID-19 response at Farmville Detention Center ("FDC") falls into three domains;

      a.  Do current practices in FDC adequately detect the number and severity of COVID-19 cases among staff and incarcerated individuals and respond in a manner consistent with CDC guidelines and other established clinical standards of care?

      b.  Do current practices in FDC adequately slow the spread of COVID-19 through the facility and between people — both staff and incarcerated individuals — in a manner consistent with CDC guidelines and other clinical standards of care?

      c.  Do current practices in FDC adequately identify and protect high-risk incarcerated individuals from serious illness and death from COVID-19?

6.      While I believe that a facility inspection is warranted to fully answer each of these three questions, the information I have reviewed for this declaration leaves me gravely concerned about the safety of people detained at FDC and staff who are working there. The deficiencies that

are apparent from this information span all three domains of my review. Information I have reviewed indicates that FDC is either unable or unwilling to comply with CDC guidelines and basic correctional and infection control practices in their response to COVID-19. For each of the three areas referenced above, I have included my concerns about the actions of ICE and FDC thus far and also noted gaps in information that can only be addressed through physical inspection of the facility.

**D.  Inadequate screening and response to cases of COVID-19**

7.  <u>Inadequate screening</u>.  The declarations of Dr. Moore and Director Crawford discuss daily screening for COVID-19 as involving a temperature check and symptom check for staff but only rely on temperature checks for detainees. This approach is grossly inadequate because many people present with elevated temperature later in their COVID-19 course and affirmatively asking about cardinal symptoms of COVID-19 is important to early detection, whether the person being screened is a detainee or staff member. The CDC has updated their guidance for detention settings twice with specific linkage to post-intake symptom screening.[1] In his first declaration, Mr. Castillo Gutierrez reports that he first experienced COVID-19 symptoms on June 30th but that he was not tested until July 4th. This delay represents several days of potential exposure of other detainees and staff to COVID-19 and a daily check of each person's COVID-19 symptoms in addition to temperature checks is required to find new cases as quickly as possible. *Part of my inspection would be to observe the current screening operations and not only assess the extent to which CDC guidelines are not being implemented, but also estimate the resource and*

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

*staffing implications of moving from temperature checks (which may require 4-8 minutes per*

*dorm/pod) to symptom and temperature checks (which may require double the time).*

8.     The declarations of Dr. Moore and Director Crawford also state explicitly that any concern about the adequacy of COVID-19 testing is "false". My experience investigating and inspecting numerous facilities is that there is very likely a gap in the testing approach of FDC. Specifically, the assertion that having tested every detained person represents adequate testing is simply inconsistent with CDC guidelines, which anticipate the need for ongoing testing (as opposed to testing every detainee once) in facilities with widespread transmission such as FDC. This ongoing testing should include people who are in a new admission quarantine group, as well as those who are in the same building as any new cases and who are otherwise identified as close contacts of new cases. In addition, Director Crawford's assertion that there is no delay in delivery of test results to detainees is in conflict with reports by detainees to the contrary, including Mr. Castillo Gutierrez who reported in his supplemental declaration that he was still waiting for a COVID-19 test result more than two weeks after the sample was taken.  *Part of my inspection would involve observation of new admission housing areas, and review the protocols in place for testing and separation of newly admitted detainees from others.*

9.     <u>Inadequate response</u>.   Beyond screening, multiple detainees report inadequate response to their reporting of potential COVID-19 symptoms or concerns. Mr. Santos Garcia states in his declaration that he reported clear symptoms of COVID-19 to medical staff, that his symptoms and report to health staff were on June 18th but that he was not seen until June 22nd. Mr. Bolanos Hernandez reports a similar delay after reporting COVID-19 symptoms to staff. Even without an outbreak, this represents a breach of correctional standards of care, which require that a patient who reports a symptom be seen by a health professional within 24 hours. Several months

into the COVID-19 outbreak, this lack of response is even more egregious. *One relevant aspect of any FDC inspection would be to review the places and processes by which detainees obtain sick call slips, submit them, and receive care.*

10.    <u>Use of solitary confinement as medical isolation</u>. CDC guidelines make clear that medical isolation should not be punitive and should not represent a setting that limits access to reading material, contact with the outside world and other basic rights of detained people. Nonetheless, the reports of multiple detainees including Mr. Perez Garcia include conditions of medical isolation and involve being locked in a cell for the entire day, without reading material or access to phone calls or other basic amenities. In addition, the reports of little medical monitoring during isolation in detainee declarations raise concerns that patients who are known to have COVID-19 may deteriorate in these cells without being assessed or cared for.

**E.  Inadequate infection control measures**

11.    <u>Egregious transfer of detainees into FDC</u>. The transfer of people from detention settings in Florida and Arizona to Farmville Detention Center has caused an outbreak of COVID-19 in FDC. Since the CDC promulgated its first version of detention guidelines for COVID-19 response in March 2020, the danger of transfers between facilities has been clear, and the need to limit such transfers universally accepted. In fact, the declarations of Dr. Moore and Director Crawford of FDC also make clear that transfers into the facility had been stopped in April 2020 for this reason. In addition, both Dr. Moore and Director Crawford report that any person coming into FDC would first be held at another facility for 14 days in new admission quarantine, to assure that they did not have COVID-19 before entering the facility. Per Director Crawford, "the number of existing negative pressure and solid door / solid wall rooms, while thus far a sufficient number to isolate individual cases of symptomatic or potentially exposed individuals, may be too few to

5

also quarantine all intakes in blanket fashion in the event of a large influx of transferees."[2]    As a result, ICE, Armor and FDC generally agreed on April 14th 2020 that all new admissions to FDC would be quarantined at Caroline County detention for 14 days before being admitted into FDC.

12.    For unknown reasons, ICE and FDC appear to have ignored these practices and policies in June 2020, when 74 detainees were accepted for transfer into FDC directly from Florida and Arizona. At the time, both states were experiencing dramatic spikes in COVID-19 infection rates, while Virginia rates were in decline (see Appendix 1-3)[3]. These 74 people were sent to, and accepted into FDC without being tested or being held at an intermediary facility for 14 days. In addition to coming from states with high rates of COVID-19, at least three of the actual facilities from which people were being sent had active cases among its detainees, including Krome Detention Center in Florida and Eloy and Florence Detention Centers in Arizona.[4] Despite this clear and present risk, ICE initiated and Director Crawford accepted the transfer of these detainees directly into FDC without being tested or quarantined. In his declaration, Director Crawford stated that at the time "there were no facts to indicate that ICA Farmville could not accommodate these transferees". But his own assessment from April, almost two months earlier had been that the lack of adequate quarantine and medical isolation housing areas should lead to the stopping of new admissions into FDC.

---

[2] Crawford Decl. ¶ 19.

[3] https://www.kff.org/coronavirus-covid-19/issue-brief/state-data-and-policy-actions-to-address-coronavirus/

[4] https://web.archive.org/web/20200602164045/ice.gov/coronavirus; https://www.reuters.com/article/us-health-coronavirus-immigration-detent/u-s-immigration-officials-spread-coronavirus-with-detainee-transfers-idUSKCN24I1G0.

13.     Prior to these mass transfers of detained people into FDC, the most recent COVID-19 case at FDC occurred in April and the total number of detained people and staff who had tested positive for COVID-19 was two.  Among the 74 people who were transferred into FDC from Florida and Arizona, Director Crawford reports that 51 had tested positive for COVID-19 within several weeks. The COVID-19 infections quickly spread throughout the facility and by mid-July, more that 80% of all detainees at FDC had tested positive, and 26 staff tested positive for COVID-19. At least six detainees required hospitalization. As of August 8, 2020, the number of detainees with COVID-19 infection at FDC has grown to 339 according to the ICE website.  One of these people, Mr. James Hill, died on August 5th. ICE reported the death of this 72 year old man, with his cause of death being "still under investigation" but they also revealed that he tested positive for COVID-19 after being transferred to the hospital for shortness of breath on July 11th having come to the attention of FDC staff that day before, on July 10th.  When multiple individuals with COVID-19 enter a facility, their contact with numerous staff and other detainees can cause rapid spread of the virus throughout the facility as both staff and detainees move about. This appears to have occurred in FDC. The declaration of Director Crawford indicates that limiting staff to working on dedicated housing areas (as opposed to working in multiple housing areas) and conducting contact tracing of close contacts of new COVID-19 cases only started after the June outbreak began. Thus FDC not only admitted extremely high-risk detainees into their facility and ignored their own policies regarding new admission quarantine, but also failed to implement any basic limitations to the movement of staff into and out of multiple housing areas, thereby increasing the spread of the virus.

14.     In addition to the egregious breach in basic infection control standards and CDC guidelines represented by the transfer of detainees into FDC, there are several other critical lapses in infection control reported by detainees.

15.     <u>Lack of Social Distancing</u>. Multiple detainees report in their declarations that social distancing is not encouraged or otherwise implemented by FDC staff. Director Crawford states in his declaration that social distancing is possible because of the number of square feet of space available to detainees, but this either misrepresents or misunderstands basic aspects of social distancing. The average amount of space per detainee is immaterial when detainees come into close contact with each other and staff at predictable choke points, such as lines for medication and meals, entering and leaving recreation spaces, and in sleeping, bathing and bathroom and phone utilization. These are everyday scenarios that bring people into very close contact within detention settings. Mr. Castillo Gutierrez reports in his declaration that detainees sleep shoulder to shoulder in bunk beds, a serious deficiency in infection control and one that is not mitigated at all by the calculation of square feet of space per detainee referenced by Director Crawford. Mr. Bolanos Hernandez reports in his declaration that social distancing is not enforced by guards. This is a crucial failing because as the CDC makes clear, social distancing is not only an individual intervention, but is also a response organizations need to implement. For detention settings this requires training of staff to promote social distancing and analysis of video by managers to identify areas and times when social distancing is not being implemented. While Director Crawford lists a series of interventions under the FDC efforts towards social distancing, his own declaration makes clear that even in April, the implementation of social distancing had been called into question by security and health staff alike. My experience in assessing social distancing during COVID-19 response in detained settings is that training of staff, video review of housing areas during off hours

and weekends, and physical plant changes are all required to implement these CDC-recommended infection control measures. The reports by detainees, combined with FDC Director Crawford's own declaration make clear that social distancing is not being effectively implemented in the facility.

16.    <u>Lack of access to PPE and lack of use of masks</u>. Multiple detainees report in their declarations that staff and other detainees often do not wear masks. Given the lack of social distancing at FDC, this represents a serious infection control failure. This failure may stem from lack of engagement with detainees about how and why masks are essential in protecting them and others against COVID-19, and may reflect a similar failure to engage staff on these issues. In addition, this failure may reflect the reliance, in part, on expired N95 masks in FDC. The FDC staff report obtaining expired N95 masks for detainee use along with other masks. The use of N95 masks is generally reserved for health staff for several reasons, notably because these masks are tight fitting and most people who are not trained in their use find them uncomfortable and struggle to wear them for long periods of time. The CDC does not recommend N95 masks for detained people and instead recommends the use of cloth face coverings. I have personally managed numerous detention outbreaks and have observed how quickly people who are not health professionals discard or stop using N95 masks. While N95 masks do provide greater protection than cloth face coverings, the use of these masks at FDC likely harms overall infection control to the extent that people stop using any mask at all. *One of the observations I make during COVID-19 inspections is the number of staff and detainees wearing masks and practicing social distancing. I also review the hand washing and cleaning/disinfecting supplies in each housing area and*

*common spaces. The elements of social distancing that I utilize for evaluation include those referenced by the CDC for correctional settings since March 2020 (see Appendix 4)[5].*

17.    <u>Use of force with pepper spray</u>. The response to a demonstration or protest among detainees who were seeking information about COVID-19 with use of force and spraying of pepper spray in a confined area represents a serious potential violation of ICE use of force policies. This also represents a dangerous action in terms of promoting the spread of COVID-19, especially in a facility with widespread transmission. The coughing, runny nose, tearing and deep breathing that results from pepper spray exposure represents a powerful accelerator of COVID-19 transmission. Reports from detainees indicate that de-escalation and communication was warranted in this incident, and that instead, ICE and FDC responded with force in a manner that may have worsened the outbreak of COVID-19.

**F.  Inadequate protection of high-risk patients**

18.    FDC has failed to identify and protect high risk patients who are detained at FDC. The declaration of Dr. Moore states that she and other staff at FDC have utilized CDC criteria for identification of high-risk patients at FDC but the list of criteria she references is from April and does not reflect recently expanded criteria utilized by the CDC, including obesity, liver disease, pregnancy and tobacco smoking. She does not provide any information about how many high-risk patients were identified when this task was undertaken, nor how many remain. Director Crawford states in his declaration that three detainees were identified as being at elevated risk. In my experience in correctional health, I would expect that between ¼ and ½ of people in detention would meet the CDC criteria for being high-risk for serious illness or death from COVID-19

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#social_distancing

infection. In addition, Dr. Moore does not identify any clinical or public health measures that will be taken to provide additional protection or care for these high-risk patients. In my experience managing outbreaks in detention settings, high risk patients can be protected in several ways, including consideration for release, cohorting inside specialized housing areas with specially trained staff, more frequent symptoms checks, and additional scheduled clinical encounters. The lack of meaningful interventions to protect high-risk patients is also supported by the declarations of detainees. Mr. Bolanos Hernandez reports in his declaration that aside from seeing signs that some people with certain health problems could have worse outcomes with COVID-19, he is unaware of any other special measures taken on his behalf as a high-risk patient. This also appears to be the case for the detainee who died, Mr. James, who was not transferred out of FDC until he exhibited shortness of breath and required hospitalization.

**G. Lack of post-COVID-19 health assessments and care.**

19.    Medically vulnerable patients who contract COVID-19 are likely to need care after they are no longer infectious, and even those who are not medically vulnerable may need more extensive care to fully recover. Care for COVID-19 patients extends beyond simply clearing them to return to general population housing areas because they have reached a 14-day mark after their diagnosis. The World Health Organization has reported that physical recovery from COVID-19 can extend well beyond the period of active infection, taking six weeks or longer.[6] Many of the people I have spoken with in detention settings report ongoing symptoms post-COVID-19 infection including shortness of breath, chest pain, tinnitus and daily headaches. These symptoms last weeks or longer and the facility must create a plan of care that assesses, documents and treats

---

[6] https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

these problems among detained people. Basic elements of a post-COVID-19 assessment include asking patients whether they experienced any of the CDC-listed symptoms during their COVID-19 infection, and whether they continue to experience any of those symptoms, or any other symptoms. This COVID-19 recovery encounter should occur with every patient who was confirmed or is suspected of having COVID-19. These efforts will likely include pulmonary rehabilitation and physical therapy or exercise as part of what patients need to recover from COVID-19.[7] At a baseline, any patient who experienced shortness of breath or other pulmonary symptoms should have their respiratory status and symptoms documented and be considered for incentive spirometry.[8] Patients with chest pain should be evaluated for cardiac complications of COVID-19, have an EKG conducted and be referred for cardiology consultation. Because COVID-19 is associated with high rates of blood clots, as well as kidney and liver damage, these recovery encounters should also include structured questions to elicit information about these symptoms, and when indicated, laboratory testing should follow.  Implementing these basic and required elements of COVID-19 care will require adequate staff as well as training. Declarations from multiple detainees at FDC reveal ongoing symptoms weeks after their initial COVID-19 diagnosis and a lack of appropriate assessment and care for their ongoing symptoms. In addition, detainees report ongoing efforts to transfer them, which should be avoided in the recovery period unless and until each patient has been assessed in the manner described above and been found to be free of disability or other ongoing symptoms that could be exacerbated by transfer. It is critical to establish that while medical vulnerable/high-risk patients are especially in need of this type of recovery

---

[7] https://rehabmed.weill.cornell.edu/sites/default/files/post_covid_rehab_-_patient_guide_0.pdf; https://www.healthline.com/health-news/what-to-do-after-recovering-from-covid-19#Walking

[8] https://lunginstitute.com/blog/incentive-spirometry-benefits/

assessment and care, any patient who is diagnosed with COVID-19 must be assessed for ongoing symptoms.

20.     In my work investigating over two dozen COVID-19 responses inside correctional settings, the transfer of detained people from Florida and Arizona into FDC represents one of the most egregious and harmful actions I have encountered. There can be no doubt that the actions of ICE in this matter has caused infection, morbidity and now mortality. The declarations of detained people, as well as FDC medical and administrative staff raise grave concerns that the facility remains unable to provide basic health services and implement the infection control measures recommended by the CDC, and to comply with basic ICE policies and other standards of care. It is notable that in announcing the death of Mr. Hill, ICE proclaims that "ICE has taken extensive precautions to limit the potential spread of COVID-19" when in fact, his death and the infection of hundreds of people at FDC demonstrate just the opposite. While I have not reviewed the medical or security records of Mr. Hill, he was clearly at elevated risk for serious illness or death from COVID-19 based solely on his age. If he experienced the same inadequate screening and delays in response to COVID-19 symptoms described above, then his death is very likely directly attributable to the numerous deficiencies and inadequacies described in this report. The information I have reviewed from both FDC staff and detainees indicate that FDC is not responding to the COVID-19 outbreak in a manner consistent with CDC guidelines or basic standards for correctional health care.

21.     The grave situation that the detainees and staff of FDC find themselves in requires an immediate, expert inspection of the facility's COVID-19 response. Having conducted many of these inspections, I am extremely confident that the inspection must be in person and will yield concrete recommendations that ICE and FDC can quickly utilize to prevent more morbidity and

mortality. I understand that CDC staff may be planning a facility visit to FDC, which I support. It is important to recognize, however, that an expert inspection of FDC by a correctional health expert is different than a visit by CDC staff. Staff from the CDC will be able to communicate the latest recommendations to FDC regarding COVID-19 prevention and management, but they will not likely review or inspect critical aspects of correctional health that bear directly on the adequacy of the FDC COVID-19 response. For example, many of the declarations I have reviewed indicate slow or inadequate access to sick call, and the CDC recommendations are silent on this important area. In my inspections, review of the sick call mechanics inside each housing area, including where sick call slips are stored, how they are accessed, returned by detainees, and collected by staff is crucial to understanding whether COVID-19 symptoms reported by detainees result in action by the facility. In addition, visits conducted by the CDC may not include staff who have directed or even provided care in correctional health services, leaving the selection of inspection topics and sites to the FDC staff. This limits the view of the facility to areas that FDC staff wish to show, instead of involving a rigorous independent assessment based on a standardized assessment approach. In order to determine the adequacy and remaining gaps in the FDC COVID-19 response, I believe a facility inspection by a correctional health expert is needed urgently.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 10th of August, in the year 2020, in the city of Port Washington, NY.

Dr. Homer Venters

_____

# EXHIBIT A

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

HEALTH ADMINISTRATOR          PHYSICIAN          EPIDEMIOLOGIST

## *Professional Profile*

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
- Review COVID-19 policies and procedures in detention settings.
- Conduct analysis of health services and outcomes in detention settings.
- Conduct site inspections and evaluations in detention settings.
- Produce expert reports, testimony regarding detention settings.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
- Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- Oversee operations and programmatic development of COCHS
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.

o   Expand documentation of attacks against health staff and facilities in Syria and
     Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC
         Health and Hospitals Corporation 8/15-3/17.
o   Transitioned entire clinical service (1,400 staff) from a for-profit staffing company
     model to a new division within NYC H + H.
o   Developed new models of mental health and substance abuse care that significantly
     lowered morbidity and other adverse events.
o   Connected patients to local health systems, DSRIP and health homes using
     approximately $5 million in external funding (grants available on request).
o   Reduced overall mortality in the nation's second largest jail system.
o   Increased operating budget from $140 million to $160 million.
o   Implemented nation's first patient experience, provider engagement and racial
     disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of
         Health and Mental Hygiene, 6/11-8/15.
o   Implemented nation's first electronic medical record and health information exchange
     for 1,400 staff and 75,000 patients in a jail.
o   Developed bilateral agreements and programs with local health homes to identify
     incarcerated patients and coordinate care.
o   Increased operating budget of health service from $115 million to $140 million.
o   Established surveillance systems for injuries, sexual assault and mental health that
     drove new program development and received American Public Health Association
     Paper of the Year 2014.
o   Personally care for and reported on over 100 patients injured during violent
     encounters with jail security staff.


**Medical Director,** Correctional Health Services, New York Department of Health and
         Mental Hygiene, 1/10-6/11.
o   Directed all aspects of medical care for 75,000 patients annually in 12 jails, including
     specialty, dental, primary care and emergency response.
o   Direct all aspects of response to infectious outbreaks of H1N1, Legionella,
     Clostridium Difficile.
o   Developed new protocols to identify and report on injuries and sexual assault among
     patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of
         Health and Mental Hygiene, 11/08-12/09.
o   Developed training program with Montefiore Social internal medicine residency
     program.
o   Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-
         12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine,
   1/08-11/09.

## Education and Training

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in
NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert    Einstein
   University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure

Clinical Associate Professor, New York University College of Global Public Health,
5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## Media

TV
i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya.
7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd
control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast
Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria, Iraq. 4/17/18.

<u>Print articles and public testimony</u>
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated.
*J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**.  Feasibility of Treating Hepatitis C in a Transient Jail Population.
*Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters** Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:  Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching
**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities
**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.

 -*Primary Project;* Draconculiasis Eradication. Activities included assessing levels
  of infection in 8 rural villages and giving prevention presentations to mothers in
  Ewe and French
 -*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island.* Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## Membership in Professional Organizations
**American Public Health Association**

## Foreign Language Proficiency

| **French** | Proficient |
|------------|-----------|
| **Ewe** | Conversant |

*Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs 10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

Belcher v. Lopinto, No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for plaintiffs 12/5/2019.

Imoerati v. Semple, U.S. District Court, CT. No 3:18cv01847 (RNC), as expert for plaintiffs, 3/11/20.

USA v. Pratt. Western Dist of PA. Criminal No. 19-213, as expert for plaintiffs (Video Hearing 4/28/20).

USA v. NELSON Western Dist. Of PA. No: 1:19-cr-00021-DSC, as expert for plaintiffs (Video Hearing 5/4/20).

Chunn v. Edge, No: 1:20-CV-01590-RPK-RLM, as expert for plaintiffs (Video Hearing 5/12/20, Video Deposition 4/30/20).

Dianthe Martinez-Brooks et al v. D. Easter, Warden No. 3:20-cv-569 (MPS), as expert for plaintiffs (Video deposition 6/8/20. Video Hearing 6/11/20).

Busby v. Booner, Western District of Tennessee, No. 3:20-cv-2359-SHL, as expert for plaintiffs (Video hearing 7/10/20).

Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).

# APPENDIX 1



**\* Large jumps in the Daily Change in Deaths and 7-Day Rolling Average Change in Deaths for the US Total and New Jersey on June 25, 2020 are due to New Jersey newly reporting both probable and cumulative deaths.** Only tests with results are included; all tests with pending results are excluded from all metrics. Case and Death Data: COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University. Testing and Hospitalization Data: The COVID Tracking Project. US total includes territories and 152 cases and 3 deaths from the Grand Princess and Diamond Princess cruise ships (not displayed). See Sources/Notes for links to sources.

# APPENDIX 2



**\* Large jumps in the Daily Change in Deaths and 7-Day Rolling Average Change in Deaths for the US Total and New Jersey on June 25, 2020 are due to New Jersey newly reporting both probable and cumulative deaths.** Only tests with results are included; all tests with pending results are excluded from all metrics. Case and Death Data: COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University. Testing and Hospitalization Data: The COVID Tracking Project. US total includes territories and 152 cases and 3 deaths from the Grand Princess and Diamond Princess cruise ships (not displayed). See Sources/Notes for links to sources.

# APPENDIX 3



**COVID-19: Daily Trends**

**KFF**

| Overview | Cumulative Trends | Daily Trends | Data Tables | Race/Ethnicity |

**Daily Change in Cases in Virginia**

**Select Metric**
Daily Change in Cases

**Select Date Range**
All values

**Select State**
- United States
- Alabama
- Alaska
- Arizona
- Arkansas
- California
- Colorado
- Connecticut
- Delaware
- District of Columbia
- Florida
- Georgia
- Hawaii
- Idaho
- Illinois
- Indiana
- Iowa
- Kansas
- Kentucky
- Louisiana
- Maine
- Maryland
- Massachusetts
- Michigan

**\* Large jumps in the Daily Change in Deaths and 7-Day Rolling Average Change in Deaths for the US Total and New Jersey on June 25, 2020 are due to New Jersey newly reporting both probable and cumulative deaths**. Only tests with results are included; all tests with pending results are excluded from all metrics. Case and Death Data: COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University. Testing and Hospitalization Data: The COVID Tracking Project. US total includes territories and 152 cases and 3 deaths from the Grand Princess and Diamond Princess cruise ships (not displayed). See Sources/Notes for links to sources.

Sources/Notes

# APPENDIX 4

# Social Distancing Examples for Corrections

**NOT one-size-fits-all**...each facility will need to choose what works for them

**Meals**
- Stagger meals
- Rearrange seating in the dining hall (e.g., remove every other chair and use only one side of the table)
- Provide meals inside housing units or cells

**Medical**
- Designate a room near each housing unit to evaluate people with COVID-19 symptoms
- Stagger sick call
- Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process

**Recreation**
- Choose spaces where people can spread out
- Stagger time in recreation spaces
- Assign each housing unit a dedicated recreation space to avoid mixing and cross-contamination

**Housing**
- Reassign bunks to provide more space between people
- Sleep head to foot
- Minimize mixing of people from different housing areas

**Common areas**
- Enforce increased space between people in
  - holding cells
  - lines
  - waiting areas such as intake (e.g., remove every other chair in a waiting area)

**Group activities**
- Limit their size
- Increase space between people
- Suspend group programs where people will be in closer contact than in their housing environment
- Choose outdoor areas or other areas where people can spread out

**COMMUNICATE the reasons for social distancing**