1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CHRISTIAN ALBERTO SANTOS      .      Civil Action No. 1:20CV821
GARCIA; SANTOS SALVADOR       .
BOLANOS HERNANDEZ; GERSON     .
AMILCAR PEREZ GARCIA; ISMAEL  .
CASTILLO GUTIERREZ,           .
                              .
            Plaintiffs,       .
                              .
    vs.                       .      Alexandria, Virginia
                              .      August 11, 2020
CHAD F. WOLF, in his official .      2:00 p.m.
capacity as Acting Secretary, .
U.S. Department of Homeland   .
Security; U.S. IMMIGRATION    .
AND CUSTOMS ENFORCEMENT;      .
MATTHEW T. ALBENCE, in his    .
official capacity as Deputy   .
Director and Senior Official  .
Performing the Duties of the  .
Director of U.S. Immigration  .
and Customs Enforcement;      .
RUSSELL HOTT, in his official .
capacity as Field Office      .
Director, Washington Field    .
Office, Enforcement and       .
Removal Operations, U.S.      .
Immigration & Customs         .
Enforcement; JEFFREY CRAWFORD,.
in his official capacity as   .
Director, Farmville Detention .
Center; IMMIGRATION CENTERS   .
OF AMERICA, LLC; ARMOR        .
CORRECTIONAL HEALTH           .
SERVICES, INC.,               .
                              .
            Defendants.       .
                              .
. . . . . . . . . . .

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE
(Via Telephone Conference)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
                                                                      2
 1    APPEARANCES: (by telephone)

 2    FOR THE PLAINTIFFS:            SIMON SANDOVAL-MOSHENBERG, ESQ.
                                     KRISTIN F. DONOVAN, ESQ.
 3                                   GRANVILLE CLAYTON WARNER, ESQ.
                                     Legal Aid Justice Center
 4                                   6066 Leesburg Pike, Suite 520
                                     Falls Church, VA 22041
 5                                     and
                                     JOSEPH D. WEST, ESQ.
 6                                   NAIMA L. FARRELL, ESQ.
                                     THOMAS J. McCORMAC, III, ESQ.
 7                                   Gibson, Dunn & Crutcher LLP
                                     1050 Connecticut Avenue, N.W.
 8                                   Washington, D.C. 20036-5306
                                       and
 9                                   SIRINE SHEBAYA, ESQ.
                                     AMBER QURESHI, ESQ.
10                                   National Immigration Project
                                     of the National Lawyers Guild
11                                   2201 Wisconsin Avenue, N.W.
                                     Suite 200
12                                   Washington, D.C. 20007

13    FOR DEFENDANTS WOLF,           LAUREN WETZLER, AUSA
         ALBENCE, HOTT, AND          YURI S. FUCHS, AUSA
14       U.S. IMMIGRATION AND        United States Attorney's Office
         CUSTOMS ENFORCEMENT:        2100 Jamieson Avenue
15                                   Alexandria, VA 22314

16    FOR DEFENDANTS IMMIGRATION     JOHN M. ERBACH, ESQ.
         CENTERS OF AMERICA, LLC,    Spotts Fain, P.C.
17       AND CRAWFORD:               411 East Franklin Street
                                     Suite 600
18                                   Richmond, VA 23219

19    FOR DEFENDANT ARMOR            EDWARD J. McNELIS, III, ESQ.
         CORRECTIONAL HEALTH         CHRISTOPHER F. QUIRK, ESQ.
20       SERVICES, INC.:             Sands Anderson, P.C.
                                     1111 East Main Street, Suite 2400
21                                   Richmond, VA 23218

22    OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Third Floor
23                                   401 Courthouse Square
                                     Alexandria, VA 22314
24                                   (703)299-8595

25
```

3

1              P R O C E E D I N G S

2          THE COURT:  Counsel, I hope you're all on the line at

3    this point.  This is the case of Christian Alberto Santos

4    Garcia, et al., versus Chad Wolf, et al., Civil Action 20cv821.

5    Can counsel for the plaintiff please identify themselves?

6          MR. WEST:  Yes, Your Honor.  This is, this is Joseph

7    West, counsel of record for the plaintiffs, and I've got

8    colleagues on the line who can identify themselves.

9          THE COURT:  All right, go ahead.

10          MS. FARRELL:  Good morning, Your Honor.  This is

11    Naima Farrell from Gibson Dunn, also counsel for plaintiff.

12          MS. SHEBAYA:  Good afternoon.  This is Sirine

13    Shebaya, with the National Immigration Project, also for

14    plaintiffs.

15          THE COURT:  All right.

16          MS. QURESHI:  Good afternoon.  This is Amber Qureshi,

17    also from the National Immigration Project, for plaintiffs.

18          MR. SANDOVAL-MOSHENBERG:  And Simon

19    Sandoval-Moshenberg, Legal Aid Justice Center.

20          THE COURT:  All right.  Now, who will be the main --

21    I'm sorry, is there anyone else for the plaintiffs?

22          MS. DONOVAN:  This is Kristin Donovan, with Legal Aid

23    Justice Center, for the plaintiffs.

24          MR. WARNER:  Also Clay Warner for Legal Aid Justice

25    Center.

4

1              MR. McCORMAC:  Thomas McCormac from Gibson Dunn.

2              THE COURT:  All right, is that all plaintiffs

3    counsel?  I assume so, all right.

4              And counsel now for the defendants?  Mr. Wolf?

5              MR. FUCHS:  Your Honor, this is Yuri Fuchs, Assistant

6    United States Attorney for the Eastern District of Virginia, on

7    behalf of the federal defendants, and the civil chief, Lauren

8    Wetzler, is on the line as well.

9              THE COURT:  All right.  How about for the Immigration

10   Centers and Mr. Crawford?

11             MR. ERBACH:  Your Honor, this is John Erbach with the

12   law firm Spotts Fain in Richmond, Virginia, on behalf of both

13   Jeff Crawford and Immigration Centers of America, Farmville,

14   LLC.

15             THE COURT:  And for Armor Correctional Health

16   Services, Inc.?

17             MR. McNELIS:  Your Honor, this is Edward J. McNelis,

18   III, with the law firm of Sands Anderson in Richmond.  I'm also

19   seated here with Christopher Quirk.  We are counsel for Armor.

20             THE COURT:  All right.  Now, in terms of the

21   plaintiff -- plaintiffs, Mr. West, are you the main

22   spokesperson?

23             MR. WEST:  No, Your Honor.  I am going to

24   introduce -- well, she's already introduced herself -- my

25   colleague, Naima Farrell, a member of the D.C. and

1    Massachusetts bar who has been moved in, admitted pro hac vice

2    for this case.  She will handle things for the Gibson Dunn

3    team.

4              THE COURT:  Which means the plaintiffs.

5              MR. WEST:  Yes, Your Honor.

6              THE COURT:  Yeah.  All right, that's fine.  All

7    right.  Now, it's very important because we are on the record,

8    so that my court reporter can get a good, clean transcript,

9    that each time an attorney is speaking, Ms. Farrell, you'll be

10   easy because you're the only female voice we're going to have,

11   but for the other voices, you've got to state your name first

12   or we won't be able to ascribe the statement to the correct

13   speaker, so please be diligent about that.

14             All right, I wanted to ask first of all a question

15   because I think it significantly affects the posture of the, of

16   the motion that's before us, which, of course, is the

17   plaintiffs' motion for a preliminary injunction, and that is,

18   according to what we read in *The Post* the other day, the CDC

19   has, in fact, I understand it, begun an inspection.  Is that

20   correct, or is that not correct?

21             And I'll ask, I guess, Ms. Farrell, you can respond

22   to that.

23             MS. FARRELL:  All right.  Your Honor, we read the

24   same thing in *The Post,* and so we assume that it has begun, but

25   I think that that question is better asked of the government.

6

1           THE COURT:  All right.  Mr. Fuchs?

2           MR. FUCHS:  Your Honor, this is Yuri Fuchs.  Indeed,

3  the --

4           THE COURT:  Wait, Mr. Fuchs.  I'm sorry, are you on a

5  cell phone?

6           MR. FUCHS:  No, I'm on a landline, Your Honor.

7           THE COURT:  All right.  Well, it wasn't very clear.

8  You're going to have to speak loud because we had trouble

9  hearing you.

10           MR. FUCHS:  Okay.  I can, I can pick up the receiver

11  if you want me to speak into that.

12           THE COURT:  Absolutely.

13           MR. FUCHS:  All right, I'll do that.  Your Honor, the

14  inspection has begun, so the details of that is that the CDC is

15  in the facility from Monday through Friday of this week.  There

16  are ten personnel on the ground.  Their major objective is to

17  basically oversee collection of nasal specimens, basic testing

18  of volunteer detainees and staff, administering questionnaires

19  to staff and detainees to assess symptoms and factors for

20  illness, and then to recommend workplace assessment of

21  infection controls and prevention practices, and they plan at

22  the end of the week to have an oral debrief with the facility

23  and then to issue a report sometime in the future regarding

24  their findings at the facility.

25           THE COURT:  Well, when you say in the future, do you

1   have a sense as to how long it will take for that report to be

2   issued?

3            MR. FUCHS:  If the -- I don't know that the CDC has

4   bound itself to a date.  On the protocol, it lists a target

5   date of September 4, 2020, and my understanding is they're

6   seeking to have one out in 30 days, but that's the target date,

7   I believe.

8            THE COURT:  Are they -- within the scope of the

9   inspection, are they going to be looking at the quality of the

10  medical services that have been provided to or that are

11  available for the detainees?

12           MR. FUCHS:  That I do not know, Your Honor.  I

13  believe they are, they are looking at prevention practices, so

14  I believe that does necessarily encumber -- encompass medical

15  treatments, but as far as what the plaintiffs are discussing, I

16  don't know if there's a complete overlap with what the CDC is

17  looking at.

18           THE COURT:  Which would suggest then that the

19  plaintiffs' request to have the independent evaluation of this

20  Dr. Venters, who apparently has been used by many jurisdictions

21  to evaluate correctional institutions, and he's an M.D., might

22  fill in a gap that is otherwise not going to be filled by the

23  CDC.

24           MR. FUCHS:  We don't know that for certain, Your

25  Honor.  I would say on the point of the medical inspection, in

1   this case, Dr. Moore has submitted pretty detailed medical

2   records of how frequently they're subject to medical

3   monitoring, to the kind of quality of care that they receive,

4   to how the facility has looked at them, and what they've

5   provided to the exact plaintiff, so I would actually stipulate

6   that those -- that the quality of the medical care isn't as in

7   dispute as plaintiffs said that it is.

8           THE COURT:  Well, I think it is in dispute.  I mean,

9   the plaintiffs were claiming in some cases, they were simply

10  given Tylenol to treat what they claimed were very

11  uncomfortable conditions and that they have not been monitored

12  on a fairly regular basis.  I mean, there is a conflict.

13          MR. FUCHS:  Your Honor, I don't want to -- I'm

14  sure -- the plaintiffs have their own experiences, and I'm sure

15  they disagree with the course of their treatment, but in this

16  particular case, the -- Dr. Moore has set forth record evidence

17  detailing when they're being treated, the times, the checks,

18  what kind of symptoms they are -- have at the time, and whether

19  or not it requires additional follow-up, and plaintiffs --

20  so -- and that sort of, sort of dispute over treatment is a

21  kind of case that this Court -- that the Fourth Circuit and

22  other courts in this district have in the past sort of said

23  that's not the basis for a deliberate indifference claim, and

24  this is the sort of dispute over the quality of treatment which

25  cases like *Clawson*, *Kiernan*, have all said that that can't rise

1   to a substantive due process claim.

2          THE COURT:  Oh, these are somewhat extraordinary

3   times, and I think in some respects, a lot of the traditional

4   jurisprudence may be changing because the law does have to meet

5   the times.

6          All right.  I saw in *The Post* article, and I can't

7   recall which attorney was cited for the plaintiffs, but,

8   Ms. Farrell, my understanding was that, that the position of

9   plaintiffs was that the, the CDC inspection would be too

10  narrow.

11         MS. FARRELL:  Yes, Your Honor.  Yes, Your Honor.

12  This is Naima Farrell.  And so we are, we are, of course,

13  grateful and happy that the CDC is investigating Farmville, and

14  we think that that is long overdue, it's a welcome development,

15  but based on the limited information we have so far about the

16  CDC's investigation, we believe that it will be too limited for

17  the reasons that Your Honor has already suggested, particularly

18  honing in on the medical conditions and then also based on the

19  timeline that Mr. Fuchs just suggested, that sounds to us to be

20  entirely too long.

21         With respect to the medical records, as you noted,

22  those are very much in dispute, and we have had, you know,

23  contemporaneous conversations with our clients about the type

24  of symptoms that they have been experiencing, and, Your Honor,

25  it was quite disturbing, honestly, to hear from our clients

1    what they were going through, and so we don't know how to

2    explain the discrepancies in those records other than to stay

3    that they are incomplete and inaccurate.

4            THE COURT:  Well, in terms of Dr. Venters' ability to

5    do the assessment that you're requesting, how quickly would he

6    do it?

7            MS. FARRELL:  He could go in this week, Your Honor.

8    He could go in this week.  In other cases, he has gone in and

9    done the, the study over two days, and so he could be there

10   this week to do it.

11           THE COURT:  In the previous studies that he has done,

12   has he evaluated the medical treatment of the inmates, or was

13   he again simply looking at the, the hygienic measures taken by

14   the facility?

15           MS. FARRELL:  He has looked at both, Your Honor, and

16   he has looked at the processes that the facilities engaged in,

17   including with respect to things like sick call and how quickly

18   the facilities have been able to respond and the adequacy of

19   their response to various treatments, in addition to looking at

20   the spread of the disease.

21           THE COURT:  All right.  Now, there are, what, 270 or

22   so, roughly, inmates in this -- or detainees in this facility;

23   is that right?  200 and something.

24           MS. FARRELL:  I believe it lists 299 at last count.

25           THE COURT:  Okay.  Does anybody know -- and I guess

1   this question might go to Mr. Erbach -- how many -- I'm sorry,

2   no, this would probably go to Mr. McNelis:  What's your medical

3   staff there at that facility?  How many, how many doctors, how

4   many nurse practitioners, how many nurses do you have there?

5            MR. McNELIS:  Your Honor, we have one -- oh, Your

6   Honor, this is Edward J. McNelis, III.

7            THE COURT:  Yes, sir.

8            MR. McNELIS:  Your Honor, we have one full-time

9   medical director.  We have roughly 20, I believe, nursing

10  staff, including RNs, LPNs; and then we have some CNAs,

11  certified nursing assistants, that assist in, for example, the,

12  you know, the temperature screening and things of that nature.

13  But our medical director is full time, 40 hours, but she's

14  available 24/7.  She's on call 24/7.

15           THE COURT:  And the medical director is an M.D.?

16           MR. McNELIS:  She is an M.D., Your Honor.  I believe

17  that she is Board certified in internal medicine, either that

18  or family practice.  I don't have the CV in front of me, but

19  she's Board certified in either family practice or internal

20  medicine.

21           THE COURT:  All right.  And one of the things that I,

22  I'm amazed that no side has presented among all the papers

23  we've got here, I don't have a picture of what Farmville looks

24  like.  I have no blueprints that show me the layout of the

25  space.  I have no photographs that would show what these dorms

12

1    look like, which I think is absolutely invaluable information

2    that the Court needs to have to understand exactly, you know,

3    what we're talking about.

4                Is that available?  Mr. Fuchs?

5                MR. ERBACH:  Your Honor, this is John Erbach on

6    behalf of defendants Crawford and ICA Farmville.  I believe we

7    could get that available for the Court if that's necessary.

8                I will say a general description is laid out in, I

9    believe, nine dorms that are separated from each other, a

10   separate medical unit, and then the entryway has a sally port

11   that separates those entering the facility from the rest of the

12   population.

13               But if Your Honor would like us to supplement with

14   some form of blueprint or photographs, I'm happy to get that

15   for Your Honor.

16               THE COURT:  I'd like both, and, of course, those

17   should be shared with opposing counsel and cocounsel as well.

18               In terms of these dorms, are they all essentially the

19   same size and layout?

20               MR. ERBACH:  I think they're approximately the same

21   layout, but they are different sizes, and there's different

22   capacities.  My understanding is on the smaller end, they

23   accommodate approximately 40 individuals.  On the larger end,

24   they may accommodate as much as 100 individuals.

25               Of course, the facility is currently at about 50

13

1   percent, a little less than 50 percent capacity.  So, you know,

2   I couldn't speak to exactly how many people are in each size

3   dorm.

4          THE COURT:  Is each dorm being used at this point

5   right now?

6          MR. ERBACH:  I believe they are -- yes, I believe

7   they are being used, and in part the reason they're all being

8   used is to cohort individuals who are COVID-19 positives

9   separately from those who are negative.

10          THE COURT:  And in terms of the sleeping

11   arrangements, are these single beds or are they bunks?

12          MR. ERBACH:  They are bunks, and they're kind of

13   arranged, I think, with several coming out from each other in

14   spokes.  I think a photograph of the bunks would be helpful.

15          THE COURT:  You said they're coming out in spokes?

16   Did I hear you correctly?

17          MR. ERBACH:  Sort of, yeah.  They're sort of

18   attached, like, at the ends.

19          THE COURT:  Yeah, I definitely need a picture of

20   that.

21          MR. ERBACH:  Okay.

22          THE COURT:  Okay, all right.  And so that the medical

23   facility is a, is a separate building from the dorms?

24          MR. ERBACH:  I don't think it's a separate

25   building -- it may not be a separate building from all of the

1    others, but it's a separate part.  It's separated from the

2    dorms itself by a wall at least.

3            THE COURT:  All right.  In terms of the bathroom

4    facilities, is there, like, one large bathroom at the end of

5    each sleeping space, or how is that set up?

6            MR. ERBACH:  My understanding is that there's at

7    least one bathroom for each dorm.

8            THE COURT:  And what's in those bathrooms?  Toilets,

9    urinals, sinks, and showers, or what's in there?

10           MR. ERBACH:  That's, that's my understanding, Your

11   Honor.

12           THE COURT:  I mean, do you know the ratio of

13   facilities per inhabitant?

14           MR. ERBACH:  I do not know that.

15           THE COURT:  Are there standards -- does anybody know,

16   are there standards in an institution of that sort of, you

17   know, like, one toilet per 15 people or anything like that?

18   Does anyone know?

19                        (No response.)

20           THE COURT:  By the great silence here, I'm assuming

21   nobody has a sense of that, all right.

22           MR. FUCHS:  Your Honor, this is Yuri Fuchs.  I'm

23   trying to really search the PBNDS.  If I, if I see it, I'll try

24   and look through it quickly.

25           THE COURT:  All right.  Okay, all right.  Obviously,

1    we don't have all the information that we should have to really

2    have a 100 percent handle on this case, but the motion that's

3    before the Court today is, is really asking for several forms

4    of relief which I would be surprised would really be objected

5    to by any of the defendants.

6              The first thing that the plaintiffs are seeking is an

7    agreement or an injunction, if I have to issue it, that none of

8    the four plaintiffs, the named plaintiffs in this case, would

9    be retaliated against for having brought this lawsuit or would

10   be transferred out of the facility at least without the

11   agreement of their counsel.  Is anyone really opposed to that?

12   Let me ask Mr. Fuchs first of all.

13             MR. FUCHS:  Your Honor, there would be -- there would

14   be no disagreement about any kind of retaliation towards,

15   towards plaintiffs as far as filing any kind of lawsuits.  In

16   terms of transferring them, ICE has not agreed to any kind of

17   injunction regarding transfer.

18             I will say that there have been no transfers out of

19   the -- in or out of the facilities since June 2, and there are

20   no plans to transfer the detainees, and I don't know if there

21   is some sort of vague or lack of clarity in the papers, but

22   there's actually never been any kind of plan to transfer these

23   detainees or other detainees at the facility in Texas.

24             THE COURT:  All right.  Well, that was a concern that

25   the plaintiffs had, and they want to be guaranteed or protected

1    against that.  So what I, what I read between the lines,

2    Mr. Fuchs, is that, that your agency does not want to agree to

3    a mandatory injunction, but in principle, there is no

4    opposition to the concept that the plaintiffs would not be

5    transferred, unless for some reason they and their counsel

6    wanted them to be transferred.

7              Is that a fair statement?

8              MR. FUCHS:  I don't think I could fairly say that

9    the, that the agency would agree to any kind of injunction in

10   or against transfers.

11             THE COURT:  All right.

12             MR. FUCHS:  But I can represent that the detainees

13   are not at any kind of risk or plans of being transferred.

14             THE COURT:  Okay.  Then the other form of relief that

15   they're seeking at this early stage is an agreement that there

16   would be no transfers into the facility until there are proper

17   protocols in place, and again, my understanding is that since

18   June 2, there have been no transfers in.

19             Is that correct, Mr. Fuchs?

20             MR. FUCHS:  That is correct, Your Honor.

21             THE COURT:  All right.  Why was this transfer done?

22   What was going on in Texas -- I'm sorry, in Florida and Arizona

23   that required this mass transfer?

24             MR. FUCHS:  Your Honor, so the operational needs that

25   motivated the June 2 transfer were twofold.  So the first was

1    that ICE has a general policy of balancing out its detainee

2    population among the facilities.  The Arizona and Florida

3    detainees came from facilities that had higher population

4    concentrations than Farmville, and prior to them being -- as

5    stated in Crawford's declaration, prior to them being sent to

6    the Farmville facility, ICA, Crawford did discuss the

7    population transfer with, with ICE.

8              The individuals were screened prior to their

9    transfer, and they were screened and ultimately tested and

10   excluded from the general population after transfer.

11             The second reason is ICE has an air regulation

12   whereby in order to move agents of ICE, they have to be moved

13   from one location to another with detainees on the same

14   airplane, I believe, and so that is the other reason that led

15   to the transfer.

16             THE COURT:  Explain -- I'm sorry, explain that second

17   one to me.

18             MR. FUCHS:  That's, that's about as much information

19   as I have, Your Honor.  It's --

20             THE COURT:  You're saying that when ICE agents have

21   to be transferred to different locations, people have to be

22   with them?

23             MR. FUCHS:  Well, that is my understanding of an ICE

24   air regulation.  That is not the primary reason.  The other

25   reason, as I stated before, is because ICE has to balance out

1   its detainee populations among different facilities, but that

2   is the -- that is the other reason.  That's an ICE air

3   regulation that requires detainees and staff to be on the same

4   flight, so they're being moved around.

5           THE COURT:  I think what you're saying then is when

6   you move inmates -- or detainees, you have to have ICE people

7   with them.  That's got to be what that means.

8           MR. FUCHS:  Yes.

9           THE COURT:  All right.  But, you know, this June move

10  was during a time period when the virus was still heavily

11  circulating, and the BOP was not moving its population around,

12  so what possible rational reason would there have been for ICE

13  to do this for it sounds like just a sort of a bureaucratic

14  purpose?  I mean, there apparently was not an overcrowding

15  emergency or any other compelling reason.

16          MR. FUCHS:  I can't necessarily represent that there

17  is overcrowding, Your Honor, but there was in the Arizona and

18  Florida facilities, there was a higher population density that

19  wasn't present at Farmville.  So to the extent that it was -- I

20  don't necessarily know that it was just some, some bureaucratic

21  on-off switch.  I think there was also a concern for, as I

22  pointed out, ICE balancing out the level of population at its

23  facilities.

24          THE COURT:  All right.  Now, what exactly, what steps

25  did they take in Florida, not at Farmville but in Florida and

1   Arizona to be sure that the people they were transferring out

2   were not carrying the virus?  Were they quarantined for two

3   weeks before they left the facility?

4          MR. FUCHS:  That I don't know, Your Honor.  I can

5   represent that the detainees were screened prior to transfer

6   for any kind of COVID symptoms or exposure to COVID.

7          THE COURT:  And the screening involved what?

8          MR. FUCHS:  I --

9          THE COURT:  The problem is, as we all know right now,

10  and certainly back on June 2, it probably was even more

11  primitive because this thing keeps changing week by week,

12  simply taking a temperature is not a guarantee that the person

13  is not positive.  We know that the problem with this disease is

14  it can be asymptomatic, so a person can be carrying the virus

15  and not showing a fever and not showing any symptoms, which is

16  why the concept of a two-week quarantine when you're moving

17  people around is the safest way of ensuring that they're not

18  going to be contaminating anyone.

19          So as far as you know then, there was no two-week

20  quarantine of these people at the facilities before they left;

21  is that correct?

22          MR. FUCHS:  Not at the facility, but when they did

23  come to the facility, they were quarantined, and the CDC

24  interim guidance recommends that when they come -- when

25  individuals are received into a facility, that facilities have

1    the ability to take measures to quarantine, isolate them, and

2    test them, and that's what's happened here in Farmville.

3            I will say, Your Honor, I don't think screening is

4    just limited to a temperature check.  I think they also ask

5    actually specific questions about exposure to COVID and other

6    symptoms.  So I don't think it's the case that they are

7    necessarily missing asymptomatic detainees filtering through

8    the system.

9            THE COURT:  Well, I mean, not to be crude about it,

10   but res ipsa loquitur, I mean, you have this large movement of

11   people from two hot areas on June 2, and by June 22, you've got

12   significant increase in the COVID positive infection rate at

13   the facility, and the only factor that seems to have changed

14   dramatically was that influx of 70 or so new people, which is

15   just, you know, incredibly dramatic, and it seems to almost

16   make the case that there was some terrible mistake made along

17   the way.

18           And, of course, as I said, that kind of transfer of

19   people who've been in that kind of an environment does seem to

20   run afoul of the CDC guidance that was in place at that time,

21   and it seems -- and it certainly is not consistent with how the

22   BOP has been functioning in that time period.  So I think this

23   case has a lot of significant problems for, for the defendants

24   in that respect.

25           All right.  In terms of the second line of relief

1   that -- again that the plaintiffs are seeking today is an

2   injunction that would prohibit the transfer, as I said before,

3   of any detainees out of the facility until there is a proper

4   protocol in place.  Again, I know ICE as a matter of principle

5   doesn't agree to any kind of mandatory injunction, but is it

6   correct that ICE at this point has not transferred anybody out

7   of the Farmville facility since June 2?

8           MR. FUCHS:  I believe that is the case, Your Honor.

9           THE COURT:  Okay.  So if there were to be an

10  injunction imposed, it doesn't appear as though it would wreak

11  any, any kind of real problem, any significant inconvenience,

12  or any kind of irreparable harm to Farmville, correct?

13          MR. FUCHS:  Not necessarily, Your Honor.  Again,

14  coming back to your point about us not conceding about the,

15  about the injunction, but I think there is a point where the

16  CDC interim guidance, for one, it's not a mandatory prohibition

17  on detainee transfers.

18          And here, going back to sort of, obviously,

19  anticipating future reality, if there is a prohibition on

20  transfers in and out of the facility, you could have a

21  situation in the future where, for instance, one facility

22  around the country is overburdened, does have a huge amount of

23  the high detainee population, and Farmville, let's say it comes

24  down to, I don't know, under 20, under 10 percent capacity, and

25  if such an injunction were in place, then you couldn't shift

1   around detainee population from the overburdened facility into

2   Farmville.

3          Obviously, it's subject to the fact that any kind of

4   transfer would, would be done with precaution, such as

5   screening and testing.

6          THE COURT:  Well --

7          MR. FUCHS:  I don't think that there's -- sorry.

8          THE COURT:  The way out of that is you'd file a

9   motion with the Court for relief from that particular portion

10  of the, of the injunction, and you would prepare a, a statement

11  as to how the transfer was going to occur so that the

12  appropriate safeguards could be checked on, and most likely, it

13  would be no problem with getting a pass, but the problem is the

14  track record right now is not a good one, and, and so the

15  requests that the plaintiffs are making at this point, when

16  you, you know, when you look at certainly this point the

17  balancing of the harms, the harms here are interesting.

18         The harms about a transfer, a transfer out harm,

19  however, I will say to you, Ms. Farrell, if it's not involving

20  your four clients, and they're the only parties you represent

21  at this point, the fact that people are leaving the facility in

22  and of itself doesn't potentially have any harm for your

23  clients, does it?

24         MS. FARRELL:  That's -- sorry, excuse me.  That's

25  true, Your Honor.  The transfer out harm would be to, to our

1   clients if they were transferred out personally.

2           THE COURT:  Correct.

3           MS. FARRELL:  And then, of course, to the public or

4   the folks who are being transferred.

5           THE COURT:  I mean, there may be other components of

6   society that would be endangered by Farmville transferring

7   people out, but in terms of the plaintiffs who are in this

8   case, it really doesn't make any difference whether Farmville

9   lets people go.  It's bringing them in that both poses the

10  possible risk without proper safeguards to your clients.

11          MS. FARRELL:  That's correct, Your Honor.

12          THE COURT:  Okay.  All right.  All right.  The next

13  thing that you asked for in your motion for injunctive relief

14  was immediately allowing the inspection by the, the private

15  doctor.  Other than the time frame that it might take to get

16  the CDC -- and I understand that the local Virginia health

17  department is also involved in that inspection; is that

18  correct, Mr. Fuchs?

19          MR. FUCHS:  I'm sorry, Your Honor, the --

20          THE COURT:  Yeah, the CDC -- I'm sorry, the CDC

21  inspection is being done in conjunction with the local Virginia

22  health department; is that correct?

23          MR. FUCHS:  That is my understanding.  They were

24  brought in at the request of the Virginia Department of Health,

25  and the findings will be shared with the Cumberland and

1   Piedmont health departments.  I don't know the specifics of

2   who, if anyone, from the health departments -- of those health

3   departments is on the ground with them, but I know that to the

4   extent you can say in conjunction, they are working in

5   conjunction with them.

6            THE COURT:  All right.  Other than the timing issue,

7   I'm not sure at this point, Ms. Farrell, why that should not be

8   a sufficient protection of your clients' rights.  Do you want

9   to articulate your position on that?

10            MS. FARRELL:  Yes, Your Honor.  I think, so there are

11   a few points.  First of all, we don't know the scope of the CDC

12   investigation.  We know what has been reported in *The Post,* and

13   what Mr. Fuchs represented is that it likely will not cover

14   everything that, you know, we would want looked at particularly

15   with respect to, to medical treatment.

16            Additionally, our expert is an expert in correctional

17   health.  He has conducted at least seven of these inspections

18   at facilities.  He knows what to look for.  He knows where to

19   look.  And, you know, we, we think that he would be able to go

20   in to get the information that we need quickly.

21            Additionally, you know, we don't know if the CDC

22   results will be public.  We would be interested to listen in on

23   the debrief on Friday that Mr. Fuchs said the CDC will be

24   giving to folks in the facility.  We don't know if results will

25   be public, and again, we don't know if the CDC will be making

1    recommendations and whether the facility will be required to

2    follow them.  The CDC, you know, can't necessarily order

3    compliance the same way that the Court can.

4            THE COURT:  Mr. Fuchs, what is the position of the

5    government on allowing counsel for the plaintiffs to be able to

6    listen in on that debrief?

7            MR. FUCHS:  Your Honor, I don't have enough

8    information on exactly what's going to take place in the

9    debrief.  I don't necessarily know that having other parties on

10   the line is, is all that necessary.

11           I will say that PRR represents that any kind of

12   recommendations that the CDC is going to offer is that they're

13   going to implement in accordance with their existing policies.

14   So it's not that CDC will just offer these recommendations in a

15   vacuum and they will be taken.

16           As to, you know, whether or not counsel can, can

17   listen in, I can't make any representations as of this time.

18           THE COURT:  How quickly could you find out?

19           MR. FUCHS:  I could, I could ask right after the

20   hearing and hopefully, hopefully fast-track it if asked to.

21           MS. FARRELL:  Your Honor?

22           THE COURT:  Yes, ma'am.

23           MS. FARRELL:  Excuse me.

24           THE COURT:  Yeah.

25           MS. FARRELL:  So I, I think it would -- like I said,

1   I think it would be wonderful if we'd be able to listen in on

2   the debrief at the end of the week, but respectfully, I think,

3   you know, we still would ask for, you know, for our own expert

4   to go in.  We think that he can, can proceed quickly and get

5   the Court the information that it needs most quickly.

6           And we also just want to say that, you know, as

7   defendants have agreed to follow CDC's guidelines before, that

8   is part of their own agency, the PBNDS, and they have not done

9   so.  They've shown that they won't do so when it becomes

10  inconvenient and when it matters most, and we think that the

11  transfers that they undertook were a key -- key data points to

12  show that they do not follow the guidance unless they are

13  ordered to do so.

14          We would also point out Your Honor had asked what was

15  going on in the Arizona and Florida facilities at the time of

16  the transfer, and there was litigation ongoing at those

17  facilities at that time, and of the 74 people who were

18  transferred in who, who defendants purportedly screened before

19  they arrived, 51 of those people ultimately came down with

20  COVID-19 and spread it into the population.

21          So we, we would just point out that that is such an

22  egregious example of violating the CDC's policies and guidance

23  and that again we would, we would ask that the Court conduct

24  its own investigation.

25          THE COURT:  Well, what I'm going to do is this:  I

1    think it certainly would be very valuable to the plaintiffs in

2    particular and to the Court to find out what exactly the CDC

3    reports on Friday.  It would also certainly help Dr. Venters if

4    I ultimately authorize him to conduct an evaluation, he doesn't

5    have to go over territory that's already been looked at,

6    especially if he agrees with the findings of the CDC.  In other

7    words, it could shorten -- if I, if I do ultimately authorize

8    him to go in, it would shorten the amount of time, it seems to

9    me, that he would need to conduct his evaluation.

10        So I really don't -- and since the debrief is this

11   Friday, it doesn't significantly delay anything.  So what I'm

12   going to do on that portion of the plaintiffs' motion that

13   requests, that requests that the -- the Court to order that the

14   Farmville facility open up to an evaluation by Dr. Venters, I'm

15   going to withhold ruling on that until, until one of two things

16   happens.

17        If the defendants indicate that they will permit -- I

18   don't think I have to let them do that.  I think I can order

19   them to allow counsel for the defendants (sic) to be able to

20   participate and to listen in on that debrief, and after that, I

21   can reevaluate whether there's still a need to allow the

22   plaintiffs' expert to go in.

23        MR. FUCHS:  Sorry, Your Honor, this is Yuri Fuchs.

24   On that first point of letting counsel listen in on the phone

25   call, I would note there actually are Privacy Act concerns with

1  having plaintiffs' counsel on the, on the phone call on Friday

2  that I, that I would have to check as well.

3        THE COURT:  What would the -- the only privacy issues

4  I could possibly see there would be if the names of individual

5  detainees are being discussed.  What other privacy issue could

6  there be?

7        MR. FUCHS:  I believe that's that.  That's that.

8  That's why -- that's the one concern would be that the CDC

9  report and its protocols of personal -- any kind of personal

10 identifiers.

11       THE COURT:  Oh, I'm sure --

12       MS. FARRELL:  Your Honor?

13       THE COURT:  Go ahead, Ms. Farrell.

14       MS. FARRELL:  Your Honor, we'd be happy to, you know,

15 sign a protective order.  And also, we would ask that

16 Dr. Venters be permitted to listen in on the call as well.

17       THE COURT:  Yeah, I think that makes good sense.  So

18 I'm going to order that, all right?

19       Now, of course, I've not even bothered to address the

20 *Winter* factors, but I'm finding in this case that there is a

21 likelihood -- a strong likelihood of success on some of the

22 merits of this case.  There is no question in my mind from the

23 objective standpoint that all parties had to know that the

24 COVID-19 virus was a pandemic, that it was particularly

25 sensitive to populations that are incarcerated, as would this

1   group of plaintiffs have been, and there's plenty of evidence

2   through both the CDC guidelines which were public and which the

3   defendants clearly all knew about.  We also have Armor's

4   recommendation to Farmville that they stop accepting inmates as

5   of April of 2020.

6           There's just a ton of evidence in this case at this

7   point, and we haven't even gotten into discovery yet, that

8   would strongly support a finding at this preliminary stage that

9   there is a likelihood of success on the merits, that there were

10  significant violations of the requirements that there be, you

11  know, substantive due process afforded to these plaintiffs in

12  terms of reasonably protecting them from a very significant

13  health emergency, and so I'm comfortable with that.

14          And in terms of balancing the harms, there is

15  potentially no harm that I can see to the defendants.  In fact,

16  if anything, there's a benefit in getting the defendants all

17  the help possible in getting good procedures and practices in

18  place so that there are no more or a minimal number of

19  positives.

20          You know, I point to the Alexandria Adult Detention

21  Center in this district, which has, I think, a population

22  probably close to the Farmville one, and unlike Farmville, has

23  people coming and going as local arrests are made and people

24  are then shipped out, and unless my numbers are wrong, they've

25  had one positive in all the months that they've had these

1    inmates coming and going, which says that a well-run

2    correctional institution can avoid mass contamination.

3         The other thing I'm concerned about, and, of course,

4    there's always a balance of the public interest, although

5    there's nobody here representing the people of Farmville and

6    nobody's representing the staff that work at that facility,

7    there's got to be a concern in the local community because the

8    people who work at this facility go home at night.  They shop

9    in the local stores.  They go to the local churches.  They have

10   their families.  And they've got to be concerned about whether

11   there's adequate safety precautions going on at that facility.

12   And so I see absolutely no harm whatsoever to any of the

13   defendants in going forward in this way.

14        So I'm going to grant in part the plaintiffs' motion

15   for preliminary injunction, and it will, it will provide that

16   the defendants are enjoined from transferring any of the named

17   four plaintiffs out of the facility unless they and their

18   counsel have agreed to such a transfer and that there will be

19   no retaliation taken against the four plaintiffs in this

20   lawsuit.

21        I'm not going to enjoin the transfer out of anyone

22   else at this point because none of the plaintiffs in this case

23   would be affected by that.  That's a public policy issue that

24   should be considered carefully, but that's not before us.

25        I am also then going to order that Dr. Venters and

1   counsel for the plaintiff be allowed to listen in on the CDC

2   debrief and will require the defendants to make sure that those

3   arrangements are put into place.  That's the level of relief

4   that I intend to give at this point.

5        And I would want by this Friday good, clear

6   photographs of the layout of a standard dormitory -- layout of

7   the bathroom and blueprint.

8        And I want to make sure --

9        MS. FARRELL:  Your Honor --

10       THE COURT:  Wait, wait.  Lastly, I want to make sure

11  that I include in the injunction that there'll be no transfers

12  into the facility until everybody is satisfied that there are

13  proper protocols and safety measures in place for such

14  transfers.

15       MR. ERBACH:  Your Honor, this is John Erbach on

16  behalf of Farmville.  Just so I can get some clarity on the

17  request for the photographs and the layout of the bathrooms and

18  the blueprints, I'm not sure if there's any security concerns.

19  Can we have an order permitting us to file those under seal

20  with the Court?  That way, both opposing counsel will have it,

21  the Court will have it, but it could be subject to a protective

22  order.

23       THE COURT:  Yeah, I'm going to permit that.  It's the

24  kind of thing that is not inappropriate.  So I will grant that.

25  Go ahead.

32

1          MR. ERBACH:  Thank you, Your Honor.

2          MS. WETZLER:  Your Honor, this is, this is Lauren

3  Wetzler, also with the federal respondents, and following up on

4  what Mr. Erbach just asked about, I was actually going to weigh

5  in with precisely that point regarding the operational security

6  concerns.

7          I have been communicating about Your Honor's inquiry

8  earlier with ICE, and there are some very significant concerns,

9  and so in addition to filing under seal, we would request that

10  that be -- that those be filed ex parte.  If that's not

11  amenable to Your Honor, then at a minimum, if they could be

12  filed Attorneys' Eyes Only?

13          There are significant concerns about those documents

14  being permitted -- the clients being permitted to see them and

15  anyone who's in the facility having those leaked because of

16  potential for vulnerability of officers to attacks or escapes

17  or smugglers.

18          THE COURT:  Well, first of all, Ms. Wetzler, the

19  inmates already know what the dorms look like.  They know what

20  the bunk beds look like.  I'm not asking for the perimeter, you

21  know, the perimeter of the facility.  I'm not asking for the

22  whole facility in that respect, but I would think, Ms. Farrell,

23  your clients don't need to see those pictures, do they?

24          MS. FARRELL:  No, they don't, Your Honor.

25          THE COURT:  All right.  So we'll do Attorneys' Eyes

33

1  Only, all right?

2          MS. FARRELL:  Your Honor?

3          THE COURT:  Yes.

4          MS. FARRELL:  This is Naima Farrell for the

5  plaintiffs.  Could you or we could please ask Mr. Fuchs what

6  time the call will be taking place on Friday, and then also set

7  a deadline for both plaintiffs and defendants to report back on

8  the -- report back to the Court?

9          THE COURT:  All right.  Mr. Fuchs, do you know what

10 time that debrief is set for?

11         MR. FUCHS:  Your Honor, I do not at the moment, but I

12 can try and find out.

13         THE COURT:  All right.  Well, obviously, I don't want

14 to put that in an order.  You're on the record.  I expect you

15 as responsible attorneys to, you know, give the plaintiffs'

16 counsel a clear notice as to the time, and make sure that, you

17 know, whatever the call-in facility is is definitely going to

18 work, all right?

19         MR. FUCHS:  Will do, Your Honor.

20         THE COURT:  Okay.  And in terms of a report back to,

21 to us, my calendar is pretty open next week.  We could, we

22 could -- Monday, August 17, I'm available.  I have a matter at

23 10:00.  Other than that, I can put this on for 11:00 if you'd

24 like for a phone conference like this.

25         MS. FARRELL:  Fine for the plaintiffs, Your Honor.

34

1   Thank you.

2         MR. FUCHS:  Your Honor, Yuri Fuchs.  It's fine for

3   me.

4         MR. ERBACH:  John Erbach.  That works for us.

5         MR. McNELIS:  Ed McNelis.  That works for us as well,

6   Your Honor.

7         THE COURT:  Very good, all right.  So we're going to

8   get an order out, I hope, today, if not, you'll get it first

9   thing tomorrow morning, that memorializes what I've just said.

10  And again, I'm looking forward to the photographs and

11  blueprints.  And when you get that, make sure you send it to us

12  in an envelope that makes it clear that it's being filed under

13  seal for eyes of counsel only, all right?

14        MR. FUCHS:  Yes, Your Honor.

15        THE COURT:  All right.  Anything else that we need to

16  address at this time?

17        MS. FARRELL:  Not from the plaintiffs, Your Honor.

18  Thank you.

19        THE COURT:  All right.  I'll take the silence of the

20  defendants meaning there is nothing further.  So we will then

21  hear back from you on Monday the 17th, at 11:00.  And it will

22  be done by the same phone-in procedure that we've done today,

23  all right?  All right?

24        MS. FARRELL:  Thank you, Your Honor.

25        THE COURT:  All right.

35

1          MR. FUCHS:  Thank you, Your Honor.

2          MR. ERBACH:  Thank you, Your Honor.

3          MR. McNELIS:  Thank you, Your Honor.

4          THE COURT:  Thank you-all.  Bye-bye.

5                         (Which were all the proceedings

6                          had at this time.)

7

8                    CERTIFICATE OF THE REPORTER

9      I certify that the foregoing is a correct transcript of

10   the record of proceedings in the above-entitled matter.

11

12

13                                    /s/
                                 _____
14                               Anneliese J. Thomson

15

16

17

18

19

20

21

22

23

24

25