## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

CHRISTIAN ALBERTO SANTOS GARCIA;
SANTOS SALVADOR BOLANOS
HERNANDEZ; GERSON AMILCAR PEREZ
GARCIA; ISMAEL CASTILLO
GUTIERREZ; DIDIER MBALIVOTO;
FRANK ODIN SOUZA BAUER; MARCO
ANTONIO MIRANDA SANCHEZ; MELVIN
IVAN VELASQUEZ ORELLANA;
OLAITAN MICHAEL OLANIYI; SHAWN
HOUSLIN; JERBIN IVAN GARCIA
GARCIA; JORGE ALEXANDER RIVERA
RODRIGUEZ; JOSE LINARES
HERNANDEZ; VANO BAZERASHVILI,

      *Plaintiffs*,

    v.

CHAD F. WOLF, in his official capacity as
Acting Secretary, U.S. Department of
Homeland Security; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT; TONY
H. PHAM, in his official capacity as Deputy
Director and Senior Official Performing the
Duties of the Director of U.S. Immigration and
Customs Enforcement; RUSSELL HOTT, in
his official capacity as Field Office Director,
Washington Field Office, Enforcement and
Removal Operations, U.S. Immigration &
Customs Enforcement; JEFFREY
CRAWFORD, in his individual capacity and in
his official capacity as Director, Farmville
Detention Center; IMMIGRATION
CENTERS OF AMERICA-FARMVILLE,
LLC; ARMOR CORRECTIONAL HEALTH
SERVICES, INC.,

      *Defendants*.

Case No. 1:20-cv-00821 (LBM/JFA)

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      For the past several months, Farmville Detention Center has been the scene of a great humanitarian crisis.  Approximately 88 percent of the civil immigration detainees housed there, including Plaintiffs, contracted COVID-19—the highly contagious and potentially lethal virus that is sweeping the globe.  Defendants, who are collectively charged with caring for these individuals and who should have been working to protect them from the virus, failed at every step, instead turning Farmville into a COVID-19 tinderbox that engulfed nearly everyone in the facility, from Plaintiffs to hundreds of other detainees to dozens of staff members.

2.      The first match was struck in early June 2020, when Defendants Chad F. Wolf, U.S. Immigration and Customs Enforcement ("ICE"), Tony H. Pham, and Russell Hott (collectively, "the Federal Defendants") transferred 74 detainees to Farmville from Florida and Arizona facilities—without prior testing—even though the Federal Defendants knew that those facilities were experiencing COVID-19 outbreaks, and despite the Centers for Disease Control and Prevention's ("CDC") recommendation against transfers with limited exceptions.  Defendants Jeffrey Crawford and Immigration Centers of America-Farmville, LLC ("ICA") (collectively, "the ICA Defendants") accepted the 74 transferees into their facility, even though they were contractually permitted to decline the transfer, and even though they knew that they did not have the capacity to quarantine, isolate, or adequately screen the transferees at intake.  Fifty-one of the individuals who were transferred subsequently tested positive for COVID-19.  Public reporting has since revealed that the primary reason for this reckless transfer was to facilitate the rapid deployment of Department of Homeland Security ("DHS") tactical teams to suppress peaceful protests against racial injustice in Washington, D.C.  The transfer was a pretext for complying with rules that bar ICE employees from traveling on charter flights unless detainees are also aboard.

1

3.      After Defendants imported the virus into the facility, it spread like wildfire:  At the height of the crisis, at least 339 detainees—or approximately *88 percent* of the overall detainee population—had tested positive for COVID-19.  Plaintiffs Santos Garcia, Perez Garcia, Castillo Gutierrez, Mbalivoto, Souza Bauer, Miranda Sanchez, Velasquez Orellana, Olaniyi, Houslin, Garcia Garcia, Rivera Rodriguez, Linares Hernandez, and Bazerashvili all tested positive for COVID-19.  And although Plaintiff Bolanos Hernandez ultimately tested negative for COVID-19, he exhibited symptoms of the virus, and like the other Plaintiffs, he endured tremendous fear and mental anguish as the deadly virus ravaged the facility, and he continues to fear that he will become infected with COVID-19.

4.      The distressingly high number of COVID-19 infections is as unfortunate as it is unsurprising.  Defendants did not take, and have not taken, appropriate precautions to protect the individuals inside Farmville.  Defendants packed up to 80 individuals in poorly ventilated dorm rooms, making them sleep inches from one another—the opposite of appropriate social distancing and a recipe for uncontrollable spread of the virus.  Defendants did not provide Plaintiffs with sufficient personal protective equipment ("PPE"), like masks and hand sanitizer.  And although Plaintiffs exhibited the hallmark symptoms of COVID-19 shortly after Defendants transferred COVID-19-positive individuals into the Farmville facility—fever, aches, pains, coughing, breathing issues—Defendants waited several days to test them for COVID-19, and several additional days to inform them that they had tested positive.

5.      Defendants' failures on the front end were compounded on the back end.  The ICA Defendants and Defendant Armor Correctional Health Services, Inc. ("Armor"), denied Plaintiffs medical treatment for multiple days after they started showing symptoms of COVID-19.  Plaintiffs' requests for doctor's visits fell on deaf ears.  Once they started to receive treatment, at

least six of the Plaintiffs (Santos Garcia, Bolanos Hernandez, Castillo Gutierrez, Garcia Garcia, Rivera Rodriguez, and Linares Hernandez) only ever received Tylenol.  Plaintiff Houslin was not even provided Tylenol for his symptoms.  Others received just Tylenol and cough or congestion medication.  For example, Plaintiff Perez Garcia eventually became so sick that he was placed into isolation, and even then he received only Tylenol and a few pills for his cough.  Plaintiff Velasquez Orellana was isolated in the processing unit for two weeks after he passed out in his dorm, and he also received only Tylenol and pills for congestion.  Several Plaintiffs did not receive medication until days after they began exhibiting COVID-19 symptoms.  And at least nine of the Plaintiffs (Santos Garcia, Bolanos Hernandez, Castillo Gutierrez, Souza Bauer, Miranda Sanchez, Houslin, Olaniyi, Garcia Garcia, and Rivera Rodriguez) remained in their dorms while awaiting their test results and while continuing to exhibit symptoms of COVID-19.

6.      Throughout this time, Plaintiffs have also been denied adequate nutrition, including while they suffered from COVID-19.  The ICA Defendants have served them expired food, uncooked or undercooked food, and food infested with bugs.  In the last month, ICA Defendants have also failed to provide Plaintiffs with sufficient food portions.

7.      Defendants' actions have jeopardized Plaintiffs' lives, health, and recovery. Defendants have violated Plaintiffs' right to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution, which guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. Defendants have violated this right by acting with deliberate indifference with regard to Plaintiffs' medical care and nutrition, which has subjected Plaintiffs to objectively unreasonable risks to their health and safety, to cruel treatment, and to conditions of confinement that amount to punishment.

8.      The Federal Defendants' actions have also violated the Administrative Procedure Act ("APA").  The Federal Defendants have failed to live up to their own binding standards for ensuring the provision of medical treatment and food services to detainees.  They have additionally failed to follow CDC guidance on managing the COVID-19 pandemic—including stopping transfers unless absolutely necessary and ensuring the provision of appropriate testing, preventive measures, and treatment—even though their binding standards require them to follow CDC guidance.

9.      In addition, the ICA Defendants' decision to accept transferees from COVID-19-positive facilities into Farmville in early June was grossly negligent.  The ICA Defendants knew—as demonstrated by their own policies—that accepting transferees in this manner could lead to an outbreak of the lethal COVID-19 virus at Farmville.  Pursuant to their contract, the ICA Defendants had the option not to accept these transferees.  By accepting these transferees, the ICA Defendants acted with utter disregard for the health and wellbeing of Plaintiffs and all others housed in or working in the facility, along with the greater Farmville community.  The ICA Defendants' wanton conduct led to the rapid spread of COVID-19 within the facility.

10.      The ICA Defendants also negligently failed to provide adequate medical treatment and nutrition to Plaintiffs as they suffered from the potentially deadly symptoms of COVID-19.

11.      Instead of solving the constitutional, common law, and statutory violations at Farmville, Defendants are poised to repeat them.  The Federal Defendants recently sought to re-start transfers into the facility, even though the COVID-19 pandemic rages on and the CDC continues to recommend that transfers be restricted except in narrow conditions.  Such transfers would seriously endanger the health of Plaintiffs and the public.

12.      Plaintiffs seek to improve the inhumane conditions present at Farmville.  They ask the Court to declare that their constitutional rights have been violated and that the Federal Defendants

violated the APA.  They ask this Court to maintain its injunction prohibiting all transfers into Farmville Detention Center and prohibiting Plaintiffs' transfer out of Farmville to another detention facility until Defendants can demonstrate that such transfer will not endanger Plaintiffs' or others' health and abides by CDC guidelines.  They further ask the Court to issue an injunction ordering Defendants to submit a written plan to improve the system of monitoring, caring for, and responding to requests for medical assistance from detainees at Farmville who are, or may be, exposed to COVID-19, in line with the recommendations of the CDC's and Plaintiffs' expert's inspection reports.  Plaintiffs ask the Court to retain jurisdiction over Defendants to monitor compliance with the Court's order.  Finally, Plaintiffs ask the Court to award them compensatory and punitive damages to compensate the injuries that they suffered and to ensure that the ICA Defendants will be deterred from acting in a similar manner in the future.

## PARTIES

13.     Plaintiff Christian Alberto Santos Garcia is a 23-year-old citizen of El Salvador. An immigration judge granted Plaintiff Santos Garcia withholding of removal and relief under the Convention Against Torture in December 2019.  He is being held in the custody of Defendant ICE at Farmville Detention Center pending the outcome of DHS's appeal of that decision to the Board of Immigration Appeals.

14.     Plaintiff Santos Salvador Bolanos Hernandez is a 35-year-old citizen of El Salvador.  An immigration judge granted Plaintiff Bolanos Hernandez withholding of removal in April 2020.  He is being held in the custody of Defendant ICE at Farmville Detention Center pending the outcome of DHS's appeal of that decision to the Board of Immigration Appeals.

15.     Plaintiff Gerson Amilcar Perez Garcia is a 27-year-old citizen of Honduras.  From February 26, 2020 to July 31, 2020, he was held in the custody of Defendant ICE at Farmville

Detention Center.  An immigration judge granted Plaintiff Perez Garcia asylum on July 30, 2020, and he was released from ICE custody the following day.

16.     Plaintiff Ismael Castillo Gutierrez is a 43-year-old citizen of Honduras.  From January 28, 2020 to August 25, 2020, he was held in the custody of Defendant ICE at Farmville Detention Center.  An immigration judge granted Plaintiff Castillo Gutierrez asylum on August 25, 2020, and he was released from ICE custody that same day.

17.     Plaintiff Didier Mbalivoto is a 42-year-old citizen of the Democratic Republic of Congo.  From October 7, 2018 to August 20, 2020, he was held in the custody of Defendant ICE at Farmville Detention Center.  An immigration judge granted Plaintiff Mbalivoto asylum on June 15, 2020.  DHS appealed to the Board of Immigration Appeals, and Plaintiff Mbalivoto remained detained at Farmville Detention Center while the appeal was pending.  Plaintiff Mbalivoto then filed a habeas corpus petition on July 22, 2020, challenging his prolonged detention.  On August 11, 2020, Judge Anthony Trenga of the U.S. District Court for the Eastern District of Virginia granted Plaintiff Mbalivoto's habeas petition and ordered a bond hearing.  Plaintiff Mbalivoto paid the statutory minimum bond and was released on August 20, 2020.

18.     Plaintiff Frank Odin Souza Bauer is a 39-year-old citizen of Bolivia.  From April 17, 2020 to October 13, 2020, he was held in the custody of Defendant ICE at Farmville Detention Center.  Prior to his detention at Farmville, from November 7, 2019 to April 17, 2020, he was held in the custody of Defendant ICE at the Caroline Detention Facility in Bowling Green, Virginia. Plaintiff Souza Bauer was deported to Bolivia on October 13, 2020.

19.     Plaintiff Marco Antonio Miranda Sanchez is a 46-year-old citizen of Mexico.  He is being held in the custody of Defendant ICE at Farmville Detention Center.  He is seeking

immigration relief under the Convention Against Torture.  His final hearing is scheduled for November 12, 2020.

20.     Plaintiff Melvin Ivan Velasquez Orellana is a 29-year-old citizen of Honduras.  He is being held in the custody of Defendant ICE at Farmville Detention Center.  On August 25, 2020, an immigration judge denied his application for withholding of removal.  His appeal of that decision is currently pending before the Board of Immigration Appeals.

21.     Plaintiff Olaitan Michael Olaniyi is a 38-year-old citizen of Nigeria.  He is being held in the custody of Defendant ICE at Farmville Detention Center.  An immigration judge denied his application for withholding of removal and relief under the Convention Against Torture.  His appeal of that decision is currently pending before the Board of Immigration Appeals.

22.     Plaintiff Shawn Houslin is a 40-year-old citizen of Jamaica.  He is being held in the custody of Defendant ICE at Farmville Detention Center.  In October 2020, an immigration judge denied his application for relief under the Convention Against Torture.  He is preparing to appeal that decision to the Board of Immigration Appeals.

23.     Plaintiff Jerbin Ivan Garcia Garcia is a 39-year-old citizen of Guatemala.  An immigration judge granted Plaintiff Garcia Garcia asylum in September 2020.  He is being held in the custody of Defendant ICE at Farmville Detention Center pending the outcome of DHS's appeal of that decision to the Board of Immigration Appeals.

24.     Plaintiff Jorge Alexander Rivera Rodriguez is a 39-year-old citizen of Honduras.  He is being held in the custody of Defendant ICE at Farmville Detention Center.  In September 2020, an immigration judge granted Plaintiff Rivera Rodriguez relief under the Convention Against Torture, and DHS has not appealed that decision.

25.     Plaintiff Jose Linares Hernandez is a 38-year-old citizen of Guatemala.  He is being held in the custody of Defendant ICE at Farmville Detention Center.  In May 2020, he lost his immigration case and an immigration judge issued him a removal order.  His appeal has been withdrawn.

26.     Plaintiff Vano Bazerashvili is a 46-year-old citizen of Georgia.  He is being held in the custody of Defendant ICE at Farmville Detention Center.  An immigration judge denied his request for cancelation of removal in May 2020, and he has appealed that decision to the Board of Immigration Appeals.

27.     Defendant Chad F. Wolf is named in his official capacity as Acting Secretary of DHS.  In his official capacity, Defendant Wolf is responsible for administering the immigration laws pursuant to 8 U.S.C. § 1103(a); routinely transacts business in the Eastern District of Virginia; supervises Defendant Russell Hott; and is legally responsible for the pursuit of the detention and removal of foreign nationals.  As such, he is a legal custodian of Plaintiffs.

28.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is a federal law enforcement agency within DHS.  ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants.  Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration detention system.  As such, Defendant ICE is a legal custodian of Plaintiffs.

29.     Defendant Tony H. Pham is named in his official capacity as Deputy Director and Senior Official Performing the Duties of the Director of ICE.  In this capacity, he is responsible for the enforcement of immigration laws and for ICE's policies, practices, and procedures.  He has authority over the detention and removal of noncitizens throughout the United States.  As such, he

is a legal custodian of Plaintiffs. Defendant Pham is automatically substituted as a party in place of his predecessor, Matthew T. Albence, pursuant to Federal Rule of Civil Procedure 25(d).

30.     Defendant Russell Hott is named in his official capacity as Director, Washington Field Office of ICE. The Washington Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at Farmville Detention Center, and Defendant Hott is responsible for administering the immigration laws and the execution of detention and removal determinations for individuals under the jurisdiction of the Washington Field Office. As such, he is a legal custodian of Plaintiffs.

31.     Defendant Jeffrey Crawford is named in his individual capacity and in his official capacity as the Director of Farmville Detention Center. Defendant Crawford is responsible for overseeing the administration and management of Farmville Detention Center. In this capacity, he is the immediate custodian of Plaintiffs. Defendant Crawford was at all times relevant to this complaint an employee and agent of Defendant ICA.

32.     Defendant Immigration Centers of America-Farmville, LLC ("ICA") is a limited liability corporation that owns and operates Farmville Detention Center. Its principal place of business is located at 508 Waterworks Road in Farmville, Virginia 23901-2674, and it is registered as a limited liability corporation under the laws of the Commonwealth of Virginia. Defendant ICA contracted with the Town of Farmville for the operation of Farmville Detention Center.[1]

---

[1]  In 2008, Defendant ICE entered into an Intergovernmental Service Agreement ("IGSA") with the Town of Farmville "for the detention and care of aliens." Exhibit A, IGSA at 1. In exchange for payment on a per-detainee per-diem basis, the Town of Farmville ensures the daily operation of the detention center. The IGSA requires the Town of Farmville to, among other things, "house all detainees as determined within [Farmville's] classification system," "provide detainees with safekeeping, housing, subsistence, medical and other services [and] ensure compliance with all applicable laws, regulations, fire and safety codes, policies and procedure," and "house detainees and perform related detention services in accordance with

33.     Defendant Armor Correctional Health Services, Inc. ("Armor") is a Florida corporation that contracts with Defendant ICA to provide health care services to persons detained at Farmville Detention Center.  Its principal place of business is located at 4960 S.W. 72nd Avenue Suite 400, Miami, Florida 33155.  Defendant Armor was at all times relevant to this complaint an agent of Defendant ICA.

34.     Defendants Crawford, ICA, Armor, and their officers and employees were at all times relevant to this complaint acting under color of state law as agents of the Town of Farmville. In the alternative, Defendants Crawford, ICA, Armor, and their officers and employees were at all times relevant to this complaint acting under color of federal law as agents of Defendant ICE.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over Claims One through Five pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States and, as to Defendants Crawford, ICA, and Armor, under 42 U.S.C. § 1983.

36.     The Court also has subject matter jurisdiction over Claims Six through Eight pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy giving rise to Claims One through Five.

37.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 28 U.S.C. § 1651.

---

the most current edition of the ICE National Detention Standards."  *Id.* at 3, 6.  The Town of Farmville, in turn, subcontracted for the operation of the facility to a private for-profit company, Defendant ICA.  Exhibit B, Subcontract Servicing Agreement at 1.  The Town of Farmville is required under the IGSA to notify and obtain approval of ICE for any subcontractor hired to carry out its responsibilities under the IGSA and ensure that "any subcontract includes all provisions of [the IGSA]."  Exhibit A at 2.  Upon information and belief, the Town of Farmville obtained the requisite approval and executed an agreement with Defendant ICA for the operation of Farmville Detention Center, *see* Exhibit B, which remains valid today.  In that contract, Defendant ICA "agree[d] to be solely responsible for servicing and meeting all of the obligations of the IGSA on behalf of [the Town of] Farmville."  *Id.* at 1.

38.     Venue is proper in this district under 28 U.S.C. § 1391, and in this division under Local Civil Rule 3(C), because a defendant is an agency of the United States or an officer or employee of the United States or any agency thereof acting in his official capacity, a defendant resides in this district, and a substantial part of the events giving rise to the claims occurred in this district.  Defendant Hott oversees the Washington Field Office of ICE Enforcement and Removal Operations, which manages the contract for detentions at the Farmville Detention Center, and his principal place of business is located in Fairfax, Virginia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

39.     No statutory exhaustion requirement applies to Plaintiffs' claims of unlawful detention because no administrative agency exists to adjudicate their constitutional challenges.

40.     Similarly, no exhaustion requirement applies to Plaintiffs' APA claim because Plaintiffs allege that the agency acted unlawfully.

41.     There also is no exhaustion requirement for Plaintiffs' common law claims.

42.     The Prison Litigation Reform Act, 42 U.S.C. § 1997e, does not apply to Plaintiffs because they are not "prisoner[s]" as defined in that statute.  *See* 42 U.S.C. § 1997e(h) ("[T]he term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law . . . ."); *see also Agyeman v. INS*, 296 F.3d 871, 886 (9th Cir. 2002) ("[W]e hold that an alien detained by the INS pending deportation is not a 'prisoner' within the meaning of the PLRA.").  Accordingly, Plaintiffs were not required to exhaust administrative remedies by filing grievances.

## STATEMENT OF FACTS

I.   **COVID-19 POSES A GRAVE RISK OF HARM TO PLAINTIFFS**

43.     COVID-19 is a highly contagious coronavirus disease that has reached pandemic status.  As of October 18, 2020, more than 8 million people in the United States have tested positive for the virus, and more than 218,500 have died.[2]  The Commonwealth of Virginia has had more than 166,000 cases, 11,800 hospitalizations, and 3,400 deaths.[3]

44.     SARS-CoV-2, which causes the COVID-19 illness, is easily transmitted.  Everyone shares a risk of contracting the virus, and everyone who contracts it shares a risk of transmitting it to other people.  The most likely means of transmitting the virus is through close human-to-human contact, especially indoors.  That is because the virus mainly spreads through respiratory droplets produced when an infected person coughs, sneezes, or talks.  Emerging research indicates that the virus is easily transmitted in indoor spaces where people are enclosed for protracted periods.

45.     Symptoms of COVID-19 include fever, cough, shortness of breath, headache, body aches, loss of taste and smell, nausea, and diarrhea.[4]  People can carry and spread the virus even if they are asymptomatic or pre-symptomatic, although precisely how the virus spreads remains unknown.  Testing or secluding only those who are symptomatic is therefore an ineffective solution to preventing further spread of COVID-19.

46.     There is no known vaccine against COVID-19 and no known medication to prevent infection.  The most effective ways to reduce the risk of contracting and spreading COVID-19 are to prevent infection and avoid community spread, such as by avoiding close contact with other

---

[2]  CDC, *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.* (last visited Oct. 18, 2020), https://bit.ly/2SyyE6k.

[3]  Va. Dep't of Health, *COVID-19 Daily Dashboard* (last visited Oct. 18, 2020), https://bit.ly/30RByXX.

[4]  CDC, *Coronavirus Disease 2019 (COVID-19): Symptoms of Coronavirus* (updated May 13, 2020), https://bit.ly/2SFRzvy.

people by practicing appropriate social distancing, washing hands often, covering one's mouth and nose with cloth, and vigorously cleaning and disinfecting touched surfaces.

47.     Contracting COVID-19 may cause serious and lasting health damage, as well as death.   Infected individuals who survive may face severe damage to their respiratory system, neurological system, and lungs, heart, liver, or other organs, resulting in prolonged recovery periods and permanent damage.   These complications can manifest in as little as two days after exposure.   Infected individuals' conditions can seriously deteriorate within days, and recovery can take weeks if not months.

48.     Even young, healthy individuals who contract COVID-19 may require supportive care.   Those who develop serious complications will need advanced support, including highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.

49.     Researchers are only beginning to understand the long-term effects of COVID-19, but it is becoming increasingly clear that even after many patients have recovered from the immediate impacts, lingering symptoms persist.   This phenomenon is so widespread that the term "long-haulers" has become common vernacular to describe those who have symptoms as a result of COVID-19 for months after the initial onset.[5]

50.     According to the Mayo Clinic, "even those who had mild versions of the disease . . . continue to experience symptoms after their initial recovery," including fatigue, cough, shortness of breath, headaches, and joint pain.[6]  COVID-19 also causes long-term heart, lung, and

---

[5]  *See, e.g.*, Jennifer Couzin-Frankel, *From "Brain Fog" to Heart Damage, COVID-19's Lingering Problems Alarm Scientists*, SCIENCE (July 31, 2020), https://bit.ly/2GTVQJ9.

[6]  Mayo Clinic, *COVID-19 (Coronavirus): Long-Term Effects*, https://mayocl.in/3lFYcu7 (last visited Oct. 11, 2020).

brain damage, and blood-clotting problems which could result in heart attacks, strokes, or long-lasting problems with the liver and kidneys.[7]  The CDC has explained that "many organs besides the lungs are affected by COVID-19," with the heart being specifically susceptible to damage from COVID-19.[8]  Post-COVID-19 heart-related complications are not limited to older and middle-aged individuals: young adults, including athletes, have been known to experience these effects, too.[9]

51.     In addition to long-term impacts on physical health, some COVID-19 patients also suffer long-term effects on their mental health and acuity.[10]  For some patients, the lingering "brain fog" they experience— "troubling cognitive symptoms that can include memory loss, confusion, difficulty focusing, dizziness and grasping for everyday words"—is debilitating to the point that they are unable get off of their couches, let alone continue working and leading normal lives.[11]

## II.    DEFENDANTS HAVE FAILED TO TAKE SUFFICIENT PRECAUTIONS TO PREVENT THE SPREAD OF COVID-19 AT FARMVILLE DETENTION CENTER

52.     On March 11, 2020, the World Health Organization ("WHO") classified the spread of COVID-19 as a pandemic.  On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*

53.     On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance advising people to adopt physical distancing measures, such as working from home, avoiding gatherings of more than 10 people, and limiting trips to grocery stores, bars, restaurants, and other areas where people share space.

---

[7]   *Id.*
[8]   CDC, *Long-Term Effects of COVID-19* (last modified Sept. 16, 2020) https://bit.ly/2GMjqru.
[9]   *Id.*
[10]  *See, e.g.*, Couzin-Frankel, *supra* note 5.
[11]  Pam Belluck, *'I Feel Like I Have Dementia': Brain Fog Plagues Covid Survivors*, N.Y. TIMES (Oct. 11, 2020), https://nyti.ms/34M4i5E.

54.     Following this advice, many states—including Virginia—shut down many parts of ordinary life, issuing orders suspending or curtailing the operation of schools and non-essential businesses, limiting gatherings, and ordering citizens to take precautions such as wearing masks.[12]

55.     To combat the disease, and to halt its advance, the White House and the CDC have urged people to take basic preventive actions, such as avoiding crowds, staying six feet away from others, keeping surfaces disinfected, and frequently washing hands or using hand sanitizer.[13]

56.     The CDC also issued interim guidance specific to managing COVID-19 in detention facilities.[14]  The CDC has recognized that "[m]any opportunities exist for SARS-CoV-2 to be introduced into a correctional or detention facility, including daily staff movements" and "transfer of incarcerated/detained persons between facilities and systems."  Detained individuals "often come from a variety of locations, increasing the potential to introduce SARS-CoV-2 from different geographic areas."  And the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent hand washing) may be limited."  "Social distancing options within correctional and detention settings may be limited due to crowded living conditions."

57.     Because detained persons face acute risks of contracting COVID-19, the CDC has instructed detention facilities to "[l]imit transfers of . . . detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine,

---

[12]  *See, e.g.*, Order of the Governor and State Health Commissioner, Declaration of Public Health Emergency (Mar. 17, 2020), https://bit.ly/32ozJDq.

[13]  *See* Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, N.Y. TIMES (Mar. 17, 2020), https://nyti.ms/3npiPfU; CDC, *Coronavirus Disease 2019 (COVID-19): Clinical Questions About COVID-19: Questions and Answers* (last updated Oct. 5, 2020), https://bit.ly/2y6X6Eh; CDC, *Coronavirus Disease 2019 (COVID-19): Social Distancing* (last updated July 15, 2020), https://bit.ly/2N4b5PF.

[14]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (last updated July 22, 2020), https://bit.ly/3kenrU3.

clinical care, extenuating security concerns, release, or to prevent overcrowding."[15]  To that end, the U.S. Bureau of Prisons stopped nearly all transfers among its facilities in March 2020.[16]

58.     The CDC has also instructed facilities to "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available and have a plan in place to restock as needed."[17]  The CDC has further instructed facilities to "[i]mplement social distancing strategies to increase the physical space between . . . detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units."[18]

59.     ICE has published Performance-Based National Detention Standards ("PBNDS") that establish mandatory policies and practices relating to medical care and nutrition that facilities and operators of facilities must follow.[19]  As relevant here, the PBNDS provide that CDC "guidelines for the prevention and control of infectious and communicable diseases shall be followed."  The PBNDS also provide "Medical Care" standards that require facilities to ensure that detainees have access to a continuum of health care services, including screening, prevention, health education, diagnosis, and treatment.  The PBNDS also provide "Food Service" standards, which require that food "shall meet federal standards for quality," "shall be protected from dust, insects and rodents," and shall maintain a "high level of sanitation."

---

[15]  CDC, *Guidance for Correctional & Detention Facilities* (last updated Oct. 7, 2020), https://bit.ly/2FFYQIP; *see also* Exhibit C, Decl. of Dr. Homer D. Venters, MD Regarding COVID-19 Inspection of Farmville Detention Center ("Venters Decl.") ¶ 10 .

[16]  Fed. Bureau of Prisons, *Updates to BOP COVID-19 Action Plan* (last updated Mar. 19, 2020), https://bit.ly/30O1zaD.

[17]  CDC, *Guidance for Correctional & Detention Facilities*, *supra* note 15.

[18]  *Id.*; Venters Decl. ¶ 10 (noting that recent CDC guidelines have explained that social distancing "is not simply a concept that detained people should follow, but reflects an infection control approach that individuals, groups and the facility operations must implement together").

[19]  ICE, Performance-Based National Detention Standards (2011), https://bit.ly/36UXg0W.

60.     As a highly contagious infectious disease, COVID-19 has proven particularly pernicious in enclosed, high-density environments like detention and correctional facilities, which have become "hotbeds for the virus."[20]   Indeed, in mid-June, when the United States' overall infection rate remained relatively constant, new infections in prisons and jails "soared," doubling from mid-May to more than 68,000 in mid-June, with coronavirus-related deaths also rising by 73 percent in that time.[21]   And at that time, according to media sources, the five largest known clusters of the virus in the United States were in correctional institutions.[22]

61.     ICE facilities fare no better than prisons and jails.  As of October 18, 2020, ICE reported that more than 6,600 individuals in its custody have tested positive for the virus.[23]

62.     Eight individuals detained in ICE facilities have died in ICE custody because of COVID-19 complications, including one detainee at Farmville.[24]  This number does not include those who died after release from complications related to COVID-19 contracted in ICE detention.

63.     Farmville has been hit particularly hard:  At the height of the crisis, at least 339 detainees—or *88 percent* of the facility's detainee population—have tested positive for

---

[20]  Tammy La Gorce, *'Everybody Was Sick': Inside an ICE Detention Facility*, N.Y. TIMES (May 15, 2020), https://nyti.ms/2UUqF4F.

[21]  Timothy Williams et al., *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 16, 2020), https://nyti.ms/3fwXKeT.

[22]  *See id.*; *see also* Laura Hawks et al., *COVID-19 in Prisons and Jails in the United States*, JAMA Internal Medicine (Apr. 28, 2020), https://bit.ly/3jpUncg (noting that "[p]rior viral epidemics have wrought havoc in carceral settings" because the "infrastructure" is "conducive to spreading disease" and thus "incarcerated [people] will be at higher risk of exposure").

[23]  *See* ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, https://bit.ly/3nER43h (last visited Oct. 18, 2020).

[24]  *Id.*

COVID-19.[25]  That Farmville has emerged as a COVID-19 hotspot is hardly surprising in light of reports of abysmal conditions at the facility.[26]

64.     Public health officials have long warned that prisons, jails, and detention facilities like Farmville were positioned to "become vectors in the pandemic because they are often overcrowded, unsanitary places where social distancing is impractical, bathrooms and day rooms are shared by hundreds of [people], and access to cleaning supplies is tightly controlled."[27]  Indeed, individuals who are detained have limited ability to take the precautionary steps that public health officials recommend as a means to guard against infection and spread, such as social distancing, mask wearing, and use of adequate ventilation.  They also have no control over the movements of others with whom they live in close proximity, and share spaces and resources.

65.     The design and operation of detention facilities, including Farmville, make it extremely difficult or impossible for those detained inside to engage in these and other prophylactic measures.  If anything, facilities like Farmville that house pre-trial detainees are at a particularly high risk for contagion because of substantial turnover among the population inside.

---

[25]  *Id.*; CDC, *Assessment of COVID-19 Transmission Among Employees and Detained Persons and Infection Prevention & Control Practices at the Farmville Detention Center—Farmville, VA, June-August 2020: Report* (Sept. 11, 2020) ("CDC Inspection Report"), ECF No. 91-1 at 23; *see also* Letter from Sens. Warner and Kaine to Acting Sec'y Wolf and Acting Director Albence (July 16, 2020), https://bit.ly/3h23SMW; Jenny Gathright, *More Than 70% of People Detained at the Farmville Detention Center Are COVID Positive*, DCIST (July 10, 2020), https://bit.ly/3fYpZUx.

[26]  *See, e.g.*, Priscilla Alvarez, *Immigrant Detainees Describe Deteriorating Conditions as Coronavirus Spreads in Facilities*, CNN (June 27, 2020), https://cnn.it/3eXYM3x (highlighting alarming conditions at Farmville Detention Center); Jenny Gathright, *After Transfers from Coronavirus Hotspots, Cases Spike at Farmville ICE Detention Facility*, DCIST (June 29, 2020), https://bit.ly/3gncDkf (same).

[27]  *See* Williams et al., *supra* note 21.

66.     The Federal Defendants have exacerbated this risk by transferring detainees among facilities, including from facilities with active COVID-19 cases.  This practice persisted at Farmville despite Defendant Crawford's request—supported by Farmville's Medical Director and Defendant Armor—to Defendant ICE, on or about April 1, 2020, that ICE cease transfers to Farmville.[28]  The Federal Defendants' decision to transfer detainees among facilities contradicted CDC's guidance that all transfers should be suspended absent narrow, compelling reasons such as medical necessity.[29]

67.     In April 2020, in response to Defendant Crawford's request to "eliminate further intakes to Farmville," the Federal Defendants proposed to institute a policy whereby transferees to Farmville Detention Center would be quarantined in individual cells in the Caroline Detention Facility in Bowling Green, Virginia before ultimately being transferred to Farmville.  Farmville's Medical Director and Defendant Armor agreed to this policy, which was "approved and implemented" on April 17, 2020.[30]

68.     On June 2, 2020, the Federal Defendants transferred 74 detainees from detention facilities in Florida and Arizona to Farmville.  They did so knowing that there were COVID-19 cases at the Florida facility from which some of the transferred detainees came.[31]  The Federal Defendants also knew or should have known that detainees in ICE's Arizona detention facilities

---

[28]   Decl. of Jeffrey Crawford ("Crawford Decl."), ECF No. 30-1 ¶ 19; Decl. of Teresa Moore, MD ("Moore Decl."), ECF No. 32-1 ¶ 14.

[29]   CDC, *Guidance for Correctional & Detention Facilities*, *supra* note 15.

[30]   Crawford Decl. ¶ 19.

[31]   *Id.* ¶ 29; CDC Inspection Report at 4 ("Two detained persons from [Arizona] who were febrile during screening were sent to the local hospital emergency department (ED) for evaluation and COVID-19 testing."); *see also* Mica Rosenberg et al., *U.S. Immigration Officials Spread Coronavirus With Detainee Transfers*, REUTERS (July 17, 2020), https://reut.rs/31txvjS ("ICE data shows that the day before the transfers, two of the three centers where the detainees came from had reported cases.").

had tested positive for COVID-19.[32]  Nevertheless, the Federal Defendants did not test transferees for COVID-19 prior to initiating the transfer.  In conducting this transfer, the Federal Defendants did not follow CDC guidelines and gave the ICA Defendants "less than 24 hours' notice" to prepare for this transfer.[33]

69.    The ICA Defendants accepted the incoming detainees, despite knowing they did not have the capacity to isolate, quarantine, and properly screen them for COVID-19.  In accepting this transfer, the ICA Defendants violated Farmville's own policy:  The incoming detainees were not quarantined at the Caroline Detention Facility because that facility "could not accommodate such a large group"; instead, they were taken directly to Farmville.[34]  Defendant Crawford acknowledged that he had the contractual authority to reject the transferees, but he chose not to do so, even though he knew that by accepting them he was violating the principal infection control mechanism at Farmville.[35]  Indeed, the Intergovernmental Services Agreement governing the relationship between Defendant ICE and the Town of Farmville granted the "Service Provider"— Defendant ICA, pursuant to the subcontract servicing agreement—a right to refuse to accept detainees:  "The Service Provider retains the right to refuse acceptance or request removal of any detainee . . . found to have a medical condition that requires medical care beyond the scope of the Service Provider's health care provider."[36]

---

[32]  *See, e.g.*, Daniel Gonzalez, *COVID-19 Outbreak at ICE Detention Center in Eloy Has Ballooned into One of the Largest in the Nation*, ARIZONA REPUBLIC (May 31, 2020), https://bit.ly/2WshDwF (noting that "[a]t least 76" individuals detained at the Eloy, Arizona detention facility "had tested positive" and that it was the "sixth largest coronavirus outbreak at an immigration detention facility in the country").

[33]  Crawford Decl. ¶ 29.

[34]  *Id.*; Moore Decl. ¶ 16.

[35]  Crawford Decl. ¶¶ 29–30.

[36]  Exhibit A art. IV.C; Exhibit B at 1; *see also supra* note 1.

70.     During his testimony at a town council meeting in August 2020, Defendant Crawford admitted that ICE officials in the Washington Field Office also objected to the transfer.[37]

71.     Government officials later revealed that "the primary reason for the June 2 transfers was to skirt rules that bar ICE employees from traveling on . . . charter flights unless detainees are also aboard."[38]   As reported by the Washington Post on September 11, 2020, "[t]he Trump administration flew immigrant detainees to Virginia this summer to facilitate the rapid deployment of Homeland Security tactical teams to quell protests in Washington, circumventing restrictions on the use of charter flights for employee travel."[39]  Publicly available data showed that the flights "were highly unusual" and there was "no other record this year of ICE transferring detainees from Phoenix to Virginia or Miami to Virginia."[40]

72.     The report also casts significant doubt on Federal Defendants' other purported explanation for the transfer—to balance population among facilities.  "ICE statistics show the facilities the detainees came from were not near capacity on June 1, when the transfers were arranged.  CCA Florence, a jail in Arizona with beds for roughly 550 detainees, was about 35 percent full that day, records show.  The facility that appeared most crowded, Eloy Detention Center in Arizona, was about 70 percent full.  Farmville was 57 percent full, according to ICE."[41]  Even accepting that the Eloy facility was more crowded, it makes little sense to balance the population by sending detained individuals to Virginia, rather than to other facilities closer to the

---

[37]  Antonio Olivo & Nick Miroff, *ICE Flew Detainees to Virginia so the Planes Could Transport Agents to D.C. Protests. A Huge Coronavirus Outbreak Followed*, WASH. POST. (September 11, 2020), https://wapo.st/35rS4Rn; *see* Farmville Virginia, *Town Council Meeting | August 12, 2020*, at 47:24, YOUTUBE (Aug. 12, 2020), https://bit.ly/35p8eex.
[38]  Olivo & Miroff, *supra* note 37.
[39]  *Id.*
[40]  *Id.*
[41]  *Id.*

Arizona facility with lower populations.  For example, as of June 3, 2020, ICE Aurora Contract Detention Center (about 1,350 miles closer than Farmville) was at only 30 percent capacity.[42]

73.    Upon arrival at Farmville Detention Center, on June 2, 2020, a detainee was identified as having COVID-19 symptoms and taken to a nearby hospital.[43]  He tested positive for COVID-19.  Thereafter, all 74 of the transferred detainees were tested, and 51 of those detainees tested positive for COVID-19.[44]  While Defendant Crawford contends that these individuals did not interact with the rest of the general population,[45] they necessarily interacted with Farmville personnel who worked with other detainees at the facility.

74.    Indeed, ICA Defendants had not yet implemented a policy of "assigning [their] staff to the same dorms," over extended periods of time; they would not do so until 20 days later—and even then only when "practical."[46]  This means Farmville staff were free to move about the facility, likely spreading COVID-19 from the 74 "quarantined" transferees throughout the facility.[47]  Additionally, there were reports that other detainees had contact with the transferees, and Plaintiff Rivera Rodriguez encountered the transferees a few times at close quarters in the hallway before he contracted COVID-19.[48]

---

[42]  *See* U.S. House of Representatives, ICE Aurora Contract Detention Center Accountability Report Electronic Request 1 (June 3, 2020), https://bit.ly/33KfwXT (listing population of 450 detainees on June 3, 2020 at Aurora Contract Detention Center); The Geo Group, Inc., *Aurora ICE Processing Center*, https://bit.ly/3mHi7KT (last visited Sept. 18, 2020) (noting detainee capacity of 1532 at Aurora Contract Detention Center).

[43]  Crawford Decl. ¶ 30.

[44]  *Id.*

[45]  *Id.*

[46]  *Id.* ¶ 35.

[47]  *See* Suppl. Venters Decl., ECF No. 43-4 ¶ 13; CDC Inspection Report at 20–21 (recommending that Farmville staff "be assigned consistently to the same housing units over time to reduce the risk of transmission between housing units through staff movements").

[48]  CDC Inspection Report at 5 (noting that transferees were placed in dorms 1, 2, 5, and 9 before testing positive and noting that facility lockdown began on June 21, 2020); Exhibit D, Decl. of

75.     Nor are detainees at Farmville safe from infection by a virus that originates outside the facility itself, in light of the large number of staff, contractors, and vendors who come and go on a daily basis.  As of August 9, 2020, at least 28 Farmville employees had tested positive for COVID-19.[49]  Moreover, Farmville is not well equipped to contain the spread of, or to treat inmates or detainees sick with, a hyper-contagious infectious disease like COVID-19.  According to Farmville's Medical Director, although Farmville was initially capable of isolating a detainee in an isolation room as the need arose, there are not enough rooms currently to serve this purpose for all at-risk individuals or those with positive test results.[50]

76.     For all of these reasons, conditions at Farmville place immigrant detainees like Plaintiffs at risk of infection and severe illness and complications from COVID-19.  Like other detention facilities, Farmville is an enclosed environment in which contagious diseases spread quickly and easily.  Detainees live in close quarters and are subject to security measures that make it extremely difficult or impossible for them to take the precautionary steps that medical and public health officials recommend as a means of guarding against infection.  For example, the design and operation of Farmville is such that detainees are unable to practice effective (and necessary) social distancing.  Further, detainees are rarely let outside, and are instead confined indoors in a facility with inadequate ventilation.  Moreover, they have no control over the movements of the other detainees with whom they live in close proximity and share spaces and resources, or the guards and other staff at the facility who are themselves potential carriers of the virus.

---

Jorge Alexander Rivera Rodriguez ("Rivera Rodriguez Decl.") ¶ 9; *see also* Mica Rosenberg et al., *U.S. Immigration Officials Spread Coronavirus With Detainee Transfers*, REUTERS (July 17, 2020), https://reut.rs/31txvjS.

[49]  *See* CDC Inspection Report at 23.

[50]  Moore Decl. ¶ 13.

77.   <u>Reckless Use of Pepper Spray</u>.  In addition, on several occasions in June and July 2020—*during* the height of the COVID-19 outbreak at Farmville—ICA Defendants recklessly and irresponsibly used pepper spray on detainees, at a time when it was not reasonable and in amounts far greater than necessary, including when detainees were peacefully protesting the deplorable conditions to which Defendants were subjecting them.[51]  The use of pepper spray was unjustified, particularly given the outbreak, as use of pepper spray increases the risk of respiratory infection and damages the respiratory system.

78.   First, the use of pepper spray increases the risk of infection to COVID-19.  The reason is straightforward:  "[I]f you're irritating the respiratory system and there is coronavirus in that system, it could cause someone to cough and that would lead to spread of those droplets."[52]

79.   In addition, the use of pepper spray harms the respiratory system, which increases the risk of infection as well as the potential severity of pepper spray's impact on individuals already

---

[51]  *See, e.g., infra* ¶ 97 (Santos Garcia); ¶¶ 147–53, 165 (Castillo Gutierrez); ¶¶ 171–73 (Mbalivoto); ¶ 237 (Garcia Garcia); ¶¶ 252–57 (Rivera Rodriguez); ¶ 294 (Bazerashvili).  *Cf.* Crawford Decl. ¶¶ 34, 37, 44 (noting instances where pepper spray was used and Special Operations Unit was deployed).

[52]  Heidi Groover, *Public health officials worry tear gas, pepper spray could contribute to coronavirus spread as Seattle protests continue*, SEATTLE TIMES (Aug. 12, 2020), https://bit.ly/3jKKd5T (quoting Allison Agwu, an associate professor of adult and pediatric infection diseases at Johns Hopkins School of Medicine); *see also* Maanvi Singh, *Teargas and pepper spray will accelerate spread of COVID-19, doctors warn*, THE GUARDIAN (June 6, 2020), https://bit.ly/34N5Snz (quoting Dr. Peter Chin-Hong, an infectious disease physician, as explaining that pepper spray will "cause people to shout and scream, propelling droplets of these fluids—which could be carrying coronavirus—and giving them superpowers, to spread much farther than six feet" and that pepper spray can irritate the nose, mouth and lungs, causing inflammation that weakens the body's ability to resist infection); Will Stone, *Tear-gassing protestors during an infectious outbreak called 'a recipe for disaster,'* NPR (June 5, 2020) (quoting Dr. Amesh Adalja of Johns Hopkins University as explaining that "the body's reaction to the chemicals cause people to shed more of the virus" because "[i]f they're coughing, the particles will actually emanate and are projectiles that travel about 6 feet or so and could land on other people"), https://n.pr/2GEip52.

infected with COVID-19 and experiencing common symptoms such as shortness of breath.  Public health and infectious disease experts have warned that "any use of tear gas, smoke, or other respiratory irritants . . . could increase risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing."[53]

80.     These risks are even more acute when pepper spray is used in closed detention facilities with poor ventilation such as Farmville.[54]  "[V]entilation is naturally less" in "indoor environments" than "in outdoor environments," which means more people can be harmed with most severe effects.[55]  As the CDC has explained, if the "release of riot control agents," which is defined to include "pepper spray," "was indoors, get out of the building."[56]

---

[53]  *See Open letter advocating for an anti-racist public health response to demonstrations against systemic injustice occurring during the COVID-19 pandemic*, https://bit.ly/2Ilcq5t; *cf.* Joseph J. Hout et al., *O-chlorobenzylidene malononitrile (CS riot control agent) associated acute respiratory illnesses in a U.S. Army Basic Combat Training cohort*, 179 MIL. MED. 393 (July 2014) (U.S. Army recruits attending Basic Combat Training are more likely to suffer from "acute respiratory illnesses" after exposure to tear gas), https://bit.ly/36TbCyU; Nat'l Capital Poison Ctr., *How dangerous is pepper spray?*, https://bit.ly/34HkzIW ("[P]eople with lung conditions . . . can have more severe breathing effects when pepper spray is inhaled.").

[54]  *See* Exhibit E, Decl. of Ashley Warmeling, Managing Attorney, Capital Area Immigrants' Right Coalition ¶ 9 ("Several [of my] clients at Farmville have recently expressed increased concerns with improper ventilation over the past several days.  These clients have shared that there are extended periods of time in which there is no air movement, as if the air conditioning unit is broken.  This lack of air movement has made it difficult for clients to breathe, and increases their fears of contracting COVID-19 from other people in their dorm who are coughing and showing symptoms."); *see also infra* ¶ 200 (Miranda Sanchez) (describing issues with ventilation system); Exhibit F, Decl. of Gerson Amilcar Perez Garcia ("Perez Garcia Decl.") ¶ 17 (describing "waves of dust blown into [his] cell through the vents"); Exhibit G, Decl. of Victor Quintanilla Gallegos ("Quintanilla Gallegos Decl.") ¶ 36 (describing dorm as "hot, with no air circulation").

[55]  Nat'l Collaborating Ctr. for Environmental Health, *Pepper Spray in the Indoor Environment*, https://bit.ly/377wKSn.

[56]  CDC, *Facts about riot control agents—Interim document*, https://bit.ly/3nDskbu; *see* Nat'l Capital Poison Ctr., *supra* note 53 (instructing that if someone "has been exposed to pepper spray," they should "get fresh air immediately" and "start decontamination procedures").

81.     Detainees in Farmville are thus in the worst situation possible.  They are indoors, in poorly ventilated areas, with no chance to move to fresh air.

82.     <u>Limited Availability of Attorney-Client Communication</u>.  Since the beginning of the COVID-19 pandemic, Defendants have also used the pandemic as a justification to limit the availability of confidential attorney-client telephone calls to detainees, even while such telephone calls have become more important as attorneys are less willing or able to risk their own health and the health of their families to visit their detained clients in person.  Meanwhile, Defendants have also suspended in-person contact visitation between attorneys and detainees, such that the only in-person attorney visitation option is now a conversation through plexiglass under circumstances that make it impossible for attorneys and detainees to review documents together, and make it nearly impossible for attorneys who do not speak the same language as their detainee clients to use an interpreter.

83.     As a result, detainees, including Plaintiffs, have had to choose between waiting several days (or significantly longer) to talk to their lawyers, or speaking with their lawyers—including discussing highly sensitive facts regarding the basis of their immigration claims—by means of public telephones in the Farmville dorms, where other detainees can hear the contents of the communications.  *See* ECF No. 66-1 at 8 (photograph showing lack of privacy for telephones inside of dorms).

84.     For the purposes of this litigation, all Plaintiffs have had to call undersigned counsel from the phones in their dorms because of the lack of options for unmonitored, private attorney-client calls at Farmville.  Calls from dorms are not private, not always free of charge, and not reliable.  Any guards and other detainees near them are able to listen to Plaintiffs describing their underlying medical conditions, their fear of retaliation, details about their immigration cases and

asylum claims, details about their criminal history, and other confidential information that they may not want to disclose in the presence of others.  Phone calls from the dorms cut off after around thirty minutes, making it even more difficult to have conversations with detained individuals about sensitive information.

85.    In order to reach their clients, undersigned counsel have typically had to leave a message for Farmville staff to pass on to their clients to call them back.  Some Plaintiffs did not receive the undersigned counsel's requests to call them back for several days or at all.

86.    The consequence of waiting several days to speak with a lawyer can result in filing deadlines being missed and immigration court trials needing to be postponed, thus prolonging detention; while the consequence of having attorney-client calls from public telephones within the dorm can result in direct risks to detainees' physical safety due to other individuals and guards potentially overhearing sensitive, confidential information, such as information regarding their sexual orientation or gender identity, or their opposition to gangs or political parties.

III.   **DEFENDANTS HAVE ACTIVELY ENDANGERED PLAINTIFFS' HEALTH AND DENIED PLAINTIFFS ADEQUATE MEDICAL CARE**

A.    **Plaintiffs Were Exposed To And Contracted COVID-19 While In Defendants' Care**

87.    Because of Defendants' failure to take adequate precautions to avoid the spread of COVID-19, Plaintiffs and many of their fellow detainees were exposed to and contracted COVID-19 while detained at Farmville.  Thereafter, Defendants failed to provide them with sufficient medical care, and they suffered needlessly as a result.

88.    The Federal Defendants exposed Plaintiffs to COVID-19 by transferring 74 individuals into Farmville from other facilities with active COVID-19 cases, with actual knowledge or reckless disregard of the fact that they had not been tested for COVID-19; with actual knowledge or reckless disregard of the fact that that COVID-19 is a highly contagious, fatal

disease that can be present in and spread by asymptomatic individuals; with actual knowledge or reckless disregard of the fact that those individuals had not been fully isolated for two weeks prior to transfer; and with actual knowledge or reckless disregard of the fact that those individuals could not be adequately isolated at Farmville.

89.    Defendants were aware of and still did not address the deficiencies in medical care that Plaintiffs and other immigration detainees have been experiencing throughout the COVID-19 outbreak.

90.    The ICA Defendants exposed Plaintiffs to COVID-19 by accepting the transfer of 74 individuals into Farmville from other facilities with active COVID-19 cases, with actual knowledge or reckless disregard of the fact that they had not been tested for COVID-19; with actual knowledge or reckless disregard of the fact that that COVID-19 is a highly contagious, fatal disease that can be present in and spread by asymptomatic individuals; with actual knowledge or reckless disregard of the fact that those individuals had not been fully isolated for two weeks prior to transfer; and with actual knowledge or reckless disregard of the fact that those individuals could not be adequately isolated at Farmville.

91.    The ICA Defendants also failed to protect Plaintiffs from COVID-19 by not taking adequate steps to prevent the virus's spread within Farmville, such as by ensuring social distancing and providing detainees with sufficient PPE.

92.    The ICA Defendants and Armor failed to provide Plaintiffs and other immigration detainees with adequate medical care throughout the COVID-19 outbreak.

### 1.    Plaintiff Christian Alberto Santos Garcia

93.    Defendants have failed to provide Plaintiff Santos Garcia with adequate protection from COVID-19 and adequate medical care.

94.     As of July 15, 2020, the ICA Defendants had provided Plaintiff Santos Garcia with only two reusable cloth masks and one N95 mask since the outset of the COVID-19 crisis.  *See* Exhibit H, Decl. of Christian Alberto Santos Garcia ("Santos Garcia Decl.") ¶ 5.

95.     Throughout that same time, Plaintiff Santos Garcia could not practice social distancing, as he was housed in a dorm with 50 to 80 other individuals with poor ventilation. Santos Garcia Decl. ¶ 7.  He slept in a bunk bed just inches from his fellow detainees.  *Id.*

96.     On or around June 21, 2020, Plaintiff Santos Garcia became sick.  Santos Garcia Decl. ¶ 9.  He developed a fever, body aches, and pain, and was unable to sleep.  *Id.*  Plaintiff Santos Garcia reported these symptoms to Farmville personnel, but they failed to provide any medical care or COVID-19 testing.  *Id.* ¶ 10.  Instead, Farmville personnel told Plaintiff Santos Garcia that his dorm (No. 5) was "clean" from the COVID-19 virus.

97.     In or about that same week, during a routine security count of the detainees, Plaintiff Santos Garcia witnessed guards pepper spray detainees who were too weak to stand due to illness and exhibiting symptoms consistent with the known symptoms of COVID-19.  Santos Garcia Decl. ¶ 14.

98.     Plaintiff Santos Garcia requested medical care on or around June 21, 2020, when he first began experiencing COVID-19 symptoms, but he was refused care.  Santos Garcia Decl. ¶ 10.  He asked for medicine during a daily temperature screening, but did not receive it.  *Id.*  ICA Defendants continued to house Plaintiff Santos Garcia in close quarters with up to 80 of his fellow detainees, where, among other things, detainees sleep inches apart from one another.  *Id.* ¶¶ 7, 10.

99.     Late in the evening of June 23, 2020, approximately two days after he first developed COVID-19 symptoms, Plaintiff Santos Garcia received his first dose of Tylenol.  Santos Garcia Decl. ¶ 16.  The Tylenol did not relieve any of his symptoms.  *Id.*

100.     Also on June 23, 2020, a person who Plaintiff Santos Garcia understood to be an ICE official visited his dorm and spoke with the detainees.  Santos Garcia Decl. ¶ 17.  This official told Plaintiff Santos Garcia and others that everyone in the facility would probably be infected with COVID-19 but that this would not result in their release.  *Id.*

101.     On June 24 and 25, 2020, Plaintiff Santos Garcia continued to exhibit COVID-19 symptoms, including a fever, body pain, and headaches.  Santos Garcia Decl. ¶ 18.  Though he continued to receive Tylenol once every 12 hours, his condition did not improve.  *Id.*

102.     By June 26, 2020, Plaintiff Santos Garcia's symptoms had only worsened.  He continued to have a fever, body aches, and a headache.  Santos Garcia Decl. ¶ 19.  But he also developed a cough and had trouble breathing.  *Id.*  Yet he continued to receive only Tylenol, was never taken to see a doctor, did not receive medicine to help his cough, and did not have his oxygen levels monitored by staff despite his difficulty breathing.[57]

103.     On the morning of July 2, 2020, Plaintiff Santos Garcia, along with all of his fellow detainees in his dorm, was first tested for COVID-19—approximately 11 days after he started exhibiting symptoms.  Santos Garcia Decl. ¶¶ 20–21.  Farmville personnel did not indicate when the test results could be expected, nor did they explain what they planned to do when detainees tested positive.  By then, Plaintiff Santos Garcia's fever had abated, but he was still exhibiting COVID-19 symptoms, including cough, body pain, and trouble breathing.  *Id.* ¶ 20.

104.     On or about July 8, 2020, Plaintiff Santos Garcia was informed by Farmville personnel that he and his fellow detainees would not be provided the individual results of their COVID-19 tests.  Santos Garcia Decl. ¶ 22.  The same Farmville representative told Plaintiff

---

[57]  Others detainees have also reported that they received only Tylenol while suffering from serious COVID-19 symptoms.  Exhibit I, Decl. of Ismael Castillo Gutierrez ("Castillo Gutierrez Decl.") ¶ 13; Exhibit J, Decl. of Francois Toure ("Toure Decl.") ¶¶ 3, 9.

Santos Garcia that the majority of people in his dorm—Dorm 5—had tested positive.  *Id.*  Plaintiff Santos Garcia also learned that all but a few individuals tested positive in Dorm 4.  *Id.*; *see also* Toure Decl. ¶ 8 (all but "2 or 3 people" in Dorm 4 tested positive for COVID-19).

105.    That same day, Defendants stopped providing Tylenol or any other form of palliative care to Plaintiff Santos Garcia and his fellow detainees.  Santos Garcia Decl. ¶ 23.

106.    In an apparent change of direction, during the evening of July 9, 2020—a full week after Plaintiff Santos Garcia was tested for COVID-19—he received news from an ICE official that he had tested positive.  Santos Garcia Decl. ¶ 25.

107.    Plaintiff Santos Garcia continued to experience COVID-19 symptoms such as a cough and difficulty breathing until at least July 15, 2020.  Santos Garcia Decl. ¶ 27.

108.    Plaintiff Santos Garcia has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

### 2.    Plaintiff Santos Salvador Bolanos Hernandez

109.    Defendants have failed to provide Plaintiff Bolanos Hernandez with adequate protection from COVID-19 and adequate medical care.

110.    Plaintiff Bolanos Hernandez started feeling sick on or about June 20, 2020. Exhibit K, Decl. of Santos Salvador Bolanos Hernandez ("Bolanos Hernandez Decl.") ¶ 6.  He developed a headache, body aches, and a cough, and believed he had a fever.  *Id.*

111.    Plaintiff Bolanos Hernandez put in a sick request, but ICA Defendants and Armor did not send anyone to see him or give him medicine for two days.  Bolanos Hernandez Decl. ¶ 6.

112.    Around that same time, Plaintiff Bolanos Hernandez—who is housed in Dorm 1— witnessed many fellow detainees fall ill.  Bolanos Hernandez Decl. ¶ 6.  Others in his dorm were exhibiting even worse symptoms, such as vomiting and losing consciousness in addition to a

cough, fever, and body aches. *Id.* Despite this, Farmville staff delayed checking in on any of the detainees in Dorm 1 for days. *Id.*

113.    When Farmville staff finally attended to Plaintiff Bolanos Hernandez on June 22, they took his and others' temperature by lining them up and pressing their foreheads against a glass window without cleaning the glass between temperature readings. Bolanos Hernandez Decl. ¶ 7. Farmville staff told people in Plaintiff Bolanos Hernandez's dorm that they would come back later that day with medicine, but they did not. *Id.*

114.    That same day, some individuals in Plaintiff Bolanos Hernandez's dorm refused to stand up for their daily count because people were getting sick, were not provided testing or medication, and were not given any information about COVID-19. Bolanos Hernandez Decl. ¶¶ 9–10. Plaintiff Bolanos Hernandez witnessed guards with guns entering his dorm and "set[ting] off some kind of a bomb at the entrance of the dorm." *Id.* The guards then took a group of people out of the dorm and gave a disciplinary complaint to anyone who wanted to go to the bathroom. *Id.* The following day, guards did not allow Plaintiff Bolanos Hernandez and others in his dorm to use the microwave, watch TV, or use phones, even to call their attorneys. *Id.* ¶ 11.

115.    When Farmville staff finally started to give detainees in Dorm 5 medicine, "all they gave everyone was Tylenol." *Id.* ¶ 5.

116.    Plaintiff Bolanos Hernandez was not tested for COVID-19 until early July. Bolanos Hernandez Decl. ¶ 12. On July 14, he received a notice that his test results were still pending. *Id.* He was tested again on July 16. *Id.*

117.    While he awaited his test results for COVID-19, Plaintiff Bolanos Hernandez started working in the kitchen and witnessed symptomatic people working in the kitchen. Bolanos Hernandez Decl. ¶¶ 8, 13.

118. In early August, a doctor told Plaintiff Bolanos Hernandez that he had not tested positive for COVID-19. Exhibit L, Suppl. Decl. of Santos Salvador Bolanos Hernandez ("Bolanos Hernandez Suppl. Decl.") ¶ 2.

119. However, as late as August 8, 2020, Plaintiff Bolanos Hernandez continued to suffer from headaches and tooth pain, which he did not have before he experienced COVID-19 symptoms. Bolanos Hernandez Suppl. Decl. ¶ 4; *see also* Bolanos Hernandez Decl. ¶ 14.

120. Throughout the COVID-19 pandemic, Plaintiff Bolanos Hernandez and others in his dorm have not been able to practice social distancing because of the way their dorm is set up and the close proximity of their beds. Bolanos Hernandez Suppl. Decl. ¶ 6; Bolanos Hernandez Decl. ¶ 15. The bunk beds are secured to the floor and cannot be moved. Bolanos Hernandez Suppl. Decl. ¶ 6. As of August 8, 2020, there were six people sleeping in his bed and there had not been any reassignments. *Id.* The beds that were empty were because people had left and the beds had not been filled with new people. *Id.* Detainees generally do not wear masks in the dorms. Bolanos Hernandez Decl. ¶ 16.

121. Plaintiff Bolanos Hernandez has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

### 3. Plaintiff Gerson Amilcar Perez Garcia

122. Defendants failed to provide Plaintiff Perez Garcia with adequate protection from COVID-19 and adequate medical care.

123. On June 18, 2020, Plaintiff Perez Garcia developed a bad headache. Perez Garcia Decl. ¶ 3. He requested medical attention, but Farmville staff refused to provide it.

124. By June 20, 2020, Plaintiff Perez Garcia's headache was worse, and he developed a fever, sore throat, persistent cough, body aches, and chills. Perez Garcia Decl. ¶ 3.

125.    He did not receive medical attention until June 22, 2020, when Farmville staff took his temperature and gave him Tylenol twice a day and a few pills for his cough.  Perez Garcia Decl. ¶ 4.  The Tylenol only temporarily reduced Plaintiff Perez Garcia's fever; it, along with body pains, continued to return as the Tylenol wore off.  *Id.*

126.    Plaintiff Perez Garcia began experiencing diarrhea on June 25, 2020, which continued for approximately 10 days.  Perez Garcia Decl. ¶ 4.  Around this time, he also lost his sense of smell and taste.  *Id.*  On June 26, 2020, he had a 105-degree fever.  *Id.* ¶ 5.  A few days later, he had a 102-degree fever.  *Id.*  He continued to have a cough, pain in his back where his lungs are located, trouble breathing, and nausea.  *Id.*  He also felt incredibly weak.  *Id.*

127.    Farmville staff failed to give Plaintiff Perez Garcia a COVID-19 test for days; instead they kept him in his dorm—Dorm 5—with 50 to 80 people, nearly all of whom were sick, for about six days.  Perez Garcia Decl. ¶ 6.

128.    Farmville staff moved Plaintiff Perez Garcia into isolation on June 24, 2020.  Perez Garcia Decl. ¶¶ 2, 7.  But he wasn't even truly isolated.  *Id.* ¶ 7.  Instead, Farmville staff placed Plaintiff Perez Garcia in a room with another man who was even sicker than Plaintiff Perez Garcia. *Id.*  This individual had a worse cough, and he did not cover his mouth when he coughed.  *Id.*  This scared Plaintiff Perez Garcia.  *Id.*

129.    Plaintiff Perez Garcia was finally tested for COVID-19 on June 26, 2020, approximately eight days after he started showing symptoms.  Perez Garcia Decl. ¶ 7.

130.    Plaintiff Perez Garcia faced horrible conditions in isolation.  His cellmate coughed throughout the night and wheezed a lot.  Perez Garcia Decl. ¶ 8.  His cellmate was so sick that he would sometimes cry throughout the night.  After hearing his cellmate struggle to breathe, Plaintiff

34

Perez Garcia sometimes thought that his cellmate was about to die—this made Plaintiff Perez Garcia nervous and scared.  *Id.*

131.   Farmville staff only gave Plaintiff Perez Garcia and his cellmate Tylenol and two blue pills for their cough.  Perez Garcia Decl. ¶ 9.  This did not help.  *Id.*  Plaintiff Perez Garcia continued to have breathing issues while in isolation.  *Id.* ¶ 10.

132.   Farmville staff gave Plaintiff Perez Garcia a brown-colored pill for about two days, but he did not know what this pill was for, and they stopped giving it to him even though his symptoms did not improve.  Perez Garcia Decl. ¶ 14.  For his diarrhea, Farmville staff gave Plaintiff Perez Garcia Gatorade approximately two times to treat dehydration, even though he had persistent diarrhea throughout his sickness.  *Id.*

133.   On June 30, 2020, Farmville staff took Plaintiff Perez Garcia's cellmate to the hospital.  Perez Garcia Decl. ¶ 11.  The same day, Plaintiff Perez Garcia learned he had tested positive for COVID-19.  *Id.*  Farmville staff refused Plaintiff Perez Garcia's request to be taken to the hospital.  *Id.* ¶¶ 12–13.

134.   Thereafter, Farmville staff barely monitored Plaintiff Perez Garcia, despite isolating him and despite his positive test.  After June 29, 2020, Farmville staff only gave him medicine and checked on him once a day.  Perez Garcia Decl. ¶ 13.

135.   Also on June 29, 2020, Plaintiff Perez Garcia put in a sick request to talk to a psychologist because he was feeling hopeless.  Perez Garcia Decl. ¶ 19.  Farmville staff did not allow him to see a psychologist.  *Id.*

136.   One evening during his stay in isolation, Plaintiff Perez Garcia felt like he could not breathe for approximately one hour.  Perez Garcia Decl. ¶ 15.  He panicked, and he screamed to the guards for help while banging on the window of his cell.  *Id.*  He did this for about 10 minutes

when he became so exhausted he had to stop.  *Id.*  Screaming like this made his breathing worse.  *Id.*  Farmville staff never responded to Plaintiff Perez Garcia's pleas for help.  *Id.* ¶ 16.

137.    Even when Plaintiff Perez Garcia could speak to the guards, it was not possible to communicate effectively because the guards did not speak Spanish and could not understand him.  Perez Garcia Decl. ¶ 16.

138.    While in isolation, Plaintiff Perez Garcia was denied soap, and so he could not wash his hands.  Perez Garcia Decl. ¶ 17.  He also was forced to go four days without a shower.  *Id.*

139.    Plaintiff Perez Garcia also struggled with severe nausea and for many days was unable to keep much food in his system.  Perez Garcia Decl. ¶ 18.  He has lost forty pounds since he first got sick.  *Id.*

140.    Plaintiff Perez Garcia's symptoms continued for approximately two weeks.  Perez Garcia Decl. ¶ 13.

141.    On July 9, 2020, Plaintiff Perez Garcia was released from isolation and returned to Dorm 5.  Perez Garcia Decl. ¶ 2.  As of July 15, 2020, although he no longer had a fever, cough, or diarrhea, Plaintiff Perez Garcia continued to suffer from extreme weakness.  *Id.* ¶ 13.

142.    On July 30, 2020, an immigration judge granted Plaintiff Perez Garcia asylum.  He was released from ICE custody the following day.

143.    Since being granted asylum and released from detention, Plaintiff Perez Garcia continues to suffer trauma and emotional distress from his experience at Farmville.  He often wakes in the middle of the night, breathing heavily, as a result of the trauma and emotional distress he experienced while detained at Farmville.

### 4.    Plaintiff Ismael Castillo Gutierrez

144.    Defendants failed to provide Plaintiff Castillo Gutierrez with adequate protection from COVID-19 and adequate medical care.

145.     While he was detained at Farmville, Plaintiff Castillo Gutierrez was housed in Dorm 7 with about 34 other detainees.  Castillo Gutierrez Decl. ¶ 4.  He could not practice social distancing because the detainees in Dorm 7 lived very close together and slept shoulder-to-shoulder in bunk beds with eight people.  *Id.* ¶ 12.  He received a mask, but he reported that many detainees did not use the masks unless they were going to court.  *Id.* ¶ 11.

146.     Plaintiff Castillo Gutierrez started to feel sick on or about June 30, 2020.  *See* Castillo Gutierrez Decl. ¶ 5.  He developed a fever, body aches, and lost his senses of taste and smell.  *Id.* ¶ 8.  He could not sleep because every position he laid in hurt.  *Id.*

147.     On July 1, 2020—shortly after he became ill and before he was tested for COVID-19—Plaintiff Castillo Gutierrez was present when guards attacked detainees with pepper spray during morning count.  Castillo Gutierrez Decl. ¶ 15.  Some of the detainees had decided to talk to the chief commander to ask for better conditions, more medication, and an explanation of what was happening inside the facility.  *Id.*  The detainees were feeling sick, had not been tested for COVID-19, and did not know what was going on.  *Id.*[58]

148.     Plaintiff Castillo Gutierrez was in bed because he felt sick, but he saw what happened.  Castillo Gutierrez Decl. ¶ 15.  After the detainees confronted the chief commander, he left and came back with more guards.  *Id.*  The guards aggressively started to tell people to go back to their beds.  *Id.*  Someone in the dorm said "violence is not going to fix anything."  *Id.*  He then heard that the guards got approval that they could use pepper spray.  *Id.*

---

[58] *See also* Rivera Rodriguez Decl. ¶¶ 10–14 (describing deployment of pepper spray by Farmville's Chief Commander in response to detainees' expression of concerns about COVID-19 and peaceful refusal to return to their bunks where they would be inches apart from one another).

149.    The guards then proceeded to pepper spray the detainees.  Castillo Gutierrez Decl. ¶ 15.  "The pepper spray started coming out in a gush that did not stop."  Exhibit M, Suppl. Decl. of Ismael Castillo Gutierrez ("Castillo Gutierrez Suppl. Decl.") ¶ 13.  Plaintiff Castillo Gutierrez believes that the guards used about four cans of pepper spray.  Castillo Gutierrez Decl. ¶ 16.  He also believes there was a camera that recorded everything that happened.  *Id.* ¶ 15.

150.    Although Plaintiff Castillo Gutierrez was in his bed, he felt the effects of the pepper spray, which spread throughout the dorm.  Castillo Gutierrez Decl. ¶ 17.  His chest hurt because of the spray, and he had to put water on his face to relieve the stinging.  *Id.*

151.    One person fainted due to the pepper spray.  Castillo Gutierrez Decl. ¶ 16.  The guards had to take him to the clinic and brought him back about two hours later.  *Id.*

152.    About 14 people were taken to isolation because when guards were pepper spraying them, they held up chairs to protect themselves.  Castillo Gutierrez Decl. ¶ 18.  As of July 16, 2020, they were still isolated, and the guards said they would not bring them back.  *Id.*

153.    To be clear, the guards were the ones who started the violence.  Castillo Gutierrez Suppl. Decl. ¶ 13.  "The people who the guards said were violent were crying for help," and "were chained and taken away as the pepper spray burned their faces."  *Id.*

154.    Plaintiff Castillo Gutierrez felt as though the guards were trying to intimidate him and fellow detainees.  Castillo Gutierrez Decl. ¶ 20.  A guard once told Plaintiff Castillo Gutierrez that he had no rights in detention.  *Id.*  He just wanted this intimidation to stop.  *Id.*

155.    In the days that followed this confrontation, Plaintiff Castillo Gutierrez continued to exhibit symptoms of COVID-19.  However, he was not tested for COVID-19 until July 4, 2020—at least four days after he began to experience symptoms—when he was tested along with all of the other detainees in his dorm.  Castillo Gutierrez Decl. ¶ 5.

156.    On July 7, 2020, he learned that he and everyone in his dorm had tested positive for COVID-19. *Id.*

157.    For about six days, Plaintiff Castillo Gutierrez received Tylenol twice a day to treat his COVID-19 symptoms.  Castillo Gutierrez Decl. ¶ 13.  However, the infirmary stopped giving him Tylenol on July 15, 2020 because they said his treatment had ended, even though he was still experiencing a lot of pain and having trouble sleeping because of the pain.  *Id.* ¶ 14.

158.    As of July 16, 2020, Plaintiff Castillo Gutierrez no longer had a fever, but he still had pain in his knees, headaches, stomach aches, and trouble sleeping.  Castillo Gutierrez Decl. ¶ 10.  He did not have these issues before he contracted COVID-19.  *Id.*  He still had not recovered his senses of taste and smell, and he had lost about 12 pounds since he became ill with COVID-19.  *Id.* ¶¶ 8–9.

159.    As of July 16, 2020, other detainees in Plaintiff Castillo Gutierrez's dorm were still sick and exhibiting COVID-19 symptoms.  Castillo Gutierrez Decl. ¶¶ 8–9.  Some were still coughing, and some still had headaches and body aches.  *Id.*

160.    Though Plaintiff Castillo Gutierrez's symptoms initially improved by the middle of July, he continued to experience COVID-19 symptoms through August.  Castillo Gutierrez Suppl. Decl. ¶ 4.  On August 4, 2020, he had diarrhea, nausea, and headaches.  *Id.*

161.    On August 5, 2020, Plaintiff Castillo Gutierrez experienced chest pain and had trouble breathing.  Castillo Gutierrez Suppl. Decl. ¶ 5.  He felt afraid to fall asleep because he thought he was going to asphyxiate.  *Id.*

162.    At this time, Plaintiff Castillo Gutierrez had lost his appetite and was eating only once a day.  Castillo Gutierrez Suppl. Decl. ¶ 5.

163.    On August 7, 2020, Plaintiff Castillo Gutierrez went to the doctor.   Castillo Gutierrez Suppl. Decl. ¶ 6.  He asked for help gaining weight, but the doctor gave him only Pepto Bismol and acetaminophen.  *Id.*  He received the same medications on August 8, 2020.  *Id.* ¶ 7.

164.    Plaintiff Castillo Gutierrez remained in his dorm with other detainees for the entire time he experienced COVID-19 symptoms.  Castillo Gutierrez Suppl. Decl. ¶ 9.  At the same time, he continued to witness other individuals in his dorm suffering COVID-19 symptoms, including body aches, headaches, and chest pain.   *Id.*   Some of these individuals were provided acetaminophen by Farmville, but others had to purchase it from the commissary.  *Id.*

165.    On August 8, 2020, Plaintiff Castillo Gutierrez learned that James Hill, a Canadian man who had been housed in Castillo Gutierrez's dorm, had died due to COVID-19.  *See* Castillo Gutierrez Suppl. Decl. ¶ 13.  Mr. Hill was part of the group of people who talked to the guards during the July 1, 2020 protest.  *Id.*  The day after guards attacked the detainees with pepper spray, Mr. Hill was taken to the hospital.  *Id.*  He returned a few days later but was subsequently removed from the dorm again.  *Id.*  News reports indicate that pepper spray contributed to James Hill's symptoms and death.  "The doctor had told [Hill] his difficulty breathing and fatigue was likely caused by pepper-spray exposure or COVID-19 or both, [Hill] told [his family]."[59]

166.    While most of Plaintiff Castillo Gutierrez's symptoms have subsided, he continues to have frequent headaches.

167.    On August 25, 2020, an immigration judge granted Mr. Castillo Gutierrez asylum and he was released from ICE custody.

---

[59]  Mica Rosenberg, *Special Report: Almost Home – COVID-19 Ensnares Elderly ICE Detainee from Canada*, REUTERS (Aug. 14, 2020), https://reut.rs/3o2fyUm.

5.      **Plaintiff Didier Mbalivoto**

168.    Defendants failed to provide Plaintiff Mbalivoto with adequate protection from COVID-19 and adequate medical care.  Plaintiff Mbalivoto recalls first hearing about COVID-19 in April 2020.  He and other detainees asked for masks at that time, but only received masks in mid-May.  The first masks they were issued were so thin and fragile that they became quickly worn out after repeated wear.  At that time, Plaintiff Mbalivoto was held in Dorm 7 along with anywhere from 50 to 60 other detainees, in bunk beds joined together at the feet.  Plaintiff Mbalivoto recalls routinely feeling the breath of fellow detainees on him as he lay in bed.

169.    Despite Plaintiff Mbalivoto's repeated entreaties, the guards would give detainees no information other than vague assurances that there was no virus inside Farmville.  As late as the end of June 2020, when Plaintiff Mbalivoto and other detainees asked about quarantine, they were told that it was simply precautionary.

170.    On July 1, 2020, several detainees in Dorm 7 did not want to return to their bunks for the 10:30 a.m. count because they wanted ICE to come and speak to them and to tell them what was going on.  The communication between the guards and other detainees was in Spanish, which Plaintiff Mbalivoto does not speak, but he was told that the detainees were asking the guards for medical attention, to test them for COVID-19, to take their daily temperature, and to give them more information.  Plaintiff Mbalivoto observed from his bunk as several other detainees refused to return to their bunks and instead remained seated in a form of protest until ICE came to give them more information about COVID-19.

171.    Several guards then entered into Dorm 7 and began spraying pepper spray or some similar chemical agent directly into the faces of the detainees who refused to return to their bunks.  The chemical spray began to fill the dorm, and Plaintiff Mbalivoto started to gasp for air.  His chest was in pain and his throat and eyes were burning.  He was particularly scared because of his

41

medical history, including respiratory issues and lung infection.  He tried covering his face and left his bunk to head to the bathroom to get water to help himself breathe.

172.    As soon as Plaintiff Mbalivoto stepped down from his bunk, a guard grabbed him. Plaintiff Mbalivoto tried to explain to the guard that he was sick and was not breathing well.  His eyes and throat were burning and he said, "let me breathe, do not handcuff me," but several guards pinned him to the wall and pressed handcuffs against his wrists so tightly that he started crying out in pain, leaving marks that lasted for several weeks.

173.    For leaving his bunk to get water during the pepper spray incident, Plaintiff Mbalivoto was charged with conduct that disrupts or interferes with the security or orderly running of the facility.  He was placed in administrative segregation, with six other detainees, as punishment.  For the first 10 days, the cell had no beds and the detainees had to sleep on very thin mattresses next to each other.  The toilets in the room were leaking, and when the detainees had to use them, they would end up stepping into, and leaving marks from, the dirty water on the same floor where they slept.  Only about 10 days later did the detainees, including Plaintiff Mbalivoto, finally get foldable beds.

174.    On or around July 3, 2020, Plaintiff Mbalivoto was tested for COVID-19, but he never received the results from that test.  He was tested again on or about July 13 or 14, while his hands were cuffed behind his back and chained to his waist and ankles.  On July 15, 2020, Plaintiff Mbalivoto was transferred to a different segregation cell.

175.    The following day, on July 16, 2020, Plaintiff Mbalivoto woke up dizzy with a sore throat, headache and body pain.  Later that day, he learned that he had tested positive for COVID-19.  That evening, when a nurse came to give Plaintiff Mbalivoto his medication for anxiety and depression, he asked what would be done about his COVID-19 diagnosis, to which the nurse

replied, "you are okay, there is no treatment." That same day, a doctor checked Plaintiff Mbalivoto's breathing with a stethoscope—one of only two times during his entire experience with COVID-19 in Farmville that anyone checked on his respiratory system.

176. On July 17, 2020, Plaintiff Mbalivoto was feeling even worse and asked to speak to the doctor. He was told it was too late and that he could see a doctor on Monday, July 20. On July 20, Plaintiff Mbalivoto was told the doctor was not available.

177. On July 21, 2020, Plaintiff Mbalivoto was still feeling sick and put in a sick call asking to see the doctor for a headache, sore throat, and nasal congestion. Later that day, he also told a nurse that he was having stomach problems and diarrhea. From around July 21 through July 24, Plaintiff Mbalivoto reminded Farmville staff every day that he was sick and had placed a sick call, but he received only vitals checks. He was told that the medical staff was overwhelmed and was two or three days behind on the schedule to see detainees. Only on the evening of July 24 did a nurse see Plaintiff Mbalivoto and write him a new prescription.

178. Plaintiff Mbalivoto was eventually transferred to the medical unit to receive care for his escalating depression and anxiety. He would continue to be handcuffed whenever he stepped outside of his room, and he was only allowed to make ten minutes' worth of calls.

179. Throughout his time in detention, Plaintiff Mbalivoto suffered from, *inter alia*, a lung infection, bronchitis, post bronchitis syndrome, an ulcer, anxiety and depression, loss of appetite, sleeplessness, and respiratory issues. Because of his medical history, Mr. Mbalivoto is particularly vulnerable to serious complications from COVID-19.

180. On August 20, 2020, Plaintiff Mbalivoto was released from Farmville. Since his release, Plaintiff Mbalivoto has experienced persistent headaches, weakness, and fatigue. He frequently spends most of his day in bed, rising only to eat, use the restroom, or read, and promptly

returning to bed thereafter.  Routine physical activity now leads to overexertion.  Once a week, Plaintiff Mbalivoto takes a 30-minute walk and falls asleep as soon as he gets home.  He has also developed routine abdominal discomfort and lower back pain.

181.    Plaintiff Mbalivoto, who had been an Information Technology professional abroad, has also experienced cognitive impairment, including memory lapses, cloudiness in his thinking, and difficulty processing information when he tries to read or focus.  His sleep remains fitful as he often dreams that he is still detained and suffering in Farmville.

### 6.    Plaintiff Frank Odin Souza Bauer

182.    Defendants failed to provide Plaintiff Souza Bauer with adequate protection from COVID-19 and adequate medical care.

183.    Plaintiff Souza Bauer tested positive for COVID-19 towards the end of July 2020. Exhibit N, Decl. of Frank Odin Souza Bauer ("Souza Bauer Decl.") ¶ 10.

184.    On June 22, 2020, Plaintiff Souza Bauer began exhibiting signs of COVID-19 infection.  Souza Bauer Decl. ¶ 5.  He requested medical assistance after getting a mild headache that day but was ignored.  *Id*.  Over the next 24–48 hours, his headache worsened, and he experienced a severe cough, body aches, loss of taste and smell, and fatigue.  *Id*. ¶ 6.  He placed another sick call request asking for medication.  *Id*.  Instead of providing medication to relieve some of his symptoms, a nurse refused to even provide him with Tylenol at the time.  *Id*.

185.    Nearly everyone in Plaintiff Souza Bauer's dorm, Dorm 5, was infected with COVID-19 and most were symptomatic.  Souza Bauer Decl. ¶ 8.  People in his dorm were so sick that they fell to the floor and had to be removed to the medical unit or to the hospital.  *Id*.  The one person in Plaintiff Souza Bauer's dorm who tested negative for COVID-19 remained in the dorm for several weeks before being moved to another dorm.  *Id*. ¶ 9.

186.     The facility eventually began providing Plaintiff Souza Bauer with Tylenol and cough medicine.  Souza Bauer Decl. ¶ 7.  When he asked for more medication because of the severity of his symptoms, the medical staff ignored him.  *Id.*  Plaintiff Souza Bauer lost 15 pounds in two weeks.  *Id.*

187.     Plaintiff Souza Bauer continues to have symptoms and complications from COVID-19.  He suffers from recurring headaches, chest pain, and fatigue.  Souza Bauer Decl. ¶ 12.  In August 2020, he placed a sick call request because he felt fluids in his ear.  *Id.* ¶ 13.  The doctor and the nurse recommended different medications, neither of which helped him.  *Id.*

188.     Around five years ago, Plaintiff Souza Bauer was diagnosed with sleep apnea.  Souza Bauer Decl. ¶ 14.  Almost every night, he wakes up in the middle of the night gasping for air, gets dizzy, and then falls back asleep.  *Id.*  While he was detained at Caroline Detention Facility, his sleep apnea caused a near-death incident—he became unconscious in his sleep and left alone in a cell for hours.  *Id.* ¶ 16.

189.     Plaintiff Souza Bauer requires a Continuous Positive Airway Pressure ("CPAP") machine in order to treat his sleep apnea, but despite his repeated attempts for Farmville to provide him with a CPAP machine, he was never provided one.  Souza Bauer Decl. ¶¶ 17–18.

190.     While he was detained at Farmville, Plaintiff Souza Bauer witnessed Farmville officers and medical staff not wearing masks and proper PPE when interacting with detainees.  Souza Bauer Decl. ¶¶ 18–19.

191.     On September 14, 2020, Plaintiff Souza Bauer wrote a letter to Judge Brinkema explaining the "most inhumane psychological torture, physical pain and suffering" he experienced as a result of contracting COVID-19 while detained at the Farmville Detention Center.  Souza Bauer Letter, ECF No. 94 ¶¶ 3–4.  As a result, Plaintiff Souza Bauer stated that he has elected to

forgo his immigration case in order to have a fighting chance to survive and see his four U.S. citizen children grow up from abroad.

192.    Plaintiff Souza Bauer was deported to Bolivia on October 13, 2020.  Souza Bauer Decl. ¶ 1.

### 7.    Plaintiff Marco Antonio Miranda Sanchez

193.    Defendants have failed to provide Plaintiff Miranda Sanchez with adequate protection from COVID-19 and adequate medical care.

194.    Plaintiff Miranda Sanchez first began experiencing COVID-19 symptoms around June 25, 2020.  He had severe symptoms, including headaches, body aches, including in his chest, kidneys, and lungs, difficulty breathing, congestion, pneumonia, diarrhea, and fever.  Exhibit O, Decl. of Marco Antonio Miranda Sanchez ("Miranda Sanchez Decl.") ¶ 5.  Plaintiff Miranda Sanchez also had fluid in his lungs and ears.  *Id*. ¶ 6.  At the time, Plaintiff Miranda Sanchez was detained with around 70 other people in Dorm 5.  *Id*. ¶ 7.

195.    At the time, Plaintiff Miranda Sanchez was only provided Tylenol, a pill for congestion, and Gatorade.  Miranda Sanchez Decl. ¶ 6.  He tested positive for COVID-19 on July 5, 2020.  *Id.* ¶ 8.

196.    Plaintiff Miranda Sanchez has experienced severe complications from COVID-19, coming close to death on a recent occasion.  Around August 12, 2020, Plaintiff Miranda Sanchez woke up in the middle of the night soaking in sweat.  Miranda Sanchez Decl. ¶ 9.  He felt some liquid in his throat, was severely congested, and had difficulty breathing.  *Id.*  One of his bunkmates later told him that it looked like he was trying to scream but he could not get his voice out.  *Id.* After repeated attempts to breathe, he was finally able to take a deep breath and blew out all of the air that he could.  *Id.*  He continued to feel congested and felt liquid in his throat.  *Id.*  Around 3:30 a.m., he was able to go back to sleep, worried that he may die before he woke up that morning.  *Id.*

197.    Plaintiff Miranda Sanchez and his immigration attorney made repeated requests to Defendants ICA and ICE to have his lungs and respiratory system evaluated, but all the facility did in the aftermath of his near-death experience was check his temperature and oxygen levels. Miranda Sanchez Decl. ¶¶ 10–11.  When Plaintiff Miranda Sanchez advocated for his own health and pleaded to have the medical staff to evaluate him, a guard told him that if he was so afraid of dying, he needs to see a psychologist, not a doctor.  *Id.* ¶ 10.

198.    Plaintiff Miranda Sanchez continues to suffer from COVID-19 symptoms, including pain in his chest, lungs, and kidneys, and frequent diarrhea.  Miranda Sanchez Decl. ¶ 12.  Farmville staff has not tested him for COVID-19 since his test in early July, and Plaintiff Miranda Sanchez is worried that he may still have COVID-19.  *Id.*

199.    Plaintiff Miranda Sanchez also suffers from other medical issues that are being exacerbated by the inadequate medical care he is receiving at Farmville.  In 2011, Plaintiff Miranda Sanchez was violently assaulted, and he has since experienced skeletal pain, headaches, problems with his vision, and anxiety.  Miranda Sanchez Decl. ¶ 19.  He receives several medications for his conditions, including medication for sleeping and managing stress.  *Id.* ¶ 13.  From October 11 to October 15, 2020, Plaintiff Miranda Sanchez was not provided his sleep and stress medications, and as a result, he had difficulty sleeping for four nights.  *Id.*

200.    Prior to his detention, Plaintiff Miranda Sanchez had worked on air conditioning maintenance and duct cleaning.  Miranda Sanchez Decl. ¶ 14.  He has reported problems with the ventilation system at Farmville because the heating, ventilation, and air conditioning ("HVAC") system is dirty and the facility does not adequately clean the system.  *Id.*  Improper cleaning and maintenance of the HVAC system can exacerbate and contribute to medical conditions, including COVID-19 infections.

201.    Plaintiff Miranda Sanchez has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

### 8.    Plaintiff Melvin Ivan Velasquez Orellana

202.    Defendants have failed to provide Plaintiff Velasquez Orellana with adequate protection from COVID-19 and adequate medical care.

203.    In June 2020, Plaintiff Velasquez Orellana began experiencing COVID-19 symptoms.  Exhibit P, Decl. of Melvin Ivan Velasquez Orellana ("Velasquez Orellana Decl.") ¶ 7. At the time, there were nearly 90 people in his dorm.  *Id*. ¶ 8.

204.    On the morning of June 23, 2020, Plaintiff Velasquez Orellana passed out in his dorm.  Velasquez Orellana Decl. ¶ 9.  He had a severe fever of 108 degrees and intense body aches. *Id*.  Prior to passing out, he had requested Tylenol to bring his fever down, but he was told to wait until the nurse is ready to give him medication.  *Id*.

205.    Plaintiff Velasquez Orellana was taken to one of the medical rooms, and then transferred to the processing unit for isolation.  Velasquez Orellana Decl. ¶ 10.  Even though the processing unit is not meant for medical isolation, Plaintiff Velasquez Orellana was placed there with three other people who were also sick with COVID-19.  *Id*.  They all had to put their beds together and even then, there was no space to even walk around.  *Id*.

206.    After seven days in the processing unit, Plaintiff Velasquez Orellana was finally tested for COVID-19 on July 1, 2020, and the test results came back positive.  Velasquez Orellana Decl. ¶ 7.

207.    Plaintiff Velasquez Orellana remained in the processing unit for two weeks and was then moved to medical isolation for another two weeks.  Velasquez Orellana Decl. ¶ 10.  He was then taken back to his dorm around July 20, 2020.  *Id*.

208.    Despite his severe symptoms, Plaintiff Velasquez Orellana was only provided with Tylenol and pills for congestion.   Velasquez Orellana Decl. ¶ 11.   Upon his request, he was provided with vitamins, but only for two weeks.  *Id.*

209.    Plaintiff Velasquez Orellana continues to suffer from COVID-19 symptoms and complications from his COVID-19 infection, including headaches, dizziness, and memory loss. Velasquez Orellana Decl. ¶ 12.

210.    Plaintiff Velasquez Orellana has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

**9.     Plaintiff Olaitan Michael Olaniyi**

211.    Defendants have failed to provide Plaintiff Olaniyi with adequate protection from COVID-19 and adequate medical care.

212.    Plaintiff Olaniyi tested positive for COVID-19 around June 24, 2020, and again around July 24, 2020.  Exhibit Q, Decl. of Olaitan Michael Olaniyi ("Olaniyi Decl.") ¶ 4.   There were around 60 people detained in his dorm at the time, with almost everyone exhibiting symptoms and later testing positive.  *Id.*

213.    Plaintiff Olaniyi continues to suffer from COVID-19 symptoms and complications, including fatigue, body pain, headaches, difficulty breathing, and memory loss.  Olaniyi Decl. ¶¶ 6–7.  His memory loss is affecting his daily functioning.  *Id.* ¶ 7.  Up until now, he has only been provided with Tylenol and ibuprofen for his symptoms.  *Id.* ¶ 6.

214.    In addition to medical issues stemming from his COVID-19 infection, Plaintiff Olaniyi has several other health conditions for which he is not being provided proper care and treatment.  He is not being given any treatment for his liver disease and anemia.  Olaniyi Decl. ¶ 8.

215.    Plaintiff Olaniyi has also been prescribed medication for his thyroid condition, which he must take on an empty stomach.  *Id.* ¶ 9.  The facility has refused to provide him with

his medication between the time that he wakes up and before he eats his first meal, which he must do in order for the medication to be effective. *Id*. When Plaintiff Olaniyi raised concerns with the facility about this issue, a nurse attempted to intimidate Plaintiff Olaniyi into signing a form stating that he has refused to take his medication. *Id*. He refused to do so and was given an incident report, which was later dismissed. *Id*. Despite the dismissal of the incident report, Farmville medical staff continue to provide Plaintiff Olaniyi with the medication at the wrong time. *Id*.

216.    Plaintiff Olaniyi has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

### 10.    Plaintiff Shawn Houslin

217.    Defendants have failed to provide Plaintiff Houslin with adequate protection from COVID-19 and adequate medical care. Around March 2020, Plaintiff Houslin began developing an intense cough, causing pain in his chest, making it difficult for him to breathe. Exhibit R, Decl. of Shawn Houslin ("Houslin Decl.") ¶ 6. He also experienced other complications, including difficulty eating, drinking, and sleeping; coughing up blood; cold and hot sweats; nasal congestion; and headaches. *Id*. Despite his sick call requests to be tested for COVID-19, Farmville staff did not test Plaintiff Houslin at the time. *Id*.

218.    In June 2020, Plaintiff Houslin began developing more severe COVID-19 symptoms, including headaches, vomiting, diarrhea, loss of taste and smell, sweating, coughing, and pain in his chest. Houslin Decl. ¶ 7. There were nearly 80 to 100 people in his dorm at the time, many of them requesting to be tested for COVID-19 for weeks due to symptoms or possible exposure. *Id*. ¶ 9.

219.    On June 22, 2020, Plaintiff Houslin requested to be tested for COVID-19 because he was experiencing COVID-19 symptoms. Houslin Decl. ¶ 7. He put in several other sick call requests around that time because he was worried that he may have COVID-19. *Id*.

50

220.     Plaintiff Houslin was not tested for COVID-19 until July 2, 2020, ten days after his sick call request.  Houslin Decl. ¶ 8.  Around July 6, he learned he had tested positive.  *Id.*

221.     While he was sick with COVID-19, Plaintiff Houslin tasted blood in his mouth and began choking on his own blood.  Houslin Decl. ¶ 10.  After Plaintiff Houslin alerted the medical staff to this issue, it took them three weeks to do an X-ray, which showed that Plaintiff Houslin had a broken blood vessel in his throat, internal bleeding, and complications in his chest and lungs.  *Id.*  Plaintiff Houslin has requested an MRI for months to determine the extent of the damage and get proper treatment, but he has not been provided with an MRI.  *Id.* ¶ 11.

222.     Although some people were provided Tylenol at Farmville while they experienced COVID-19 symptoms, Plaintiff Houslin was denied Tylenol.  Houslin Decl. ¶ 12.

223.     Plaintiff Houslin has a high risk of severe illness or death from COVID-19 due to his hypertension.  Houslin Decl. ¶ 13.  Yet, Defendants have not taken any special precautions to protect him from severe complications or death.

224.     Plaintiff Houslin was born premature and has been diagnosed with several mental health conditions as a result.  Houslin Decl. ¶¶ 4, 14.  Prior to his detention at Farmville, he was in a mental institution in New York.  *Id.* ¶ 17.  At Farmville, his mental health conditions have not been adequately treated.  The medications he is being given for his conditions are having adverse effects on his physical and mental health, and despite repeated requests for proper medication, Farmville has not provided him the medication that he needs.  *Id.* ¶¶ 15–18.  For example, he is not provided any medication for his post-traumatic stress disorder and the medical staff have not explained the side effects of the medication that he does take, leading to other complications in his liver.  *Id.*

225.    Plaintiff Houslin continues to suffer from COVID-19 symptoms and complications, including severe coughing and fevers.  Houslin Decl. ¶ 19.  Despite the facility's claims that no one has experienced COVID-19 symptoms since July 10, Plaintiff Houslin has told Farmville staff several times that he continues to have these symptoms.  *Id.*

226.    Around September 21, 2020, Plaintiff Houslin began vomiting almost everything that he ate.  Houslin Decl. ¶ 20.  He immediately requested to see Dr. Moore, but they told him that he had to wait two weeks until his next appointment with her.  *Id*.  When he finally saw Dr. Moore on October 5, she told him there was no space for him in the medical unit.  *Id*. ¶ 21.  He has been severely dehydrated and feels like his body is drying up on the inside.  *Id*. ¶ 20.

227.    Plaintiff Houslin's vision is also deteriorating and Farmville has not responded to have his vision checked.  Houslin Decl. ¶ 22.

228.    Plaintiff Houslin's health has deteriorated significantly since being detained at Farmville as a result of Defendants' failure to provide adequate protection from COVID-19 and adequate medical care.  Plaintiff Houslin is afraid that his body is shutting down at the detention facility and he believes that he will die at Farmville if things remain the same.  Houslin Decl. ¶ 23.

229.    Plaintiff Houslin has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

### 11.    **Plaintiff Jerbin Ivan Garcia Garcia**

230.    Defendants have failed to provide Plaintiff Garcia Garcia with adequate protection from COVID-19 and adequate medical care.

231.    Plaintiff Garcia Garcia was housed in Dorm 7 this summer with approximately 75 other detainees.  Exhibit S, Decl. of Jerbin Ivan Garcia Garcia ("Garcia Garcia Decl.") ¶ 5.  Social distancing was impossible in the dorm.  *Id*.  Nearly every bed was occupied and the detainees slept and ate very close to one another.  *Id*.

232.    Plaintiff Garcia Garcia initially received only two masks to protect himself from COVID-19.  Garcia Garcia Decl. ¶ 6.  He received an additional mask a few months later.  *Id.* However, people did not wear masks in the dorms.  *Id.*

233.    Plaintiff Garcia Garcia developed symptoms of COVID-19 this summer during the outbreak at Farmville.  Garcia Garcia Decl. ¶¶ 8–9.  He suffered from a fever, headache, earache, and body aches.  *Id.* ¶ 10.  His fever lasted about a week, but he continues to have body pain and headaches.  *Id.*

234.    During the outbreak of COVID-19, all of the detainees in Plaintiff Garcia Garcia's dorm were sick.  Garcia Garcia Decl. ¶ 9.  Plaintiff Garcia Garcia heard his fellow detainees complain that their heads and bodies hurt.  *Id.*  He saw one man pass out twice and fall onto the floor before being taken to a room by himself.  *Id.*  However, the other detainees experiencing COVID-19 symptoms, including Plaintiff Garcia Garcia, stayed in the dorms and were not isolated.  *Id.*

235.    Plaintiff Garcia Garcia and his fellow detainees reported to the guards at Farmville that they felt sick.  Garcia Garcia Decl. ¶ 11.  The guards instructed the detainees to make a sick request.  *Id.*  After making a sick request, a nurse came to the dorm to give Plaintiff Garcia Garcia Tylenol.  *Id.*  The nurses distributed Tylenol for approximately a week before stopping.  *Id.*  If Plaintiff Garcia Garcia required additional medical due to his COVID-19, he had to put in a sick request before a nurse would return with Tylenol.  *Id.*

236.    Plaintiff Garcia Garcia and his fellow detainees raised their concerns regarding inadequate medication, masks, and protection to an immigration officer.  Garcia Garcia Decl. ¶ 12. Plaintiff Garcia Garcia also complained to the immigration officer about the rancid milk at

Farmville. *Id*. The officer told Plaintiff Garcia Garcia that he could not help him, and the conditions did not improve. *Id*.

237. During the outbreak of COVID-19 at the facility, there was a protest in Dorm 7, which is next to Dorm 6 where Plaintiff Garcia Garcia was housed. Garcia Garcia Decl. ¶ 13. Plaintiff Garcia Garcia could hear screams and noise coming from the protest. *Id*. Fumes then entered Dorm 6—Plaintiff Garcia Garcia later learned from detainees in Dorm 7 that the guards used pepper spray during the protest. *Id*. The fumes from the pepper spray made it hard for Plaintiff Garcia Garcia and others to breathe. *Id*. The detainees in Dorm 6 were coughing, crying, and had mucus running out of their noses. *Id*. Plaintiff Garcia Garcia and his fellow detainees pleaded with the guards to open the door and give them air. *Id*. The guards refused, and the commander came into the dorm with a pepper spray canister in his hand. *Id*. Plaintiff Garcia Garcia and the detainees pleaded with the commander to not use the pepper spray and to open the door. *Id*. Approximately 30 minutes after the fumes entered Dorm 6, the commander agreed to open the door to give the detainees more air. *Id*.

238. During the COVID-19 outbreak at Farmville, Plaintiff Garcia Garcia's dorm was placed on lockdown. Garcia Garcia Decl. ¶ 14. During the lockdown, Plaintiff Garcia Garcia and others in his dorm were tested for COVID-19. *Id*. Many of the detainees in Dorm 6 tested positive. *Id*. Plaintiff Garcia Garcia's test did not produce a result. *Id*. He was tested again two weeks later and tested positive. *Id*. Plaintiff Garcia Garcia remained in his dorm with the detainees who had already tested positive while he waited for the results of his second test. *Id*. Plaintiff Garcia Garcia has not been tested for COVID-19 since his second test. *Id*.

239. Plaintiff Garcia Garcia is currently housed in Dorm 7 with approximately 18 other detainees. Garcia Garcia Decl. ¶ 15. Dorm 7 was recently placed on lockdown in early October.

*Id*.  Some detainees in the dorm developed headaches and body aches; however, these detainees were not isolated from the other detainees in Dorm 7 during the lockdown.  Plaintiff Garcia Garcia does not think these detainees were tested for COVID-19.  *Id*.

240.    Plaintiff Garcia Garcia has continued to experience symptoms of COVID-19, including headaches and body aches.  Garcia Garcia Decl. ¶ 16.  His body still feels weak and his back and hips hurt.  *Id*.  The week of October 12, 2020, Plaintiff Garcia Garcia began experiencing problems with his vision and he cannot see clearly.  *Id*.

241.    Plaintiff Garcia Garcia is scared of another outbreak of COVID-19 at Farmville because it is difficult for him to protect himself from the virus while detained at Farmville.  Garcia Garcia Decl. ¶ 17.  Plaintiff Garcia Garcia and his fellow detainees are very worried.  *Id*.

242.    Plaintiff Garcia Garcia has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

### 12.    Plaintiff Jorge Alexander Rivera Rodriguez

243.    Defendants have failed to provide Plaintiff Rivera Rodriguez with adequate protection from COVID-19 and adequate medical care.

244.    Plaintiff Rivera Rodriguez has been detained at Farmville in Dorm 7 since before the COVID-19 outbreak.  Rivera Rodriguez Decl. ¶ 5.  When the COVID-19 outbreak began, there were approximately 60 detainees in his dorm.  *Id.*  The beds were very close together, and Plaintiff Rivera Rodriguez slept about a foot away from other detainees.  *Id.*  He also sat just inches away from other detainees during meal time.  *Id.*

245.    Plaintiff Rivera Rodriguez was given several masks, but many detainees did not wear their masks inside the dorm.  Rivera Rodriguez Decl. ¶ 5.

246.    About two weeks after transferees arrived from facilities in Florida and Arizona, everyone in the dorm started to get sick.  Plaintiff Rivera Rodriguez observed detainees with

fevers, body aches, diarrhea, and vomiting.  Rivera Rodriguez Decl. ¶ 6.  With the exception of one person, Farmville staff did not remove the sick individuals from the dorm, "even when it was obvious that they were very sick."  *Id.*  Plaintiff Rivera Rodriguez feared he would be exposed to the virus.

247.    Some transferees from Florida and Arizona were initially held in Dorm 8.  *See* CDC Inspection Report at 4.  After they were moved from Dorm 8, Plaintiff Rivera Rodriguez was assigned to clean Dorm 8, though Farmville staff did not tell him that the dorm may have been exposed to COVID-19.  Rivera Rodriguez Decl. ¶ 8.  He was given gloves and overalls, but he had to use the mask he already was given while he cleaned.  *Id.*  He was not given a replacement mask after he was finished cleaning Dorm 8.  *Id.*  Another detainee who cleaned Dorm 8 with Plaintiff Rivera Rodriguez became sick soon thereafter.  *Id.*

248.    Prior to getting sick with COVID-19, Plaintiff Rivera Rodriguez encountered the transferees from Florida and Arizona a few times in the hallway.  Rivera Rodriguez Decl. ¶ 9.  During these encounters, he came within six feet of these individuals.  *Id.*

249.    Plaintiff Rivera Rodriguez also observed guards come and go from Dorm 9—where sick transferees were then being held—and then enter Dorm 7.  Rivera Rodriguez Decl. ¶ 9.

250.    Around this time, Plaintiff Rivera Rodriguez observed that some guards were sick.  Rivera Rodriguez Decl. ¶ 7.

251.    On July 1, 2020, individuals in Plaintiff Rivera Rodriguez's dorm were concerned about their potential exposure to COVID-19, and they asked to speak to ICE about their concerns.  Rivera Rodriguez Decl. ¶ 10.  The officers told them that ICE was not coming, and they ordered the detainees to return to their bunks.  *Id.*  Some of the individuals refused to go back to their

bunks, but no one was violent.  *Id.*  Plaintiff Rivera Rodriguez remained silent and did not resist or refuse any instructions.  *Id.*

252.    Thereafter, the chief commander left Dorm 7 and then returned with pepper spray and about six to eight guards.  Rivera Rodriguez Decl. ¶ 11.  The guards began spraying pepper spray at Plaintiff Rivera Rodriguez and other detainees in Dorm 7.  *Id.*  Plaintiff Rivera Rodriguez was sprayed in the face.  *Id.*  He felt his throat close up and his chest tighten, and he had trouble breathing.  *Id.*

253.    Plaintiff Rivera Rodriguez suffers from asthma.  Rivera Rodriguez Decl. ¶ 4.

254.    Plaintiff Rivera Rodriguez ran to the bathroom to splash water in his eyes and down his throat.  Rivera Rodriguez Decl. ¶ 11.  He requested medical attention and drinking water from the chief commander.  *Id.*  These requests were refused.  *Id.*  Instead, the chief commander told Plaintiff Rivera Rodriguez to lie down in his bed.  *Id.*  Plaintiff Rivera Rodriguez followed this instruction.

255.    At some point, Plaintiff Rivera Rodriguez lost consciousness.  Rivera Rodriguez ¶ 12.  He regained consciousness in the medical unit.  *Id.*  He was told by medical personnel that he had been found cold and unresponsive in his bed.  *Id.*  Plaintiff Rivera Rodriguez estimates that he was unconscious for about 45 minutes.  *Id.*  He also observed bruises on his arms.

256.    Following the pepper spray incident, individuals in Dorm 7, including Plaintiff Rivera Rodriguez, were not permitted to use the showers or phones for four or five days as punishment.  Rivera Rodriguez Decl. ¶ 13.

257.    On July 2, 2020, the day after he was sprayed with pepper spray, Plaintiff Rivera Rodriguez began to feel sick.  Rivera Rodriguez Decl. ¶ 14.  Plaintiff Rivera Rodriguez had a fever, headache, body aches, chest pain, and he also had difficulty breathing.  *Id.*  He observed that

the COVID-19 outbreak was worse in Dorm 7 after the pepper spray incident.  *Id.*  Plaintiff Rivera Rodriguez observed that nearly everyone in the dorm was sick, and a lot of people were suffering. *Id.*

258.    Plaintiff Rivera Rodriguez had a fever for about two days.  Rivera Rodriguez Decl. ¶ 15.  For about two weeks, Plaintiff Rivera Rodriguez had body aches and difficulty breathing. *Id.*  His lungs hurt and felt heavy whenever he took a breath.  *Id.*  He also had headaches and pain in his chest—two symptoms that continue to persist today.  *Id.*

259.    When he started to feel sick Plaintiff Rivera Rodriguez immediately told the guard, but the guard told him to make a sick request.  Rivera Rodriguez Decl. ¶ 16.  Plaintiff Rivera Rodriguez observed guards telling other detainees the same thing.  *Id.*

260.    Plaintiff Rivera Rodriguez and other detainees in Dorm 7 put in a sick request on or around Friday, July 3, 2020.  Rivera Rodriguez Decl. ¶ 17.  Plaintiff Rivera Rodriguez did not receive any medical attention until Monday, July 6, 2020.  *Id.*  On that day, a nurse took his temperature and gave him Tylenol.  *Id.*

261.    Plaintiff Rivera Rodriguez observed that the box containing sick call requests began to fill up, but no one came to collect the slips.  Rivera Rodriguez Decl. ¶ 18.

262.    Nurses continued to come to the Dorm to pass out Tylenol, but they did not begin doing temperature checks regularly until after a lawsuit was filed.  Rivera Rodriguez Decl. ¶ 18.

263.    Even though Plaintiff Rivera Rodriguez has asthma and is therefore at a higher risk of COVID-19 complications, the officers and medical staff did not treat him any differently from the rest of the detainees.  Rivera Rodriguez Decl. ¶ 19.

264.    On approximately July 3, 2020, Plaintiff Rivera Rodriguez and everyone in his dorm was tested for COVID-19.  Rivera Rodriguez Decl. ¶ 20.  Plaintiff Rivera Rodriguez and

everyone else in his dorm (except two individuals) tested positive for COVID-19.  *Id.*  The two individuals who did not test positive still exhibited symptoms and remained in the dorm.  *Id.*

265.   Plaintiff Rivera Rodriguez was retested for COVID-19 later in July, and his test results were non-conclusive.  Rivera Rodriguez Decl. ¶ 20.

266.   The COVID-19 outbreak was a very scary experience for Plaintiff Rivera Rodriguez.  Rivera Rodriguez Decl. ¶ 22.  He is afraid that COVID-19 is still present at Farmville. *Id.* ¶ 23.  At the end of September, his dorm was placed on quarantine because a guard was sick. *Id.*  During the quarantine, two people in his dorm were sick—they had fevers, sore throats, and generally did not feel well.  *Id.*  These sick individuals were not removed from the dorm while they were exhibiting symptoms.  *Id.*

267.   Plaintiff Rivera Rodriguez fears that he will be reinfected with COVID-19.  Rivera Rodriguez ¶ 23.

268.   Currently, there are 18 or 19 individuals in Plaintiff Rivera Rodriguez's dorm. Rivera Rodriguez ¶ 24.  Nevertheless, it is difficult to maintain social distance from other detainees. *Id.*  Although the beds are now spread out, Plaintiff Rivera Rodriguez still sleeps about two feet from another detainee.  *Id.*

269.   Plaintiff Rivera Rodriguez has continued to have lingering symptoms since contracting COVID-19.  Rivera Rodriguez Decl. ¶ 25.  Specifically, he has continued to experience chest pain, headaches, and trouble breathing.  *Id.*  Although Plaintiff Rivera Rodriguez had experienced chest pain before arriving at Farmville, his chest pain has been much worse since he contracted COVID-19.  *Id.*  The last time that he felt that he could breathe well was about a month ago.  *Id.*

270.    Plaintiff Rivera Rodriguez has also experienced memory issues since contracting COVID-19.  Rivera Rodriguez Decl. ¶ 26.

271.    Plaintiff Rivera Rodriguez has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation, and he has not received some of the undersigned counsel's messages.

### 13.    Plaintiff Jose Linares Hernandez

272.    Defendants have failed to provide Jose Linares Hernandez with adequate protection from COVID-19 and adequate medical care.

273.    Plaintiff Linares Hernandez has type 2 diabetes and a serious liver condition. Exhibit U, Decl. of Jose Linares Hernandez ("Linares Hernandez Decl.") ¶¶ 4–5.  The diet Plaintiff Linares Hernandez is provided at Farmville exacerbates his diabetes symptoms, and his blood sugar levels have significantly increased during his time at Farmville.  *Id.* ¶ 5.  His blood sugar recently spiked to a potentially life-threatening level.  *Id.*  Prior to arriving at Farmville, Plaintiff Linares Hernandez took pills and maintained a healthy diet to control his diabetes.  *Id.* ¶ 6.  At Farmville, he requires four insulin shots per day in addition to diabetes pills.  *Id.*

274.    Plaintiff Linares Hernandez was housed in Dorm 5 this summer with approximately 80 other detainees.  Linares Hernandez Decl. ¶ 9.  He estimates that he slept about a foot and a half from other detainees at night.  *Id.*  Detainees in his dorm were not able to socially distance. *Id.*  He observed that there was limited air flow in his dorm and that the air ducts were dirty.  *Id.*

275.    Plaintiff Linares Hernandez has received approximately three masks in total at Farmville.  Linares Hernandez Decl. ¶ 19.  He is not certain whether he can clean the masks.  *Id.*

276.    Prior to the COVID-19 outbreak, Plaintiff Linares Hernandez felt sick.  Linares Hernandez Decl. ¶ 7.  A nurse gave him a COVID-19 test, which caused his nose to bleed.  *Id.* After about two days, he was taken to the hospital to stop the bleeding in his nose.  *Id.*

277.     Approximately two weeks after transferees from Florida and Arizona arrived at Farmville, Plaintiff Linares Hernandez and many other detainees became ill.  Linares Hernandez Decl. ¶¶ 8, 10.  Plaintiff Linares Hernandez had a fever, body pains, headaches, chills, and nausea. *Id.* ¶ 10.  His fever lasted approximately eight days.  *Id.*

278.     Other individuals in his dorm complained of similar symptoms, such as fevers, headaches, body aches, and nausea.  Linares Hernandez Decl. ¶ 8.  Plaintiff Linares Hernandez observed individuals pass out and fall onto the dorm floor.  *Id.*  He also observed individuals who were unable to get up from their beds.  *Id.*

279.     During the COVID-19 outbreak, nurses came to Plaintiff Linares Hernandez's dorm multiple times per day to pass out Tylenol.  Linares Hernandez Decl. ¶ 11.  Plaintiff Linares Hernandez is not supposed to take too much Tylenol due to his liver condition, but he accepted the Tylenol because he felt so sick.  *Id.*  Plaintiff Linares Hernandez and other detainees in his dorm submitted multiple sick requests because they wanted medical attention—not just Tylenol.  *Id.* ¶ 12.  Nevertheless, Plaintiff Linares Hernandez did not receive any additional medical treatment for his COVID-19 symptoms besides Tylenol.  *Id.* ¶ 11.

280.     After Plaintiff Linares Hernandez started to feel better, he was moved to a room by himself where he remained for approximately one month.  Linares Hernandez Decl. ¶¶ 13, 15. Plaintiff Linares Hernandez believes he should have been moved out of his dorm *before* he got sick—not *afterwards*—to protect him from COVID-19 because, given his medical conditions, he was at higher risk of experiencing serious complications from the virus.  *Id.* ¶ 14.

281.     During his isolation, Plaintiff Linares Hernandez felt like he was going crazy. Linares Hernandez Decl. ¶ 15.  His contact with other people was very limited.  *Id.*  The experience was "traumatic" and "felt like punishment."  *Id.*

282.     Plaintiff Linares Hernandez received a COVID-19 test about three weeks after he started to feel sick.  Linares Hernandez Decl. ¶ 16.  The test came back negative.  *Id.*  He received another test after that, which was positive.  *Id.*  He did not receive any other COVID-19 tests.  *Id.*

283.     Plaintiff Linares Hernandez continues to have headaches.  Linares Hernandez Decl. ¶ 10.  For the past three months or so, he has experienced confusion, memory problems, and uncontrollable shaking.  *Id.* ¶ 18.  These problems began after he contracted COVID-19.  *Id.*  He is also losing his vision.  *Id.* ¶ 17.  His vision problems began about five months ago, before he contracted COVID-19.  *Id.*  Medical staff have told him he needs to see a neurologist and eye specialist; he is still waiting to be sent to the specialists.  *Id.* ¶¶ 17–18.

284.     Plaintiff Linares Hernandez is currently housed in Dorm 4.  Linares Hernandez Decl. ¶ 19.  There are approximately 20 people in his dorm.  *Id.*  He sleeps about five feet away from another individual.  *Id.*  Detainees do not wear masks inside the dorm.  *Id.*

285.     A man in Plaintiff Linares Hernandez's dorm recently reported feeling sick.  Linares Hernandez Decl. ¶ 20.  He understands that the man was given a pill and sent back to the dorm.  *Id.*

286.     Plaintiff Linares Hernandez reports that the provision of medical services continues to be slow.  Linares Hernandez Decl. ¶ 20.  For example, if someone reports that they have a headache, it could take two days to receive medical attention.  *Id.*

287.     Plaintiff Linares Hernandez has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

### 14.     Plaintiff Vano Bazerashvili

288.     Defendants have failed to provide Vano Bazerashvili with adequate protection from COVID-19 and adequate medical care.

289.    Plaintiff Bazerashvili suffers from heart disease and high blood pressure.  Exhibit T, Decl. of Vano Bazerashvili ("Bazerashvili Decl.") ¶ 5.  He was recently diagnosed with liver disease as well.  *Id.*

290.    Plaintiff Bazerashvili was housed in Dorm 7 this summer.  Bazerashvili Decl. ¶ 6. He estimates that there were about 70 to 80 other individuals in his dorm.  *Id.*  It was impossible for him to maintain distance from other people.  *Id.*  He slept about 10 centimeters away from another detainee.  *Id.*

291.    Plaintiff Bazerashvili and other detainees fell ill in June.  Bazerashvili Decl. ¶ 7. Plaintiff Bazerashvili experienced a fever, headache, body aches, chills, and chest pains.  *Id.*  His blood pressure spiked.  *Id.*  Other people in his dorm experienced symptoms such as fevers and coughing.  *Id.*  With limited exceptions, sick detainees remained in the dorm and were not isolated. *Id.*

292.    Plaintiff Bazerashvili and others in his dorm were not tested for COVID-19 and did not receive medical attention when they first fell ill.  Bazerashvili Decl. ¶ 8.  Nurses did not check on them or bring them medication.  *Id.*  He and others submitted sick request forms, but Farmville staff stopped collecting them.  *Id.*

293.    On July 1, 2020, detainees in Dorm 7 asked to speak with an ICE officer regarding the lack of medical attention.  Bazerashvili Decl. ¶ 9.  People in the dorm engaged in a peaceful protest by requesting that an ICE officer came to speak with them and refusing to return to their bunks until their request was addressed.  *Id.* ¶ 12.

294.    In response, guards sprayed everyone in the dorm, including Plaintiff Bazerashvili, with pepper spray.  Bazerashvili Decl. ¶ 10.  Plaintiff Bazerashvili struggled to breathe and his eyes watered.  *Id.*  The pepper spray affected everyone in the dorm and caused them to cough and

cover their faces.  *Id.*  The pepper spray chemicals lingered in the air for at least a month and provoked a choking sensation when you entered the dorm.  *Id.* ¶ 11.

295.    Nurses did not begin to come to Dorm 7 to pass out Tylenol and check blood pressure until after the pepper spray incident.  Bazerashvili Decl. ¶ 13.

296.    In addition, Plaintiff Bazerashvili and other detainees in the dorm were not tested for COVID-19 until a few days after the pepper spray incident.  Bazerashvili Decl. ¶ 13.  Plaintiff Bazerashvili tested positive for COVID-19.  *Id.*  He received one more test after that, which also came back positive.  *Id.*

297.    At some point after the pepper spray incident, Plaintiff Bazerashvili was moved to the medical unit because he was very sick.  Bazerashvili Decl. ¶ 14.  He remained there for about two weeks.  *Id.*

298.     Plaintiff Bazerashvili has been unable to consistently make private attorney-client calls with undersigned counsel for the purposes of this litigation.

\*   \*   \*

299.    Plaintiffs are not alone in their experiences of being exposed to, contracting, and suffering from COVID-19 at Farmville:  As of August 9, 2020, 262 current detainees and 28 employees at Farmville had tested positive for COVID-19.[60]  And as of October 8, 2020, a total of 339 detainees had tested positive for COVID-19 during the course of the pandemic.[61]

---

[60]   CDC Inspection Report at 23.
[61]   ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 23.

**B.      Plaintiffs Are At Risk Of Infection Or Reinfection With COVID-19**

300.     Not only have Defendants subjected Plaintiffs to conditions that have jeopardized their recovery, but Defendants are also exposing Plaintiffs who are currently detained (Santos Garcia, Bolanos Hernandez, Miranda Sanchez, Velasquez Orellana, Olaniyi, Houslin, Garcia Garcia, Rivera Rodriguez, Linares Hernandez, and Bazerashvili) to the risk of becoming infected or reinfected with COVID-19.

301.     "In general, the unknowns of immune responses to SARS-CoV-2 currently outweigh the knowns.  We do not know how much immunity to expect once someone is infected with the virus, we do not know how long that immunity may last, and we do not know how many antibodies are needed to mount an effective response."[62]

302.     A small but growing number of cases suggest that reinfection with COVID-19 is possible.  There have been recent reports of presumed reinfection among patients who appeared to fully recover after their first infection in Colorado, New Jersey, New York, Tennessee, and Texas.[63]  In late August, genome sequencing confirmed that a 33-year-old man in Hong Kong was infected a second time with the coronavirus more than four months after his first infection.[64]  Since

---

[62]  D. Clay Ackerly, *My Patient Caught COVID-19 Twice.  So Long to Herd Immunity Hopes?*, VOX (July 12, 2020), https://bit.ly/2BeBGqL.

[63]  *See, e.g.*, Jordan Chavez, *Colorado Woman Tests Positive for COVID-19 Twice*, 9NEWS (June 18, 2020), https://bit.ly/3fGJznU; Ackerly, *supra* note 62; Rich Condit et al., *This Week in Virology: Do, There Is No Try* (July 12, 2020), https://bit.ly/2SMPA8A;  CNN Wire, *Family Furious After 87-Year-Old Mother Tests Positive Twice for COVID-19*, MY FOX8 (July 4, 2020), https://bit.ly/2ZIulsY; Meredith Yeomans, *Dallas Woman Battling Coronavirus, Again*, NBCDFW (June 15, 2020), https://bit.ly/32DdKbN.

[64]  Apoorva Mandavilli, *First Documented Coronavirus Reinfection Reported in Hong Kong*, N.Y. TIMES (Aug. 24, 2020), https://nyti.ms/2FdfUFU; Kelvin Kai-Wang To et al., *Coronavirus Disease 2019 (COVID-19) Re-infection by a Phylogenetically Distinct Severe Acute Respiratory Syndrome Coronavirus 2 Strain Confirmed by Whole Genome Sequencing*, Clinical Infectious Diseases (Aug. 25, 2020), https://bit.ly/3nw0Zb4.

then, there have been confirmed cases of reinfection in Belgium, the Netherlands, and Ecuador.[65]

303.    On October 12, 2020, scientists confirmed the first case of reinfection in the United States, a 25-year-old man from Nevada.[66]  Significantly, for this patient, "[t]he second infection was symptomatically more severe than the first," resulting in hospitalization.[67]  This is the second confirmed reinfection where the patient was sicker the second time.[68]  A patient in Ecuador with a confirmed reinfection also suffered more severe symptoms during his second bout of COVID-19.[69]

304.    Additionally, one study published on June 16, 2020 found that 10 percent of nearly 1,500 COVID-19-positive patients registered undetectable antibody levels within weeks of first showing symptoms.[70]  The study's authors concluded that "after SARS-CoV-2 infection, people are unlikely to produce long-lasting protective antibodies against the virus."[71]  A second study published June 18, 2020 in *Nature Medicine* found that COVID-19 patients typically lost their antibodies two to three months after recovering from the infection, especially among those who tested positive but were asymptomatic.[72]

---

[65]  Mia Jankowicz, *A Nevada Man Was Reinfected with the Coronavirus – The First Confirmed Case in the US – And the 2nd Time Was Worse*, BUSINESS INSIDER (Oct. 13, 2020), https://bit.ly/34T84tP.

[66]  Richard L. Tillett et al., *Genomic Evidence for Reinfection with SARS-CoV-2: A Case Study*, Lancet Infectious Diseases (Oct. 12, 2020), https://bit.ly/3iXXU0a; *see also* Rebecca Hersher, *Scientists Confirm Nevada Man Was Infected Twice with Coronavirus*, NPR (Oct. 12, 2020), https://n.pr/2GVnpCh.

[67]  Tillett et al, *supra* note 66.

[68]  Hersher, *supra* note 66.

[69]  *See id.*

[70]  Amanda Heidt, *Studies Report Rapid Loss of COVID-19 Antibodies*, THE SCIENTIST (June 19, 2020), https://bit.ly/3jpObAW.

[71]  *Id.*

[72]  *Id.*

305.    Despite media reports of three-month immunity following infection with the virus, the CDC clarified in a statement that the "science does not imply a person is immune to reinfection with SARS-CoV-2, the virus that causes COVID-19, in the 3 months following infection."[73] Similarly, the World Health Organization announced last month that it does not recommend countries issuing so-called "immunity passports" because scientists still do not know whether COVID-19 antibodies reduce the risk of reinfection.[74]

306.    The CDC cautions that "additional research is ongoing" regarding reinfections.[75] "Therefore, if a person who has recovered from COVID-19 has new symptoms of COVID-19, the person may need an evaluation for reinfection, especially if the person has had close contact with someone infected with COVID-19."[76]   The CDC ultimately advises, "Whether you test positive or negative for COVID-19 on a viral or an antibody test, you still should take steps to protect yourself and others.  We do not know yet if people who recover from COVID-19 can get infected again. Scientists are working to understand this."[77]

307.    Even if not reinfected, many people infected with COVID-19 show either extended periods of symptoms or recurring bouts of symptoms, worsening dramatically even after they appear to have recovered.[78]

---

[73]  CDC, *Updated Isolation Guidance Does Not Imply Immunity to COVID-19* (updated Aug. 14, 2020), https://bit.ly/33MZ9ej.

[74]  Berkeley Lovelace Jr., *WHO Doesn't Recommend Coronavirus Passports, Because Immunity Remains Questionable*, CNBC (Sept. 16, 2020), https://cnb.cx/3ltltzo.

[75]  CDC, *Duration of Isolation & Precautions for Adults* (updated Sept. 10, 2020), https://bit.ly/3iMZaDk.

[76]  *Id.*

[77]  CDC, *Test for Past Infection* (updated June 30, 2020), https://bit.ly/34INQmH.

[78]  *See, e.g.*, Ed Yong, *COVID-19 Can Last for Several Months*, THE ATLANTIC (June 4, 2020), https://bit.ly/30t1ZlH.

### C.   The ICA Defendants Have Denied Plaintiffs Proper Nutrition While They Suffer From COVID-19

308.   In addition to denying Plaintiffs adequate medical treatment, the ICA Defendants have denied Plaintiffs proper nutrition throughout the COVID-19 pandemic, including when they have been experiencing COVID-19 symptoms.

309.   Plaintiff Bolanos Hernandez, Miranda Sanchez, and Rivera Rodriguez worked in the kitchen while they were exhibiting COVID-19 symptoms and before they had received their COVID-19 test results.  *See* Bolanos Hernandez Decl. ¶ 13; Miranda Sanchez Decl. ¶ 15; Rivera Rodriguez Decl. ¶ 21.

310.   Plaintiff Castillo Gutierrez reported that he knew of four to five people who had tested positive for COVID-19 who were working in the kitchen in early August 2020.  Castillo Gutierrez Suppl. Decl. ¶ 12.  Plaintiff Rivera Rodriguez also reported that he worked in the kitchen with people from other dorms who got sick and continued to work in the kitchen.  Rivera Rodriguez Decl. ¶ 21.

311.   The ICA Defendants have served Plaintiffs and other detainees inedible food, including expired milk, undercooked foods, and uncooked foods, such as raw rice, potatoes, and beans.  Santos Garcia Decl. ¶ 12; Bolanos Hernandez Decl. ¶ 17; Castillo Gutierrez Suppl. Decl. ¶ 11; Miranda Sanchez Decl. ¶¶ 16–18; Houslin Decl. ¶ 24; Olaniyi Decl. ¶ 10; Garcia Garcia Decl. ¶ 7; *see also* Quintanilla Gallegos Decl. ¶ 18 (explaining that "[t]he detention center has been feeding [detainees] rotten food," such as "sour milk and rotting apples").

312.   Plaintiff Miranda Sanchez worked in the kitchen at Farmville and had prior training on food safety and proper handling procedures, which he believes are not being followed at Farmville.  Miranda Sanchez Decl. ¶ 16.  While working in the kitchen, Plaintiff Miranda Sanchez saw expired food being served by the facility.  *Id.* ¶ 17.

313.    Plaintiff Bolanos Hernandez reports that he has been served expired milk around ten times since he has been at Farmville.  Bolanos Hernandez Decl. ¶ 17.  Plaintiff Olaniyi reports that he was served expired milk as recently as late September 2020.  Olaniyi Decl. ¶ 10.  Plaintiff Garcia Garcia reports that when he complained to an immigration officer about rancid milk at Farmville, the officer said he could not help him, and the conditions did not improve.  Garcia Garcia Decl. ¶ 12.

314.    Plaintiff Santos Garcia, Plaintiff Perez Garcia, and other detainees have also found bugs in their food.  For example, in the month before Plaintiffs filed their original complaint, Plaintiff Santos Garcia was served food with bugs in it on three occasions.  Santos Garcia Decl. ¶ 11.  And Plaintiff Perez Garcia discovered worms in his food just a few days before Plaintiffs filed the original complaint.  Perez Garcia Decl. ¶ 24.  Unfortunately, he did not discover the worms—which were in beans served to him—until he had eaten nearly half of his meal.  *Id.*

315.    Plaintiff Linares Hernandez, who suffers from type 2 diabetes, is provided food that exacerbates his diabetes symptoms.  Linares Hernandez Decl. ¶ 6.  Since arriving at Farmville, his blood sugar levels have significantly increased—to the point of being life-threatening on at least one occasion.  *Id.* ¶ 5.  Prior to arriving at Farmville, Plaintiff Linares Hernandez only had to take pills to control his diabetes.  *Id.* ¶ 6.  At Farmville, he needs four insulin shots per day in addition to pills.  *Id.*

316.    In the last month, ICA Defendants have dramatically reduced the portion sizes of the meals served.  For example, when served rice or beans with a meal, Plaintiffs used to receive approximately three cups of rice or beans.  Plaintiffs receive much smaller amounts now, approximately one-quarter cup of rice or beans.  This quantity of food is not sufficient to support Plaintiffs' nutritional health.

* * *

317.    At bottom, Defendants failed to take adequate precautions to protect Plaintiffs and other detainees against infection from COVID-19.  As a result, Plaintiffs and the vast majority of detainees at Farmville have contracted the deadly virus.  Defendants have then failed to provide adequate medical treatment for Plaintiffs while they have experienced COVID-19 symptoms. Defendants' continued disregard for the guidance of medical and public health officials and their failure to provide Plaintiffs with adequate medical care and nutrition jeopardizes Plaintiffs' recovery and makes it more likely that they will become reinfected with COVID-19 or will infect others.

## IV.    RECENT INSPECTIONS CONFIRM THE INADEQUATE PROTECTIONS AGAINST THE SPREAD OF COVID-19 AT FARMVILLE

318.    Multiple recent inspections of Farmville confirm that Defendants have failed to take adequate steps to prevent the spread of COVID-19 within the facility and to detect and treat individuals who contract the deadly virus, and that such deficiencies have not yet been adequately remediated to date.

319.    The CDC conducted an assessment of Farmville's infection prevention and control practices from August 9 through August 15, 2020.  The assessment was conducted in response to a request from the Virginia Department of Health, following Governor Northam's July 22, 2020 letter to President Trump requesting the CDC's assistance with the COVID-19 outbreak at Farmville.  CDC Inspection Report at 1–2.  The information reported by the CDC was based on a site visit of the Farmville facilities, interviews with Farmville leadership and staff, and a short questionnaire administered to staff and detainees.  *Id.* at 3.

320.    The CDC's report included the following findings, *inter alia*:

a.    "At the time of th[e] written report, [Farmville's] policy was to only test detained persons who have COVID-19-like symptoms."  CDC Inspection Report at 18.

b. "Once space is no longer available to individually isolate symptomatic detained persons awaiting test results, [Farmville's] current plan is to cohort symptomatic people with pending test results in the same space" as detainees who have tested positive for COVID-19. *Id.* at 19–20.

c. "Three of the four disinfectants used at [Farmville] are not on the EPA list of registered disinfectants." *Id.* at 21.

d. "Inconsistent use of PPE" and "[v]ery little signage indicating how to don and doff PPE was observed." *Id.* at 21.

e. 80 percent of detainees who completed the CDC's questionnaire reported that they were unable to social distance from other detainees. *Id.* at 8. The most frequent reason provided was "beds being too close" and "everyone is too close to each other in the dormitory." *Id.*

f. "Signage encouraging social distancing was not posted." *Id.* at 21.

321. As of June 22, 2020, ICA Defendants began to assign its staff to the same dorms and locations throughout the facility, but only when "practical." Crawford Decl. ¶ 35.

322. The CDC concluded that Farmville's limited ability "to implement appropriate medical isolation and timely quarantine cohorting" contributed to the COVID-19 outbreak at Farmville, and that "[t]he risk of reintroduction of SARS-CoV-2 into [Farmville] still exists." CDC Inspection Report at 13.

323. In addition, pursuant to the agreed inspection protocol and the Court's order granting in part Plaintiffs' motion for preliminary injunction in this case, *see* ECF Nos. 58, 59, Dr. Homer Venters also conducted an independent inspection of Farmville's facilities on August 20, 2020. Farmville Detention Inspection Report of Dr. Homer Venters ("Venters Inspection Report"), ECF No. 79-1 ¶¶ 1–2. Dr. Venters' assessment included a review of Farmville's entry area, facility intake, medical clinic, and several housing areas as well as interviews with Farmville management and detainees. *Id.* ¶ 5.

324. Based on his interviews, Dr. Venters reported that Farmville's response to the detainees' protests in June concerning their unaddressed COVID-19 symptoms "was to utilize

71

force, including large-scale deployment of pepper spray, and then transfer protesters into solitary confinement," including "indefinite" administrative segregation.  Venters Inspection Report ¶ 7.

325.    Dr. Venters' report also included the following findings for each of the inspection categories identified in the Court's order:

a.    <u>Inadequate screening for temperature and symptoms</u>.  "Armor staff do not appear to elicit the presence of symptoms in their daily COVID-19 screenings," which "is a critical departure from CDC guidelines."  Venters Inspection Report ¶ 9(b). Farmville's system for finding COVID-19 symptoms "is so deficient and at odds with CDC recommendations" that Dr. Venters "do[es] not believe that the facility actually knows the extent of current COVID-19 symptoms."  *Id.*  Indeed, contrary to Defendants' claim that no detainee had exhibited symptoms since July 10, 2020, eight detainees reported to Dr. Venters that they had ongoing symptoms as of August 10, 2020.  *Id.* ¶ 10(a).

b.    <u>Insufficient identification and protection of detainees who are at increased risk for severe illness or death from COVID-19 due to their age and/or underlying medical conditions</u>.  "Armor, ICA, and ICE do not appear to have any plan for creating specialized surveillance and protection of high-risk patients, despite having knowledge of who they are."  *Id.* ¶ 10(b).

c.    <u>Insufficient sick call response</u>.  Despite Defendant Crawford's and Armor's Health Services Administrator's statements that "100%" of detainees are seen within 24 hours of their sick call requests, 20 of the 21 detainees Dr. Venters spoke with "reported that sick call requests either take several days to result in being seen, or that they go unanswered altogether."  *Id.* ¶ 11(a).  "This lack of timely sick call response undoubtedly increased the spread of COVID-19 throughout the facility and the lack of any quality assurance regarding sick call timeliness makes this an ongoing deficiency."  *Id.* ¶ 11(b).

d.    <u>Inadequate efforts to control the spread of COVID-19</u>.  Farmville "failed to initiate basic infection control efforts identified by the CDC since March, including social distancing in medication lines and creating specialized teams and training for cleaning of effects of people suspected to have COVID-19."  *Id.* ¶ 12(d).  Several detainees reported that "the signs and discussion of social distancing, as well as the changes to bunks and seats had only been initiated in the 24 hours before [Dr. Venters'] inspection, so [the detainees] were skeptical that the facility was interested in making these changes last."  *Id.* ¶ 12(b)  Detainees also reported that "no special training occurs and no PPE is utilized for cases of cleaning property or bedding of people with suspected or known COVID-19."  *Id.* ¶ 12(c).

e.    <u>Ignorance of Farmville leadership and lack of trust between Farmville and detainees</u>.  "The level of animosity and disengagement among detainees is more acute at [Farmville] than any other facility [Dr. Venters has] inspected, and flows directly from the reality that widespread COVID-19 was caused by the mass

transfers into the facility in June and that the predictable consequences of these transfers, detainees becoming ill, were ignored by staff." *Id.* ¶ 12(e)(ii).

f. Premature plan to scale back on COVID-19 testing. Many detainees who became ill with COVID-19 "are documented as having no symptoms simply because they were only asked about symptoms when tested (as opposed to when they reported being ill) or because of the lack of adequate interpreter services." *Id.* ¶ 13(a). Any plans to decrease mass testing would be "premature." *Id.* ¶ 13(b).

326. Dr. Venters concluded that "the leadership of ICA and Armor, as well as ICE officials, violated their own policies and basic standards of infection control by allowing the transfer of detained people from facilities with COVID-19 cases into [Farmville]" and that "basic standards of care for people who became ill with COVID-19 were ignored, leaving individuals to endure their illness with little or no health assessments or care." *Id.* ¶¶ 14–15.[79]

## V. DEFENDANTS' ABANDONED REQUEST TO RESTART TRANSFERS DEMONSTRATES THAT THEY STILL DO NOT RECOGNIZE THE THREAT POSED BY COVID-19

327. On August 11, 2020, this Court granted in part Plaintiffs' motion for preliminary injunction and enjoined Defendants from "[t]ransferring any detainees into the Farmville Detention Center until further Order of the Court," among other things. Order, ECF No. 44 at 1.

328. On September 8, 2020, Federal Defendants filed a motion to alter or amend the Court's judgment, asking the Court to permit them to restart transfers into Farmville so long as all new transfers were quarantined at Caroline Detention Facility ("Caroline") for 14 days and were

---

[79] Recent federal government reports confirm Dr. Venters' assessment. The Majority Staff of the U.S. House of Representatives Committee on Homeland Security found that "ICE has not adequately protected the health of detainees during the pandemic." MAJORITY STAFF, U.S. HOUSE OF REPS. COMM. ON HOMELAND SEC., ICE DETENTION FACILITIES: FAILING TO MEET BASIC STANDARDS OF CARE 18 (Sept. 21, 2020), https://bit.ly/36FIITR. Further, it has been reported that a draft report from DHS itself acknowledges that transferring detainees between facilities has contributed to COVID-19 outbreaks in ICE facilities across the nation. Hamed Aleaziz, *Federal Officials Now Say that Transferring Detainees Between Jails Holding Immigrants Contributed to Coronavirus Outbreaks*, BUZZFEED (Oct. 6, 2020), https://bit.ly/36Fmxfp.

offered COVID-19 testing before further transfer to Farmville.  Defs.' Mem. in Support of Mot. to Alter or Amend, ECF No. 82 at 3–4.

329.    This is the same inadequate policy that Defendants had in place in April but ignored in June, when they allowed 74 detainees to enter the facility in violation of the policy.

330.    Federal Defendants' request to restart transfers demonstrates that they still do not recognize the gravity of the threat posed by COVID-19 and that, if left to their own devices, they will continue to endanger Plaintiffs' health and safety.

331.    Federal Defendants' proposal erred in focusing on only stopping COVID-19 from reentering Farmville, without accounting for the improvements needed to prevent the virus's spread within the facility.  Both facets—preventing COVID-19 from entering the facility via new transfers and implementing policies to prevent or control the spread of the virus inside the facility—are critical.

332.    Indeed, even when Federal Defendants were complying with their April policy of quarantining transferees at Caroline, COVID-19-positive individuals slipped through the cracks. On April 24, 2020, after two detainees had quarantined at Caroline for 14 days, they tested positive for COVID-19 while at Farmville.  *See* Crawford Decl. ¶¶ 19, 28.

333.    On September 21, 2020, Federal Defendants withdrew their request to restart transfers because Caroline—the facility where Federal Defendants proposed to isolate individuals before moving them to Farmville—is experiencing its own COVID-19 outbreak.  *See* ECF No. 97.

334.    As of September 28, 2020, there were 28 active COVID-19 cases being monitored among Caroline detainees and 12 cases among its staff.  *See* Pls.' Response to Order Regarding *Pro Se* Letters, ECF No. 98 at 6.  With a reported population of 168 detainees and 100 staff

members, this means that about 17 percent of detainees and at least 12 percent of all staff members at Caroline had tested positive for COVID-19.[80]

335.    As of this filing, Caroline has had a total of 39 positive cases, two of which remain under active monitoring.[81]

336.    Unlike at Farmville, the Caroline outbreak does not appear to stem from any large transfer of COVID-19 positive detainees into the facility.[82]   This likely indicates intra-facility infection—the very condition that would defeat Federal Defendants' plan to stop the spread of COVID-19 by quarantining Farmville-bound detainees at Caroline.

337.    One likely reason for intra-facility infection is that the Caroline facility only recently stopped rotating staff members between dorms and instead assigned them to a single dorm.[83]   The CDC recommends keeping staff from rotating between dorms to prevent infection from spreading within the facility.   CDC Inspection Report at 20.

338.    It is apparent that Caroline faces many of the same challenges as Farmville.   Federal Defendants' proposed plan to rely on Caroline as a detainee waypoint for new transfers into Farmville without implementing adequate protections against intra- and inter-facility transmission of COVID-19 confirms that they are still not taking this threat seriously.   If Federal Defendants wish to shuttle detainees between the two facilities, then the same protections required for Farmville must also be applied to Caroline, or else all of those protections will be in vain.

---

[80]   ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 23; Sabrina Moreno, *Caroline's ICE Facility has 25 Detainee and 12 Staff COVID cases; Federal Agency Drops Motion to Lift Transfers Ban Into Farmville*, RICHMOND TIMES DISPATCH (Sept. 22, 2020), https://bit.ly/3hWTtlQ.

[81]   ICE, *ICE Guidance on COVID-19: ICE Detainee Statistics*, *supra* note 23.

[82]   Moreno, *supra* note 80 (according to an ICE spokesperson, "[t]he two [detainees] who tested positive Sept. 14 were not transferred in").

[83]   *Id.*

## VI.   DEFENDANTS HAVE FAILED TO FOLLOW THE REQUIREMENTS OF THE PBNDS IN MULTIPLE WAYS

339.   The Performance-Based National Detention Standards ("PBNDS") apply at all ICE-dedicated civil detention facilities, including Farmville.

340.   The PBNDS set forth a set of mandatory requirements to which a facility is bound.

341.   Private contractors are also subject to, and required to follow, the PBNDS.

342.   The PBNDS set mandates for medical care and food services, and require detention facilities to adhere to CDC guidelines and recommendations for prevention and control of infectious diseases.  Federal Defendants have violated multiple mandates in each of these three categories.

### PBNDS: Medical Care Standards

343.   The Federal Defendants have failed to ensure that the ICA Defendants and Armor follow the PBNDS mandates for providing medical care, which provide that "[d]etainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment," PBNDS at 257, in multiple ways.

344.   Appropriate medical care.  The PBNDS medical care standards provide that: "Every facility shall directly or contractually provide its detainee population with . . . [m]edically necessary and appropriate medical . . . health care."  PBNDS at 260.  In furtherance of that requirement, "[e]ach facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting to local, state and federal agencies."  *Id.* at 261.  Such "[p]lans shall include . . . control, treatment and prevention strategies; . . . procedures for the identification,

surveillance, immunization, follow-up and isolation of patients; hand hygiene; [and] management of infectious diseases." *Id.*

345.   Federal Defendants did not appropriately screen detainees for COVID-19. Detainees who were transferred into the facility were not fully tested and quarantined before joining the facility's population.

346.   Federal Defendants did not ensure ICA Defendants and Armor appropriately identified COVID-19 in the facility.  Detainees' requests for medical visits because of COVID-19 symptoms were often ignored or delayed.  Defendants did not conduct adequate testing within the facility when the outbreak began.

347.   Federal Defendants did not ensure ICA Defendants and Armor appropriately isolated detainees.  Detainees who exhibited symptoms of COVID-19 remained part of the general population, as did detainees who tested positive for COVID-19.

348.   Federal Defendants did not ensure ICA Defendants and Armor appropriately treated detainees for COVID-19.  ICA Defendants and Armor provided sick detainees with woefully inadequate medicine to combat their symptoms.  Additionally, detainees' requests for medical visits were often ignored or delayed.

349.   <u>Timely medical attention and sick call requests</u>.   The PBNDS medical care standards provide that:  "Detainees shall be able to request health services on a daily basis and shall receive timely follow-up."  PBNDS at 257.  Accordingly, "[e]very facility shall directly or contractually provide its detainee population with . . . [t]imely responses to medical complaints." *Id.* at 260.

350.   More specifically, the PBNDS medical care standards provide that:  "Each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request

health care services . . . provided by a physician or other qualified medical staff in a clinical setting." PBNDS at 271. "All detainees . . . shall have access to sick call." *Id.* at 272. The sick-call procedures "shall include . . . an established procedure . . . in place at all facilities to ensure that all sick call requests are received and triaged by appropriate medical personnel within 24 hours after a detainee submits the request." *Id.* at 271.

351. At Farmville, there is no written tracking or quality assurance monitoring of whether sick call requests actually result in a patient being seen within 24 hours. Venters Inspection Report ¶ 11(a).

352. Sick call requests do not always result in a detainee being seen by medical personnel within 24 hours. Venters Inspection Report ¶ 11(a). To the contrary, sick call requests often take several days to result in a visit with medical personnel. *Id.* Some sick call requests go unanswered altogether. *Id.*

353. At least ten detainees submitted sick call requests for COVID-19 symptoms during the initial stages of the outbreak at Farmville. Venters Inspection Report ¶ 11(a). None reported being seen by medical personnel within 24 hours. *Id.* One detainee waited through five days of COVID-19 symptoms and multiple requests for medical care until he was seen by a nurse. *Id.*

354. <u>Communication assistance</u>. The PBNDS medical care standards provide that: "The facility shall provide communication assistance to . . . detainees who are limited in their English proficiency." PBNDS at 257. The standards further provide that: "Every facility shall directly or contractually provide its detainee population with . . . [s]taff or professional language services necessary for detainees with limited English proficiency (LEP) during any medical . . . appointment, sick call, treatment, or consultation." *Id.* at 260. The standards further provide that: "Facilities shall provide appropriate interpretation and language services for LEP

detainees related to medical and mental health care.  Where appropriate staff interpretation is not available, facilities will make use of professional interpretation services."  *Id.* at 264.

355.    Approximately 50 percent of the detainees in Farmville speak only Spanish.  None of the dozens of Armor health staff speak Spanish.  COVID-19 screenings have been conducted by a single nurse who does not speak Spanish, without an interpreter.  Accordingly, detainees who are limited in their English proficiency are not provided communication assistance.

### PBNDS: Food Services Standards

356.    The Federal Defendants have also failed to ensure that the ICA Defendants follow the PBNDS mandates for providing food services, which "ensure[ ] that detainees are provided a nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation."  PBNDS at 228.

357.    The PBNDS Food Service standards provide that "[f]ood and ice shall be protected from dust, insects and rodents, . . . and other sources of contamination.  Protection shall be continuous, whether the food is in storage, in preparation, on display or in transit."  PBNDS at 236.

358.    ICA Defendants have served food to Plaintiffs and other detainees in Farmville that contains bugs or other insects.

359.     The PBNDS Food Service standards provide that food service personnel "shall ensure" that "foods are cooked at the required temperatures" to ensure the food is fully cooked.  PBNDS at 235.

360.    ICA Defendants have served food to Plaintiffs and other detainees in Farmville that is undercooked or expired.

361.    The PBNDS Food Service standards also provide that:  "All food service employees are responsible for maintaining a high level of sanitation in the food service department.   An effective food sanitation program prevents health problems."  PBNDS at 243.  Further, the "facility administrator shall document that food service personnel have received a pre-employment medical examination to identify communicable diseases that may contraindicate food service work," *id.* at 244, which reflects the PBNDS Food Service standards' goal of preventing food service workers handling food preparation and service when at risk of communicating diseases to others.

362.    Food service staff and detained persons have performed their jobs preparing and serving food even while infected by COVID-19 or while showing COVID-19 symptoms.

**PBNDS: Following CDC Guidance**

363.    The PBNDS also provide that "[CDC] guidelines for the prevention and control of infectious and communicable diseases shall be followed."  PBNDS at 258.  Defendants have failed to follow multiple aspects of CDC guidance.

364.    <u>Transfers</u>.  CDC guidance for detention facilities provides:  "Limit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding."  CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note 14.  It further provides:  "Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release), unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding."  *Id.*

365.    On June 2, 2020, Federal Defendants transferred 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.  These

individuals were not tested, quarantined, or properly screened before their arrival at Farmville, and 51 of them subsequently tested positive for COVID-19.

366.    Transferring these individuals was not necessary for medical evaluation.

367.    Transferring these individuals was not necessary for medical isolation/quarantine.

368.    Transferring these individuals was not necessary for clinical care.

369.    Transferring these individuals was not necessary for extenuating security concerns.

370.    Transferring these individuals was not necessary for release.

371.    Transferring these individuals was not necessary to prevent overcrowding.

372.    Instead, the transfer was designed to transport DHS personnel to Washington, D.C. for deployment in response to civil justice protests.

373.    Social distancing.  CDC guidance provides that facilities must "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units."  CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note 14.  That includes "[e]nforc[ing] increased space between individuals in holding cells as well as in lines and waiting areas such as intake."  It also includes "[i]f space allows, reassign[ing] bunks to provide more space between individuals, ideally 6 feet or more in all directions," and "[m]inimiz[ing] the number of individuals housed in the same room as much as possible."  *Id.*  It further includes "[m]odifying work detail assignments so that each detail includes only individuals from a single housing unit."  *Id.*

374.    From the start of the outbreak until this Court's preliminary injunction, ICA Defendants did not arrange detainees' beds in a way that allowed appropriate social distancing. Detainees were forced or permitted to sleep less than six feet apart.

375.    Defendants also did not isolate all of the detainees who were transferred from a Florida or Arizona facility.  Four of the detainees who initially tested negative were moved into general population dorms.  All four tested positive by July 2, 2020.

376.    On or around August 13, 2020, 80 percent of Farmville detainees who responded to a CDC questionnaire reported "not being able to social distance from other detained persons." CDC Inspection Report at 8.  Similarly, 33 percent of staff members reported not being able to social distance while at work.  *Id.* at 10–11.

377.    ICA Defendants and Armor have not provided for social distancing in lines that form to receive medications.

378.    ICA Defendants and Armor have not posted signage encouraging social distancing.

379.    As of September 11, 2020, the CDC "recommend[ed]" that Defendants "consider spreading people out into the unused portions of the [facility] to provide more physical space between people," CDC Inspection Report at 19, demonstrating that Defendants continued to not provide for adequate social distancing.

380.    <u>Treatment</u>.    CDC guidance provides that "[f]acilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms."  CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note 14.

381.    At least ten detainees submitted sick call requests for COVID-19 symptoms during the initial stages of the outbreak within the facility.  None reported being seen by medical personnel within 24 hours.  One detainee waited through five days of COVID-19 symptoms and multiple requests for medical care until he was seen by a nurse.

382.   <u>Personal Protective Equipment</u>.   CDC guidance provides that facilities must "[e]nsure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available and have a plan in place to restock as needed."   CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note 14.   Relatedly, CDC guidance provides: "Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities."   *Id.*   It further provides: "Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE."   *Id.*

383.   Farmville staff did not and do not always use recommended PPE.   Farmville staff who use recommended PPE often do not use it properly.

384.   Federal Defendants have not provided training to Farmville staff on when and why PPE should be used, and how to put on and take off PPE.

385.   Federal Defendants have not provided signage about proper donning and doffing of PPE.

386.   Farmville staff task detainees with cleaning and disinfecting their housing areas. Detainees who clean housing areas do not receive special training on how to properly clean and disinfect such areas.   Additionally, Farmville staff do not require PPE to be used to clean property or bedding of people with suspected or known COVID-19.   Further, detainees who are not on any cleaning assignment have been ordered to gather and clean the personal effects of patients who had COVID-19 or who were showing COVID-19 symptoms.

387.   <u>Verbal screening</u>.   CDC guidelines provide that verbal screening of detained individuals should elicit the presence of COVID-19 symptoms.   CDC guidelines for verbal screening direct facility personnel to ask the following question:   "Today or in the past 24 hours,

have you had any of the following symptoms?  1.  Fever, felt feverish, or had chills?  2.  Cough?

3.  Difficulty breathing?"  CDC, *Interim Guidance on Management of Coronavirus Disease 2019*,

*supra* note 14.

388.    Nurses have conducted COVID-19 screenings at Farmville that do not ask any

questions about symptoms.

389.    Nurses have conducted COVID-19 screenings at Farmville in which they ask

general questions about how detainees feel or whether they have COVID-19 symptoms, without

asking about specific symptoms.

390.    <u>Staff assignments</u>.  CDC guidance provides that facilities must "[m]ake plans in

advance for how to change staff duty assignments to prevent unnecessary movement between

housing units during a COVID-19 [outbreak].  If there are persons with COVID-19 inside the

facility, it is essential for staff members to maintain a consistent duty assignment in the same area

of the facility across shifts to prevent transmission across different facility areas."  CDC, *Interim

Guidance on Management of Coronavirus Disease 2019*, *supra* note 14.

391.    ICA Defendants' staff were not consistently assigned to work in the same housing

units or areas, which increased the risk of transmission between housing units through staff

movements.

392.    ICA Defendants also created work details in which detained persons working in the

kitchen and the barber shop came from different housing units.

393.    <u>Cleaning standards</u>.  CDC guidance provides that facilities must "[t]horoughly and

frequently clean and disinfect all areas where individuals with confirmed or suspected COVID-19

spend time."  CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note

14.

394.    ICA Defendants and Armor do not thoroughly and frequently clean and disinfect all areas where detainees spend time.

395.    For example, in the medical clinic, there are two holding cells where patients wait to be seen.  These rooms are not cleaned in between every group of patients.

396.    <u>Prevention practices for staff</u>.  CDC guidance provides:  "Ensure staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty."  CDC, *Interim Guidance on Management of Coronavirus Disease 2019*, *supra* note 14.  Symptoms of COVID-19 are defined as fever or chills; cough; shortness of breath; fatigue; muscle aches; headaches; loss of taste or smell; sore throat; congestion; nausea; and diarrhea.  CDC, *Symptoms of Coronavirus*, *supra* note 4.

397.    Staff members frequently report to work while "experiencing" COVID-19 symptoms such as "headaches, cough, diarrhea, nausea, muscle aches, fatigue, or shortness of breath."  CDC Inspection Report at 10.  Staff members do not always wear gloves when interacting with detained persons.  Staff members do not always wear respirators or face masks while interacting with detained persons.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of the Right to Substantive Due Process Under the Fifth Amendment**

**Against Defendants Chad F. Wolf, U.S. Immigration and Customs Enforcement,
Tony H. Pham, Russell Hott**

**On Behalf of Plaintiffs Santos Garcia, Bolanos Hernandez, Miranda Sanchez, Velasquez
Orellana, Olaniyi, Houslin, Garcia Garcia, Rivera Rodriguez, Linares Hernandez, and
Bazerashvili for
Declaratory and Injunctive Relief**

398.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

399.    Plaintiffs assert a claim for violations of their Fifth Amendment Due Process rights against Defendants Wolf, ICE, Pham, and Hott (collectively, the "Federal Defendants").

400.    The Due Process Clause of the Fifth Amendment to the United States Constitution guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.

401.    The Federal Defendants violate this right to substantive due process when they fail to satisfy their affirmative duty to provide conditions of reasonable health and safety to the people they hold in their custody, and therefore violate the Constitution when they fail to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

402.    The Federal Defendants also violate the right to substantive due process when, acting with deliberate indifference, they subject civil detainees to objectively unreasonable risks to their health and safety, to cruel treatment, or to conditions of confinement that amount to punishment.

403.    The Federal Defendants are aware of the serious risk posed by COVID-19 and failed to take actions that could adequately protect Plaintiffs from contracting the virus or that would allow Plaintiffs to safely recover once they contracted the virus.

404.    The Federal Defendants subjected Plaintiffs to an unreasonable risk of contracting COVID-19, a potentially lethal disease for which there is no vaccine or cure.  Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, the Federal Defendants have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville.  The Federal Defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance.  The Federal Defendants have also failed to ensure that the ICA Defendants and Armor provided Plaintiffs and other detainees proper personal protective equipment, promptly tested the detainee population for COVID-19, and immediately isolated symptomatic detainees.

405.    In addition, the Federal Defendants exacerbated the risk of COVID-19 infection by continuing to transfer detainees among detention facilities across the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers.  In particular, on June 2, 2020, the Federal Defendants transferred 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.  These individuals were not tested, quarantined, or properly screened before their arrival at Farmville, and 51 of them subsequently tested positive for COVID-19.

406.    After Plaintiffs contracted COVID-19, the Federal Defendants failed to ensure that the ICA Defendants and Armor provided Plaintiffs with adequate medical treatment for their symptoms.  In so doing, the Federal Defendants acted with deliberate indifference to serious and irreparable harm.

407.    The Federal Defendants also have failed to ensure that the ICA Defendants are providing Plaintiffs and other detainees with adequate, safe nutrition.  Instead, they have allowed the ICA Defendants to feed Plaintiffs food that was expired, undercooked, and infested with bugs.

408.    The Federal Defendants' actions in failing to ensure adequate conditions at Farmville jeopardized Plaintiffs' recovery from COVID-19 and increased the risk that Plaintiffs could have exposed their fellow detainees to COVID-19, thus also endangering other detainees' health and wellbeing.

409.    The Federal Defendants' actions in failing to ensure adequate conditions at Farmville also increase the chances that currently detained Plaintiffs will be infected or reinfected with COVID-19.

410.    By subjecting Plaintiffs to these risks, the Federal Defendants are maintaining detention conditions that amount to punishment and are failing to ensure Plaintiffs' safety and health in violation of Plaintiffs' substantive due process rights.

411.    The restriction of confidential attorney-client telephone calls, pursuant to the purported justification of the COVID-19 pandemic, has also violated Plaintiffs' Fifth Amendment due process rights.

412.    Absent judicial relief in the form of an injunction ordering the Federal Defendants to institute condition reforms, Plaintiffs are suffering—and will continue to suffer—irreparable harm.

**SECOND CAUSE OF ACTION**

**Violation of the Right to Substantive Due Process Under the Fourteenth Amendment
Under 42 U.S.C. § 1983**

**Against Defendants Jeffrey Crawford, Immigration Centers of America-Farmville, LLC,
Armor Correctional Health Services, Inc.**

**On Behalf of Plaintiffs Santos Garcia, Bolanos Hernandez, Miranda Sanchez, Velasquez
Orellana, Olaniyi, Houslin, Garcia Garcia, Rivera Rodriguez, Linares Hernandez, and
Bazerashvili for
Declaratory and Injunctive Relief**

413.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

414.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' Fourteenth Amendment Due Process rights against Defendants Crawford and ICA (the "ICA Defendants"), and Armor.

415.    Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Westmoreland v. Brown*, 883 F. Supp. 67, 71 (E.D. Va. 1995) (quotation marks omitted).  To establish liability under Section 1983, Plaintiffs must show that the ICA Defendants and Armor, acting under color of law, violated Plaintiffs' federal constitutional rights, and thereby caused the complained-of injury. *Coppage v. Mann*, 906 F. Supp. 1025, 1035 (E.D. Va. 1995).

416.    Here, Defendant ICE contracts with the Town of Farmville, which in turn contracts with Defendant ICA, for the operation of Farmville Detention Center.  Employees, agents, and officers of Defendant ICA, including Defendants Crawford and Armor, are therefore state or local actors and subject to suit under Section 1983, *see Richardson v. McKnight*, 521 U.S. 399, 413 (1997), independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

89

417.    Like the Due Process Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.

418.    The ICA Defendants and Armor violate this right to substantive due process when they fail to satisfy their affirmative duty to provide conditions of reasonable health and safety to the people they hold in their custody, and violate the Constitution when they fail to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

419.    The ICA Defendants and Armor also violate the right to substantive due process when, acting with deliberate indifference, they subject civil detainees to objectively unreasonable risks to their health and safety, to cruel treatment, or to conditions of confinement that amount to punishment.

420.    The ICA Defendants and Armor are aware of the serious risk posed by COVID-19 and failed to take actions that could adequately protect Plaintiffs from contracting the virus or that would allow Plaintiffs to safely recover once they contracted the virus.

421.    The ICA Defendants and Armor subjected Plaintiffs to an unreasonable risk of contracting COVID-19, a potentially lethal disease for which there is no vaccine or cure.  Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, the ICA Defendants and Armor have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville.  The ICA Defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance. The ICA Defendants and Armor have also failed to provide Plaintiffs and other detainees proper

personal protective equipment, unreasonably delayed testing the detainee population for COVID-19, and failed to isolate symptomatic detainees, including Plaintiffs Santos Garcia, Bolanos Hernandez, Castillo Gutierrez, Souza Bauer, Miranda Sanchez, Olaniyi, Houslin, Garcia Garcia, and Rivera Rodriguez.   And even though the ICA Defendants and Armor ultimately isolated Plaintiffs Perez Garcia and Velasquez Orellana, they waited several days after they exhibited COVID-19 symptoms to do so and left Plaintiff Velasquez Orellana in the processing unit, instead of a medical unit, for two weeks for isolation.   ICA Defendants and Armor eventually placed Plaintiff Bazerashvili in the medical unit, but only after he was sick for days in his dorm.   ICA Defendants and Armor did not isolate Plaintiff Linares Hernandez until after the worst of his illness has passed.   He was then isolated for about a month, which was a traumatic experience for him.

422.    In addition, the ICA Defendants exacerbated the risk of COVID-19 infection by continuing to accept mass transfers of detainees from detention facilities in other parts of the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers, and despite knowing that they do not have the capacity to properly isolate, quarantine, or screen incoming people.   In particular, on June 2, 2020, the ICA Defendants accepted a transfer of 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.   These individuals were not quarantined before their arrival at Farmville and were not adequately screened for COVID-19 infection, and 51 of them subsequently tested positive for COVID-19.

423.    Since Plaintiffs contracted COVID-19, the ICA Defendants and Armor have failed to provide Plaintiffs with adequate medical treatment for their symptoms.   In so doing, the ICA Defendants and Armor have acted with deliberate indifference to serious and irreparable harm.

424.     The ICA Defendants also have failed to provide Plaintiffs and other detainees with adequate, safe nutrition.  Instead, they have fed Plaintiffs food that was expired, undercooked, and infested with bugs.

425.     The ICA Defendants' and Armor's actions in failing to ensure adequate conditions at Farmville jeopardized Plaintiffs' recovery from COVID-19 and increased the risk that Plaintiffs could have exposed their fellow detainees to COVID-19, thus also endangering other detainees' health and wellbeing.

426.     The current conditions also increase the chances that currently detained Plaintiffs will be infected or reinfected with COVID-19.

427.     By subjecting Plaintiffs to these risks, the ICA Defendants and Armor have maintained detention conditions that amount to punishment and have failed to ensure Plaintiffs' safety and health in violation of Plaintiffs' substantive due process rights.

428.     The ICA Defendants and Armor are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  *Monell* establishes that municipal liability under Section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights.  *Id.*; *see Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987).

429.     The ICA Defendants and Armor had a policy or custom of deliberate indifference to the deprivation of constitutional rights, and this policy or custom caused Plaintiffs' injury.  *See Westmoreland*, 883 F. Supp. at 76 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).  The ICA Defendants and Armor also failed to properly train their employees and staff about the risks of COVID-19 infections, what medical care is appropriate for preventing and

treating COVID-19 infections and related injuries, and what nutrition is appropriate for individuals detained in Farmville.

430. The ICA Defendants' and Armor's failure to protect Plaintiffs from exposure to COVID-19 and failure to provide Plaintiffs with adequate medical care once they were infected constitutes official inaction that qualifies as an official policy or custom. *See Milligan v. City of Newport News*, 743 F.2d 227, 229–31 (4th Cir. 1984). This inaction resulted in Plaintiffs suffering from COVID-19 and being denied adequate medical care and nutrition in violation of the Fourteenth Amendment.

431. Absent judicial relief in the form of an injunction ordering the ICA Defendants and Armor to institute condition reforms, Plaintiffs are suffering—and will continue to suffer— irreparable harm.

### THIRD CAUSE OF ACTION

### Violation of the Right to Substantive Due Process Under the Fourteenth Amendment Under 42 U.S.C. § 1983

### Against Defendants Jeffrey Crawford, in his individual capacity; Immigration Centers of America-Farmville, LLC

### On Behalf of All Plaintiffs for Damages

432. Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

433. Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' Fourteenth Amendment Due Process rights against the ICA Defendants.

434. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Westmoreland*, 883 F. Supp. at 71 (quotation marks omitted). To establish liability under Section 1983, Plaintiffs must show that the

ICA Defendants, acting under color of law, violated Plaintiffs' federal constitutional rights, and thereby caused the complained-of injury.  *Coppage*, 906 F. Supp. at 1035.

435.     Here, Defendant ICE contracts with the Town of Farmville, which in turn contracts with Defendant ICA, for the operation of Farmville Detention Center.  Employees, agents, and officers of Defendant ICA, including Defendant Crawford, are therefore state or local actors and subject to suit under Section 1983, *see Richardson v. McKnight*, 521 U.S. 399, 413 (1997), independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

436.     Like the Due Process Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.

437.     The ICA Defendants violate this right to substantive due process when they fail to satisfy their affirmative duty to provide conditions of reasonable health and safety to the people they hold in their custody, and violate the Constitution when they fail to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

438.     The ICA Defendants also violate the right to substantive due process when, acting with deliberate indifference, they subject civil detainees to objectively unreasonable risks to their health and safety, to cruel treatment, or to conditions of confinement that amount to punishment.

439.     The ICA Defendants are aware of the serious risk posed by COVID-19 and failed to take actions that could adequately protect Plaintiffs from contracting the virus or that would allow Plaintiffs to safely recover once they contracted the virus.

440.    The ICA Defendants subjected Plaintiffs to an unreasonable risk of contracting COVID-19, a potentially lethal disease for which there is no vaccine or cure.  Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, the ICA Defendants have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville.   The ICA Defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance.  The ICA Defendants have also failed to provide Plaintiffs and other detainees proper personal protective equipment, unreasonably delayed testing the detainee population for COVID-19, and failed to isolate symptomatic detainees, including Plaintiffs Santos Garcia, Bolanos Hernandez, Castillo Gutierrez, Souza Bauer, Miranda Sanchez, Olaniyi, Houslin, Garcia Garcia, Rivera Rodriguez.  And even though the ICA Defendants ultimately isolated Plaintiffs Perez Garcia and Velasquez Orellana, they waited several days after they exhibited COVID-19 symptoms to do so and left Plaintiff Velasquez Orellana in the processing unit, instead of a medical unit, for two weeks for isolation. ICA Defendants and Armor eventually placed Plaintiff Bazerashvili in the medical unit, but only after he was sick for days in his dorm.  ICA Defendants and Armor did not isolate Plaintiff Linares Hernandez until after the worst of his illness has passed.  He was then isolated for about a month, which was a traumatic experience for him.

441.    In addition, the ICA Defendants exacerbated the risk of COVID-19 infection by continuing to accept mass transfers of detainees from detention facilities in other parts of the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers, and despite knowing that they do not have the capacity to properly isolate, quarantine, or screen incoming people.  In particular, on June 2, 2020, the ICA Defendants accepted a transfer of 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-

19 outbreaks to Farmville.  These individuals were not quarantined before their arrival at Farmville and were not adequately screened for COVID-19 infection, and 51 of them subsequently tested positive for COVID-19.

442.    Since Plaintiffs contracted COVID-19, the ICA Defendants have failed to provide Plaintiffs with adequate medical treatment for their symptoms.  In so doing, the ICA Defendants have acted with deliberate indifference to serious and irreparable harm.

443.    The ICA Defendants also have failed to provide Plaintiffs and other detainees with adequate, safe nutrition.  Instead, they have fed Plaintiffs food that was expired, undercooked, and infested with bugs.

444.    The ICA Defendants' actions in failing to ensure adequate conditions at Farmville jeopardized Plaintiffs' recovery from COVID-19 and increased the risk that Plaintiffs could have exposed their fellow detainees to COVID-19, thus also endangering other detainees' health and wellbeing.

445.    The current conditions also increase the chances that currently detained Plaintiffs will be infected or reinfected with COVID-19.

446.    By subjecting Plaintiffs to these risks, the ICA Defendants have maintained detention conditions that amount to punishment and have failed to ensure Plaintiffs' safety and health in violation of Plaintiffs' substantive due process rights.

447.    The ICA Defendants are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability.  *See Monell*, 436 U.S. at 694.  *Monell* establishes that municipal liability under section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights.  *Id*.; *see Spell*, 824 F.2d at 1385.

448.    The ICA Defendants had a policy or custom of deliberate indifference to the deprivation of constitutional rights, and this policy or custom caused Plaintiffs' injury.  *See Westmoreland*, 883 F. Supp. at 76 (citing *City of Oklahoma City*, 471 U.S. at 823).  The ICA Defendants also failed to properly train their employees and staff about the risks of COVID-19 infections, what medical care is appropriate for preventing and treating COVID-19 infections and related injuries, and what nutrition is appropriate for individuals detained in Farmville.

449.    The ICA Defendants' failure to protect Plaintiffs from exposure to COVID-19 and failure to provide Plaintiffs with adequate medical care once they were infected constitutes official inaction that qualifies as an official policy or custom.  *See Milligan*, 743 F.2d at 229–31.  This inaction resulted in Plaintiffs suffering from COVID-19 and being denied adequate medical care and nutrition in violation of the Fourteenth Amendment.

450.    The ICA Defendants are liable to Plaintiffs for all damages resulting from their deliberate indifference to the deprivation of constitutional rights.

**FOURTH CAUSE OF ACTION**

**Violation of the Right to Substantive Due Process Under the Fifth Amendment**

**Against Defendants Jeffrey Crawford, Immigration Centers of America-Farmville, LLC, Armor Correctional Health Services, Inc.**

**On Behalf of Plaintiffs Santos Garcia, Bolanos Hernandez, Miranda Sanchez, Velasquez Orellana, Olaniyi, Houslin, Garcia Garcia, Rivera Rodriguez, Linares Hernandez, and Bazerashvili for**
**Declaratory and Injunctive Relief**

451.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

452.    In the alternative, should this Court find that the ICA Defendants and Armor were operating solely under color of federal law, Plaintiffs assert a claim for violations of their Fifth Amendment due process rights against the ICA Defendants and Armor.

453.     The Due Process Clause of the Fifth Amendment to the United States Constitution guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement.

454.     The ICA Defendants and Armor violate this right to substantive due process when they fail to satisfy their affirmative duty to provide conditions of reasonable health and safety to the people they hold in their custody, and violate the Constitution when they fail to provide for basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

455.     The ICA Defendants and Armor also violate the right to substantive due process when, acting with deliberate indifference, they subject civil detainees to objectively unreasonable risks to their health and safety, to cruel treatment, or to conditions of confinement that amount to punishment.

456.     The ICA Defendants and Armor are aware of the serious risk posed by COVID-19 and failed to take actions that could adequately protect Plaintiffs from contracting the virus or that would allow Plaintiffs to safely recover once they contracted the virus.

457.     The ICA Defendants and Armor subjected Plaintiffs to an unreasonable risk of contracting COVID-19, a potentially lethal disease for which there is no vaccine or cure.  Despite knowing the substantial risk to Plaintiffs' and other detainees' health and safety, the ICA Defendants and Armor have disregarded this risk by failing to mitigate or control the risk of exposure to COVID-19 at Farmville.  The ICA Defendants have maintained an overcrowded facility which makes it impossible for Plaintiffs and other detainees to properly socially distance. The ICA Defendants and Armor also failed to provide Plaintiffs and other detainees proper personal protective equipment, unreasonably delayed testing the detainee population for

COVID-19, and failed to isolate symptomatic detainees, including Plaintiffs Santos Garcia, Bolanos Hernandez, Castillo Gutierrez, Souza Bauer, Miranda Sanchez, Olaniyi, Houslin, Garcia Garcia, and Rivera Rodriguez.  And even though the ICA Defendants and Armor ultimately isolated Plaintiffs Perez Garcia and Velasquez Orellana, they waited several days after they exhibited COVID-19 symptoms to do so and left Plaintiff Velasquez Orellana in the processing unit, instead of a medical unit, for two weeks for isolation.  ICA Defendants and Armor eventually placed Plaintiff Bazerashvili in the medical unit, but only after he was sick for days in his dorm.  ICA Defendants and Armor did not isolate Plaintiff Linares Hernandez until after the worst of his illness has passed.  He was then isolated for about a month, which was a traumatic experience for him.

458.    In addition, the ICA Defendants have continued to accept mass transfers of detainees from detention facilities in other parts of the country throughout the COVID-19 pandemic, despite CDC guidance warning against such transfers, and despite knowing that they do not have the capacity to properly isolate, quarantine, or screen incoming people.  In particular, on June 2, 2020, the ICA Defendants accepted a transfer of 74 detainees from detention facilities in Arizona and Florida that were experiencing COVID-19 outbreaks to Farmville.  These individuals were not quarantined before their arrival at Farmville and were not adequately screened for COVID-19 infection, and 51 of them subsequently tested positive for COVID-19.

459.    Since Plaintiffs contracted COVID-19, the ICA Defendants and Armor have failed to provide Plaintiffs with adequate medical treatment for their symptoms.  In so doing, the ICA Defendants and Armor have acted with deliberate indifference to serious and irreparable harm.

460.     The ICA Defendants also have failed to provide Plaintiffs and other detainees with adequate, safe nutrition.  Instead, they have fed Plaintiffs food that was expired, undercooked, and infested with bugs.

461.     The current conditions at Farmville jeopardize Plaintiffs' recovery from COVID-19 and increase the risk that Plaintiffs could expose their fellow detainees to COVID-19, thus also endangering other detainees' health and wellbeing.  The ICA Defendants' and Armor's actions also risk Plaintiffs being reinfected with COVID-19.

462.     The current conditions also increase the chances that Plaintiffs will be infected or reinfected with COVID-19.

463.     By subjecting Plaintiffs to these risks, the ICA Defendants and Armor are maintaining detention conditions that amount to punishment and are failing to ensure Plaintiffs' safety and health in violation of Plaintiffs' substantive due process rights.

464.     Absent judicial relief in the form of an injunction ordering the ICA Defendants and Armor to institute condition reforms, Plaintiffs are suffering—and will continue to suffer—irreparable harm.

## FIFTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act

### Against Defendants Chad F. Wolf, ICE, Tony H. Pham, Russell Hott

### On Behalf of Plaintiffs Santos Garcia, Bolanos Hernandez, Miranda Sanchez, Velasquez Orellana, Olaniyi, Houslin, Garcia Garcia, Rivera Rodriguez, Linares Hernandez, and Bazerashvili for
### Declaratory and Injunctive Relief

465.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

466.    The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

467.    Under the APA, a court "shall" "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right."  5 U.S.C. § 706(2)(A), (B).

468.    Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and related cases, an agency and agency officials are required to follow their own policies.

469.    The PBNDS apply at all ICE-dedicated civil detention facilities, including Farmville.

470.    The PBNDS set forth a set of mandatory requirements to which a facility is bound.

471.    Private contractors are also subject to, and required to follow, the PBNDS.

472.    The Federal Defendants have failed to ensure that the ICA Defendants and Armor follow the PBNDS medical care standards, which provide that "[d]etainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment," PBNDS at 257, in multiple discrete ways.  Defendants have not provided

appropriate medical care; timely medical attention and sick call requests; and communication assistance, as required by the PBNDS medical standards.  *See supra* ¶¶ 343–355.

473.    The Federal Defendants have also failed to ensure that the ICA Defendants follow the PBNDS mandates for providing food services, which "ensure[ ] that detainees are provided a nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation."  PBNDS at 228.  Defendants have not protected food from dust, insects, rodents, and other contamination; have served food that is undercooked or expired; and food service staff have performed their jobs preparing and serving food even while infected by COVID-19 or while showing COVID-19 symptoms.  *See supra* ¶¶ 356–362.

474.    The PBNDS also provide that "CDC guidelines for the prevention and control of infectious and communicable diseases shall be followed."  PBNDS at 258 (parenthesis omitted). The Federal Defendants have failed to follow, and have also failed to ensure that the ICA Defendants follow, multiple discrete aspects of CDC guidance regarding transfers of detained persons; social distancing; treatment for COVID-19; the use of personal protective equipment; verbal screening procedures; staff assignments; cleaning standards; and prevention practices for staff.  *See supra* ¶¶ 363–397.

475.    Plaintiffs are prejudiced by the Federal Defendants' failure to follow the PBNDS and failure to ensure that the ICA Defendants and Armor follow the PBNDS.  Plaintiffs have suffered and will continue to suffer irreparable injury because of this failure to follow the PBNDS.

476.    A fundamental principle of administrative law is that an "agency must follow its own rules."  *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 549 (2009); *see also Accardi*, 347 U.S. at 260.  The Federal Defendants' failure to follow the PBNDS and failure to ensure that the ICA Defendants and Armor follow the PBNDS is unlawful agency action.

## SIXTH CAUSE OF ACTION

### Negligence

### Against Defendants Jeffrey Crawford, Immigration Centers of America-Farmville, LLC

### On Behalf of All Plaintiffs for Damages

477.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

478.    Under Virginia law, defendants are liable for negligence when a plaintiff shows "that a duty existed between the plaintiff and defendant, that the duty was somehow breached, causation in fact, proximate causation that the breach caused the injury, and damages resulting from that breach." *Cole v. Eckerd Corp.*, 54 Va. Cir. 269, 270 (Va. Cir. Ct. 2000).

479.    Virginia law recognizes that a "special duty [is] owed by one who exercises total dominion over another." *Kovari v. Brevard Extraditions, LLC*, No. 5:18-cv-0070, 2020 WL 2563730, at *20 (W.D. Va. May 20, 2020) (citing *Quisenberry v. Huntington Ingalls Inc.*, 296 Va. 233, 247 (2018)) (finding private extradition company owed heightened duty of care to detainee). This special duty is owed to individuals detained by private entities. *Id.* (citing *Dudley v. Offender Aid & Restoration, Inc.*, 241 Va. 270 (1991) and *Fox v. Custis*, 236 Va. 69 (1988)).

480.    At all relevant times, Plaintiffs were detainees in the care, control, and custody of the ICA Defendants, who owed a special duty to them to exercise reasonable and ordinary care in detaining Plaintiffs to provide safe conditions of confinement free from injury or harm.

481.    The ICA Defendants breached their duty to Plaintiffs, including in the following ways:

    a.   Accepting the June 2, 2020 transfer of detainees from facilities then known to house detainees who were COVID-19 positive;

b.  Failing to abide by their own policy of temporarily quarantining all transferees at the Caroline Detention Facility;

c.  Failing to take adequate steps to prevent the spread of COVID-19 throughout the facility once COVID-19-positive detainees arrived at the facility, including by failing to properly isolate new arrivals from the general population;

d.  Failing to provide Plaintiffs with adequate PPE to protect themselves from the rampant spread of COVID-19 within the facility;

e.  Failing to adequately educate Plaintiffs on the utility and proper use of PPE;

f.  Failing to promptly identify and isolate infected individuals;

g.  Failing to implement basic infection control measures identified by the CDC; and

h.  Recklessly deploying pepper spray, at a time when it was not reasonable and in amounts far greater than necessary, to obtain compliance from detainees who were not acting violently and presented no risk of harm to anyone, during the COVID-19 outbreak, which contributed to the rapid spread of the virus throughout the facility and worsened the medical conditions of those already infected.

482.    These actions by the ICA Defendants were the direct and proximate cause of the harm that Plaintiffs suffered.

483.    Plaintiffs in no way contributed to their own injuries.

484.    The ICA Defendants made conscious decisions to either act or fail to act causing Plaintiffs to suffer grave physical pain and severe emotional distress and anguish.

485.    The ICA Defendants are liable to Plaintiffs for all damages resulting from their negligence.

486.    At all relevant times, Defendant Crawford knew, or in the exercise of any reasonable diligence should have known, that accepting the June 2, 2020 transfer and failing to do the things described above in paragraphs 481(a–h) would put Plaintiffs in grave risk of harm.

487.    At all relevant times, Defendant Crawford acted within the scope of his employment with ICA and within the ordinary course of ICA's business when he violated the duty of care owed to Plaintiffs, acted with complete and utter disregard for Plaintiffs' safety, health, and wellbeing, and acted with conscious disregard and reckless indifference to Plaintiffs, knowing his conduct would probably injure Plaintiffs.

488.    Defendant Crawford's actions were within the scope of his employment with Defendant ICA because his job duties include responsibility for the day-to-day operations of Defendant ICA, oversight of all employees of Defendant ICA and all subcontractors of Defendant ICA, including Defendant Armor, and ensuring the safety and wellbeing of all detainees at the facility.

489.    Defendant ICA authorized or otherwise ratified Defendant Crawford's conduct described herein.

## SEVENTH CAUSE OF ACTION

### Gross Negligence

### Against Defendants Jeffrey Crawford, Immigration Centers of America-Farmville, LLC

### On Behalf of All Plaintiffs for Damages

490.  Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

491.  At all relevant times, Plaintiffs were detainees in the care, control, and custody of the ICA Defendants, who owed a duty to them to exercise reasonable and ordinary care in detaining Plaintiffs to provide safe conditions of confinement free from injury or harm.

492.  The ICA Defendants breached their duty to Plaintiffs, including in the following ways:

a.  Accepting the June 2, 2020 transfer of detainees from facilities then known to house detainees who were COVID-19 positive;

b.  Failing to abide by their own policy of temporarily quarantining all transferees at the Caroline Detention Facility;

c.  Failing to take adequate steps to prevent the spread of COVID-19 throughout the facility once COVID-19-positive detainees arrived at the facility, including by failing to properly isolate new arrivals from the general population;

d.  Failing to provide the Plaintiffs adequate PPE to protect themselves from the rampant spread of COVID-19 within the facility;

e.  Failing to adequately educate Plaintiffs on the utility and proper use of PPE;

f.  Failing to promptly identify and isolate infected individuals;

g.  Failing to implement basic infection control measures identified by the CDC; and

h.  Recklessly deploying pepper spray, at a time when it was not reasonable and in amounts far greater than necessary, to obtain compliance from detainees who were not acting violently and presented no risk of harm to anyone, during the COVID-19 outbreak, which contributed to the rapid spread of the virus throughout the facility and worsened the medical conditions of those already infected.

493.   The ICA Defendants committed these actions with complete and utter disregard for Plaintiffs' safety, health, and wellbeing.

494.   These actions by the ICA Defendants were the direct and proximate cause of the harm that Plaintiffs suffered.

495.   Plaintiffs in no way contributed to their own injuries.

496.   The ICA Defendants made conscious decisions to either act or fail to act causing Plaintiffs to suffer grave physical pain and anguish and severe emotional distress.

497.   The ICA Defendants are liable to Plaintiffs for all damages resulting from their gross negligence.

498.   At all relevant times, Defendant Crawford knew, or in the exercise of any reasonable diligence should have known, that accepting the June 2, 2020 transfer and failing to do the things described above in paragraphs 492(a–h) would put Plaintiffs in grave risk of harm.

499.   At all relevant times, Defendant Crawford acted within the scope of his employment with Defendant ICA and within the ordinary course of Defendant ICA's business when he violated the duty of care owed to Plaintiffs, acted with complete and utter disregard for Plaintiffs' safety, health, and wellbeing, and acted with conscious disregard and reckless indifference to Plaintiffs, knowing his conduct would probably injure Plaintiffs.

500.    Defendant Crawford's actions were within the scope of his employment with Defendant ICA because his job duties include responsibility for the day-to-day operations of Defendant ICA, oversight of all employees of Defendant ICA and all subcontractors of Defendant ICA, including Defendant Armor, and ensuring the safety and wellbeing of all detainees at the facility.

501.    Defendant ICA authorized or otherwise ratified Defendant Crawford's conduct described herein.

### EIGHTH CAUSE OF ACTION

**Willful and Wanton Negligence**
**Against Defendants Jeffrey Crawford, Immigration Centers of America-Farmville, LLC**

**On Behalf of All Plaintiffs for Damages**

502.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

503.    At all relevant times, Plaintiffs were detainees in the care, control, and custody of the ICA Defendants, who owed a duty to them to exercise reasonable and ordinary care in detaining Plaintiffs to provide safe conditions of confinement free from injury or harm.

504.    The ICA Defendants breached their duty to Plaintiffs, including in the following ways:

    a.  Accepting the June 2, 2020 transfer of detainees from facilities then known to house detainees who were COVID-19 positive;

    b.  Failing to abide by their own policy of temporarily quarantining all transferees at the Caroline Detention Facility;

c. Failing to take adequate steps to prevent the spread of COVID-19 throughout the facility once COVID-19-positive detainees arrived at the facility, including by failing to properly isolate new arrivals from the general population;

d. Failing to provide the Plaintiffs adequate PPE to protect themselves from the rampant spread of COVID-19 within the facility;

e. Failing to adequately educate Plaintiffs on the utility and proper use of PPE;

f. Failing to promptly identify and isolate infected individuals;

g. Failing to implement basic infection control measures identified by the CDC; and

h. Recklessly deploying pepper spray, at a time when it was not reasonable and in amounts far greater than necessary, to obtain compliance from detainees who were not acting violently and presented no risk of harm to anyone, during the COVID-19 outbreak, which contributed to the rapid spread of the virus throughout the facility and worsened the medical conditions of those already infected.

505. The ICA Defendants committed these actions and omissions in conscious disregard of Plaintiffs' safety, health, and wellbeing. The ICA Defendants consciously acted or failed to act with reckless indifference to the consequences and were aware, based on their knowledge of existing circumstances and conditions, that their conduct would probably cause injury to Plaintiffs.

506. These actions by the ICA Defendants were the direct and proximate cause of the harm that Plaintiffs suffered.

507. Plaintiffs in no way contributed to their own injuries.

508.    The ICA Defendants made conscious decisions to either act or fail to act causing Plaintiffs to suffer grave physical pain and anguish and severe emotional distress.

509.    The ICA Defendants are liable to Plaintiffs for all damages resulting from their willful and wanton negligence.

510.    At all relevant times, Defendant Crawford knew, or in the exercise of any reasonable diligence should have known, that accepting the June 2, 2020 transfer and failing to do the things described above in paragraphs 504(a–h) would put Plaintiffs in grave risk of harm.

511.    At all relevant times, Defendant Crawford acted within the scope of his employment with Defendant ICA and within the ordinary course of Defendant ICA's business when he violated the duty of care owed to Plaintiffs, acted with complete and utter disregard for Plaintiffs' safety, health, and wellbeing, and acted with conscious disregard and reckless indifference to Plaintiffs, knowing his conduct would probably injure Plaintiffs.

512.    Defendant Crawford's actions were within the scope of his employment with Defendant ICA because his job duties include responsibility for the day-to-day operations of Defendant ICA, oversight of all employees of Defendant ICA and all subcontractors of Defendant ICA, including Defendant Armor, and ensuring the safety and wellbeing of all detainees at the facility.

513.    Defendant ICA authorized or otherwise ratified Defendant Crawford's conduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

A.      Enter a declaration that:

      a.   Defendants' conduct violates the Fifth and Fourteenth Amendments to the United States Constitution and is therefore unlawful;

      b.   Defendant Crawford's and Defendant ICA's conduct constituted negligence, gross negligence, and willful and wanton negligence; and

      c.   Federal Defendants' conduct violated the APA and is therefore unlawful.

B.      Issue an injunction ordering Defendants to immediately reform conditions by instituting the following:

      a.   Defendants shall create a written plan to improve the system of monitoring, caring for, and responding to requests for medical assistance from detainees at Farmville Detention Center who are, or may be, exposed to COVID-19. That plan shall address the following:

         i.   Screening detainees for COVID-19 symptoms;

        ii.   Assessing detainees for the presence of ongoing health problems related to COVID-19 infections;

     iii.   Special protections for detainees who have medical conditions that could place them at higher risk from COVID-19 infections;

     iv.   Ensuring that reports of medical issues or health symptoms receive prompt and appropriate responses from health care staff; and

      v.   Procedures for controlling the spread of COVID-19 within Farmville, between Farmville and the community, and between Farmville and other immigration detention facilities, including:

1. The use of personal protective equipment;

2. Social distancing;

3. Cleaning;

4. Testing for COVID-19;

5. Quarantining; and

6. The use of isolation or solitary confinement.

vi. In creating that plan, Defendants shall give careful consideration to:

1. Guidelines from the CDC and ICE's Health Service Corps, keeping in mind that these guidelines are not necessarily designed to address an outbreak of the sort documented at Farmville;

2. Creating auditable processes that allow results to be tracked for purposes of quality control; and

3. The fact that many detainees do not speak English.

vii. Defendants shall submit a plan to Plaintiffs' counsel by a date to be set by the Court. Counsel for Defendants and Plaintiffs shall thereafter meet and confer regarding the draft and make best efforts to reach agreement.

viii. Defendants shall file a final version of the plan by a date to be set by the Court and Plaintiffs shall file any objections to the plan by a date to be set by the Court.

ix. Defendants shall enact the approved written plan.

C.      Maintain the injunction prohibiting all transfers into Farmville Detention Center, and prohibiting Plaintiffs' transfer out of Farmville to another detention facility, until Defendants can demonstrate that such transfer will not endanger Plaintiffs' or others' health and abides by CDC guidelines;

D.      Issue a permanent injunction prohibiting Defendants, their subordinates, agents, employees, and all others acting in concert with them from retaliating against Plaintiffs—whether currently or formally detained—for having brought this suit;

E.      Issue an injunction ordering Federal Defendants to immediately comply with the PBNDS Medical Standards, Food Service Standards, and CDC Guidance as incorporated into the PBNDS;

F.      Retain jurisdiction and monitor Defendants' compliance with the above requirements by ordering Defendants to regularly update the Court of its progress implementing the Court's order;

G.      Enter a judgment for compensatory damages in favor of Plaintiffs in an amount to be determined that would fully compensate Plaintiffs for the injuries alleged herein resulting from the conduct of Defendants Crawford and ICA who are jointly and severally liable;

H.      Award punitive damages to Plaintiffs, in an amount to be determined at trial, that would punish jointly and severally Defendants Crawford and ICA for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

I.      Award Plaintiffs their reasonable attorneys' fees and costs in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412, or under 42 U.S.C. § 1988(b), or any other statute; and

J.      Any other and further relief that this Court deems just, equitable, and proper.

Dated: October 19, 2020

Respectfully submitted,

By:      */s/Simon Sandoval-Moshenberg*

Joseph D. West (Va. Bar No. 16834)
David Debold (*pro hac vice*)
Naima L. Farrell (*pro hac vice*)
Thomas J. McCormac IV
   (*pro hac vice*)
Blair Watler (*pro hac vice*)
Katherine King (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel: 202-955-8551
jwest@gibsondunn.com
ddebold@gibsondunn.com
nfarrell@gibsondunn.com
tmccormac@gibsondunn.com
bwatler@gibsondunn.com
kking@gibsondunn.com

*Pro bono counsel for Plaintiff Christian Alberto Santos Garcia*

Simon Sandoval-Moshenberg
   (Va. Bar No. 77110)
Kristin Donovan (Va. Bar No. 92207)
Granville Warner (Va. Bar. No. 24957)
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Tel: 703-778-3450
simon@justice4all.org
kristin@justice4all.org
cwarner@justice4all.org

Sirine Shebaya (*pro hac vice*)
Amber Qureshi (*pro hac vice*)
NATIONAL IMMIGRATION PROJECT OF THE
   NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue, N.W., Suite 200
Washington, D.C. 20007
Tel: 617-227-9727
sirine@nipnlg.org
amber@nipnlg.org

*Pro bono counsel for Plaintiffs Santos Salvador Bolanos Hernandez, Gerson Amilcar Perez Garcia, Ismael Castillo Gutierrez, Didier Mbalivoto, Frank Souza Bauer, Marco Antonio Miranda Sanchez, Melvin Ivan Velasquez Orellana, Olaitan Michael Olaniyi, Shawn Houslin, Jerbin Ivan Garcia Garcia, Jorge Alexander Rivera Rodriguez, Jose Linares Hernandez, and Vano Bazerashvili.*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on this date, I uploaded the foregoing, along with all

attachments thereto, to this Court's CM/ECF system, which will send a Notice of Electronic Filing

(NEF) to all counsel of record.


Dated: October 19, 2020                    Respectfully submitted,


                                           By:      *s/ Simon Sandoval-Moshenberg*
                                           Simon Sandoval-Moshenberg (Va. Bar No. 77110)
                                           LEGAL AID JUSTICE CENTER
                                           6066 Leesburg Pike, Suite 520
                                           Falls Church, VA 22041
                                           Tel: 703-778-3450
                                           simon@justice4all.org